COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS (213113)
SHIRLEY H. HUANG (206854)
JASON C. DAVIS (253370)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
shirleyh@csgrr.com
jasond@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re CADENCE DESIGN SYSTEMS, INC. SECURITIES LITIGATION | No. C-08-4966 SC |
| | CLASS ACTION |
| This Document Relates To: | PLAINTIFFS' CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | |
| DAVID COLLINS, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| vs. | |
| CADENCE DESIGN SYSTEMS, INC., MICHAEL J. FISTER, KEVIN S. PALATNIK, WILLIAM PORTER and KEVIN BUSHBY, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

JURISDICTION AND VENUE ................................................................................11

THE PARTIES...........................................................................................................11

CONTROL PERSONS ..............................................................................................13

CONFIDENTIAL WITNESSES ..............................................................................14

BACKGROUND TO CLASS PERIOD ...................................................................16

DEFENDANTS' FRAUDULENT SCHEME AND FALSE AND MISLEADING
     STATEMENTS DURING THE CLASS PERIOD .........................................19

     Cadence Uses Its Falsified Financials to Leverage Its Attempt to Buy Out Mentor
          Graphics in Order to Conceal Its Bookings and Revenue Bubble........................36

     Cadence Issues 2Q08 False Financial Results and Partial Disclosure of the
          Company's True Financial Condition Causing Stock Price Decline, While
          the Company Continues to Conceal Improper Revenue Recognition ..................38

     Defendants Admit Knowledge of Important Accounting Regulations Governing
          Multiple Element Transactions and Participating in the Negotiations of
          Such Deals ...........................................................................................................46

     Cadence Announces Mass Terminations of Top Executive Officers Including the
          CEO Announces Stock Price Declines Still Fails to Disclose False
          Financials ............................................................................................................49

     Cadence Announces That It Will Restate 1Q08 and 2Q08 Financial Statements,
          Stock Price Plummets But Still Artificially Inflated..............................................51

     Cadence Restates Both 1Q08 and 2Q08 Totaling More than $36 Million in
          Product Revenue, and Admits That the Accounting Irregularities Were
          Larger in Scope Than Previously Indicated..........................................................53

CADENCE'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD...............56

     Cadence's Restatement .............................................................................................57

     Cadence Overstated Revenue ...................................................................................59

     The 1Q08 Restatement..............................................................................................60

     The 2Q08 Restatement..............................................................................................61

     Defendants' Internal Accounting Controls .............................................................63

     Other GAAP Violations............................................................................................67

**Page**

LOSS CAUSATION/ECONOMIC LOSS ....................................................................69

NO SAFE HARBOR .............................................................................................72

APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET ..........73

CLASS ACTION ALLEGATIONS ...........................................................................73

COUNT I ...........................................................................................................75

     For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ...............................................................................................75

COUNT II ..........................................................................................................75

     For Violation of Section 20(a) of the Exchange Act Against All Defendants .................75

PRAYER FOR RELIEF .........................................................................................76

JURY TRIAL DEMAND ........................................................................................76

**INTRODUCTION**

1.      This is a securities class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of Cadence Design Systems, Inc. ("Cadence" or the "Company") publicly traded securities between April 23, 2008 and December 10, 2008, inclusive (the "Class Period"), who were damaged thereby (the "Class"). The claims asserted herein are brought against Cadence and four of its current or former officers and directors: Michael J. Fister ("Fister"), President, Chief Executive Officer ("CEO") and a director during the Class Period until his resignation from Cadence on October 15, 2008; Kevin S. Palatnik ("Palatnik"), Senior Vice President and Chief Financial Officer ("CFO") during the Class Period; William Porter ("Porter"), CFO until April 23, 2008 and Executive Vice President and Chief Administrative Officer ("CAO") during the Class Period until his resignation from Cadence on October 15, 2008; and Kevin Bushby ("Bushby"), Executive Vice President, Worldwide Field Operations until his resignation from Cadence on October 15, 2008 (collectively, the "Individual Defendants").

2.      Cadence is a Delaware Corporation which develops electronic design automation ("EDA") software and hardware for the design and verification of semiconductor chips and systems for electronics companies worldwide. The Company was founded in 1987 and is headquartered in San Jose, California. The Company is traded on the NASDAQ (National Association of Securities Dealers Automated Quotation System) market under the symbol CDNS.

3.      During the Class Period, defendants engaged in a fraudulent scheme and multiple violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") (17 C.F.R. §240.10b-5), by making false and misleading public statements concerning the Company's current and future financial condition, and quarterly financial results.

4.      Specifically, plaintiffs allege that during the Class Period, Cadence and the Individual Defendants devised and carried out a fraudulent scheme to misrepresent and conceal the Company's true financial condition by causing the Company to materially overstate 1Q08 and 2Q08 revenue and earnings results. Cadence and the Individual Defendants issued false and misleading statements in press releases, analyst conference calls and quarterly reports filed with the SEC regarding the

Company's financial and operating conditions, including its earnings and shareholder equity, by failing to properly recognize revenue on multiple element software sales which were required to be recognized ratably, *i.e.*, over the life of the software license, as opposed to upfront at the time of sale. As a result, Cadence materially overstated the Company's revenue and earnings in violation of Generally Accepted Accounting Principles ("GAAP") and the Company's revenue recognition policies. The Company's improper revenue recognition caused the Company's financial statements during the Class Period to be false and misleading and the price of Cadence stock to be artificially inflated, or artificially maintained at an inflated level.

5.      Prior to the Class Period, on January 30, 2008, Cadence announced its 4Q07 and FY07 results and its guidance for FY08. While it reported in-line non-GAAP earnings per share ("EPS"), it missed the Company's own revenue guidance by $3 million. Citing market conditions, Cadence also lowered its guidance for FY08 by almost 20% to the $1.4-$1.5 billion range, below analysts' consensus of $1.74 billion. Upon the negative news, Cadence's stock dropped over 33% in one day, from $15.16 per share to $10.15 per share on January 31, 2008. Thus, leading up to the Class Period and learning from its recent history, defendants knew that Cadence's stock would take another beating if the Company's financials were not carefully managed to at least meet the analysts' expectations, particularly since the Company had substantially lowered guidance for FY08 at the beginning of the year.

6.      In 1Q08, following the huge stock drop in January 2008, Cadence's business continued to deteriorate as no major bookings were coming in. Even worse, because the Company had changed its licensing model in mid-2007 to increase its term contracts, thereby recognizing more revenue from licensing deals upfront, the future revenue stream (*i.e.*, the Company's backlog) was diminishing and the Company began to see an implosion of its bookings and revenue bubble. To prevent the Company's stock from taking another beating, and to sustain Cadence's stock at inflated prices, defendants caused the Company to pull future revenue forward to meet the Street's expectations and to falsely report its results for the first half of 2008 through improper accounting entries, which inflated the Company's reported revenue and net income. Specifically, in violation of the Company's revenue recognition policies and GAAP, Cadence improperly recognized $24.8

1    million in Product Revenue on a multiple element transaction upfront in 1Q08 rather than

2    recognizing the transaction ratably.  Significantly, a part of that contract involved incubation

3    technology – *i.e.*, product that was still in development and had not even been made commercially

4    available at that time.  Nonetheless, defendants deliberately disregarded the basic accounting rules

5    and recognized the transaction upfront in a lump-sum.  ***The $24.8 million deal was the largest***

6    ***contract for 1Q08***, representing close to 10% of the Company's reported revenue, and more than

7    15% of the Company's reported Product Revenue for 1Q08.  According to confidential employee

8    witnesses, the deal was with a Japanese customer.  Given the size, nature and timing of the deal, and

9    the procedures and protocol in place at Cadence for negotiating, reviewing and approving contracts

10   and revenue recognition, defendants Fister, Porter, Palatnik, and Bushby had knowledge of, or

11   deliberately and recklessly disregarded, the transaction at issue and the improper accounting of it.

12           7.      To conceal the improper revenue recognition and the true financial condition of the

13   Company's revenue and bookings bubble, Cadence also conveniently, for the ***first time*** in the

14   Company's history, declined to provide the breakdown of percentages of revenue that was

15   recognized upfront versus ratably in its quarterly reporting for 1Q08.  Several analysts noted that

16   without the breakdown of revenue mix information, the visibility of Cadence's pipeline was limited,

17   particularly given the change in the Company revenue model in mid-2007 that further obscured the

18   market's understanding of Cadence's pipeline information.  Unbeknownst to the market at the time,

19   ***but for*** the lump-sum upfront $24.8 million Product Revenue recognized for 1Q08, Cadence would

20   have missed its guidance. (Compare originally reported $287 million revenue for 1Q08 versus

21   guidance $280-$290 million; $270 million after restatement and other adjustments.)

22           8.      Seeing that the Company could barely meet its 1Q08 guidance after falsifying its

23   financials, defendants sought an aggressive plan to find more revenue.  In April 2008, Cadence

24   quietly approached its rival, Mentor Graphics Corp. ("Mentor Graphics"), and proposed to buy out

25   Mentor Graphics for $1.6 billion in cash.  Cadence saw this as a golden opportunity to pull in all

26   Mentor's customers and its steady revenue stream, thereby not having to disclose Cadence's

27   depleting pipeline and its deteriorating financial condition. The private discussions with Mentor

28   Graphics continued in April-May 2008, and after Mentor Graphics' management rejected the offer,

1   Cadence took the matter public by announcing its take-over bid for Mentor Graphics in June 2008.

2   In order to appear as an eligible suitor to Mentor Graphics' board and investors, and to raise the

3   necessary financing to buy Mentor Graphics, defendants knew that the fraudulent scheme they

4   started in 1Q08 had to be continued so that the stock price of Cadence could be maintained at an

5   inflated price pending the Mentor Graphics acquisition.

6          9.      In 2Q08, Cadence's financial condition and business outlook continued to deteriorate.

7   On July 23, 2008, Cadence was forced to take down its guidance for the rest of FY08 by slashing it

8   by another 26%, from $1.5 billion to $1.1 billion.  During the July 23, 2008 conference call, Cadence

9   also surprised the market by announcing that the Company would, once again, shift its licensing

10  contracts back to a primarily subscription-based model, which would allow the Company to

11  recognize licensing revenue on a ratable basis.  Several analysts questioned the revenue model

12  change, and noted that Cadence's drastic decline in its business outlook was "company-specific" and

13  that none of the other companies in the EDA industry suffered the same drastic decline in the same

14  time period.  *See* ¶¶79-89 below.  The market reacted harshly to the further lowering of guidance and

15  the sudden business model change by massive sell-off of Cadence's stock, and the stock price

16  dropped more than 30% from $10.27 per share on July 23, 2008, to $7.11 per share on July 24, 2008,

17  following the quarterly conference call.

18         10.     Unbeknownst to the investors, Cadence's 2Q08 results were much worse than

19  Cadence reported.  In 2Q08, to meet the Company's already-low guidance, defendants again

20  manipulated the Company's financials by causing the Company to improperly recognize $12 million

21  in Product Revenue upfront on a multiple element transaction that should have been recognized

22  ratably.  Again, ***but for*** the lump-sum upfront $12 million Product Revenue improperly recognized

23  in 2Q08, Cadence would have missed its guidance for 2Q08, which was projected to be in the range

24  of $310 million to $320 million.  The Company originally reported its 2Q08 revenue at $329

25  million; it subsequently restated its financial results for 2Q08 to $308 million, after it admitted to

26  multiple accounting violations including the improper revenue recognition of the $12 million deal.

27  Furthermore, Cadence improperly failed to book a liability related to the $18 million in cash

28  received in 2Q08 by selling the accounts receivable associated with the $24.8 million contract that

1   was improperly recognized in 1Q08, in deliberate violation of GAAP.  Moreover, the accounting

2   manipulations permitted Cadence to report a net income of a $5.0 million rather than a net loss of

3   $16.8 million, an overstatement of net income by 436%.

4         11.     As Cadence's stock price continued to hover around $7 per share following the

5   disclosure of the 2Q08 results, the Mentor Graphics deal fell apart in August 2008.  On August 15,

6   2008, Cadence withdrew its hostile bid, citing Mentor Graphics' unwillingness to negotiate despite

7   the fact that it was Cadence, not Mentor Graphics, that cancelled the scheduled meeting between the

8   two companies to discuss the proposed acquisition.  Many analysts and media reports observed that

9   Cadence withdrew the bid to "save face" since it did not have enough cash to go forward with the

10  deal, and that given its stock drop following the announcement of its 2Q08 results and outlook, it

11  would have been difficult for Cadence to secure financing for the acquisition, since the stock

12  valuation of Cadence would be a key factor in evaluating the terms of the financing for the

13  acquisition.

14        12.     As part of the fraudulent scheme, defendants knew and participated/approved the

15  issuance of falsified financials.  According to confidential employee witnesses, defendants Fister,

16  Porter, Palatnik, and Bushby were heavily involved with contract negotiation with customers, and

17  reviewed or approved the terms of the contracts and/or made the decisions with respect to how the

18  revenue for the contracts was to be recognized.  Furthermore, defendants had access to Cadence's

19  forecasting and financial reporting  systems (*i.e.*, Siebel for forecasting, eDA-on-Tap for bookings

20  and order management, SAP for financial reporting), and knew at all times the Company's bookings

21  and booked revenue, and how much more revenue the Company needed to meet the Street's

22  expectations.  Moreover, given that ***the $24.8 million deal in 1Q08 was the largest contract in that***

23  ***quarter***, and that the $12 million deal in 2Q08 was among the largest deals in that quarter, and given

24  defendants' positions and access to sales and financial information at Cadence, defendants knew

25  about these deals and the Company's improper revenue recognition of them.

26        13.     On October 15, 2008, the Company abruptly announced a major exodus of senior

27  management, including defendants Fister, Porter and Bushby.  Ex. 31.  At the time of the purported

28  resignations, a new chief executive had not even been appointed.  One witness reported that the

1    Board forced the executives to resign, *i.e.*, they got fired, in part, in connection with the false

2    financials that the Company would have to restate.  Cadence's stock price dropped 15% in one day

3    upon the announcement of the sudden departure of the key executives.  The stock dropped below $5

4    per share, closing at $4.50 on October 15, 2008.

5           14.    Subsequently, on October 22, 2008, after the market closed, the Company issued a

6    press release titled "Cadence Announces Accounting Review and Postpones Release of Third

7    Quarter 2008 Financial Results and Webcast; Reaffirms Third Quarter 2008 Guidance."  Ex. 34.

8    The release stated in part:

9           Cadence Design Systems, Inc. . . . today announced that it is reviewing, in
            conjunction with the company's independent accountants and legal advisors, the
10          recognition of revenue related to customer contracts signed during the first quarter of
            2008.

11          Cadence initiated the review after preliminarily determining during its regular
12          review of its third quarter results that approximately $24 million of revenue relating
            to these contracts was recognized during the first quarter of 2008, but should have
13          been recognized ratably over the duration of the contracts commencing in the second
            quarter of 2008. Cadence expects to restate its financial statements for the first
14          quarter of 2008 and the first half of 2008 to correct the revenue recognition with
            respect to these contracts.

15          Cadence will release its third quarter 2008 financial results and conduct a
16          Webcast as soon as practicable.

17          15.    As a result of this disclosure, Cadence's stock price dropped over 25% in one day

18   from $4.32 per share to $3.22 per share, with over 25 million shares traded on October 23, 2008.

19   The October 22, 2008 announcement was only a partial disclosure, as it did not fully revealed the

20   extent of the fraud that necessitated the restatement and the extent of Cadence's true financial

21   condition that had be concealed by defendants' scheme.

22          16.    On December 10, 2008, Cadence restated its financials for 1Q08 and 2Q08, revealing

23   that the Company's accounting improprieties were worse than previously disclosed and were not

24   limited to just one quarter.  The Company admitted that the scheme involved two quarters, and that

25   ***but for*** accounting manipulations that took place, the Company would have missed its previous

26   guidance for both 1Q08 and 2Q08.  Moreover, the Company made the startling revelation that in fact

27   none of the lump-sum $24.8 million in Product Revenue that was recognized in 1Q08 could be

28   recognized until 4Q08 because part of the deal involved a product that had not even been made

commercially available in 1Q08.  The Company's December 10, 2008 press release (Ex. 39) stated, in part:

**Results of Accounting Investigation**

As announced on October 22, 2008, Cadence will be restating its quarterly financial statements for the periods ending March 29, 2008 and June 28, 2008. Cadence will adjust $24.8 million of product revenue recognized in the first quarter of 2008 and $12.0 million of product revenue recognized in the second quarter of 2008. This revenue will be instead realized over the term of the relevant arrangement. . . .

During the first quarter of 2008, Cadence executed a term license arrangement with a customer and, during the third quarter of 2008, Cadence executed a subscription license arrangement with the same customer. As part of its regular quarterly review process for the third quarter, Cadence identified certain factors that, when evaluated together, indicated that the software arrangements executed with this customer both in the first quarter and in the third quarter were negotiated in contemplation of one another. Accordingly, Cadence determined that the term license arrangement executed during the first quarter and the subscription license arrangement executed during the third quarter collectively represented a multiple element arrangement. Because the subscription arrangement provides the customer with the right to use unspecified additional software products that become commercially available during the term of the arrangement, Cadence determined that the revenue relating to this multiple element arrangement should be recognized during the term of the arrangement, beginning in the fourth quarter of 2008.

. . . However, as a result of the investigation, the Company has identified a material weakness relating to the insufficient design and ineffective operation of certain internal controls over the recognition of revenue from term license agreements . . . .

As part of the remediation efforts that Cadence has begun implementing in response to the identified material weakness, Cadence reexamined a transaction that occurred during the second quarter of 2008 in which it concurrently cancelled a subscription arrangement and executed both a term license arrangement and hardware arrangement with a customer. Specifically, Cadence determined that, despite the cancellation of the subscription arrangement, the customer did not intend to substantively cancel its right to access future new technology because at the time the subscription license was cancelled the customer intended to re-establish its right to access future new technology at a later time. Accordingly, Cadence has determined that $12.0 million of revenue originally recognized in the second quarter of 2008 relating to the term license and hardware arrangement should be recognized ratably over the term of the arrangement, consistent with the way in which revenue was recognized on the cancelled subscription arrangement.

17.     In the Amended Form 10-Q for 1Q08 filed on December 11, 2008, the Company provided additional details on the Company's restatement, and the scope of the Company's accounting shenanigans:

In connection with [the $24.8 million transaction in 1Q08], ***Cadence entered into an agreement to sell $18.0 million of the receivable to a financing institution, and Cadence received the cash for this receivable sale during the three months***

*ended June 28, 2008.  Cadence has restated its Condensed Consolidated Statement of Cash Flows for the six months ended June 28, 2008 to reflect this cash receipt as Cash flows from financing activities and its Condensed Consolidated Balance Sheet as of June 28, 2008 to reflect the amount due to the financing institution as a liability.*

*This restatement also corrects revenue recognition for one arrangement identified during Cadence's remediation efforts described in Item 4 – Controls and Procedures under which $12.0 million of product revenue was recognized during the three and six months ended June 28, 2009, but should be recognized during the term of the arrangement, beginning in the third quarter of 2008.*

Since Cadence is restating its Quarterly Report on Form 10-Q for the quarter ended June 28, 2008 for these two revenue arrangements, Cadence has also recorded two other **product revenue** adjustments, in the aggregate amount of $8.4 million, that were previously disclosed in Cadence's Quarterly Report on Form 10-Q for the quarter ended June 28, 2008, initially filed with the SEC on July 29, 2008.  In addition, Cadence has recorded an adjustment to reduce Cost of product by $2.5 million for a hardware arrangement during the three and six months ended June 28, 2008.

\*       \*       \*

*In the course of this review, Cadence determined that with respect to one customer, despite the cancellation of the subscription arrangement, the customer did not intend to substantively cancel its right to access future new technology because at the time the subscription license was cancelled, the customer intended to re-establish its right to access future new technology at a later time.  Accordingly, Cadence has determined that product revenue of $12.0 million originally recognized in the three and six months ended June 28, 2008 in connection with this term license agreement and a hardware arrangement with this customer should be recognized ratably over the term of the arrangement, consistent with how revenue was being recognized on the cancelled subscription arrangement.*

18.     The following chart shows the impact of the restatement and adjustments made to the Company's 1Q08 and 2Q08 financial results:

| (In $000's, except per share data) | | | | |
|---|---|---|---|---|
| | Originally Reported | Restated/ Adjusted[1] | Amount Overstated/ (Understated) | % Reported Amount Overstated/ (Understated) |
| **Quarter Ended 3/29/08:** | | | | |
| Total Revenue | 287,187 | 270,750 | 16,439 | 5.7% |
| Product Revenue | 156,193 | 133,954 | 22,239 | 14.2% |
| Net Loss | (18,747) | (35,023) | (16,276) | (86.8)% |
| Loss Per Share | $    (0.07) | $    (0.13) | $    (0.06) | (86.8)% |
| | | | | |
| **Quarter Ended 6/28/08:** | | | | |
| Total Revenue | 329,478 | 308,041 | 21,437 | 6.5% |
| Product Revenue | 195,444 | 175,039 | 20,405 | 10.4% |
| Net Income/(Loss) | 4,996 | (16,794) | 21,790 | 436.1% |
| Earnings/(Loss) Per Share | $    0.02 | $    (0.07) | $    0.09 | 458.0% |

19.     Contrary to Fister's and Palatnik's Sarbanes-Oxley certifications, in connection with the restatement, the Company also admitted to a material weakness in Cadence's internal control over financial reporting:

> In the course of this reevaluation in connection with the restatement, our management identified a material weakness in internal control over financial reporting.
>
> ***There was a material weakness in our internal controls over the application of revenue recognition criteria required by SOP 97-2 "Software Revenue Recognition" in the context of multiple-element software arrangements.***
>
> *          *          *
>
> •     Controls were not adequately designed to facilitate communication of all information pertinent to the negotiations with customers between the sales and sales finance organizations and the personnel responsible for determining the appropriate recognition of the revenue related to such license agreements.  As a result, controls relative to the sales and sales finance organizations reviewing, analyzing and evaluating available information pertinent to revenue recognition for term license agreements were not operating effectively.

---

[1]     Rather than restate a second time, in 4Q08 Cadence made a $5.8 million adjustment to reduce Product Revenue previously recognized in 1Q08.  The tax effect related to this adjustment is not included in 1Q08 net loss or loss per share.

• Controls were not adequately designed to detect or prevent the inappropriate issuance of evaluation licenses to customers for incubation technology. Incubation technology is not commercially available for release.

As a result of the material weakness in internal control over financial reporting, our management did not detect that revenue from three license term arrangements was improperly recognized.

20.   To address the material weaknesses, the Company commenced the implementation of improvements to the internal control over financial reporting, and its disclosure controls and procedures, as follows:

• Individuals who are part of the sales process will be required to take enhanced comprehensive, ongoing compliance training specific to our policies and procedures;

• We will require additional analysis, communication, and accompanying documentation from our sales and sales finance organizations relating to recognition of revenue for term license agreements, with particular emphasis on transactions when factors are present that increase the risk that the transaction could be deemed to be a subset of a multiple element arrangement;

• *We will make certain personnel changes and increase supervision and training to effectuate the changes discussed above*.

21.   Following these disclosures, on December 10, 2008.  Cadence's stock price dropped over 22%, from $3.93 to $3.04 per share on December 11, 2008, with over 21 million shares traded.

22.   The following chart illustrates how defendants' false and misleading statements and omissions caused the price of Cadence securities to be maintained at an inflated price and how Class members were damaged when the Company's relevant true financial and operating conditions began to be revealed to the market:



**Cadence Design Systems, Inc.**
March 3, 2008 to December 31, 2008

## JURISDICTION AND VENUE

23.     The claims asserted arise under §§10(b) and 20(a) of the Exchange Act  (15 U.S.C. §78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5). Jurisdiction is conferred by §27 of the Exchange Act.  Venue is proper in this District pursuant to §27 of the Exchange Act.  Cadence's headquarters are located in San Jose, California and false statements were made in this District and acts giving rise to the violations complained of occurred in this District.

## THE PARTIES

24.     The Court-appointed lead plaintiff, Alaska Electrical Pension Fund, purchased or acquired Cadence's publicly traded securities during the Class Period and suffered damages as a result of the wrongful acts alleged herein.

25.     Defendant Cadence Design Systems, Inc. is a Delaware Corporation which purports to develop electronic design automation software and hardware for electronics companies worldwide.  The Company's headquarters are located in San Jose, California and its stock is traded under the symbol CDNS on the NASDAQ.  During the Class Period, Cadence has less than 5,000 employees.

26.     Defendant Michael J. Fister was, until his resignation in October 2008, President, CEO and a director of the Company.  In the Company's SEC filings, Fister, as the CEO, was identified as the chief operating decision maker, consistent with Statement of Financial Accounting Standards ("SFAS") No. 131 reporting requirement.  During the Class Period until his departure from the Company, Fister was responsible for overseeing the Company's finances and operations. Fister participated in the Company's conference calls for 1Q08 and 2Q08, during which false and misleading statements concerning the Company's business and financial condition were made.

27.     Defendant Kevin S. Palatnik was, at all relevant times, a Senior Vice President and CFO of the Company.  Palatnik was appointed as the CFO on April 23, 2008.  Prior to that, Palatnik served as Senior Vice President and Corporate Controller, leading the Company's financial planning as well as its audit and compliance functions.  *See* the Company's April 23, 2008 press release.  Ex. 9.  Furthermore, according to the press release, during his tenure at Cadence, Palatnik has held a number of senior financial and operational positions, including Corporate Vice President, Finance and Operations, and Corporate Vice President, Technical Field Operations.  In March 2006, Palatnik was appointed Corporate Controller, and in April 2007 was promoted to Senior Vice President and Controller.  In that role, he led the Company's financial planning as well as its audit and compliance processes.  According to the Company's website, as the CFO, Palatnik is responsible for managing the Company's global finance organization, including Investor Relations, Information Technology, Workplace Resources, Operations and Controller functions.  Palatnik participated in the Company's 2Q08 conference call as well as several technology conferences with analysts during the Class Period.

28.     Defendant William Porter was, until his resignation in October 2008, Executive Vice President and CAO of the Company.  Prior to April 23, 2008, Porter served as CFO of Cadence

1   since 1999 and was the Company's CFO when the improperly recognized $24.8 million transaction

2   took place in 1Q08.   Porter is an active Certified Public Accountant in California.   Porter

3   participated in the Company's April 23, 2008 conference call and several technology conferences

4   with analysts during the Class Period.

5         29.   Defendant Kevin Bushby was, until his resignation in October 2008, Executive Vice

6   President, Worldwide Field Operations.  Bushby's duties and responsibilities prior to his resignation

7   included overseeing Cadence's sales organization; he was in charge of Cadence's sales during 1Q08

8   and 2Q08 when the Company deliberately and improperly recognized revenue on certain

9   transactions that were later restated.

10                              **CONTROL PERSONS**

11        30.   During the Class Period, the Individual Defendants, as senior executive officers

12   and/or directors of Cadence, had access to the adverse undisclosed information described herein

13   regarding the Company's business operations, financial condition, loss reserves, products, markets,

14   customer relationships and present and future business prospects.  The Individual Defendants knew

15   or recklessly disregarded that said adverse information had not been disclosed to, and was being

16   concealed from, the investing public.

17        31.   Because they were responsible for running the Company, it is appropriate to treat the

18   Individual Defendants as a group for pleading purposes and to presume that the false, misleading,

19   and incomplete information contained in the Company's public filings, press releases and other

20   publications, as alleged herein, are their collective actions.  Each of the Individual Defendants was

21   directly involved in the day-to-day operations of the Company at the highest levels and was privy to

22   confidential proprietary information concerning the Company and its business, operations, products,

23   growth, financial statements, and financial condition, as alleged herein.   Said defendants were

24   involved in drafting, producing, reviewing and/or disseminating the false and misleading statements

25   and information alleged herein, were aware of or deliberately disregarded that the false and

26   misleading statements were being issued regarding the Company, and approved or ratified these

27   statements, in violation of the federal securities laws.

28

32.     As officers, directors and controlling persons of a publicly held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

33.     Each of the Individual Defendants is liable as a direct participant in, and co-conspirator with respect to the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their positions, are "controlling persons" within the meaning of §20 of the Exchange Act (15 U.S.C. §78t) and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

34.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of the Company's SEC filings, reports, press releases, and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, each of the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

## CONFIDENTIAL WITNESSES

35.     The allegations included herein are based in part on information and belief and are supported by first-hand accounts of former Cadence employees referred to herein as confidential witnesses ("CW"). The information provided by the former employees is reliable and credible

1  because (1) each witness worked at Cadence's headquarters in the San Jose offices during the Class

2  Period, (2) each witness has personal knowledge of the information provided, (3) the witness' job

3  title, position and responsibilities show he/she has personal knowledge of the information provided,

4  (4) many of the witness accounts corroborate one another, and (5) the witness accounts are

5  corroborated by other information alleged herein.

6         (a)    CW1 is a former Sales Administrator with Cadence until November
7  2008.  For 15 years as a Sales Administrator at Cadence, CW1's duties involved
   receiving sales order from Cadence's Sales/Finance organization and entering the
   terms and details of the orders into Cadence's order management system so that the
8  orders could be booked, fulfilled and revenue could be recognized.

9         (b)    CW2 is a former Vice President of Finance with Cadence for eight
   years until January 4, 2009.  Prior to 2007, CW2 was in charge of Cadence's
10 Sales/Finance group and was responsible for setting the contract approval structure
   and revenue recognition procedures at Cadence.  In 2007 and 2008, CW2 oversaw
11 the Finance/Research and Development group.  In 2008, CW2 reported to Controller
   Mike Doktorczyk, who reported to Palatnik.
12
13        (c)    CW3 is a former Senior Manager in the Marketing group who worked
   at Cadence before, during and after the Class Period and reported to corporate Vice
   Presidents.  CW3 participated in executive-level conversations and meetings with
14 personnel from the Marketing, Sales, and Finance Groups that involved all aspects of
   marketing, including products, prices, discounts, business models and booking and
15 revenue considerations.  As a senior manager, CW3 worked closely with Cadence's
   Finance, Sales/Finance, and Marketing groups, and has personal knowledge of the
16 Company's practice of managing upfront and ratable revenue and the bookings
   bubble created by this practice.
17
18        (d)    CW4 is a former Director of Engineering with Cadence, based at the
   Company's facility in San Jose, from 1999 until November 2008.  During CW4's
   tenure at Cadence, CW4 was involved in contract negotiations with customers.
19
20        (e)    CW5 is a former Senior Technical Marketing Manager at Cadence
   from 2000 until May 2008.  By January 2008, CW5's position was transferred to the
21 Business Operations group in addition to within the Marketing Department, and was
   responsible for the collection of sales and marketing data from the Company's sales
22 personnel regarding the Company's 400 large customer accounts, including the
   names of the customers, types of licenses purchased, and what Cadence's products
23 and what competitor products customers were purchasing.  Additionally, CW5 and
   her supervisor Farid Mashayekh ("Mashayekh") collected customer segmentation
24 data, indicating the market segment information for Cadence, which was presented
   by Mashayekh and distributed to the senior management via a quarterly market
25 analysis report in PowerPoint format.

26        (f)    CW6 is a former Senior Product Marketing Manager from 2004 until
   November 2008 who was responsible for marketing Cadence's emulation
27 accelerator.  In CW6's marketing capacity, he visited with Cadence's customers,
   including Cadence's customers in Japan.  Because CW6 worked closely with
28 Cadence's Sales personnel on deals that involved his group's product, CW6 has

PLAINTIFFS' CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - C-08-4966 SC                                                                    - 15 -

personal knowledge of the contract negotiations, review and approval process at Cadence.

(g)     CW7 is a former Business Systems Analyst who worked at Cadence for over ten years until November 2008.  As a Systems Business Analyst, CW7 worked closely with Cadence's IT organization and Sales/Finance organizations to define and create Cadence's Siebel CRM system - which was fundamentally used by Cadence to track sales opportunities and booked deals and to ensure that the orders were fulfilled.  CW7 has extensive personal knowledge of Cadence's IT systems, including Siebel CRM, eDA-on-TAP, SAP and Epiphany, and how Cadence, including the senior management, accessed and utilized these systems for forecasting, bookings, and financial reporting.

## BACKGROUND TO CLASS PERIOD

36.     In 2006, Cadence piloted an EDA card, which was a internet-based delivery mechanism for Cadence's software that enables its customers to draw down on technology in increments of time as short as a week and as long as a year.  The EDA cards essentially worked as a debit card – which allowed the customers to purchase items within the catalog at the prices specified therein up to the amount of cash that had been loaded onto the card.  In 2007, the EDA cards were part of Cadence's Product Revenue.  As defined in the Company's Form 10-K for FY07, "Product revenues include all fees earned from granting licenses to use our software, and from sales and leases of our hardware products, and exclude revenues derived from maintenance and services.  We offer customers three license types for our software: perpetual, term and subscription.  *See* 'Software Licensing Arrangements' below for additional discussion of our license types."  In 2007, 68% of the Company's total revenue came from Product Revenue.  Ex. 6 at 2.  Cadence booked about $1.2 billion in EDA cards, which the Company offered on both term license basis (also referred to as the EDA "gold card") or subscription basis (referred to as the EDA "platinum card").  The Company has described its revenue recognition policies and practices with respect to its software license sales, and particularly its subscription and term licenses sold with EDA cards.  The Company's revenue recognition policies stated that it applied GAAP, specifically American Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") 97-2 revenue recognition requirements for ratable recognition of multiple element transactions.  As described in the Company's Form 10-K filed on February 26, 2008 (Ex. 6), the Company recognized its revenue as follows:

*Revenue Recognition*

We apply the provisions of Statement of Position, or SOP, 97-2, "Software Revenue Recognition," as amended by SOP 98-9, "Modification of SOP 97-2, Software Revenue Recognition, With Respect to Certain Transactions," to all software licensing transactions and to all product revenue transactions where the software is not incidental. We also apply the provisions of SFAS No. 13, "Accounting for Leases," to all hardware lease transactions. We recognize revenue when persuasive evidence of an arrangement exists, the product has been delivered, the fee is fixed or determinable, collection of the resulting receivable is probable, and vendor-specific objective evidence of fair value, or VSOE, exists.

\*       \*       \*

*Subscription licenses* – [Cadence's] subscription license arrangements offer [Cadence's] customers the right to:

- Access and use all software products delivered at the outset of an arrangement throughout the entire term of the arrangement, generally two to four years, with no rights to return;

- Use unspecified additional software products that become commercially available during the term of the arrangement . . . .

\*       \*       \*

In general, revenue associated with subscription licenses is recognized ratably over the term of the license commencing upon the later of the effective date of the arrangement or delivery of the software product. Subscription license revenue is allocated to product and maintenance revenue. The allocation to maintenance revenue is based on vendor specific objective evidence, or VSOE, of fair value of the undelivered maintenance that was established in connection with the sale of our term licenses.

In the event that a subscription license arrangement is terminated by mutual agreement and a new term license arrangement is entered into either concurrently with or subsequent to the termination of the subscription license arrangement, the revenue associated with the new term license arrangement is recognized upon the later of the effective date of the arrangement or delivery of the software product, assuming all other criteria in SOP 97-2 have been met.

*Term licenses* – [Cadence's] term license arrangements offer [Cadence's] customers the right to:

- Access and use all software products delivered ***at the outset*** of an arrangement throughout the entire term of the arrangement, generally two to four years, with no rights to return; and

\*       \*       \*

In general, ***revenue associated with the term licenses is recognized upon the later of the effective date of the arrangement or delivery of the software product***.[2]

37.     On January 30, 2008, Cadence reported its 4Q07 and FY07 results.  Ex. 1.  While the Company met the analysts' expectation of EPS, it missed the 4Q07 revenue guidance by $3 million. Additionally, Cadence reduced the revenue guidance for FY08 by approximately $200 million (from $1.71 billion to the range of $1.49 billion to $1.54 billion).  On the same day, Fister and Porter met with the analysts to discuss the Company's financial results and outlook.  During the conference call, Fister and Porter justified the lowering of the guidance as a conservative measure on Cadence's part in response to the "increasingly aggressive pricing environment that we have not seen during the past few years."  In response, several analysts had a knee-jerk reaction, asking whether the reduction in guidance was a sign of Cadence's weakening competitiveness or if there were other company-specific factors that contributed to the revised guidance.  Ex. 2.

38.     Analysts had mixed reactions to the revenue miss and the lowering of the guidance. For example, Deutsche Bank immediately noted the grim outlook for the Company and downgraded the stock by issuing a report on January 31, 2008, highlighting "Too Many Moving Parts." It noted:

> "Despite delivering strong 4Q bookings, Mgmt. gave surprisingly weak FY08 guidance – well below DB/Street estimates – blaming the softening semi buying environment.  Recent quarterly results, tepid guidance, shifting license model, and an apparent lack of large deals in the pipeline prompts us to downgrade the stock to Hold . . . ."

Ex. 4.

39.     Other analysts, on the other hand, seemed to have accepted management's explanation for the revised guidance but with cautions.  RBC Capital Markets, for instance, issued a neutral report on January 31, 2008 (Ex. 5), noting that "we believe Management set weak guidance to help negotiate better value" for the contracts that would be up for renewal, and recommended investors to hold on to the stock.  While D.A. Davison & Co. issued a report with a "BUY" rating, it

---

[2]     In the Forms 10-Q for 1Q08 and 2Q08, Cadence repeatedly assured investors that its revenue recognition process complied with GAAP, and referred to this section in the Form 10-K as the Company's revenue recognition policies.

1   warned investors that "We suspect that ongoing changes in the revenue model and the continued

2   pull-ins of deals eventually came to a halt, causing the sudden reduction in sales outlook."  Ex. 3.

3          40.     Following the announcement of its FY07 results and the guidance for 2008,

4   Cadence's stock price dropped over 33% from $15.16 per share to $10.15 per share on January 31,

5   2008, with more than 53 million shares traded in one day.   Thus, leading up to the Class Period,

6   defendants knew that the market was on the fence about Cadence's revised guidance for FY08, and

7   that its stock price would take another beating if the Company's reported financials were not

8   carefully managed to meet the already-lowered guidance and Wall Street's expectations.

9   **DEFENDANTS' FRAUDULENT SCHEME AND FALSE AND MISLEADING
    STATEMENTS DURING THE CLASS PERIOD**

10

11         41.     Defendants' false and misleading representations during the Class Period began with

12  its 1Q08 reported financial results and forecast for the remainder of FY08.  The false 1Q08 revenue

13  and earnings results were followed by a conference call hosted by defendants and a series of analysts

14  reports which repeated defendants' false statements concerning the 1Q08 financial results, the 2Q08

15  and FY08 revenue and earnings forecasts and the propriety of the Company's licensing and revenue

16  recognition processes.  Each of the materially false representations, individually and together, caused

17  Cadence's stock price to be artificially inflated.

18         42.     <u>False and Misleading Statements:</u>  On April 23, 2008, the Company issued a press

19  release discussing the Company's 1Q08 financial results.  Ex. 9.  The Company falsely stated that it

20  had, on a GAAP basis, $287 million in revenue in 1Q08, and had only suffered a ($0.07) per share

21  loss:

22         Cadence Design Systems, Inc. . . . ***today reported first quarter 2008 revenue
           of $287 million***, compared to revenue of $365 million reported for the same period in

23         2007.  ***On a GAAP basis, Cadence recognized a net loss of $19 million, or $(0.07)
           per share on a diluted basis***, in the first quarter of 2008, compared to net income of
           $44 million, or $0.15 per share on a diluted basis, in the same period in 2007.

24

25         43.     Defendants knew however, but failed to disclose, the extent to which its so-called

26  bookings for the remainder of the fiscal year had been declining dramatically and that in order to

27  report barely respectable (by Wall Street standards) 1Q08 results, the Company improperly recorded

28

PLAINTIFFS' CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - C-08-4966 SC                                                                        - 19 -

1   more than $24 million in revenue upfront on a multiple element transaction, which was required by

2   GAAP and SOP 97-2 to be recognized ratably as detailed in ¶36.

3       44.   In addition to falsely reporting the Company's 1Q08 financial results, the April 23,

4   2008 press release forecasted revenue and earnings results for 2Q08 and FY08, and falsely assured

5   investors that the 2Q08 and FY08 forecast and results would indeed be based upon performance

6   measured under GAAP.   In truth, defendants knew but failed to disclose that in 1Q08, they had

7   improperly recorded revenue on a $24.8 million transaction that under GAAP, specifically SOP 97-

8   2, could not be recognized until 4Q08, and that they had failed to apply the accounting rules as they

9   had told the market they did.   *See* ¶36 (discussing the Company's revenue recognition policies).

10   Defendants had no reasonable basis for their 2Q08 and FY08 revenue forecast because they knew

11   they had already pulled future 1Q08 revenue into earlier quarters to meet earnings estimates:

12       Business Outlook

13           For the second quarter of 2008, the company expects total revenue in the
14   range of $310 million to $320 million. ***Second quarter GAAP net income per
    diluted share is expected to be in the range of $0.02 to $0.04*** . . . .

15           ***For the full year 2008, the company expects total revenue in the range of
    $1.49 billion to $1.54 billion. On a GAAP basis, net income per diluted share for
16       fiscal 2008 is expected to be in the range of $0.64 to $0.72*** .

17       45.   <u>False and Misleading Statement:</u>   On April 23, 2008, defendants Fister and Porter

18   hosted a conference call for investors and analysts to discuss the Company's 1Q08 earnings and

19   revenue results and FY08 financial forecast.   Defendants repeated the materially false revenue and

20   earnings results for the quarter.   Ex. 10.   Defendants particularized and falsely reported Product

21   Revenue for 1Q08 as $156 million for the quarter:

22           Results for our key operating metrics for Q1 were – total revenue of $287
    million . . . . ***GAAP earnings per share for Q1 with the net loss of $0.07*** compared
23   to net income of $0.15 in Q1 of 2007. . . . ***Total revenue for the first quarter was
    $287 million, compared to $365 million in Q1 of 2007, down 21%. Product
24   revenue was $156 million*** , maintenance revenue was $99 million and services
    revenue was $32 million. ***Revenue mix by geography in Q1 was 40% for the
    Americas, 22% for Europe, 26% for Japan and 12% for Asia, one customer
25       accounted for approximately 11% of total revenue*** .

26

27       46.   <u>False and Misleading Statement:</u>   In addition to the false financial results for 1Q08,

28   defendants detailed the purported basis of the 2Q08 forecast and specifically stated (notwithstanding

knowledge that 1Q08 revenues were overstated by $16.4 million and earnings by $16 million)[3] that the Company's "business strategy" of upfront revenue recognition had never been stronger and Cadence was on track to meet operating targets for FY08:

> Now I will turn to our outlook for Q2 in the year. **For Q2 we expect revenue to be in the range of $310 to $320 million. GAAP EPS should be in the range of $0.02 to $0.04 and non-GAAP EPS in the range of $0.13 to $0.15. For the year 2008 we expect revenue to be in the range of $1.49 to $1.54 billion, we expect backlog to grow to $2.1 billion at the end of 2008. . . . GAAP EPS should be in the range of $0.64 to $0.72. . . .**
>
> **For 2008, we expect to generate operating cash flow of at least $350 million. We expect . . . to be approximately 125 at the close of 2008. . . . Although the semiconductor environment remains challenging, I am confident in our strategy, our technology has never been stronger and we are on track to achieve our operating targets for the year.**

47.    During the April 23, 2008 conference call, securities analysts inquired about the Company's disclosures in 1Q08 and the strength of its so-called backlog which would purportedly support the full year revenue and earnings forecast. Ex. 10.  In addition, analysts questioned the Company's decision not to disclose the percentage of revenue from upfront bookings recorded in 1Q08.  Investors and analysts were particularly concerned that the Company might be recognizing more revenue upfront on its software license deals in order to simply meet revenue and earnings estimates and placing substantial risk on future financial results.  *Id.*  Defendants fielded the questions but flatly and falsely rejected the idea that Cadence's upfront revenue recognition strategy skewed the Company's true current and future financial condition and continued to conceal the truth about the 1Q08 revenue and earnings results – which had only been achieved because the Company improperly booked as upfront revenue $24.8 million from a multiple element arrangement transaction in violation of GAAP and the Company's own revenue recognition policies.  *See* ¶36. Defendants also assured investors that Cadence expected its revenue stream from subscription and term licenses to be balanced at 50/50 for the fiscal year and that they should not be concerned with the breakdown of the percentage each type of license contributed to the reported revenue:

---

[3]     The amounts of overstatement were again modified in the Company's latest Form 10-K filed on March 2, 2008, when the Company disclosed further adjustments.

Rich Valera – Needham & Company Analyst: . . . And to just sort of revisit that decision not to give the upfront versus ratable, it seems as you move to the back half, *the fear will be that you could move to an exceptionally sort of upfront weighted model, which could allow you to achieve the numbers, but could essentially make things more valuable and potentially more risky as you move forward*.

[Defendant] Porter:  . . . In terms of mix, I do expect a balance between what you would consider subscription and term business for the year.  So, it's going to be around 50/50, I believe.  And then if we expect that to dramatically change we would let you know.

Ex. 10 at 7.

48.     On April 24, 2008, securities analysts repeated the Company's false and misleading 1Q08 revenue and earnings results and 2Q08 and FY08 forecasts through widely distributed analyst reports.  Exs. 11-13.  For example, RBC Capital Markets issued a report titled, "Cadence Design Systems Reiterates guidance, Beats expectations and stating that the 1Q08 revenue and earnings results and increase in 2Q08 guidance should alleviate some investors concern about the Company's positions":

> *Management beat expectations of downside risk by reiterating CY08 guidance Q1 print was at the high end of guidance.  Q2 guidance was raised, slightly ahead of consensus*. . . .
>
> *After two quarters of surprises, merely meeting guidance, we believe, should help alleviate Street's negative sentiments*. . . .
>
> *Management reiterated CY08 revenue guidance of $1.49B-$1.54B* and raised EPS guidance by 3c to $1.14-$1.22.  Lowered share count due to an aggressive buyback of 7% of float led to the EPS raise.  Q1 was reported as $287M/$0.04m at high end of guidance.

Ex. 11.

49.     On April 24, 2008, Needham & Co., LLC ("Needham") also issued a report titled, "CDNS: In-Line 1Q08; Unchanged (and Still Back-End Loaded) '08 Guidance; Maintain Buy."  Ex. 12.  The report explained that notwithstanding concerns about the Company's previously issued outlook (issued after the 4Q07 and FY07 results) of declining revenues for FY08, the reported 1Q08 financial results had restored some investors' confidence in the future and Needham maintained its "buy" rating on the Company's stock:

> We don't think Cadence changed anyone's mind as they delivered an inline 1Q08 and reaffirmed 2008 guidance, *but at least the company took a small step in restoring recently shattered investor confidence*. . . . *That said, given the depressed*

*valuation and management's strong track-record prior to last quarter's miss and guide-down, we are inclined to retain our Buy rating*.

50.     On April 24, 2008, JPMorgan Chase & Co. ("JPMorgan") issued a report regarding the Company's 1Q08 reported results, noting that the Company had met revenue and earnings expectations for the quarter and repeating defendants' reports of deferred revenue (scheduled to be recognized in the back half of the fiscal year) which purportedly legitimized and provided the purported basis for the Company's revenue and forecast for the remainder of FY08. Ex. 13. Indeed, unaware of the facts that had been concealed by defendants concerning the true financial condition of the Company and particularly the revenue recognition manipulation resulting in the 1Q08 overstatement of a $24.8 million software license transaction, JPMorgan reported that it was the back-ended nature of annual revenue that was keeping the Company's stock price from taking off, nevertheless, it was the "saving grace" for the Company:

> *Results for the quarter were in-line*. We had said we thought the bar for the quarter was set low so even a beat would not tell us much about true health of the business, but in-line with such a low bar could be viewed negatively.

> *The saving grace, in our view, was the $30M increase in deferred revenue*. Overall, we see the results as being as expected, the environment as being very tough as end customers are facing uncertainty, and with a back-end loaded year we think it prevents the stock from out performing.

> *                *                *

> *Once again there was a customer that made up over 10% of revenue and that will continue to feed investor concerns about lumpiness and reliance on at least one large deal per quarter to make numbers.*

51.     <u>False and Misleading Statement:</u>  On April 25, 2008, Cadence filed a Form 10-Q signed by Fister and Palatnik with the SEC setting forth the 1Q08 financial results. The Form 10-Q was accompanied by false Sarbanes-Oxley certifications signed by Fister and Palatnik. *See* Ex. 14. Additionally, the Form 10-Q again stated the Company's revenue recognition policies by deferring back to the "Critical Accounting Estimates" section in its Form 10-K for FY07 for an additional description of license type and timing of revenue recognition. Indeed, the Company identified SOP 97-2 and its application to multiple element transactions  as critical to the way in which its revenue was recognized, as described in ¶36 above.

52.     Following the issuance of Cadence's false 1Q08 revenue and earnings results, Cadence's stock price traded at artificially inflated prices between $9-$11 range between April 23, 2008 and July 23, 2008.  But for the false financial statements and false forecasts, the Company's stock price would have suffered a material significant decline as it did when the truth began to be revealed about the Company's true financial condition.  *See* ¶¶155-165.

53.     On May 21, 2008 at the JPMorgan Technology Conference, where Palatnik and Porter met with analysts, Palatnik again reassured that the Company's outlook remained the same:

> "[T]here's also been no change in guidance that Bill gave in the April call from the January call at the top-line level.

Ex. 16.

54.     <u>Reasons Why Statements in ¶¶42-51 Were False and Misleading and Defendants Knowledge of Falsity or Deliberate Recklessness.</u>  The statements concerning the Company's (a) 1Q08 revenue and earnings results; (b) Product Revenue results; (c) 2Q08 revenue and earnings forecast; and (d) its policy of upfront and ratable revenue recognition were each false and misleading for the following reasons:  First, defendants have unequivocally admitted that the Company's 1Q08 revenue and earnings were materially false and misleading.  The Company has restated 1Q08 revenues and earnings results as detailed in ¶¶116-118; 132-134.  Specifically, 1Q08 reported Product Revenue was overstated over 10% by one transaction alone.  In truth, the Company had not earned any of the $24.8 million until 4Q08, had not had a customer that properly represented 11% of revenue in the quarter, and had not sold $156 million worth of its product in the quarter.  As detailed below at ¶¶116-118; 132-134, the Company improperly recognized revenue "upfront" on a multiple element transaction that should not have been recognized until 4Q08 at the earliest.  The reported earnings were also overstated by at least 86.8%.  Cadence's accounting for the largest transaction in 1Q08 was booked entirely upfront, in direct violation of GAAP.  Of course, this also violated the Company's internal revenue recognition policy which it told investors that it complied with SOP 97-2:

> We recognize revenue when persuasive evidence of an arrangement exists, the product has been delivered, the fee is fixed or determinable, collection of the resulting receivable is probable, and vendor-specific objective evidence of fair value, or VSOE, exists.

1    55.    Defendants knew, or deliberately disregarded, that the 1Q08 $24.8 million transaction

2    was a multiple element transaction such that *all of the revenue* recognized during quarter was

3    improper and in violation of GAAP.  Indeed, Cadence had not *earned* that $24.8 million in 1Q08

4    and the terms of the transaction were not effective until 4Q08.  In fact, the Company now admits that

5    part of the deal contemplated in 1Q08 involved product that had not even been commercially

6    available at the time.  The Company's admission on December 11, 2008 that the Company had a

7    material weakness in financial reporting regarding incubation technology confirms that.  In short, the

8    Company recognized a lump-sum $24.8 million in revenue in part, for product that had not even

9    been developed in 1Q08.

10    56.    Defendants also knew, or were deliberately reckless in not knowing, the detailed

11    nature of the $24.8 million transaction and the fact that it had not been completed (it was done in

12    contemplation of a later negotiated transaction) and its material impact on reported 1Q08 financials.

13    Cadence was only able to report revenue and earnings in the range of what they had told the market

14    in January 2008 because it falsified its financials and improperly recognized revenue on the

15    transaction in violation of GAAP.  Indeed, the restatement of  $24.8 million was directly related to

16    reported "Product Revenue" for 1Q08 which represented *15%* of the Company's reported "Product

17    Revenue" in the period. *See* Exs. 38, 43; *see* ¶125.  This transaction was such a large portion of the

18    Company's Product Revenue (more than 15% of the Product Revenue reported), all recognized

19    upfront for the quarter, that Cadence's top executives and in particular the Company's CFO and

20    Controller, defendants Porter and Palatnik (in 1Q08), must have been aware of it and the accounting

21    for it.  Indeed, the Company told investors that sales with one customer represented 11% of the

22    Company's 1Q08 revenues.  Further, the topic of "upfront" revenue recognition and its propriety

23    was the featured discussion during the 1Q08 conference call hosted by defendants, and investors

24    openly challenged the Company management on whether that approach was correct.  *See* Ex. 10 at

25    6-7.  Defendants falsely assured investors that defendants' financial reporting was correct and, of

26    course, legal.

27    57.    The reports of several of confidential witnesses confirm that defendants knew or

28    deliberately disregarded the appropriate revenue recognition on the this restated transaction because

1    defendants' express approval was needed in a contract of this magnitude.  Indeed, the $24.8 million

2    transaction was the ***largest deal*** of the Company's reported revenue for the quarter.  While the

3    Company originally reported that "one customer accounted for approximately 11% of total revenue"

4    during the conference call and in the SEC filing as required by the applicable SEC disclosure rules, it

5    later modified the disclosure after the restatement in the amended Form 10-Q for 1Q08: "Taking into

6    account the restatement adjustments noted in Note 2, no one customer accounted for 10% or more of

7    total revenue during the three months ended March 29, 2008."  Ex. 43.  Thus, the detail of the

8    restated  transaction  confirms  that  the  restatement  involved  the  one  customer  who  originally

9    accounted for 11% of the Company's reported revenue for the quarter prior to the restatement, the

10   largest customer for that quarter.

11        58.    Of the $287 million of revenue recognized for 1Q08, $156 million was recognized for

12   Product Revenue.  As originally reported, Cadence's Product Revenue sales declined 34% from the

13   same period in 2007.  As later admitted by the Company in its December 11, 2008 Form 10-Q, $24.8

14   million from the restated transaction was for "Product Revenue" improperly recognized during the

15   quarter, which represented ***over 15% of the total Product Revenue recognized for 1Q08***.[4]  Without

16   the $24.8 million overstatement of Product Revenue, the Company would have reported a ***41%***

17   ***decline*** for Product Revenue from the same period in 2007.  Product Revenue was indeed at the ***core***

18   of the Company's business and revenue stream because according to the Company, Product Revenue

19   drives maintenance and service revenue, *i.e.*, Cadence had to sell its products first before selling any

20   ancillary or related maintenance/services.[5]  Indeed, Cadence's reporting of Product Revenue was a

21   key metric – as it also served as an indicator of Cadence's market share in the various EDA product

22

---

23   [4]      After other adjustments, the Company admitted that the Product Revenue was overstated by
24   14.2%.

25   [5]      In the Company's Form 10-K for 2007, the Company described its maintenance revenue as
     derived from "technical support to our customers to facilitate their use of software and hardware
26   products."  In 2007, maintenance revenue was 24% of the total revenue reported.  Service revenue,
     which consisted 8% of its total revenue in 2007, came from fee-based services, which "may be sold
27   separately sold and performed in conjunction with the sale, lease or license of our products."  Ex. 6
     at 6, 9.

28

1  spaces.  The restatement of $24.8 million is not only nearly 10% of the total revenue and 15% of the

2  Product Revenue reported; the impact of it on the income/loss would have been tremendous, as the

3  Company already initially reported a loss of $19 million.  For 1Q08, Cadence's revenue forecast

4  guidance was $280-$290 million in revenue and $0.03-$0.05 EPS.  ***But for*** the $24.8 million of

5  revenue improperly recognized, Cadence would have missed its revenue (and earnings) forecast for

6  1Q08 by at least $15 million – guidance that was already lowered at the beginning of 2008.  Ex. 8.

7         59.     Several witnesses report that the Individual Defendants were involved or had

8  knowledge of the restated transaction at issue.  According to plaintiffs' witnesses CW2 and CW3,

9  the restated transaction involved a Japanese customer.  The revenue reported for Japan in the

10  Amended Form 10-Q filed on December 11, 2008 was restated from $75 million to $56 million,

11  after the restatement and adjustments were made, further supporting the witnesses' accounts that the

12  restated transaction involved a Japanese customer.[6]  Plaintiffs' witnesses also report that given the

13  contract review and approval processes at Cadence, and the magnitude of the contact involved, that

14  the Individual Defendants at least had knowledge of it.

15         (a)     According to CW2, the former Vice President of Finance who was responsible

16  for the Sales/Finance group and setting up the contract approval structure prior to the Class Period,

17  and who confirmed that the contract approval process remained the same in 2008, the Company's

18  contracts with Japanese customers were first reviewed by the CFO equivalent for Cadence in Japan.

19  CW2 also reported that for contracts with Japanese customers, the Company also retained an

20  independent translator so that corporate finance in the San Jose headquarters could streamline

21  negotiations of legal terms and conditions of the contracts, rather than relying only on the "sales

22  guys" to communicate the details of the contracts.  The Japanese contracts would next be reviewed

23  by corporate accounting personnel in San Jose as part of determining how much revenue would or

24

25  [6]     CW3 states that Fujitsu was likely the customer involved in the $24.8 million restated
26  transaction.  CW6 also states that the Company purportedly closed a deal with Fujitsu in 1Q08, and
    it had tried to close other large deals with other Japanese customers including Hitachi in 1Q08 to
27  close the revenue gap.  CW2 confirms that Cadence had offered an eight year agreement to at least
    one customer – Fujitsu in 2008, and that the deal was booked in 1Q08.

28

1   could be recognized from the transaction.  The contracts and associated accounting were next

2   reviewed by the Controller at the time (Palatnik in 1Q08).  For a deal as big as the one in 1Q08, it

3   would definitely had been reviewed by the then-CFO Porter.  Finally, CW2 states that Fister was

4   commonly involved in deal negotiations with customers and that Bushby was definitely involved in

5   helping negotiate deals with customers.

6           (b)     CW3, a former Senior Manager of the Marketing group, corroborated the

7   report of CW2 that that revenue recognition decisions would be made at the San Jose headquarters

8   and would have involved multiple personnel and levels of review.  According to CW3, contracts

9   were evaluated according to the contract size itself, the term of the contract, and whether or how

10  much revenue could be realized upfront or ratably, as well as the amount of discount being extended.

11  Further corroborating CW2, CW3 stated that there were clear processes in place for escalating the

12  review and approval of contracts based on the size of the contracts because large contracts were "not

13  boilerplate" and were "very unique" and required considerable review and analysis.  CW3

14  emphasized the number of individuals and groups involved in this process, particularly for a deal as

15  large as $24 million.  The deal review process generally began with a transaction/contract being

16  received by the Sales/Finance organization from the Cadence Sales organization.  Depending on the

17  nature of the deal, there would be "back and forth" between Sales/Finance and "senior sales"

18  personnel, as well as more senior personnel within Sales/Finance, including – at times – all the way

19  to Porter and Palatnik depending on the size and complexity of the transaction.  The deal would

20  eventually be handed over by the Sales/Finance organization to the Revenue Accounting group,

21  which CW3 said was ultimately responsible within Cadence for determining how revenue was to be

22  recognized.  The Revenue Accounting group was overseen during the Class Period by Vice President

23  of Finance John Wall, who reported to Palatnik and/or to Porter depending on the period.  The

24  Revenue Accounting group ensured the revenue was documented as ratable or upfront.  CW3 states

25  that Palatnik was definitely involved in decisions about revenue recognition.

26          (c)     According to CW4, former Director of Engineering in the Company's San

27  Jose Headquarters, given the size of the contracts involved with the restated transactions, defendants

28  had knowledge of them by at least approving the deals.  CW4 knew this because this witness, as a

1   former Director of Engineering, occasionally negotiated contracts that involved Custom Integrated

2   Circuits ("CIC") products from his division, and thus was made aware of the contract approval

3   procedures at Cadence.  Consistent with CW3's account, CW4 reported that product contracts were

4   initially negotiated with customers by Cadence sales personnel.  Each deal with a customer had to be

5   first approved by the head of the appropriate sales division and then by senior management of the

6   accounting and finance departments.  CW4 also states that product contracts for the Company's top

7   three or four customers in the number of products and value of contract in any given quarter required

8   the approval of Palatnik and Porter, whereas contracts of small values (*i.e.*, $2 or $3 million) were

9   typically approved by Finance personnel reporting to Porter.  CW4 was made aware of the contract

10   approval structure at Cadence as he regularly presented his division's products to prospective

11   customers and noted that the CFO at the time had to approve the terms of the contracts because of

12   their size.  Any contracts with the top 30 major customer accounts required approval by the CFO, as

13   well as the relevant divisional heads.  CW4 corroborated CW1 and CW3 that contracts with the

14   purported values of $24 million or $12 million would have to be approved by the CFO and the

15   relevant divisional heads.

16              (d)      CW1, a former Sales Administrator whose responsibilities included entering

17   sales contracts into Cadence's systems after the contracts had been negotiated and approved, states

18   the key individuals who approved contracts during the Class Period were Palatnik, Vice President of

19   Global Business Services Mike Doktorczyk ("Doktorczyk"), and Controller for Cadence's

20   Sales/Finance Chuck Calhoun ("Calhoun").  CW1 also states that large-value contracts and large

21   discounts needed Palatnik's approval, and that contracts like $24 million in one quarter would have

22   fallen in the range of large contracts that needed Palatnik's approval.

23              (e)      Plaintiffs' other witnesses corroborate that the Individual Defendants were

24   involved and approved the revenue recognition of the deals signed.  CW7, a former Business

25   Systems Analyst, whose job was to keep Cadence's Siebel system running – the system that kept

26   track of details of sales opportunities and booked sales – reported that Porter or Palatnik "signed off

27   on big stuff" in terms of revenue recognition, and that Bushby was undoubtedly involved in

28   evaluating deals and the manner in which revenue was to be recognized after Calhoun, Doktorczyk,

1   and Jeff Rysyk (Director of Sales Operations) "ok'd deals" in terms of how much revenue was to be

2   recognized.  Likewise, CW6, a Senior Product Marketing manager who was regularly involved in

3   the sales process, reported that the Finance and Accounting operations at Cadence's headquarters,

4   not the international offices, determined revenue recognition on the international deals signed.

5          60.    In addition to meeting its own revenue and earnings guidance, the falsified financials

6   also helped Cadence cover up the extent of the revenue and bookings bubble that the Company was

7   facing but had emphatically denied.   In 3Q07, Cadence had shifted its contract model from

8   subscription to term licenses, thereby allowing the Company to immediately recognize a substantial

9   portion of its licensing revenue upfront.  This revenue model change however, had two drastic

10  effects.  First, it obscured the Company's real sales and market share trends and the visibility of

11  Cadence's pipeline in terms of revenue and bookings.  Second, by recognizing its licensing revenue

12  upfront on contracts that were multi-years, Cadence was essentially robbing its future and creating a

13  revenue bubble by pulling forward all future revenue from multi-year contracts into one quarter

14  when needed.  The shift in the revenue model maintained a façade that it was thriving despite the

15  industry downturn in 2007, it, however, put Cadence in the unsustainable position of constantly

16  needing to book new, large contracts to realize revenue, at a time when the number of customers in

17  the EDA industry was already stagnated.  While senior management purportedly addressed the

18  bookings and revenue bubble by lowering its guidance for FY08 in January 2008, they also knew

19  that the guidance for FY08 was already set so low that the Company had to meet at least its own

20  guidance at all costs.  Indeed, a miss of its own guidance or further lowering of the guidance would

21  signal to the market that Cadence was losing its competitiveness and market share and that the

22  Company did not have the visibility of its pipeline that it claimed it had.  Thus, instead of telling the

23  market the true financial condition of Cadence in 1Q08, defendants falsified Cadence's financials to

24  meet its guidance while seeking options to cover up the extent of its depleting pipeline and the

25  implosion of its bookings and revenue bubble.  Several former employees reported that defendants

26  knew about the bookings and revenue bubble, and the implication of it on the Company's future

27  outlook.

28

1    (a)    CW5, the former Senior Technical Marketing Manager whose responsibilities

2  included collecting Cadence's sales and market segment data in late 2007 and early 2008, reported

3  that defendants knew about the imploding bookings and revenue bubble by 1Q08.  According to

4  CW5, the sales data collection was a continuous process, and that even before the review and

5  analysis of the data collected in a given quarter was completed, CW5 and CW5's supervisor,

6  Mashayekh were already collecting data from the sales personnel for the next quarter;

7    (b)    According to CW5, Cadence's internal data analysis indicated a huge drop in

8  sales and market share by 1Q08.  CW5 states that once the data for the first quarter of 2008 had been

9  collected in the 4Q07, it indicated that the annualized sales numbers were declining compared to the

10  prior year data, and there was a downturn in almost all Cadence's customer accounts, based on the

11  "annualized run-rate" projected for 2008 to the "annualized run-rate" that was projected for 2007.

12  CW5 states that the sales data collected in the first quarter of 2008 indicated that Cadence was losing

13  some of its strategic deals, including a huge drop in the sales numbers for IBM, one of Cadence's

14  largest accounts.  CW5 indicates that the senior management at Cadence was aware of sales data and

15  the drastic downturn in the sales run rate because CW5's analyses were reviewed and submitted to

16  the senior management by Mashayekh in a final quarterly market analysis report in PowerPoint

17  presentation – which consisted of the market share information and quarter-by-quarter and year-by-

18  year comparison of the data.  The sales and market segment data was presented by Mashayekh and

19  distributed to the CEO, the CFO, all Vice President-level personnel and the Company's accounting

20  team.  Thus, senior management knew precisely where the Company stood in terms of its own

21  financial performance.

22    (c)    CW3, the former Senior Manager who had personal knowledge of Cadence's

23  marketing and business operations, states that Cadence's top management knew about the bookings

24  bubble by 2008.  In order to keep reporting significant upfront revenue, Cadence had to extend very

25  significant discounts to customers as part of renegotiating existing contracts.  However, given

26  intense competition and the overall shrinking EDA market, these opportunities to renegotiate

27  contracts were diminishing and the heavy discounts obviously hurt Cadence's margins.

28

(d)     According to CW3, by late 2007, Cadence realized that it was not going to be acquired after all by any private equity firm and had exacerbated the existing revenue/bookings bubble problem by pulling in so much revenue forward in mid-2007.  CW3 states that the Marketing and Operations groups briefed senior executives, including Palatnik, regarding the bookings bubble situation by early 2008 and the concern that Cadence would not be able to continue recognizing so much revenue upfront as it had in prior years.  CW3 reported that Cadence's biggest problem from the shift to the term licensing model was that recognizing as much revenue upfront as possible demanded that Cadence constantly sign new contracts or renew existing contracts in order to continue reporting as much (or more) revenue as had been reported in prior periods.  But recognizing revenue upfront on long-term contracts means that Cadence needed to renew those contracts much sooner than the scheduled expiration of the contracts and doing this was not good for Cadence's margins or long-term prospects.  Customers were only willing to renew these contracts if they received incentives, such as significant discounts or free maintenance or services.  Thus, the new business model (*i.e.*, shifting its licensing model from subscription to term licenses for new renewal contracts) that was implemented in mid-2007 also compromised Cadence's maintenance and service revenue stream.

61.     Thus, to disguise the bookings and revenue bubble and the revenue of $24.8 million improperly recognized upfront in 1Q08, ***for the first time*** the Company did not provide quarterly bookings mix of the percentage of revenue recognized ratably versus upfront for the quarter.  As one analyst observed, "As expected, the company stopped providing quarterly bookings mix - which limits the ability to model actual quarterly bookings and backlog contribution . . .  With reduced transparency into bookings mix and backlog, we are more cautious on 2H results with 60% of revs and 84% of earnings falling into this period.  While we still believe CDNS holds strong competitive positioning in key EDA markets and remains committed to margin leverage, the business model transition, apparent lack of large renewals in 1H08 and risk to deal push-outs in a tough semiconductor environment keep us on the sidelines for now."

62.     Confidential witnesses CW1 and CW7 also independently state that the senior executives, including the Individual Defendants, had access to the Company's forecasting bookings,

1   and financial reporting systems which kept track of the state of pending or anticipated contract

2   negotiations, as well as the terms of the contracts (*i.e.*, term versus subscription), so that defendants

3   knew exactly how much revenue they needed to meet analyst expectations based on their regular

4   monitoring of the various systems in place, and how much bookings was in the pipeline.

5         (a)    CW7, the former Business Systems Analyst, states that Cadence used the

6   Siebel CRM system to track sales opportunities and booked deals, and to ensure that orders were

7   fulfilled.  The Japanese sales force, like all of the Cadence sales force, entered details into the Siebel

8   system, including a potential value of the contract and when the contract would be expected to close.

9   At that point, the deal became part of the Company's overall pipeline, and the senior management

10  would regularly look into the Siebel system to evaluate the prospective deals in the pipeline.

11  According to CW7, when the deals were booked, the revenue was booked in Cadence's SAP system

12  and financial data related to booked revenue from SAP was also entered into a system called

13  Epiphany, at which time that information was to loop back around and be entered into the Siebel

14  system.  CW7 reported that, given how Cadence had always been "very meticulous" about deals

15  coming in and how much revenue was going to be booked, the nature of the restatement seemed

16  "fishy."  Indeed, CW7 could not recall a $24 million customer transaction in 1Q08 but offered that

17  such an amount of revenue for a single deal was "huge . . .  that's a big deal."

18        (b)    CW1, the former Sales Administrator whose job required CW1 to upload

19  information into systems, states the eDA-on-Tap and Siebel systems tracked whether certain

20  contracts were characterized as "term" or "subscription" contracts.  CW1 further states that

21  defendants had access to both systems and thus knew how much revenue the Company could

22  recognize on the contracts.  The scanned copies of the contracts were uploaded into the two systems

23  and therefore actual copies of the contracts could be viewed within the systems.  The eDA-on-Tap

24  system designated contracts as Pool A or Pool B, one for subscription contracts and the other for

25  term contracts.  The eDA-on-Tap system shows the full dollar amount of a contract, as well as the

26  kinds of remix rights that the customers has purchased.  The Siebel system had much of the same

27  kind of data as the eDA-on-Tap system, but was more of a forecasting tool which showed

28  prospective deals to which the sales personnel had assigned a percentage likelihood of when the deal

1   was likely to close.  According to CW1, the two systems also showed the signatures of the various

2   individuals at Cadence who had signed the contracts.  CW1 states that very large contracts and very

3   large discounts needed Palatnik's approval and the systems reflect so.

4         63.     Furthermore, defendants actually knew or recklessly disregarded that the 2Q08 and

5   FY08 guidance they provided the market was false and misleading because the forecast was based

6   on the false financials reported for 1Q08.  Because defendants knew that the 1Q08 reported

7   financials were false and misleading, they had no basis for making the 2Q08 projections and FY08

8   projections.

9         64.     The Individual Defendants' knowledge or deliberate recklessness regarding the falsity

10  of the financial results reported is further supported by defendants' repeated assurance that they

11  closely monitored the Company's financial outlook, including their access to information about

12  pending contracts, including the timing of the contracts to come in.  During the 1Q08 conference

13  call, in which Fister and Porter were present, Fister stated: "***When we plan the pipeline, and like I***

14  ***say we do this with a lot of visibility, in some appreciating detail, we took into account the time***

15  ***shift***, and I think you remember that that was lot of work done.  I said when we projected that this

16  year was going to be harder for us as we were looking at that time flexibility to continue. It's not a

17  matter of if, it's a matter of when. . . ."  These admissions indicate the extent of defendants'

18  knowledge of the details concerning Cadence's sales, sales pipeline, and revenue recognition.

19        65.     In addition to defendants' access to Cadence's internal data, defendants' scienter can

20  be inferred from their own admissions of their hands-on approach to dealing with Cadence

21  customers, which is also corroborated by witness accounts that Fister, Bushby, and Porter routinely

22  met with customers to negotiate and close deals.

23        (a)     Several witnesses reported that Fister, Bushby and Porter often met with

24  customers to negotiate contracts and thus they knew the terms of the contracts.  CW1 said that Fister

25  "puts his time in with customers."  According to CW1, there were news briefs routinely sent to

26  company employees, particularly regarding "higher-end deals," that mentioned that Fister and

27  particular sales representatives had participated in closing the deals.  CW6 reported that Fister and

28

1  Porter regularly met with Japanese customers.  CW2 also said that Bushby, as the head of the Sales

2  group, was routinely involved in deal negotiations with customers.

3     (b) Fister's scienter is inferred from his multiple admissions that he personally

4  dealt with customers and, according to CW1 and CW6, that Fister's time with customers included

5  contract negotiation.  During the January 30, 2008 conference call with analysts, in response to an

6  analyst's question whether the EDA cards were the right thing to offer as a licensing mechanism and

7  a way to deliver technology, Fister responded, "***I spend quite a lot of time out there with the***

8  ***customers***."  Ex. 2 at 5.  At the March 3, 2008 Morgan Stanley Technology Conference, Fister again

9  stated: ". . . I myself spend a lot of time with companies of [sic] big and small."  Ex. 7 at 7.  At the

10  May 21, 2008 JPMorgan Technology Conference where Palatnik and Porter were present, Porter

11  explained to the analysts why his new position as the CAO was created.  "For those of you who

12  know Mike, he is always on the road working with customers, and so he spends a lot of time there."

13  Ex. 16 at 3.  Thus, Fister had knowledge of the nature of contracts with customers that involved

14  multiple element arrangements.  As the chief in charge, it was highly likely that he would know the

15  details with the largest customer for the quarter – the $24.8 million deal at issue.

16     (c) Porter's and Bushby's knowledge of the large deals, including the restated

17  $24.8 million deal at issue, is further supported by Porter's statement in response to an analyst's

18  question during the April 23, 2008 conference call concerning Cadence's Product Revenue decline,

19  in which Porter responded, ". . . ***I can tell you me and Kevin [Bushby] are out there everyday***

20  ***upfront and personal, we know where we are going.***"  Ex. 10 at 13.  Thus, Porter and Bushby must

21  have known that 15% of the Product Revenue for 1Q08 came from one deal alone – the same deal

22  that they approved to improperly recognize the lump-sum upfront.  During the same conference call,

23  Fister also emphasized both Porter's and Palatnik's hands-on involvement with the Company's

24  financial reporting and strategic planning, in response to an analyst's question regarding Porter's

25  transition to the position of CAO:  "Simple, we've got great talent in the company.  We're

26  continuously trying to take advantage of that, so that we can drive bandwidth in another areas.  ***The***

27  ***growth strategy of the company, we're perfectly timed to continue to not only think about that, but***

28  ***execute on it.  Kevin Palatnik, as you get to meet him***, he missed that Analysts Day, so you know,

PLAINTIFFS' CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - C-08-4966 SC                        - 35 -

1   *he is a great guy, has been driving lot of the financial machine for the last two years as a*

2   *Controller, and it gives Bill lot more bandwidth to do that*. . . .   And we have structured and

3   continue to structure the Company at the top line management, so that we can go and evolve it and

4   grow it.  That's what all of  us are doing . . . ."  *Id.*

5   **Cadence Uses Its Falsified Financials to Leverage Its Attempt to Buy Out Mentor Graphics**
    **in Order to Conceal Its Bookings and Revenue Bubble**
6

7          66.    During 1Q08 and 2Q08, as Cadence's bookings and pipeline continued to deteriorate,

8   defendants knew that manipulating the reported financials was only a short-term solution to keep the

9   stock price up.  In an attempt to get a fresh pool of customers and inject more lump-sum revenue,

10  defendants set out an ambitious plan to acquire one of its main rivals, Mentor Graphics.  According

11  to CW3, Cadence's attempt to acquire Mentor Graphics was an act of desperation that – had it

12  succeeded – would have enabled Cadence to convert Mentor Graphics' revenues upfront by

13  renegotiating all Mentor Graphics' contracts upon the acquisition, and thereby Cadence could have

14  bought itself another year or so before the consequences of the revenue/bookings bubble overtook

15  the Company.

16         67.    On April 16, 2008, as the senior management were finalizing Cadence's false

17  financials for 1Q08, Fister approached the CEO of Mentor Graphics about combining Cadence and

18  Mentor Graphics via an acquisition.  In April and May 2008, defendants Fister and Porter met with

19  Mentor Graphics' senior executives to discuss the terms of Cadence's proposal: $16 per share in

20  cash, with the transaction valued at $1.6 billion.  In late May, Mentor Graphics rejected the proposal

21  and informed Cadence of its desire to remain independent and that it did not want to pursue any

22  further discussion.

23         68.    Faced with the rejection, and seeing that Cadence's revenue and revenue pipeline

24  continued to plummet in 2Q08, defendants set out a more aggressive plan.  On June 17, 2008,

25  Cadence issued a press release and held a conference call to announce its hostile take-over bid,

26  whereby Cadence made it known publicly, especially to the investors of Mentor Graphics, that it had

27  submitted a proposal to the board of directors of Mentor Graphics to acquire it for $16 per share in

28  cash, a 30% premium of Mentor Graphic's stock price at the time.  Defendants hoped that with the

1   public announcement of its acquisition offer, the shareholders of Mentor Graphics would put

2   pressure on their board to overcome Mentor Graphics' initial rejection of Cadence's proposed offer.

3        69.    Several media covered the announcement and provided additional details on the

4   proposal.  For example, Cowen & Company ("Cowen") issued a report titled, "Potential deal for

5   MENT just beginning" (Ex. 18) on June 18, 2008:

6        **Potential deal for MENT just beginning . . .**

7        Conclusion: CDNS went public with an offer to buy MENT for $16/sh cash
    ($1.6B EV) after MENT mgmt rejected its proposal.  This deal represents a premium

8   of 30% and values MENT at ~ 15.4x FY09 (Jan) consensus EPS and 1.7x EV/'F09
    revs.  ***CDNS plans to raise about $1.1 B in debt to fund the deal***.  MENT issued a

9   press release following a CC held by CDNS to explain its rational; the MENT board
    rejected the offer again. . . .

10

11       **Why Do It?**  MENT has a large direct sales and support channel which is
    where a lot of the ST financial leverage exists. . . . Taking a large competitor out has

12  positive LT implications for industry pricing which benefits everyone.

13                            \*       \*       \*

14       **CDNS would finance with an additional $1.1B in debt**

15       The transaction that CDNS outlined is a cash deal worth about $1.6B
    ($16/share), Cadence expressed a willingness to consider some equity in the

16  consideration, but a cash offer is initially what's on the table.  CDNS hasn't yet had
    the opportunity to do real due diligence – its projections etc. are based largely on

17  public data.  ***Cadence has approximately $500M in cash that it could use; it
    proposes to raise an additional $1.1B in debt to fund this transaction. Cadence has***

18  ***already had some discussions with banks; we surmise it believes it can raise debt at
    somewhere at 6% or better.***

19       70.    In response to Cadence's hostile take-over attempt, Mentor Graphic's board retained

20  financial and legal advisors to evaluate the offer.  The two companies and their respective advisors

21  agreed to meet on August 15, 2008.

22       71.    Against this backdrop, it was critical that Cadence portray a rosy picture of its

23  financial and operating conditions in 1Q08 and 2Q08.  In order to appear as an eligible suitor to

24  Mentor Graphics' board and investors, and to raise the necessary financing to buy Mentor Graphics,

25  defendants knew that  Cadence could not afford to miss a quarter of its own guidance, especially

26  when the Company had substantially lowered the guidance at the outset of 2008.  Thus, defendants

27  were motivated to inflate the stock price of Cadence by carrying out the fraudulent scheme described

28  herein.

72.     The hostile take-over bid, however, came a little too late.  On July 23, 2008, after improperly scrubbing its data and pulling a $12 million transaction from future quarters forward to meet its own 2Q08 guidance, Cadence reluctantly told the market that it was once again lowering its guidance for FY08, cutting its guidance by $400 million from $1.5 billion to $1.1 billion.  Ex. 19. Following the release of its 2Q08 results on July 23, 2008, Cadence's stock tanked 30% in one day closing at $7.11 per share on July 24, 2008, and continued to trade in the $7-$8 range per share in August 2008.

73.     On August 15, 2008, Cadence withdrew its bid for Mentor Graphics, right before the pre-scheduled meeting with Mentor Graphics.  Even though Cadence publicly cited to Mentor Graphics' unwillingness to negotiate as the reason for the withdrawal, several media and analyst reports observed that it was a "save face" tactic by Cadence because it would have been difficult for Cadence to obtain financing on the deal given its dismal 2Q08 results, its FY08 guidance and its plunging stock price. *See* Exs. 26-28 (August 15, 2008 Article "Cadence could find it tough to raise debt for bid"; August 18, 208 article titled "Cadence drops pursuit of Mentor – debt financing challenges help scuttle the unsolicited $1.6 billion bid"; August 25, 2008 article titled, "What a difference a day makes; How the Cadence/Mentor deal went south").

**Cadence Issues 2Q08 False Financial Results and Partial Disclosure of the Company's True Financial Condition Causing Stock Price Decline, While the Company Continues to Conceal Improper Revenue Recognition**

74.     On July 23, 2008, the Company reported its 2Q08 revenue and earnings results.  The Company falsely reported that it had earned $329 million in revenues and $0.02 EPS, as detailed below.  *See* Exs. 19-20.  The Company and the Individual Defendants knew but failed to disclose that it had improperly recorded revenue in violation of GAAP and SOP 97-2.  The Company nevertheless revealed that the FY08 earnings forecast had substantially dropped by at least $400 million since the last time that they reassured the guidance.  These disclosures concerning the Company's revenue and earnings outlook were in direct contrast with previous assurances by the Company that the second half of FY08 would be stronger and back-end loaded, not withstanding analysts previous concerns (falsely allayed by defendants) that the Company's revenue and business model put substantial risk on its future results.

1    75.   <u>False and Misleading Statement:</u>  On July 23, 2008, the Company issued its 2Q08

2    revenue and earnings results in a press released titled, "Cadence Reports Q2 Revenue of $329

3    Million." Ex. 19.  The Company falsely reported that it had earned (on a GAAP basis) $329 million

4    revenue and $0.02 per share:

5              Cadence Design Systems, Inc. today reported second quarter 2008 revenue of
               $329 million, compared to revenue of $391 million reported for the same period in
6              2007.  ***On a GAAP basis, Cadence recognized net income of $5 million, or $0.02
               per share on a diluted basis, in the second quarter of 2008***, compared to net income
7              of $60 million, or $0.20 per share on a diluted basis, in the same period in 2007.

8                                  *        *        *

9              "***Although we achieved our Q2 numbers, it was more difficult than we
               planned***. Customers are demanding still more flexibility in when, what and how they
10             purchase software and hardware," said Mike Fister, chief executive officer. "As a
               result ***we've made the decision to lower our outlook and transition to an
11             approximately ninety-percent ratable license mix***."

12   76.   <u>False and Misleading Statement:</u>  On the same day, July 23, 2008, defendants hosted

13   a conference call with the analysts during which defendants Fister and Palatnik repeated the

14   Company's false financial results for 2Q08. Ex. 20.  Defendants stated falsely that the Company had

15   "achieved" 2Q numbers:

16             Revenue for Q2 was $329 million, and non-GAAP earnings per share was $0.14.

17             ***Although we achieved our Q2 numbers and had a number of successes with
               our customer and new technology releases, it was challenging.***
18
                                   *        *        *
19
               ***As a result, we have made the difficult but necessary decision to lower our
20             outlook and transition to an approximately 90% ratable license mix.***

21   77.   With respect to the 2Q08 results during the conference call, Palatnik also specifically

22   identified the results as being in compliance with GAAP:

23             ***GAAP earnings per share for Q2 was $0.02 compared to $0.20 for Q2 of 2007. . . .
               Product revenue was $195 million, maintenance revenue was $100 million, and
24             services revenue was $34 million***.

25   78.   Finally, with respect to the Company's forecast for the remainder of the fiscal year

26   2008, defendants particularly stated that they expected 3Q08 revenue to be $235 million and EPS to

27   be ($0.50-$0.54):

28

PLAINTIFFS' CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - C-08-4966 SC                                                          - 39 -

The outlook reflects the shift to a 90% ratable mix and lower business levels for the remainder of the year.  For Q3, we expect revenue to be in the range of 235 to $245 million. . . .  For 2008, we expect weighted average contract life to be in the range of three to four years.  We expect to be break even for the non-GAAP operating margin on an annual basis for 2008.  GAAP EPS should be in the range of a loss of $0.50 to $0.54 . . . .

79.     Securities analysts immediately questioned the lowered revenue and earnings guidance and the Company's business model change during the 2Q08 conference call because it was starkly inconsistent with the way defendants had previously characterized the Company's financial outlook.  Ex. 20 at 4-8.  Defendants Fister and Palatnik continued to conceal the true facts concerning false financial results of 1Q08 (which resulted from improper revenue recognition pulling revenue from future periods), Cadence's true financial and business outlook and falsely blamed the "market conditions" as the reason for the changes.  For example, Richard Valera, an analyst at Needham asked about the sharp decline in bookings:

[C]learly a quarter ago, presumably, you were expecting to do something on the order of $1.5 billion or so of bookings, so did the environment deteriorate that quickly that your bookings outlook could have gone from $1.5 billion down to $1.1 billion in one quarter or any color around that would be helpful?

80.     In response, Fister again denied any company-specific factor that was causing the lowering of the guidance: "certainly the environment deteriorated."

81.     Mahesh Sangeneria, an analyst from RBC Capital Markets, was skeptical about the scripted explanations for the sudden drastic reduction in forecast and the abrupt business model change:

I think *we have been in this environment for awhile, but what degraded, and again I will say the same thing that, yes, things are bad, but I can't get from semiconductor companies or any in other Companies that things are gotten so much worse what you're forecasting* . . . .

Can you give us a little bit more color on what was the thought process in changing going back to the 90% ratable model?  You just recently went from 70% plus to 50% kind of and now you're going back to 90.  Can you walk us through some of your through process in that?

82.     Defendant Palatnik responded to the question again falsely suggesting that revenue and earnings in 2Q08 were legitimate – though achieved with significant challenges – but again failed to disclose that the Company for two consecutive quarters had artificially inflated its reported revenue and earnings results in violation of GAAP and SOP 97-2:

As Mike said, the environment as we exited Q2, early Q3, proved much more challenging that we anticipated. ***Even though we successfully completed the quarter. With that as a back drop, it was our conclusion that moving to a more ratable mix will enable us to keep our focus on the value of our technology*** . . . .

83.     Rather than disclosing the financial condition of the Company, Fister reassured the analysts that the Company's guidance had been conservative and taken into account that it was projecting FY08 to be a back-end loaded year.  Ex. 20 at 5.

84.     When Jay Vleeschhouwer again inquired about the timing of the revenue model change, Palatnik again blamed the market conditions as the cause of the model change, without disclosing that the EDA business model had created a bookings and revenue bubble and that Cadence's 2Q08 results were good, and did not disclose that the reported financials were in fact manipulated:

I would add, ***from a mix change or model change, it really boils down to environment.  We're very happy with the numbers we publish for Q2***, but in those last few weeks the discussions with customers were very, very challenging, and as they took another look at their businesses in the second half, we had those conversations, we had on our plate both selling I would say incremental technology as well as renewals in the second half, and when discussing the potentials with that for our customers, it was pretty obvious they wanted either more flexibility or I would say more challenging discussions around terms, so boiling it all down to an environmental change, that's really what caused us to move the model.

85.     When Terence Whalen, a Citigroup analyst, again asked for the percentage of bookings on ratable versus upfront to determine and clarify Cadence's pipeline, defendants again refused to provide the breakdown, concealing material facts concerning the Company's financial condition:

Yes.  Once again, from a ratability standpoint we're only going to report backlog once a year, so we're not going to get into the bookings ratability on a quarterly basis.  We know that we manage it on an annual basis.  It is lumpy within the quarters, and we don't want to confuse anyone with the quarterly numbers.

Ex. 20 at 10.

86.     Following the July 23, 2008 announcement, several analysts immediately downgraded the stock.  RBC Capital Markets analysts issued a report on July 24, 2008 (Ex. 22) stating that it was surprised by Cadence's lowered guidance and the sudden change in its revenue model:

*Management reduced CY08 revenue midpoint by a hefty $370M, 25% of original guidance.  Equally surprising, it changed the revenue model from upfront to 90% ratable.*  As we have lost visibility to a turn-around in revenue, we are downgrading our rating to Sector Perform. . . .   Management guided CY08 revenue $1.12B-1.114B, down 25% from earlier $1.49B-$1.54B.  Order outlook dropped to $1.1B vs. our $1.62B.  CFO outlook dropped to $175M from the previous $350M.

*We were not prepared for the severity of the shortfall*, even though we had previewed softness in Q2 bookings, backlog draw-down and moderate risk to CY08 guidance.  The level of the shortfall and the timing of the announcement could be explained if both of the top two customers we had expected to order in 2H, pushed out orders.  *We find the timing of the transition to a ratable revenue model peculiar*. . . .  *After several quarters of assuring investors that an upfront model offered superior visibility into orders, the U-turn suggests to us a management arguably in something of a turmoil.*

87.     Moreover, while analysts and investors had been skeptical of the process of issuing EDA cards which effectively allowed the Company to pull revenues forward, thus creating a so called "air pocket" that might negatively affect future revenues, there was no disclosure that the Company was improperly recognizing revenue in violation of GAAP and SOP 97-2.

88.     On July 24, 2008, Cowen issued a report maintaining a neutral rating repeating defendants' false explanations that the Company's financial results could be explained by the business changes.  Ex. 23.  It nonetheless expressed shock at the revenue model:

We're not that surprised that CDNS reset its H2:08 expectations.  It cited further deterioration in cust demand/pressure on terms.  Previous targets looked too ambitious regardless.

*What's shocking is that only several quarters after CDNS abandoned its ratable model for a 50%/50 subs mix; it's now doubled back and decided to move to a 90% model – implicitly acknowledging the superiority of this model.  A complete about-face.*  Bookings look to be down a substantial 35%y-y.  We've argued that the abrupt shift to the "EDA CARD" and a more turns drives biz left CDNS vulnerable at exactly the wrong time *and that this shift effectively pulled revs forward creating a bookings air pocket*. . . .

*Q2 EPS of $0.14 on $329M vs. $0.14 on $316M.*  Made the Q but suggested environment got much more difficult at the end, and H2 looked more uncertain so they reset.  No idea on subs mix in Q2.  *While macros are v difficult and semis under pressure to conserve $$, we do not expect LAVA or SNPS to reflect this "dramatic" change.  We still think a lot of this is CDNS specific* though it's obviously tough out there – has been for awhile.

89.     Needham also issued an analyst report on July 24, 2008, entitled "CDNS: Massive Guide Down on Model Shift and Bookings Reset; Right Long Term Move, But Guly Near Term;

1    Maintain Hold." Ex. 21.  The report noted, "While industry conditions have likely gotten tougher on

2    the margin, *we believe 90%-plus of Cadence's problems are company specific*."

3        90.    Following the July 23, and July 24, 2008 disclosures, Cadence's stock price suffered

4    an immediate decline as a result of the reduced forward-looking 2008 revenue and earnings guidance

5    and disclosures concerning the Company's business model and revenue recognition practices.

6    Indeed, while the Company disclosed that it was changing its business model, it refused to disclose

7    the details concerning revenues that would be recognized ratably as opposed to upfront.  *See* ¶85.

8    These disclosures caused shares of Cadence's stock to plunge from $10.27 to $7.11 per share, or

9    31%, on July 24, 2008.  By comparison, the S&P MidCap 400 Index dropped only 3%, the S&P 400

10   Information Technology Index dropped by only 2.7%, and the NASDAQ Index dropped under 2%

11   on the same day.  The reporting of its (false) 2Q08 results and reduced revenue outlook, however,

12   only partially revealed the true financial and operating conditions of Cadence, as defendants still

13   concealed that its 1Q08 and 2Q08 reported financials were manipulated to meet the Wall Street

14   estimates (and to prevent a further decline).  Moreover, the defendants were still concealing from the

15   market the bookings and revenue holes created by its business model that essentially left the

16   Company's pipeline depleted by mid-2008.

17       91.    <u>False and Misleading Statement.</u>  On July 29, 2008, Cadence filed a Form 10-Q with

18   the SEC, signed by Fister and Palatnik setting forth the financial results described in the above

19   paragraph. Ex. 24.  The Form 10-Q was accompanied by certifications signed by defendants Fister

20   and Palatnik. *Id.*  Additionally, in the Form 10-Q, the Company stated, "Product revenue associated

21   with term and perpetual licenses is generally recognized at the beginning of the license period,

22   whereas product revenue associated with subscription licenses is recognized over multiple periods

23   during the term of the license. In order to provide our customers with the desired flexibility, our

24   license mix will change to a higher proportion of licenses that require ratable revenue recognition

25   which will result in a decrease in our expected revenue for the second half of fiscal year 2008." *Id.*

26   at 22.

27       92.    <u>Reasons Why These Statements in ¶¶74-78, 80, 82-85 Were Knowingly False and</u>

28   <u>Misleading and Defendants' Knowledge or Deliberate Recklessness:</u>  The statements concerning the

1   Company's (a) 2Q08 revenue and earnings results; (b) Product Revenue results; (c) 3Q08 revenue

2   and earnings forecast; and (d) its policy of upfront revenue recognition were each false and

3   misleading for the following reasons:  First, defendants have unequivocally admitted that the

4   Company's 2Q08 revenue and earnings were materially false and misleading.  The Company has

5   restated 2Q08 revenues and earnings results.

6          93.    As detailed below at ¶¶135-139, the Company improperly recognized revenue

7   "upfront" on a multiple element transaction that should have been recognized ratably.  Cadence's

8   accounting for this $12 million transaction in 2Q08 was booked entirely upfront, in direct violation

9   of GAAP and the Company's own revenue recognition policies.  The reported earnings were also

10  overstated by at least 458%, after all other adjustments were made.

11         94.    Defendants knew, or deliberately disregarded, that the 2Q08 $12 million transaction

12  was a multiple element transaction such that *all of the revenue* recognized during the quarter was

13  improper and in violation of GAAP.  Indeed, Cadence had not *earned* that $12.0 million in 2Q08.

14         95.    For 2Q08, Cadence reported $195.4 million in Product Revenue, which represented a

15  26% decline in Product Revenue from the same period in 2007.  With the restatement of $12 million

16  from the above transaction and an additional $8.4 million of adjustments in Product Revenue,

17  Cadence's Product Revenue for 2Q08 is $175.0 million, which represents more than 10% decrease

18  in the reported Product Revenue alone, and a 33% decline from the same period in 2007.

19         96.    *But for* the $12 million in revenue that was improperly recognized in 2Q08, Cadence

20  would have missed its projections for 2Q08, which was projected in the range of $310 million to

21  $320 million on April 23, 2008, and reaffirmed during the May 8, 2008 Merrill Lynch Technology

22  Conference and the May 21, 2008 JPMorgan Technology Conference.  Exs. 15-16.  Cadence was

23  only able to report revenue and earnings in the range of what they had told the market because it

24  falsified its financials and improperly recognizing revenue on this transaction in violation of GAAP.

25  Cadence restated its 2Q08 revenue at $308 million.  Had Cadence not falsified its 2Q08 financials, it

26  would have reported a net loss of $16.7 million and ($0.07) earning loss per share, rather than a net

27  income of $4.9 million and EPS of $0.02.  This alone represents a 436% overstatement in net

28  income.  *See* ¶¶125-131; 135-139.

97.     Furthermore, Cadence improperly recorded $18 million in cash from the accounts receivable sold from the improperly recognized $24.8 million transactions in 2Q08.  As it later admitted (and restated), the Company did not have the accounts receivable to sell in the first place, and could not have sold the receivables for cash for this particular transaction that they knew could not be recognized in lump-sum in 1Q08.  This reporting of additional cash was important because Cadence needed and wanted to appear as "cash rich" in the on-going negotiation with Mentor Graphics.  In fact, by the time that Cadence reported its 2Q08 financials, the shareholders of Mentor Graphics were contemplating Cadence's hostile take-over bid which made it more appealing that Cadence reported more cash in its financials.

98.     As described in more detail in ¶59 above, the reports of several confidential witnesses confirm that defendants knew or deliberately disregarded the appropriate revenue recognition on the this restated transaction because defendants' express approval was needed in a contract of this magnitude.  CW3, a former Senior Manager of the Marketing group, corroborated the report of CW2 that that revenue recognition decisions would have involved multiple personnel and levels of review, and would have escalated to the Individual Defendants given the size of the contract involved.  According to CW3, because contracts as large as $12 million were "not boilerplate," it would have required considerable review and analysis.  CW1, the former Sales Administrator who regularly input contract information into Cadence's systems, reported also that $12 million would have been considered as a large value contract in a given quarter.  CW4, the former Director of Engineering in the Company's San Jose office, corroborated CW1 and CW3 that contracts with the purported value of $12 million would have to be approved by the CFO Palatnik and the relevant divisional heads.

99.     Other witnesses corroborate that the Individual Defendants were involved and approved the revenue recognition of the deals signed.  CW7, a former Business Systems Analyst reported that Porter or Palatnik "signed off on big stuff" in terms of revenue recognition, and that Bushby was undoubtedly involved in evaluating deals and the manner in which revenue was to be recognized because he was in charge of the Sales group.  CW1 and CW7 also independently stated that the senior executives, including the Individual Defendants, had access to the Company's forecasting bookings, and financial reporting systems which kept track of the state of pending or

1    anticipated contract negotiations, as well as the terms of the contracts (*i.e.*, term versus subscription),

2    so that defendants knew exactly how much revenue they needed to meet analyst expectations based

3    on their regular monitoring of the various systems in place, and how much bookings was in the

4    pipeline, as described in ¶62 above.

5          100.    Furthermore, defendants actually knew or recklessly disregarded that the 3Q08 and

6    FY08 guidance they provided the market was false and misleading because the forecast was based

7    on the false financials reported for 1Q08 and 2Q08.  Because defendants knew that the 1Q08

8    reported financials were false and misleading, they had no basis for making the 3Q08 projections

9    and FY08 projections.  The Individual Defendants' knowledge or deliberate recklessness regarding

10   the falsity of the financial results reported is further supported by defendants' repeated assurance that

11   they closely monitored the Company's financial outlooks, including their access to information

12   about pending contracts, including the timing of the contracts to come in, as described in ¶62 above,

13   and in subsequent admissions of their knowledge of the applicable accounting rules.

14   **Defendants Admit Knowledge of Important Accounting Regulations Governing Multiple Element Transactions and Participating in the Negotiations of Such Deals**

15

16         101.    Following the July 2008 disclosures further lowering of guidance and the shift in

17   business model, analysts peppered Cadence with inquiries concerning the Company's financial and

18   operational condition.  Defendants' responses further demonstrate their knowledge of the accounting

19   rules governing the multiple element transactions and how Cadence's characterization of the

20   contracts would implicate the accounting rules, thus affecting the amount of revenue that could or

21   could not be recognized.  For example, during the August 7, 2008 RBC Capital Markets 2008

22   Technology, Media & Communications Conference (Ex. 25), Palatnik met with the analysts to

23   discuss revenue recognition:

24         And not only did we lower business levels but we changed our revenue mix and our
           business model if you will.  We were and have been quoted in early January through
           a 50-50 revenue from upfront versus ratable license mix.  ***And we moved all the way
25         to a 90% ratable license mix that has an impact on revenue and EBITDA and all
           the classic measures.***

26                              *       *       *

27         And we came out in January for the year, we saw 50-50, so primarily based on cards.
28         Going forward, we don't really view that card mix is going to change.  So the natural

question is, if you had such a high mix of gold cards, synonymous with term agreements, revenue upfront, what's going to change going forward?   And unfortunately, that's where you get into the accounting of things.

> *In order to take revenue upfront on gold cards and term agreements, there are certain rules within accounting.   When we had those discussions with customers , quite often when we sold a gold card, we couldn't sell a subscription license or services with that.  We had to create separation.* . . . We're going forward and talking about releasing the handcuffs on our channel. *We're now giving them the ability to eliminate that separation*. . . .

> *In accounting, that will be viewed as a single unit of arrangement and all be accounted for ratably*.

102.   Palatnik's statements are a clear admission of knowledge of basic accounting rules and his and the Company's financial staff's role in the negotiations of the contracts, requiring the "separation" in order for the Company to recognize revenue upfront.

103.   During the September 3, 2008 Citigroup Global Technology Conference, analysts again bombarded Palatnik with questions about the sudden decision to change the revenue model in 2Q08. Ex. 29. Palatnik's responses, again, demonstrate his and the Company's savvy understanding of the applicable accounting rules for multiple element arrangement contracts, and that contrary to defendants' prior explanations that it was the customers who demanded the change, Palatnik admitted that it was merely Cadence's accounting for multiple-element arrangement contracts that changed:

> *Let me talk specifically about 90/10.  90% of the licenses will be ratable, 10% Product revenue from upfront licenses.  In terms of how we describe that, term licenses and gold cards, are basically Product revenue upfront, subscription licenses, and platinum cards are both ratable.  And the reason they are ratable is there are delivery points or conditions over time, such that we haven't completed delivery*. . . .

> In moving to 90/10 actually, it unlocks the sales force.  When we were dependent on let's say more revenue upfront, if our sales force sold a term license or a gold card into our customer base.  The accountants assets to separate the discussion between a term license and a subscription license for some period of time.  Going back a year, 18 months . . . .  So by moving to 90/10 actually it unlocks our salesforce to have a consistent discussion with customers, such that if they have $10 million of budget to spend, they can commit some funds to current technology, either through a term license or a gold card and future technology through a subscription of our platinum card and may even pick up a services agreement as well.  *That's entitled MEA accounting or multiple element arrangement.   So a single arrangement with multiple elements.  Under MEA accounting it is all accounted for ratably*.

Now in terms of the customer discussions, the customer doesn't want to get into rhetoric discussions anyway.  They are only interested with their dollars, what can I buy from current technology or license from current technology?  What can I devote to future technology?  So the customer discussion doesn't change.  ***It's only the accounting on Cadence side that now when a gold card and a platinum card are sold together it will be accounted for ratably.***

104.  <u>False and Misleading Statements</u>:  One week later, on September 10, 2008, at the Deutsche Bank Securities Technology Conference in which Palatnik participated, analysts continued to question the Company's sudden revenue model change.  Ex. 30.  Rather than coming clean and telling the market that Cadence was essentially using its licensing business model to pull revenue forward as needed to cover revenue gaps, Palatnik again insisted that the change was driven by customers:

Unidentified Audience Member Analyst:  I wanted to talk a little bit about your business model.  And Cadence had been really a very consistent business model for three plus years, maintaining kind of 75%, 25% mix subscription and upfront.  And then I guess about year and-a-half ago, it went to sort of 50/50.  The EDA Cards became kind of popular.  Now with the reset, you're going to 90/10 – 90% subscription, 10% upfront.  ***So one thing that investors don't like is change and surprises***; ***so if you could talk about why the business had been fairly consistent for that time, why it's shifted back to 50/50, now back to 90-10, and what's really the thought there***?

KEVIN S. PALATNIK:  . . . In 2007, the volume of cards, where customers were embracing that as a vehicle to license our technology, we saw a strong uptake; and in Q3 we saw a very significant uptake, primarily around Gold Cards.  Now gain, 75, 25 mode – 75% product revenue ratably.  When we saw that uptake in Gold Cards, where product revenue is recognized upfront, that drove ratability – and we announced this in our earnings call in Q3 – down to 49%.  So a very significant uptake.  In Q4, seasonally, our largest quarter of the year, we saw that ratability number increased a little bit; but coming out of Q3 and Q4 of last year, in January – January's guidance for 2008 – we said what we experienced in the last two quarters, that's what we should experience for all of 2008.  Basically, a 50/50 model.  Okay?  All right.

Q1, Q2 experience.  When we looked at our Q1 discussions, when we looked at our Q2 discussions, we looked at our second half of business; ***we did agonize over changes our business model and moving to a 90/10***.  Others in the industry, both before our announcement and subsequent to our announcement, I think those who are familiar, moved to a 90/10 model.  Part of the drives of that, I think, were to unlock the potential in the sales force, to give us more pricing leverage.  Q1, Q2 experiences with customers in this macro environment, the discussions – or I should say the terms that they were looking for in the business – got very difficult.  And terms can be translated into discounts, so in order to rebalance that negotiation – that discussion – with customers, we moved to a 90-10 model.

**Cadence Announces Mass Terminations of Top Executive Officers Including the CEO
Announces Stock Price Declines Still Fails to Disclose False Financials**

105.     On October 15, 2008, the Company issued a press release announcing mass terminations of top executive officers including defendants Fister, Bushby and Porter. Ex. 31. Each of these individuals was a key executive associated with the sales and financial performance.  The release, titled "Cadence Board of Directors Creates Interim Office of the Chief Executive; Michael Fister Resigns," stated in part:

> Cadence Design Systems, Inc. . . today announced that its Board of Directors has formed an Interim Office of the Chief Executive to oversee the day-to-day running of the company's operations, effective immediately. The Interim Office of the Chief Executive includes: John B. Shoven, Ph.D., Chairman of the Board of Directors of Cadence, who has been appointed to the position of Interim Executive Chairman, Lip-Bu Tan, a director of Cadence since 2004, who has been appointed Interim Vice Chairman of Cadence's Board, and Kevin S. Palatnik, Senior Vice President and Chief Financial Officer. Charlie Huang, Senior Vice President – Business Development, has been named Chief of Staff of the Interim Office of the Chief Executive.

> The formation of the Interim Office of the Chief Executive followed Michael Fister's resignation as President, Chief Executive Officer and a director of the company, by mutual agreement between Mr. Fister and the Board.

> "Our Board of Directors believes that the formation of the Interim Office of the Chief Executive is the best structure to lead Cadence during this time of transition," said Dr. John Shoven, Chairman of the Board. . . .

> The company also announced that Kevin Bushby has resigned as Executive Vice President – Worldwide Field Operations, effective immediately. Thomas Cooley, Corporate Vice President – Field Marketing, will succeed Mr. Bushby, leading Worldwide Field Operations. . . .

> The company also announced the resignations of James S. Miller, Jr., Executive Vice President – Products and Technologies Organization, William Porter, Executive Vice President and Chief Administrative Officer, and R.L. Smith McKeithen, Executive Vice President – Corporate Affairs, effective immediately.

Update on Expected Third Quarter Results

106.     On the same day, October 15, 2008, Needham analysts issued a report, noting that the terminations might be an indication that the true financial condition of the Company had been worse than had been feared by investors or disclosed during the 2Q08 conference call:

> CDNS: Out with Old . . . Then What?; CDNS Clean out Exec Team as Initial Phase of Major Restructuring (Intraday @ 3:15PM $4.65). . . . ***Mostly, not that surprising. While the breadth of the resignations is surprising, the loss of Fister is not. . . .  A sign things are worse than feared?  The obvious initial concern on seeing such***

*sweeping management changes is that things are worse than the already grim outlook provided on the 2Q call*.

Ex. 32.

107.    On the same day, TheStreet.com published an article, echoing the market's suspicion that the Company had been concealing its true financial and operating condition by manipulating its business model and the way that the Company recognized revenue on long-term contracts.  Ex. 33.  The report also noted the failure of the take-over bid of Mentor Graphics:

> Cadence Design Systems' (CDNS: NYSE) leadership paid the price for its poor performance this year.

> Shares in the design software maker fell 55 cents, or 10.4%, to $4.75 in recent trading after the resignations of Cadence's top executives were announced earlier Wednesday.

*        *        *

> *Fister shifted the company away from industry-standard two or three-year contracts to five-year agreements, enabling it to book more revenue up front*, Smith says.  The shift to longer contracts "insulated their actual earnings for three years. *At the end of three years, the bubble popped*," he says.

*        *        *

> What Fister did was to launch a hostile takeover bid in June for Mentor.  But Cadence backed off August 15 after it could not arrange financing on beneficial terms.

108.    The sudden massive change in top senior management supports a strong inference of scienter.  Fister, Bushy and Porter's sudden resignations were not typical of Cadence's hiring and termination patterns.  In fact, all of these executives had an employment agreement in place which obligated them to remain as Cadence's employee until the end of their employment contracts, which were all subject to renewal upon Cadence's Board's approval.  Only a few months before their sudden resignations, Fister, Bushby and Porter's employment contracts were amended, as reported in the Company Form 8-K filed on August 1, 2008.  None of them appeared to be at retirement age, as Fister was 53, Bushy 52, and Porter 53, in 2008.  At the time of the termination, none of them announced any other personal or professional opportunities that they were going to pursue.  CW3, a former Senior Manager who was involved with Cadence's Finance, Operations, and Marketing,

1   reported that Cadence's Board asked the senior management to resign in part because of the false

2   financials in 1Q08 and 2Q08 that gave rise to the need to restate.

3       109.    Following the October 15, 2008 announcement of the terminations of the senior

4   management, Cadence's stock price immediately declined by 15%, from $5.30 per share to $4.50 per

5   share on October 15, 2008, and declined another 5% the next day on October 16, 2008, to close  at

6   $4.30 per share.

7   **Cadence Announces That It Will Restate 1Q08 and 2Q08 Financial Statements, Stock Price Plummets But Still Artificially Inflated**

8

9       110.    On October 22, 2008, notwithstanding the Company's publicly-reported policy of

10   recognizing revenue ratably on multiple element transactions, and despite falsely assuring investors

11   the Company's financial reporting was accurate (even when pressed by analysts that it appeared that

12   the Company may be improperly pulling revenue forward), after the market closed, the Company

13   issued a press release (Ex. 34) announcing an accounting review and that it would have to restate

14   revenues for the first and second quarters of 2008:

15       **Cadence Announces Accounting Review and Postpones Release of Third Quarter 2008 Financial Results and Webcast; Reaffirms Third Quarter 2008 Guidance**

16

17       Cadence Design Systems, Inc. . . . today announced that it is reviewing, in conjunction with the ***company's independent accountants and legal advisors, the recognition of revenue related to customer contracts signed during the first quarter of 2008.***

18

19       Cadence initiated the review after preliminarily determining during its regular review of its third quarter results that approximately $24 million of revenue relating to these contracts was recognized during the first quarter of 2008, but should have been recognized ratably over the duration of the contracts commencing in the second quarter of 2008. ***Cadence expects to restate its financial statements for the first quarter of 2008 and the first half of 2008 to correct the revenue recognition with respect to these contracts.***

20

21

22

23       111.    On October 22, 2008, Deutsche Bank issued a report, noting as follows:

24       When it rains it pours. . . .  Cadence (CDNS) announced postponement of 3Q results following discovery of revenue recognition issues regarding 1Q08 contracts. ***While the identified dollar amount of $24m is small, it raises concerns over further rev rec issues and adds to the overall cloud hanging over the company including the recent top management shake-up***.

25

26

27   Ex. 35.

28

112.    On October 23, 2008, RBC Capital Markets issued a report indicating that the revenue recognition failures could even be worse than reported.  Titled, "Can of Worms," the report highlighted:

> We could be looking at a slippery slope if the review extends beyond 1Q08. *A review covering periods involving changes to revenue recognition models could open a can of worms*. . . .
>
> *This latest wrinkle only adds to company-specific negativity.  The senior management staff exited the Company last week leaving behind, we believe a leadership vacuum and loss of continuity*.

Ex. 37.

113.    JPMorgan analysts reported in an October 23, 2008 report titled, "Restating 1H08 Revenue; Reiterates 3Q08; Lowering Estimates":

> Based on what we know now it appears to be a VSOE (Vendor Specific Objective Evidence) issue which does not change our view of CDNS as a high risk/high reward turnaround story.
>
> VSOE issue we believe: $24M of contracts recognized in 1Q08 now need to be recognized ratably over contract life starting in 2Q08.   The problem was discovered reviewing results for 3Q08, which suggests to us that certain contracts in the quarter triggered VSOE issues with related deals in 1Q08.  *There are no contracts in 2Q08 impacted so we think this is an isolated incident.*
>
> *            *            *
>
> *VSOE is the issue we believe.   The recent resignation of five members of management will have investors immediately wondering if there is a connection or issue of prior management doing something wrong in 1Q08 to cause this situation*. . . .
>
> No mention of 2Q08 contracts, could mean issue is isolated.  In the release the $24M in contracts were all in 1Q08, and while restatement will impact 2Q08 as the $24M is spread out over the life of the contracts, there is nothing specifically said about contracts in the second quarter.

Ex. 36.

114.    On October 24, 2008, *Zacks Equity Research* also issued an article summarizing the demise:

> Bear of the Day: Cadence Design Systems (Nasdaq: CDNS).  Cadence appears to be in big trouble as the company's *CEO resigned unexpectedly amid mounting financial problems and disappointing results.   Adding to the upheaval, the company delayed its Q308 earnings results, expected to be released on October 22nd, on improper accounting issues related to contract revenues signed during Q1*.

Cadence has been losing share to Synopsys and is struggling through a down-turn in the semiconductor cycle. Cadence also withdrew its bid for Mentor Graphics, further dimming its growth prospects.

Ex. 38.

115. Following these disclosures, Cadence's stock price declined over 32% from a close of $4.32 per share on October 22, 2008 to $2.90 per share on October 24, 2008. Between October 24, 2008 and December 10, 2008, Cadence's stock price remained artificially inflated at around $3-$4 per share.

**Cadence Restates Both 1Q08 and 2Q08 Totaling More than $36 Million in Product Revenue, and Admits That the Accounting Irregularities Were Larger in Scope Than Previously Indicated**

116. On December 10, 2008, Cadence belatedly released its 3Q08 financials and restated results for 1Q08 and 2Q08. While the Company reported that its 3Q08 results were in line with its previous guidance, it provided startling details regarding the Company's restatement and internal investigation, further revealing that the financial condition for its previous quarters was far worse than it had revealed on July 23, October 15, and October 22, 2008. Ex. 39. In fact, the restatement involved two quarters, $36 million in Product Revenue, $18 million in cash, other accounting errors, and an admission of material weaknesses in the Company's financial reporting. In short, the restatement was not limited in the scope that the Company previously alluded to:

> *[Results of Accounting Investigation.] As announced on October 22, 2008, Cadence will be restating its quarterly financial statements for the periods ending March 29, 2008 and June 28, 2008. Cadence will adjust $24.8 million of product revenue recognized in the first quarter of 2008 and $12.0 million of product revenue recognized in the second quarter of 2008. This revenue will be instead realized over the term of relevant arrangement. The results of the Audit Committee's investigation into the restatement issues are summarized below.*
>
> During the first quarter of 2008, Cadence executed a term license arrangement with a customer and, during the third quarter of 2008, Cadence executed a subscription license arrangement with the same customer. *As part of its regular quarterly review process for the third quarter, Cadence identified certain factors that, when evaluated together, indicated that the software arrangements executed with this customer both in first quarter and in the third quarter were negotiated in contemplation of one another.* Accordingly, Cadence determined that the term license arrangement executed during the first quarter and the subscription license arrangement executed during the third quarter collectively represented a multiple element arrangement. Because the subscription arrangement provides *the customer with the right to use unspecified additional software products that become commercially available during the term of the arrangement, Cadence determined that the revenue relating to this multiple element arrangement should be*

*recognized during the term of the arrangement, beginning in the fourth quarter of 2008.*

                    \*       \*       \*

Upon completion of the investigation, the Audit Committee concluded that the circumstances that led to the restatement were not the result of illegal conduct on the part of Cadence's directors, officers, or other employees.[7] . . . [A]s a result of the investigation, the Company has identified a material weakness relating to the insufficient design and ineffective operation of certain internal controls over the recognition of revenue from term license agreements. . . .

As part of the remediation efforts that Cadence has begun implementing in response to the identified material weakness, Cadence reexamined a transaction that occurred during the second quarter of 2008 in which in concurrently cancelled a subscription arrangement and executed both a term license arrangement and hardware arrangement with a customer. Specifically, Cadence determined that, despite the cancellation of the subscription arrangement, the customer did not intend to substantively cancel its right to access future new technology because at the time the subscription license was cancelled the customer intended to re-establish its right to access future new technology at a later time. **Accordingly, Cadence has determined that $12.0 million of revenue originally recognized in the second quarter of 2008 relating to the term license and hardware arrangement should be recognized ratably over the term of the arrangement, consistent with the way in which revenue was recognized on the cancelled subscription arrangement.**

117.    During a conference call with analysts on December 10, 2008, Palatnik repeated the statement in the press release and added more details about the restatement:

The results of the audit committee's investigation into the restatement issues are summarized as follows. During the first quarter of 2008, Cadence executed a term license arrangement with a customer, and during the third quarter of 2008 Cadence executed a subscription license arrangement with the same customer. As part of our regular quarterly review process for the third quarter, we identified certain factors that, when evaluated together, indicated that **the software arrangements executed with this customer both in the first quarter and in the third quarter were negotiated in contemplation of one another.**

                    \*       \*       \*

**Because the subscription arrangement provides the customer with the right to use unspecified additional software products that become commercially available during the term of the arrangement, we determined that the revenue relating to this multiple element arrangement should be recognized during the term of the arrangement, beginning in the fourth quarter of 2008.**

                    \*       \*       \*

---

[7]    Defendants also sought to place themselves in the position of judge and jury and exonerate themselves by stating that the conduct resulting in the restatement was not illegal.

1

2

3

4

5

6

7

> Finally, because we're re restating our quarterly report on Form 10-Q for the quarters ended March 29, 2008, and June [28], 2008, Cadence has also recorded two other revenue adjustments that were previously disclosed in our quarterly report on Form 10-Q for the quarter ended June 28, 2008, initially filed on July 29, 2008.  We determined that product revenue for two contracts totaling $8.4 million recognized during Q2 2008 should have been recognized during Q1 2008.  The net result of all the adjustments is an approximate decrease of $16.4 million to previously reported Q1 2008 revenue and an approximate decrease of $21.4 million to previously recorded Q2 2008 revenue.  A reconciliation of Cadence's previously reported and restated statements of operations for the quarter ended March 29, 2008 and the quarter and six months ended June 28, 2008 is included with the third quarter earnings press release.

Ex. 40.

8

9

10

11

12

13

14

118.     Additionally, contrary to Fister's and Palatnik's Sarbanes-Oxley certifications for Cadence's 1Q08 and 2Q08 reported financial results, the Company admitted to a series of material weaknesses in internal control over financial reporting.  Specifically, contrary to the repeated representations of the Company's compliance with SOP 97-2 for multiple-element software arrangements, the Company admitted in fact that it had not had the adequate internal control in place for compliance.  *See* ¶¶19-20 above; *see also* Ex. 44, 45.

15

16

17

18

19

20

119.     In response to this disclosure, Cadence's stock price declined over 22% on December 11, 2008 from $3.93 per share to $3.04 per share, with more than 21 million shares traded, compared to only 8 million volume on December 10, 2008.  By comparison, the NASDAQ Index declined slightly more than 3%, the S&P MidCap 400 Index dropped 4%, and the S&P 400 Information Technology Index dropped 3%, indicating that the cause of the decline was due to the Company-specific disclosures as opposed to market factors.

21

22

23

120.     On December 11, 2008, Needham issued a report discussing the restatement.  Ex. 41.  It further indicated that now that revenues and earnings had been restated, it was more likely that forecasted future results would be set more appropriately:

24

> CDNS: Reports 3Q08; Accounting Issues Resolved; '09 Guidance Cut; Stock Looks Cheap Relative to Long-Term, But Remain on Sidelines for Now; Hold.

25

26

27

> While we remain on the sidelines for now given our current limited visibility into 2010/11 (and resulting modest estimates), we acknowledge that with expectations now likely set appropriately and the stock near historic trough multiples, downside in the shares is likely limited.

28

> Accounting restatement resolved/contained.  The restatement involved reduction of 1Q08 revenue by $16.4M and 2Q08 revenue by $21.4M . . .

*'08/'09 guidance cut (to rock-bottom?).*  For '08, CFO/bookings now at $50M/$775-800M vs. $175M/$1.1B before and for '09 now at $800-900M bookings and break-even CFO vs. $250M CFO before.  Implied '09 revenue is $800-900M vs. ~$1.1B earlier.

121.    RBC Capital Markets issued a report on December 11, 2008, titled, "Struggling Through":

While management reported completion of the accounting review, business fundamentals continue to deteriorate.  CY08 guidance midpoint was lowered by 10%, implied CY09 revenue was down 20% from expectations. . . .

Our d/g thesis is intact: a) broken order pipeline places severe pressure on CY08/09 top line, b) macro issues whittle orders down further and limit cash collection from customers, c) *inconsistency in operations, the recent accounting issue is yet another example, will likely add additional uncertainties.  We are reducing our estimates wile maintaining our $4 price target and Underperform rating.*

Ex. 42.

122.    Deutsche Bank also issued a report on December 11, 2008, telling the investors, "No reason to hurry into this one":

Cadence Design (CDNS) released 3Q results yesterday following a seven-week internal review of several revenue recognition issues. *The review resulted in a $37m revenue re-statement and the issues were isolated to two contracts, clearing the way for CDNS to get current with SEC filings.  Despite the removal of this overhang, we maintain our Hold rating due to the sharp reduction in 4Q and 2009 guidance,* uncertainty around the demand environment and lack of a permanent CEO.

Ex. 43.

**CADENCE'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD**

123.    In order to inflate the price of Cadence stock, defendants caused the Company to falsely report its financial results for the quarters ended March 29, 2008 (1Q08) and June 28, 2008 (2Q08), filed with its Forms 10-Q, as well as financial results included in press releases and other SEC filings throughout the Class Period.  Defendants violated GAAP and SEC rules because said financial information was not prepared in conformity with applicable GAAP and SEC requirements, nor was the financial information a fair presentation of the Company's operations.  Defendants did so primarily by improperly overstating revenue by recognizing it prematurely.   As a result, Cadence's revenue, net income and EPS were materially overstated in 1Q08 and 2Q08.

1    124.    As noted above, these accounting improprieties violated GAAP and SEC rules.

2    GAAP are those principles recognized by the accounting profession as the conventions, rules and

3    procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation

4    S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not

5    prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote

6    or other disclosure.  Regulation S-X requires that interim financial statements must also comply with

7    GAAP.  17 C.F.R. §210.10-01(a).

8    **Cadence's Restatement**

9    125.    There is no dispute about the falsity of Cadence's financial statements.  Defendants

10   have admitted the falsity, described the need to "correct" revenue recognition and restated the

11   previously reported numbers.  As a result of the accounting errors as alleged herein during the Class

12   Period, Cadence was ultimately forced to restate its previously released financial statements for the

13   first two quarters of FY08 to comply with GAAP.[8]  This restatement was material and had a

14   significant impact on revenue, net income and EPS, as illustrated in the table below:

15

16

17

18

19

20

21

22

---

23   [8]    In connection with the restatements, Cadence disclosed on December 11, 2008 that it had
24   also identified improper revenue recognition relating to a term license agreement that had been
     preliminarily recognized in the quarterly period ended September 27, 2008 (3Q08).  This resulted in
25   adjustments to the preliminary condensed consolidated financial statements for the three and nine
     months periods ended September 27, 2008.

26

27

28

| (In $000's, except per share data) | | | | |
|---|---|---|---|---|
| | **Originally Reported** | **Restated/ Adjusted[9]** | **Amount Overstated/ (Understated)** | **% Reported Amount Overstated/ (Understated)** |
| **Quarter Ended 3/29/08:** | | | | |
| Product Revenue | 156,193 | 133,954 | 22,239 | 14.2% |
| Net Loss | (18,747) | (35,023) | (16,276) | (86.8)% |
| Loss Per Share | $     (0.07) | $     (0.13) | $     (0.06) | (86.8)% |
| | | | | |
| **Quarter Ended 6/28/08:** | | | | |
| Product Revenue | 195,444 | 175,039 | 20,405 | 10.4% |
| Net Income/(Loss) | 4,996 | (16,794) | 21,790 | 436.1% |
| Earnings/(Loss) Per Share | $     0.02 | $     (0.07) | $     0.09 | 458.0% |

126.    The fact that Cadence restated its previous financial statements is an admission that: (i) the financial results originally issued during the Class Period and its public statements regarding those results were materially false and misleading, and (ii) the financial statements reported during the Class Period were incorrect based on information available to defendants at the time the results were originally reported.

127.    As noted by the SEC, "GAAP only allows a restatement of prior financial statements based upon information 'that existed at the time the financial statements were prepared,'" and "restatements should not be used to make any adjustments to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared."[10]    The Financial Accounting Standards Board ("FASB"), the governing body that promulgated the accounting rules regarding restatements of prior financial statements has defined "restatement" as "the process of revising previously issued financial statements to reflect the

---

[9]    Rather than restate a second time, in 4Q08 Cadence made a $5.8 million adjustment to reduce Product Revenue previously recognized in 1Q08.  The tax effect related to this adjustment is not included in 1Q08 net loss or loss per share.

[10]    Brief of the United States Securities and Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *in Limine* to Exclude Evidence of the Restatement and Restatement Report, *In re Sunbeam Sec. Litig.*, No. 98-cv-8258-DMM, at 11, 13 (S.D. Fla. Feb. 22, 2002) ("Sunbeam Brief").

correction of an error in those financial statements." *See* SFAS No. 154, ¶2.  FASB has also defined the "errors" that may be corrected through a restatement: "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of GAAP, or oversight or misuse of facts ***that existed at the time that the financial statements were prepared***." *Id.*  Indeed, as alleged herein, the restatement at issue here was not due to a simple mathematical error, honest misapplication of a standard or oversight, rather, as admitted by defendants, it was due to accounting errors that plaintiffs allege were due to intentional misuse of the facts that were known at the time.

128.    The SEC has reiterated its position that, in its investigations of restated financial statements, it often finds that the persons responsible for the improper accounting acted with scienter:

> [T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, *inter alia,* **to prove the falsity and materiality of the original financial statements [and] to demonstrate that persons responsible for the original misstatements acted with scienter** . . .

Sunbeam Brief at 1.

**Cadence Overstated Revenue**

129.    During the Class Period, Cadence overstated its Product Revenue, resulting in inflated net earnings and/or understated losses.  Cadence primarily accomplished this by improperly recognizing all revenue relating to various license agreements prematurely at the time of delivery, rather than ratably over the term of the contract as required by GAAP.

130.    Cadence licenses software using three different license types: subscription licenses, term licenses and perpetual licenses.  Cadence's subscription license arrangements provide the customer access to and use of all software products delivered at the outset of the arrangement and the ability to use additional unspecified software products that may become commercially available during the term of the arrangement.  According to Cadence's SEC filings, "In general, revenue associated with subscription licenses is recognized ratably over the term of the license commencing upon the later of the effective date of the arrangement or delivery of the software product." Cadence's term license arrangements provide the customer access to and use of all software products

1   delivered at the outset of the arrangement only.  According to Cadence's SEC filings, "In general,

2   revenue associated with term licenses is recognized upon the later of the effective date of the

3   arrangement or delivery of the software product."  Perpetual licenses do not relate to the allegations

4   in this case, so we will not address them at this time.

5         131.   Defendants have admitted in the restated SEC filings and in the 2008 Form 10-K that

6   revenue was prematurely recognized in 1Q08 and 2Q08 as term licenses when it should have been

7   recognized ratably as subscription licenses for at least three deals.  In doing so, defendants violated

8   their own stated revenue recognition policy and GAAP, resulting in material misstatements of the

9   financial statements.

10  **The 1Q08 Restatement**

11        132.   During 1Q08, Cadence executed a term license arrangement and defendants

12  recognized the entire $24.8 million of Product Revenue in 1Q08 after review by defendant Porter,

13  according to CW2.  However, this term license was really just one part of a larger agreement.  The

14  term license arrangement was negotiated in contemplation of a subscription license arrangement

15  with the same Japanese customer; and conversely, the subscription license was negotiated in

16  contemplation of the term license.[11]  These agreements were so closely related that they were, in

17  effect, parts of a single arrangement in accordance with GAAP.  *See* Technical Practice Aid ("TPA")

18  TIS Section 5100.39, *Software Revenue Recognition for Multiple-Element Arrangements*.  As such,

19  the arrangement was in substance a subscription, and thus the entire fee should have been recognized

20  ratably during the term of the arrangement, beginning with 4Q08, as admitted by Cadence.  This is in

21  accordance with GAAP which requires "all software product-related revenue from the arrangement

22  should be recognized ratably over the term of the arrangement beginning with the delivery of the

23  first product" in accounting for a subscription, provided all other revenue recognition requirements

24  have been met (*i.e.*, persuasive evidence of an arrangement exists, the vendor's fee is fixed or

25  determinable, and collectability is probable).  *See* SOP 97-2, *Software Revenue Recognition*, ¶¶8, 49.

26  ──────────────────────────

27  [11]      The related subscription license arrangement was ultimately entered into in 3Q08.

28

1  As a result of defendants' improper accounting for this transaction, $24.8 million was improperly

2  recognized as revenue in 1Q08.

3  133.    Additionally, also in violation of SOP 97-2, defendants recognized $5.8 million of

4  Product Revenue for a software arrangement in 1Q08, but Cadence belatedly announced on March 2,

5  2009 that the revenue on this arrangement should have been recognized on a ratable basis.  As such,

6  during 4Q08, Cadence recorded an adjustment reducing Product Revenue by $5.8 million to

7  "correct" the amount of Product Revenue previously improperly recognized during 1Q08.

8  Defendants chose not to restate 1Q08 a second time, but instead made an adjustment in 4Q08,

9  claiming that the correction was not considered material to the consolidated financial statements.

10  The $5.8 million adjustment represented an overstatement of 4.3% of 1Q08 Product Revenue.  This

11  improper revenue recognition exacerbates the problems previously announced in the restatement.

12  134.    As a result of defendants' improper revenue recognition relating to these

13  arrangements, 1Q08 Product Revenue as originally reported was overstated 14.2% and the net loss

14  was understated 86.8%.[12]  *See* table at ¶125.

15  **The 2Q08 Restatement**

16  135.    One of the transactions resulting in the 2Q08 restatement involved $12 million of

17  improperly recognized Product Revenue.  During 2Q08, a customer of Cadence cancelled an existing

18  subscription license and concurrently executed a $12 million term license arrangement.  Despite the

19  cancellation of the subscription, the customer did not intend to substantively cancel its right to access

20  future new technology.  At the time the subscription license was cancelled, defendants knew the

21  customer intended to re-establish its right to access future new technology because it would not have

22  restated if the information had not existed at the time, in accordance with SFAS No. 154, ¶5.

23  Effectively, while the form of the agreement had changed, the substance had not.[13]  The arrangement

24

---

25  [12]    The $24.8 million restated plus the $5.8 million adjusted of Product Revenue improperly
26  recognized in 1Q08 as discussed above was partially offset by an $8.4 million increase as defendants
   restated revenue previously recognized in 2Q08 to 1Q08.

27  [13]    By recording revenue on the term license in 2Q08, defendants violated one of the most basic
28  concepts of GAAP – recording the form of the transaction over the substance of the transaction.

1  was still going to be treated as a subscription license and, thus, required revenue recognition on a

2  ratable basis.  As such, Product Revenue of $12 million was improperly recognized in 2Q08 in

3  connection with this term license agreement and a hardware arrangement and was restated in order to

4  recognize it ratably over the term of the arrangement, consistent with how revenue was being

5  recognized on the cancelled subscription arrangement.

6        136.   Also contributing to the 2Q08 restatement was improper accounting for factored

7  receivables relating to the $24.8 million arrangement negotiated in 1Q08 which was discussed in the

8  previous section.  *See* ¶97.  In connection with the $24.8 million arrangement, defendants entered

9  into an agreement to sell $18 million of the accounts receivable to a financing institution, and

10  Cadence received the cash for this receivable sale during 2Q08.  Because the sold receivable is

11  considered part of the subscription license arrangement, the transaction was no longer deemed a true

12  sale in accordance with SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets*

13  *and Extinguishments of Liabilities*, which makes it clear that a company cannot sell a financial asset

14  that it does not have control over.  Since revenue was unable to be recognized on the $24.8 million

15  arrangement in 1Q08, there was no associated receivable in Cadence's control for defendants to sell.

16  Effectively, the factoring transaction was a financing and was restated as such.  In the restatement,

17  Cadence recorded a liability of $18 million due to the financing institution, $1.5 million of which is a

18  current liability.  The $18 million of cash received from the financing institution which had been

19  improperly recorded as part of cash flows from operating activities was restated to cash flows from

20  financing activities.  Additionally, the Company's receivables balance as of June 28, 2008 was

21  reduced by approximately $6.9 million, as that was the amount remaining on the balance sheet (*i.e.*,

22  the amount that had not been "sold" to the financing institution) of the $24.8 million receivable.

23

24

---

25  Qualitative Characteristics of Accounting Information states: "Substance over form is an idea that

26  also has its proponents, but it is not included because it would be redundant.  The quality of
reliability, and, in particular of representational faithfulness, leaves no room for accounting

27  representations that subordinate substance to form."  See Statement of Financial Accounting
Concepts ("SFAC") No. 2, ¶160.

28

137.    Defendants also restated the following in 2Q08: (i) a $1 million reduction of maintenance revenue related to the $24.8 million 1Q08 arrangement which should have been recognized during the term of the arrangement beginning in 4Q08; (ii) a $2.5 million reduction of cost of product for a hardware arrangement; and (iii) an $8.4 million reduction to Product Revenue.

138.    As a result of defendants' improper revenue recognition relating to the above arrangements, 2Q08 Product Revenue as originally reported was overstated 10.4% and net income was overstated 436.1%, going from net income to a net loss position.  *See* table at ¶125.

139.    Defendants knew or were reckless in not knowing that the arrangements discussed above as part of the 1Q08 and 2Q08 restatements were effectively subscription licenses for which revenue should not have been recognized upfront, but rather ratably.  Defendants deliberately ignored the substance of the transactions and instead improperly recognized revenue based on the contrived form.  Accordingly, defendants knew or were reckless in not knowing that revenue and earnings were inflated throughout the Class Period.

**Defendants' Internal Accounting Controls**

140.    Internal control[14] is a process, carried out by an entity's board of directors, management and other personnel, designed to provide reasonable assurance that, among other things, the financial statements are reliable and accurate and that a company complies with applicable laws and regulations.

141.    Management of any public company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15 and 15d-15(f) under the Exchange Act.

142.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records, and accounts, which, in reasonable detail,

---

[14]    AICPA Professional Standards AU Section 319.06, *Internal Control in a Financial Statement Audit*, defines internal control as "a process – effected by an entity's board of directors, management, and other personnel – designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations."

1   accurately and fairly reflect the transactions and dispositions of the assets of the issuer; [and] (B)

2   devise and maintain a system of internal accounting controls sufficient to provide reasonable

3   assurances that . . . transactions are recorded as necessary . . . to permit preparation of financial

4   statements in conformity with [GAAP] . . . ."  These provisions require an issuer to employ and

5   supervise reliable personnel, to maintain reasonable assurances that transactions are executed as

6   authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to

7   compare accounting records with physical assets. *SEC v. World-Wide Coin Investments, Ltd.*, 567 F.

8   Supp. 724, 750-51 (N.D. Ga. 1983).

9       143.    Notwithstanding the allegations above and the indicators of scienter herein,

10   defendants knew or were reckless in not knowing that its system of internal accounting controls

11   governing revenue recognition was inadequate.  According to Cadence's SEC filings, under the

12   supervision and with the participation of management, including defendants Fister and Palatnik,

13   evaluations were carried out each quarter regarding the effectiveness of the design and operation of

14   the Company's disclosure controls and procedures; thus, defendants were fully aware of Cadence's

15   control procedures.  As of the end of 1Q08 and 2Q08, defendants Fister and Palatnik positively

16   concluded that based on their evaluations, Cadence's "disclosure controls and procedures were

17   sufficiently[15] effective to ensure that the information required to be disclosed by Cadence in

18   Cadence's reports filed or submitted under the Exchange Act is recorded, processed, summarized

19   and reported within the time periods specified in the SEC's rules and forms and is accumulated and

20   ***communicated to [Cadence's] management, including the CEO and CFO***, as appropriate to allow

21   timely decisions regarding required disclosure." *See* Part I, Item 4. Controls and Procedures of the

22   1Q08 Form 10-Q and 2Q08 Form 10-Q.  *See also* the certifications signed by each of these

23   defendants pursuant to Rule 13a-14 of the Exchange Act as presented in these Forms 10-Q.

24       144.    Subsequently, after the restatement was announced, defendants were forced to change

25   their story.  Defendants disclosed that during a reevaluation of the effectiveness of the design and

26

27   [15]    The 2Q08 Form 10-Q does not state "sufficiently" here.

28

operation of Cadence's disclosure controls and procedures as of the end of 1Q08, 2Q08 and 3Q08, management identified significant control deficiencies that constituted material weaknesses[16] in the Company's internal control over financial reporting, specifically related to "the application of revenue recognition criteria required by SOP 97-2 'Software Revenue Recognition' in the context of multiple-element software arrangements."  The material weakness related to both the insufficient design and ineffective operation of certain internal controls over the recognition of revenue from term license agreements.  Thus, the certifications made by defendants Fister and Palatnik in the 1Q08 and 2Q08 quarterly SEC filings that Cadence's disclosure controls and procedures were sufficiently effective, were false and misleading when made.  Additionally, CW2 states that Cadence's need to restate meant under Sarbanes-Oxley Act of 2002 that the Company lacked an adequate internal control that should have prevented the problematic revenue from being recognized.

145.    Throughout the Class Period, defendants were aware of the deficiencies and inadequacies of Cadence's internal controls.  Despite this knowledge, Cadence did not comply with the following requirements for internal control over financial reporting: Rules 13a-15 and 15d-15(f) under the Exchange Act, Sections 302, 404 and 906 of the Sarbanes-Oxley Act of 2002, and Item 308 of Regulation S-K.

146.    For example, Cadence violated Section 13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning various items such as its revenues, receivables, liabilities and net income.  It overstated revenue, receivables and net income, and understated liabilities.  Moreover, Cadence's inaccurate and false records were not isolated or unique instances because they were improperly maintained for multiple reporting periods throughout FY08.

147.    In addition, Cadence violated Section 13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities.  Defendants failed to ensure that adequate controls were in place to ensure that Cadence was properly recognizing

---

[16]    AICPA Professional Standards Section AU 325.06, *Communicating Internal Control Related Matters Identified in an Audit*, defines a material weakness as "a significant deficiency, or a combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the financial statements will not be prevented or detected."

1   revenue.  Defendants failed to ensure that transactions were reported in accordance with Cadence's

2   own policies and with GAAP.

3         148.    Under Section 302 of the Sarbanes-Oxley Act of 2002, the principal officers of the

4   Company are required to certify that: they are responsible for establishing, maintaining and regularly

5   evaluating the effectiveness of the issuer's internal controls; they have made certain disclosures to

6   the issuer's auditors and the audit committee of the board of directors about the issuer's internal

7   controls; and they have included information in the issuer's quarterly and annual reports about their

8   evaluation.

9         149.    Under Section 906 of the Sarbanes-Oxley Act of 2002, the chief executive officer and

10   the chief financial officer must certify each periodic report containing financial statements filed by

11   an issuer with the SEC pursuant to Section 13(a) or 15(d) of the Exchange Act, 15 U.S.C. §78m(a)

12   or §78o(d), and that information contained in the periodic report fairly presents, in all material

13   respects, the financial condition and results of operations of the issuer.

14         150.    Under Item 308, *Internal Control Over Financial Reporting*, of Regulation S-K,

15   management is required to provide a report of the registrant's internal control over financial

16   reporting (as defined in Rule 13a-15 or Rule 15d-15(f) under the Exchange Act) that contains: (a) a

17   statement of management's responsibility for establishing and maintaining adequate internal control

18   over financial reporting for the registrant; (b) a statement identifying the framework used by

19   management to evaluate the effectiveness of the registrant's internal control over financial reporting

20   as required by Rule 13a-15(c) or Rule 15d-15 under the Exchange Act; (c) management's

21   assessment of the effectiveness of the registrant's internal control over financial reporting as of the

22   end of the registrant's most recent fiscal year, including a statement as to whether or not internal

23   control over financial reporting is effective – this discussion must include disclosure of any material

24   weakness in the registrant's internal control over financial reporting identified by management and

25   management is not permitted to conclude that the registrant's internal control over financial

26   reporting is effective if there are one or more material weaknesses in the registrant's internal control

27   over financial reporting; and (d) a statement that the registered public accounting firm that audited

28   the financial statements included in the annual report containing the disclosure required by this Item

1  has issued an attestation report on management's assessment of the registrant's internal control over

2  financial reporting.

3         151.    During the Class Period, defendants violated the requirements for internal control

4  over financial reporting alleged above as follows:

5                 (a)     Cadence's Forms 10-Q contained certifications required by Rule 13a-14 of the

6  Exchange Act.  The certifications for the periods ended March 29, 2008 and June 28, 2008 were

7  signed by defendants Fister and Palatnik.  Exs. 14, 24.  The certifications signed by Fister and

8  Palatnik knowingly or recklessly were false or misleading given defendants' later admissions about

9  Cadence's financial reports and internal controls;

10                (b)     Defendants failed to establish and maintain an adequate system of internal

11 controls, and failed to regularly evaluate the status of those controls or the lack thereof; and

12                (c)     Defendants did not maintain effective process and transaction level controls.

13        152.    Defendants' failure to strengthen Cadence's known inadequate internal controls

14 rendered Cadence's financial reporting inherently unreliable and contributed to the Company's

15 inability to prepare financial statements that complied with GAAP.  Nonetheless, as detailed above,

16 throughout the Class Period, the Company regularly issued quarterly financial statements without

17 ever disclosing the known existence of the significant and material deficiencies in its internal

18 accounting controls and falsely asserted that its financial statements complied with GAAP.

19 **Other GAAP Violations**

20        153.    In addition to the GAAP and SEC violations described above, the Company also

21 violated the following fundamental GAAP principles:

22                (a)     The principle that interim financial reporting should be based upon the same

23 accounting principles and practices used to prepare annual financial statements was violated

24 (Accounting Principles Board Opinion No. 28, ¶10);

25                (b)     The principle that revenues generally are not recognized until realized or

26 realizable and earned (SFAC No. 5, ¶¶83-84);

27

28

1    (c)    The principle that financial reporting should provide information that is useful

2 to present and potential investors and creditors and other users in making rational investment, credit

3 and similar decisions was violated (SFAC No. 1, ¶34);

4    (d)    The principle that financial reporting should provide information about the

5 economic resources of an enterprise, the claims to those resources, and effects of transactions, events

6 and circumstances that change resources and claims to those resources was violated (SFAC No. 1,

7 ¶40);

8    (e)    The principle that financial reporting should provide information about how

9 management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

10 for the use of enterprise resources entrusted to it was violated.  To the extent that management offers

11 securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

12 accountability to prospective investors and to the public in general (SFAC No. 1, ¶50);

13    (f)    The principle that financial reporting should provide information about an

14 enterprise's financial performance during a period was violated.  Investors and creditors often use

15 information about the past to help in assessing the prospects of an enterprise.  Thus, although

16 investment and credit decisions reflect investors' expectations about future enterprise performance,

17 those expectations are commonly based at least partly on evaluations of past enterprise performance

18 (SFAC No. 1, ¶42);

19    (g)    The principle that financial reporting should be reliable in that it represents

20 what it purports to represent was violated.  That information should be reliable as well as relevant is

21 a notion that is central to accounting (SFAC No. 2, ¶¶58-59);

22    (h)    The principle of completeness, which means that nothing is left out of the

23 information that may be necessary to insure that it validly represents underlying events and

24 conditions was violated (SFAC No. 2, ¶79); and

25    (i)    The principle that conservatism be used as a prudent reaction to uncertainty to

26 try to ensure that uncertainties and risks inherent in business situations are adequately considered

27 was violated.  The best way to avoid injury to investors is to try to ensure that what is reported

28 represents what it purports to represent (SFAC No. 2, ¶¶95, 97).

154.   Additionally, defendants' improper accounting for revenue was material, given the SEC's guidance on materiality.  SEC Staff Accounting Bulletin ("SAB") Topic 1M, *Materiality*, summarizes GAAP definitions of materiality.  SAB Topic 1M represents the codification of certain SAB's, including SAB No. 99, Materiality, as of May 9, 2003.  SAB No. 99 became effective August 12, 1999.  SAB Topic 1M says, *inter alia*, "[a] matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative, as well as quantitative, considerations.  For example, considerations such as whether a misstatement changes income into a loss or whether the misstatement arises from an item capable of precise measurement are factors that should be taken into account in determining the materiality of the misstatement.

## LOSS CAUSATION/ECONOMIC LOSS

155.   During the Class Period, as detailed herein, defendants made false and misleading statements concerning the current and future financial condition of the Company and engaged in a scheme to deceive investors regarding the same.  These materially false representations caused Cadence's stock to trade at an inflated level and operated as a fraud or deceit on the Class.  Later, when the relevant truth regarding the Company's reported revenue, earnings and prospects began to be disclosed, Cadence's stock price declined, as the prior artificial inflation came out of the stock price over time.  As a result, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

156.   Throughout the Class Period, it was part of defendants' scheme to present a misleading picture of Cadence's financial condition and prospects by failing to truthfully disclose that the Company's sales and revenue were the result of improperly recognizing revenue in a manner that was inconsistent with GAAP, SOP 97-2 and the Company's own revenue recognition policy.  The Company's publicly reported quarterly earnings results for 1Q08 and 2Q08 were materially overstated because defendants caused the Company to pull future revenue forward by improperly recognizing $36.8 million in 1H08 in violation of GAAP and SOP 97-2.  But for these deliberate accounting improprieties, Cadence would have missed its own guidance for 1Q08 and 2Q08.

157.   Defendants' false and misleading financial statements, including false forecasts of 2Q08 revenue and earnings, had the intended effect.  Following the statements regarding the Company's 1Q08 results, defendants' false and misleading statements caused Cadence's stock to trade at artificially inflated prices throughout the Class Period, causing Cadence's stock to trade as high as $11.67 per share on May 29, 2008.  Between April 23, 2008 and July 23, 2008, Cadence's stock continued to trade between $9.59 per share and $11.67 per share.  Later, when the relevant true facts of the Company's financial and operating conditions, which had been concealed by defendants' fraudulent scheme, began to be revealed to the market, Cadence's stock price began a continuous and precipitous decline as the prior artificial inflation began to come out of Cadence's stock price.

158.   On July 23, 2008, while Cadence reported revenue and earnings results purportedly (but falsely) within Wall Street analyst expectations, Cadence revealed that it was reducing its FY08 guidance by another $400 million.  The Company also disclosed that it would sharply change its revenue model for recognizing licensing contracts inconsistent with prior representations.  Shares of Cadence suffered an immediate 30.8% drop to $7.11 per share on July 24, 2008, with more than 33 million shares traded.  By comparison, the S&P MidCap 400 Index dropped only 3%, the S&P 400 Information Technology Index dropped by only 2.7%, and the NASDAQ Index dropped under 2% on the same day.  Some analysts observed that the drastic downturn was company-specific, as other semiconductor or EDA companies were not experiencing the same expected decline in their forecast and revenue that Cadence was reporting.  The July 23, 2008 disclosures, however, only partially revealed the true financial and operating conditions of Cadence – while defendants continued to conceal that in fact, Cadence only met its revenue and earnings guidance by improperly recognizing revenue upfront rather than ratably in violation of GAAP.

159.   Following the July 23, 2008 disclosures, Cadence's stock price continued to decline as the market expressed concerns as to how Cadence could starkly change its guidance and licensing revenue model.  For instance, at the September 3, 2008 Citigroup Global Technology Conference and the September 10, 2008 Deutsche Bank Securities Technology Conference, analysts again and again asked Cadence to clarify its outlook and the implication of the model change, which effectively changed the Company's revenue recognition on licensing revenues, on the Company's

1    reporting of revenue.  Exs. 29, 30.  Despite defendants' attempt to explain the sudden changes, and

2    while investors remained concerned about the implications of the change on the Company's business

3    and financial outlook, Cadence's stock price steadily declined but still traded at an inflated level.

4           160.    On October 15, 2008, the Company announced the sudden resignations of key

5    executives, including defendants Fister, Porter and Bushby.  Following the announcement of the

6    major exodus of the senior management, Cadence's stock price dropped by 15%, from $5.30 per

7    share to $4.50 per share on October 15, 2008, and continued to drop another 5% to close at $4.30 per

8    share on October 16, 2008.  One analyst immediately issued a report, asking whether the massive

9    resignations of the top executives was "[a] sign things are worse than feared?"  Ex. 32.  In the two

10   days that Cadence's stock lost over 18% in value, the S&P MidCap 400 Index dropped 6%, the S&P

11   Information Technology Index dropped 6%, and the NASDAQ Index dropped 3%.

12          161.    On October 22, 2008, after the close of the market, instead of announcing its 3Q08

13   results, Cadence announced that it would have to restate its financial results for 1H08 due to

14   improper revenue recognition of certain transactions.  As a result of this disclosure, Cadence's stock

15   price dropped over 25% on October 23, 2008, from $4.32 per share to $3.22 per share, on more than

16   25 million shares traded compared to a volume of 4 million shares traded on October 22, 2008.  This

17   decline in Cadence's stock price was a result of the artificial inflation caused by defendants'

18   misleading statements coming out of the stock price.  By comparison, the NASDAQ Index dropped

19   no more than 1% while the S&P MidCap 400 Index dropped less than 3%, and the S&P 400

20   Information Technology Index dropped slightly over 3% on the same day.

21          162.    Several analysts immediately issued negative reports on Cadence, highlighting that

22   "[w]hen it rains it pours. . . .  [W]hile the identified dollar amount of $24m is small, it raises

23   concerns over further [revenue recognition] issues and adds to the overall cloud hanging over the

24   company including the recent top management shake-up."  Ex. 35.  Another analyst downgraded the

25   stock, noting the announcement of intent to restate as "[t]his latest wrinkle only adds to company-

26   specific negativity."  Ex. 37.

27          163.    Following the analyst reports issued on October 22-24, 2008, Cadence's stock price

28   continued to drop, closing at $2.90 per share on October 24, 2008.  Between October 24, 2008 and

1   December 10, 2008, Cadence's stock price hovered around $3-$4 per share, as investors waited to

2   see the scope of the restatement and the 3Q08 results as well as the Company's projected outlook for

3   4Q08 and FY09.

4   164.   On December 10, 2008, Cadence reported its 3Q08 results, along with the details of

5   the restatement.   The restatement revealed to the market that the true financial and operating

6   condition of the Company was far worse than it had previously revealed on July 23, October 15, and

7   October 22, 2008.  As detailed in the restatement, the Company improperly recognized $24.8 million

8   of Product Revenue in 1Q08 (the largest transaction of that quarter) and $12 million of Product

9   Revenue in 2Q08.   Additionally, contrary to defendants Fister's and Porter's Sarbanes-Oxley

10   certifications during the Class Period, the Company admitted to material weaknesses in internal

11   controls over financial reporting.  Following the Company's December 10, 2008 disclosures, as a

12   direct result of defendants' admissions and the revelations regarding the truth about Cadence's

13   misstatement of its financial results, Cadence's stock price dropped over 22% in one day from $3.93

14   per share to $3.04 per share, with more than 21 million shares traded on December 11, 2008.  By

15   comparison, the NASDAQ Index dropped slightly above 3%, the S&P MidCap 400 Index dropped

16   4%, and the S&P 400 Information Technology Index dropped 3% on the same day.

17   165.   Like other members of the Class of purchasers of Cadence stock who purchased at

18   artificially inflated prices during the Class Period, lead plaintiff suffered an economic loss, *i.e.*,

19   damages, when Cadence's stock price continued to decline following the Company's several partial

20   disclosures on July 23, 2008, October 15, 2008, October 23, 2008, and finally on December 10,

21   2008, regarding defendants' scheme to conceal Cadence's failing business outlook and true financial

22   condition.

23   **NO SAFE HARBOR**

24   166.   Cadence's verbal "Safe Harbor" warnings accompanying its oral forward-looking

25   statements ("FLS") issued during the Class Period were ineffective to shield those statements from

26   liability.

27   167.   The defendants are also liable for any false or misleading FLS pleaded because, at the

28   time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

1    authorized and/or approved by an executive officer of Cadence who knew that the FLS was false.

2    None of the historic or present tense statements made by defendants were assumptions underlying or

3    relating to any plan, projection or statement of future economic performance, as they were not stated

4    to be such assumptions underlying or relating to any projection or statement of future economic

5    performance when made, nor were any of the projections or forecasts made by defendants expressly

6    related to or stated to be dependent on those historic or present tense statements when made.

7    **APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET**

8         168.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-

9    market doctrine in that, among other things:

10             (a)    Defendants made public misrepresentations or failed to disclose material facts

11   during the Class Period;

12             (b)    The omissions and misrepresentations were material;

13             (c)    The Company's stock traded in an efficient market;

14             (d)    The misrepresentations alleged would tend to induce a reasonable investor to

15   misjudge the value of the Company's stock; and

16             (e)    Plaintiffs and other members of the Class purchased Cadence common stock

17   between the time defendants misrepresented or failed to disclose material facts and the time the true

18   facts were disclosed, without knowledge of the misrepresented or omitted facts.

19        169.    At all relevant times, the market for Cadence common stock was efficient for the

20   following reasons, among others:

21             (a)    As a regulated issuer, Cadence filed periodic public reports with the SEC; and

22             (b)    Cadence regularly communicated with public investors via established market

23   communication mechanisms, including through regular disseminations of press releases on the major

24   newswire services and through other wide-ranging public disclosures, such as communications with

25   the financial press, securities analysts and other similar reporting services.

26                        **CLASS ACTION ALLEGATIONS**

27        170.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

28   of Civil Procedure on behalf of all persons who purchased Cadence common stock during the Class

1   Period.  Excluded from the Class are defendants, directors and officers of Cadence and their families

2   and affiliates.

3       171.    The members of the Class are so numerous that joinder of all members is

4   impracticable.  The disposition of their claims in a class action will provide substantial benefits to

5   the parties and the Court.  Cadence had more than 250 million shares of stock outstanding, owned by

6   thousands of persons.

7       172.    There is a well-defined community of interest in the questions of law and fact

8   involved in this case.  Questions of law and fact common to the members of the Class which

9   predominate over questions which may affect individual Class members include:

10                  (a)     Whether the Exchange Act was violated by defendants;

11                  (b)     Whether defendants omitted and/or misrepresented material facts;

12                  (c)     Whether defendants' statements omitted material facts necessary in order to

13  make the statements made, in light of the circumstances under which they were made, not

14  misleading;

15                  (d)     Whether defendants knew or recklessly disregarded that their statements were

16  false and misleading;

17                  (e)     Whether the price of Cadence common stock was artificially inflated; and

18                  (f)     The extent of damage sustained by Class members and the appropriate

19  measure of damages.

20      173.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class

21  sustained damages from defendants' wrongful conduct.

22      174.    Plaintiffs will adequately protect the interests of the Class and have retained counsel

23  who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict

24  with those of the Class.

25      175.    A class action is superior to other available methods for the fair and efficient

26  adjudication of this controversy.

27

28

**COUNT I**

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

176.     Plaintiffs incorporate all of the above, ¶¶1-175, by reference.

177.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

178.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Cadence common stock during the Class Period.

179.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cadence common stock.  Plaintiffs and the Class would not have purchased Cadence common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

180.     As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Cadence common stock during the Class Period.

**COUNT II**

**For Violation of Section 20(a) of the Exchange Act Against All Defendants**

181.     Plaintiffs incorporate all of the above, ¶¶1-180, by reference.

182.     The Individual Defendants acted as controlling persons of Cadence within the meaning of §20 of the Exchange Act.  By virtue of their positions and their power to control public

1  statements about Cadence, the Individual Defendants had the power and ability to control the actions

2  of Cadence and its employees.  Cadence controlled the Individual Defendants and its other officers

3  and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange

4  Act.

## PRAYER FOR RELIEF

6        WHEREFORE, plaintiffs pray for judgment as follows:

7        A.     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal

8  Rules of Civil Procedure;

9        B.     Awarding plaintiffs and the members of the Class damages and interest;

10        C.     Awarding plaintiffs reasonable costs, including attorneys' fees; and

11        D.     Awarding such equitable/injunctive or other relief as the Court may deem just and

12  proper.

## JURY TRIAL DEMAND

14        Plaintiffs demand a trial by jury on all issues.

15  DATED:  April 24, 2009           COUGHLIN STOIA GELLER
                        RUDMAN & ROBBINS LLP

16                    SHAWN A. WILLIAMS
                  SHIRLEY H. HUANG

17                    JASON C. DAVIS

18

19                             s/ Shirley H. Huang
                        SHIRLEY H. HUANG

20

21                    100 Pine Street, Suite 2600
                  San Francisco, CA  94111

22                    Telephone:  415/288-4545
                  415/288-4534 (fax)

23                    Lead Counsel for Plaintiffs

24  S:\CasesSD\Cadence 08\CPT00058724_Consolidated.doc

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on April 24, 2009, I electronically filed the foregoing with the Clerk of

3

the Court using the CM/ECF system which will send notification of such filing to the e-mail

4

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6

participants indicated on the attached Manual Notice List.

7

I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on April 24, 2009.

9

10

  s/ Shirley H. Huang

SHIRLEY H. HUANG

11

12

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP

100 Pine Street, 26th Floor

13

San Francisco, CA  94111

Telephone:  415/288-4545

14

415/288-4534 (fax)

15

E-mail:shirleyh@csgrr.com

16

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 3:08-cv-04966-SC

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey A. Berens**
  jeff@dyerberens.com

- **Peter Arthur Binkow**
  info@glancylaw.com,pbinkow@glancylaw.com

- **Ethan D. Dettmer**
  edettmer@gibsondunn.com,psaunders@gibsondunn.com

- **Robert J. Dyer , III**
  bob@dyerberens.com

- **Lionel Z. Glancy**
  info@glancylaw.com

- **Michael M. Goldberg**
  info@glancylaw.com

- **Shirley H. Huang**
  shirleyh@csgrr.com,jdecena@csgrr.com,vcordial@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Matthew Paul Montgomery**
  mattm@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Blair Allen Nicholas**
  blairn@blbglaw.com,denab@blbglaw.com,kayem@blbglaw.com,kristinas@blbglaw.com

- **Brian O. O'Mara**
  bo'mara@csgrr.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Karen T. Rogers**
  krogers@milberg.com,schang@milberg.com,cchaffins@milberg.com

- **Jeff S. Westerman**
  jwesterman@milberg.com,schang@milberg.com,cchaffins@milberg.com

- **Shawn A. Williams**
  shawnw@csgrr.com,jdecena@csgrr.com,vcordial@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Catherine J. Kowalewski
Coughlin Stoia Geller Rudman & Robbins LLP
655 W Broadway #1900
San Diego, CA 92101
```