United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re CADENCE DESIGN SYSTEMS, INC. ) No.  C-08-4966 SC
SECURITIES LITIGATION                )
_____) ORDER GRANTING MOTION
                                     ) TO DISMISS
This Order Relates to:               )
                                     )
CASE NOS. 08-4966 SC, 08-5027 SC,    )
and 08-5273 SC                       )
_____)

I.    **INTRODUCTION**

     This is a dispute involving securities fraud allegedly
committed by Defendant Cadence Design Systems, Inc. ("Cadence").
The Consolidated Amended Complaint ("CAC") also names as
defendants Cadence's former CEO, Michael J. Fister ("Fister"),
Senior Vice President and CFO Kevin Palatnik ("Palatnik"), former
Executive Vice President and CAO William Porter ("Porter"), and
former Executive Vice President of Worldwide Field Operations,
Kevin Bushby ("Bushby;" collectively with other individuals,
"Individual Defendants," and with Cadence, "Defendants").  Docket
No. 39, ¶¶ 26-29.  Plaintiffs, including lead plaintiff Alaska
Electrical Pension Fund, are entities that purchased or acquired
Cadence's publically traded securities during a period when, they
allege, Cadence's share prices were fraudulently inflated.  See
CAC ¶ 24.

     This Court now considers a Motion to Dismiss ("Motion") filed
by Defendants.  Docket No. 43.  Plaintiffs have submitted an

United States District Court
For the Northern District of California

Opposition, Docket No. 45, and Defendants have submitted a Reply, Docket No. 47.  Having considered the papers of all parties, the Court GRANTS Defendants' Motion, and the CAC is DISMISSED WITHOUT PREJUDICE.

## II.  __BACKGROUND__

Plaintiffs allege that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and a regulation promulgated thereunder, Rule 10b-5, 17 C.F.R. § 240.10b-5.  CAC ¶¶ 176-82.  Plaintiffs claim that Defendants did this by improperly accounting for two of Cadence's major transactions that took place in the first half of 2008, by recognizing revenue in those quarters that Cadence had not yet earned, thereby overstating Cadence's earnings and inflating its stock prices.  See generally CAC.  It is undisputed that Cadence committed several accounting errors in the first and second quarters of 2008 ("1Q" and "2Q," respectively), which required it to restate its financial results for those quarters. See Mot. at 2.  Defendants maintain that Plaintiffs have failed to sufficiently plead that the errors were caused by fraud.  Id.

### A.  __An Overview of Cadence and its Accounting__

Cadence is a Delaware Corporation that develops electronic design automation software and hardware for electronics companies. CAC ¶ 25.  It is a publically traded company, traded on the NASDAQ.  Id.  Cadence's headquarters are located in San Jose, California, although it has additional offices around the world. See id. ¶¶ 25, 59(e), 67.

1    Since 2006, Cadence has been marketing its technology through
2    "EDA cards," which augment an internet-based delivery mechanism
3    for Cadence's software, and which allow its clients to utilize
4    Cadence's technology for periods of time that are determined on a
5    license-by-license basis.  Id. ¶ 36.  These cards are primarily
6    offered in connection with two different types of licenses: term
7    licenses and subscription licenses.[1]  Id. ¶ 36.  These two types
8    of licenses are different, both in terms of the scope of rights
9    that they allow the licensee, and in terms of accounting
10   recognition.  As described in Cadence's 10-K for the fiscal year
11   of 2007, a term license allows Cadence's customers to "[a]ccess
12   and use all software products delivered at the outset of an
13   arrangement throughout the entire term of the arrangement,
14   generally two to four years, with no rights to return."  Appendix
15   to CAC, Docket No. 40, Ex. 6 ("2007 10-K") at 30.  In other words,
16   a term license allows a customer to use a defined set of software.
17   See id.  Subscription licenses, on the other hand, are more open
18   ended, and allow both the "access and use [of] all software
19   products delivered at the outset of an arrangement," and the
20   additional right to "[u]se unspecified additional software
21   products that become commercially available during the term of the
22   arrangement."  Id.

23   The accounting treatment for term and subscription licenses
24   differs dramatically in terms of when revenue is supposed to be
25   recognized, according to both Generally Accepted Accounting

26   _____

27   [1] Cadence also offers "perpetual licenses," but these licenses
     are not material to this suit.  See CAC ¶ 36.

28                                    3

United States District Court
For the Northern District of California

Principles ("GAAP") and Cadence's internal accounting policies
(which purport to follow GAAP). Id. at 29-30. For a term
license, revenue "is recognized upon the later of the effective
date of the arrangement or delivery of the software product." Id.
at 30. That is, a term license can give Cadence the ability to
recognize revenue from the license right away, or at least within
the quarter that the license was entered into. Revenue from a
subscription license, on the other hand, must be recognized
ratably over the entire term of the license. Id. As a rough
hypothetical: If Cadence were to enter into one subscription
license and one term license, each lasting for two years and each
for $8 million, Cadence could immediately recognize an $8 million
revenue for the term license. However, it would only be able to
recognize $1 million of revenue per quarter for the subscription
license. The party to the subscription license would also be
allowed access to future technology made available over the two-
year period, while the party to the term license would be more
restricted.

Needless to say, the determination of whether a large license
constitutes a term or subscription license may have substantial
effects on the revenue that Cadence recognizes over a given
quarter. The core of this suit is the accounting treatment of two
transactions. Cadence has acknowledged that two licenses were
incorrectly treated as term licenses even though they were in fact
subscription licenses. One error occurred in the first quarter of
2008, and another error occurred in the second quarter of 2008.

4

**United States District Court**
For the Northern District of California

B.   **The First Quarter of 2008**

Plaintiffs trace the chain of events that led to both of the accounting errors back to the third quarter of 2007.  According to Plaintiffs, this is when Cadence began pulling revenue forward by "shift[ing] its licensing model from subscription to term licenses to permit Cadence to immediately recognize a substantial portion of its licensing revenue up front, rather than ratably."  Opp'n at 3; CAC ¶ 60.  The "shift" involved persuading customers to enter into term, rather than subscription, licenses when negotiating new or renewed licensing contracts.  CAC ¶ 60(d).  This sometimes entailed concessions that further depleted Cadence's future maintenance or service revenue streams.  Id.  However, it allowed Cadence to recognize revenue immediately, thereby boosting earnings in the short term.  According to Plaintiffs, this created a "revenue bubble," since Cadence had a limited client pool and could not enter into new contracts indefinitely; this strategy therefore traded long-term income stability for short-term gain. Id. ¶ 61.  Plaintiffs contend that Cadence began to feel the negative effects of the revenue bubble during 1Q of 2008, when it recognized that it would not be able to make its revenue guidance for 4Q of 2007, and lowered its guidance for 2008.  Id. ¶¶ 6, 37. Cadence stock fell by 33% after it announced these results, and several analysts expressed pessimism regarding the company.  Id. at 38-40.

During 1Q of 2008, Cadence entered into a $24.8 million licensing agreement with an unspecified customer (the "1Q agreement").  Plaintiffs believe, based on the restated financial

5

reports and several confidential witnesses from Cadence, that the

contract was most likely entered into with a Japanese company,

possibly Fujitsu. Id. ¶ 59.[2]   Cadence accounted for this

transaction as it would a term license, i.e., by recognizing all

$24.8 million of the revenue in 1Q of 2008, rather than ratably

over the term of the agreement. Id. ¶ 55.  However, the license

was actually entered into in contemplation of another software

arrangement that was not finalized until 3Q of 2008 (the "3Q

agreement"). Id. ¶¶ 56, 116; Appendix to CAC, Ex. 39 ("Dec. 10

Press Release") at 10.[3]  As Cadence would later conclude:

> [T]he term license arrangement executed during the
> first quarter and the subscription license
> arrangement executed during the third quarter
> collectively represented a multiple element
> arrangement. Because the subscription arrangement
> provides the customer with the right to use
> unspecified additional software products that
> become commercially available during the term of
> the arrangement, Cadence determined that the
> revenue relating to this multiple element
> arrangement should be recognized during the term of
> the arrangement, beginning in the fourth quarter of
> 2008.

Dec. 10 Press Release at 10.

Plaintiffs also allege that the agreement contemplated

certain "incubation technology," which had not yet been released

in 1Q. CAC ¶ 55.  Contemplation of rights to a future technology

---

[2] Plaintiffs point out that when the financial report for 1Q
of 2008 was restated, the reported revenue for Japan was most
strongly affected. CAC ¶ 59.  However, Plaintiffs apparently
remain uncertain as to the identity of the customer, reciting that
a confidential witness "states that Fujitsu was likely the customer
. . . ." Id. at 27 n.6.

[3] Page numbers for press releases are used as they appear on
the Exhibits.

United States District Court
For the Northern District of California

further suggests that the license was more properly classified as a subscription, rather than term, license.

Plaintiffs contend that this misclassification was deliberate, and that Individual Defendants knew that the 1Q agreement should have been classified as a subscription license. Id. ¶ 56. Plaintiffs point out that, but for this error, Cadence would not have met its revenue projections for the 1Q. Id. Management recognized that this was a large and important transaction for the company; indeed, Porter reflected during a conference call, before the error was revealed, that "one customer accounted for approximately 11% of total revenue." Id.; Appendix to CAC, Ex. 10 ("1Q Conf. Call") at 4. Plaintiffs contend that this was the largest deal of 1Q. CAC ¶ 57.[4]

This first error led to many of the statements that Plaintiffs now claim were false and misleading. For example, on April 23, 2008, Cadence issued a press release stating that it had $287 million in revenue, and only suffered a $0.07 per share loss during 1Q. Id. ¶ 42; Appendix to CAC, Ex. 9. On that same day, Fister and Porter hosted a conference call in which they repeated the erroneous financial results. CAC ¶ 45; Appendix to CAC, Ex. 10. Two days later, Cadence filed its 10-Q for 1Q, which again repeated the results. CAC ¶ 51; Appendix to CAC, Ex. 14

---

[4] Although Plaintiffs repeat this several times, there is no indication that this would have been the largest deal of 1Q had it been treated correctly. In its restated 10-Q for the 1Q of 2008, after the error was revealed, Cadence recognized that "no one customer accounted for 10% or more of total revenue during the three months ended March 29, 2008." Appendix to CAC, Ex. 43 ("1Q Conf. Call") at 18.

("1Q 10-Q").  All of the statements were false, because the revenue for the 1Q agreement should not have been recognized at that time.

   **C.   <u>The Second Quarter of 2008</u>**

   In 2Q of 2008, Cadence made a similar error, this time with respect to a $12 million transaction (the "2Q agreement").  CAC ¶¶ 93, 135-39.  Plaintiffs do not identify any details regarding this transaction, or regarding the identity of the customer.  However, Cadence later stated that the transaction involved a customer who was simultaneously cancelling a subscription license and executing a term license arrangement and hardware arrangement.  Dec. 10 Press Release at 11.  Cadence later:

> determined that, despite the cancellation of the subscription arrangement, the customer did not intend to substantively cancel its right to access future new technology because at the time the subscription license was cancelled the customer intended to reestablish its right to access future new technology at a later time.  Accordingly, . . . $12.0 million of revenue originally recognized in the second quarter of 2008 relating to the term license and hardware arrangement should be recognized ratably over the term of the arrangement, consistent with the way in which revenue was recognized on the cancelled subscription arrangement.

<u>Id.</u>

   Plaintiffs claim that this error was the result of an intent to mislead the market and inflate Cadence's revenues.  CAC ¶ 94. Once again, Plaintiffs point out that, but for the error, Cadence would have missed its projections for 2Q.  <u>Id.</u> ¶ 95.  Plaintiffs also contend that Defendants were motivated to create a "rosy picture," to enhance its ability to take on debt that it needed to

acquire a competitor, Mentor Graphics.  <u>Id.</u> ¶ 71.

This led to a number of allegedly fraudulent and misleading statements, similar to those identified by Plaintiffs with respect to 1Q.  For example, Cadence repeatedly and incorrectly stated financial results that incorporated the improperly recognized revenue -- in press releases, in its 10-Q for 2Q, and in conference calls.  <u>See id.</u> ¶¶ 75-76, 91; Appendix to CAC, Ex. 19; Appendix to CAC, Ex. 20; Appendix to CAC, Ex. 24 ("2Q 10-Q").[5] Also in 2Q, Cadence again lowered its guidance for 2008 from $1.8 million to $1.4 million.  CAC ¶¶ 74-77.

### D.  <u>Subsequent Events and Disclosures</u>

On October 15, 2008, Cadence announced that Fister was resigning as President, CEO, and director of Cadence, that Bushby was resigning as Executive Vice President of Worldwide Field Operations, and that Porter was resigning as Executive Vice President and CAO.  <u>Id.</u> ¶ 105; Appendix to CAC, Ex. 31 ("Oct. 15 Press Release") at 97-98.  As Plaintiffs noted, "[n]one of them appeared to be at retirement age, as Fister was 53, Bushy 52, and Porter 53, in 2008.  At the time of the termination, none of them announced any other personal or professional opportunities that they were going to pursue."  CAC ¶ 108.  The resignation of six executive officers (including three non-parties to this suit) was also reported in the announcement.  Press Release at 97-98.

One week later, on October 22, 2008, Cadence issued another

---

[5] Plaintiffs note that, in 2Q, Cadence also improperly recorded $18 million in cash from the accounts receivable sold from the improperly recognized 1Q agreement.  CAC ¶ 101.

United States District Court
For the Northern District of California

press release, this time announcing that it had discovered the

error regarding the 1Q agreement, and that it was initiating an

accounting review and postponing its 3Q financial results.

Appendix to CAC, Ex. 32 ("Oct. 22 Press Release") at 89.  The

announcement read in part as follows:

> Cadence initiated the review after preliminarily
> determining during its regular review of its third
> quarter results that approximately $24 million of
> revenue relating to these contracts was recognized
> during the first quarter of 2008, but should have
> been recognized ratably over the duration of the
> contracts commencing in the second quarter of 2008.
> Cadence expects to restate its financial statements
> for the first quarter of 2008 and the first half of
> 2008 to correct the revenue recognition with
> respect to these contracts.

Id.

The restatements were eventually released on December 10,

2008.  See Dec. 10 Press Release.  In addition to exploring the

impact of the error with respect to the 1Q agreement, Cadence

claimed that the review uncovered the error with respect to the 2Q

agreement.  Id. at 11.

Cadence suggested that the errors were, at least in part, the

result of a communication and control failure.  It announced that

"the Company has identified a material weakness relating to the

insufficient design and ineffective operation of certain internal

controls over the recognition of revenue from term license

agreements."  Id.  In its first restated 10-Q, Cadence describes

the material weakness in more detail:

> The material weakness relates to both the
> insufficient design and ineffective operation of
> certain internal controls over the recognition of
> revenue from term license agreements. Specifically,
> the material weakness is comprised of the following

United States District Court
For the Northern District of California

10

components:

- Controls were not adequately designed to facilitate communication of all information pertinent to the negotiations with customers between the sales and sales finance organizations and the personnel responsible for determining the appropriate recognition of the revenue related to such license agreements. As a result, controls relative to the sales and sales finance organizations reviewing, analyzing and evaluating available information pertinent to revenue recognition for term license agreements were not operating effectively.

- Controls were not adequately designed to detect or prevent the inappropriate issuance of evaluation licenses to customers for incubation technology. Incubation technology is not commercially available for release.

1Q 10-Q at 39.  The 10-Q claims that, because of these weaknesses, management did not detect that the revenue from the 1Q agreement was improperly recognized.  Id.

Cadence also announced several remedial measures that it would undertake to correct the deficiencies:

- Individuals who are part of the sales process will be required to take enhanced comprehensive, ongoing compliance training specific to our policies and procedures;

- We will require additional analysis, communication, and accompanying documentation from our sales and sales finance organizations relating to recognition of revenue for term license agreements, with particular emphasis on transactions when factors are present that increase the risk that the transaction could be deemed to be a subset of a multiple element arrangement;

- We will enhance our existing processes and controls with respect to evaluation licenses that are applied to all technology being evaluated by customers; and

11

**United States District Court**
For the Northern District of California

1    • We will make certain personnel changes and
2      increase supervision and training to effectuate
       the changes discussed above.

3    <u>Id.</u> at 40.

4       After additional adjustments, Plaintiffs calculate that

5    Cadence's product revenue was overstated by 14.2% for 1Q, and by

6    10.4% for 2Q.  CAC ¶¶ 58, 125.  Immediately following the

7    announcements, Cadence's stock dropped by 22%.  CAC ¶¶ 21.

8

9    III. **<u>Legal Standard</u>**

10      A.   **<u>Motion to Dismiss Under 12(b)(6)</u>**

11      In deciding a motion to dismiss under Rule 12(b)(6) of the

12   Federal Rules of Civil Procedure, a court must "accept the

13   plaintiffs' allegations as true and construe them in the light

14   most favorable to plaintiffs." <u>Gompper v. VISX, Inc.</u>, 298 F.3d

15   893, 895 (9th Cir. 2002).  The court's review is generally

16   "limited to the complaint, materials incorporated into the

17   complaint by reference, and matters of which the court may take

18   judicial notice." <u>Metzler Inv. GMBH v. Corinthian Colleges, Inc.</u>,

19   540 F.3d 1049, 1061 (9th Cir. 2008) (citing <u>Tellabs, Inc. v. Makor</u>

20   <u>Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007)).

21      B.   **<u>Pleading Standard Under the Private Securities</u>**
22           **<u>Litigation Reform Act of 1995 ("PSLRA")</u>**

23      Plaintiffs here seek to state a claim under Section 10(b) of

24   the Exchange Act. <u>Id.</u> ¶¶ 176-80.  This statute makes it unlawful

25   for "any person . . . [t]o use or employ, in connection with the

26   purchase or sale of any security registered on a national

27   securities exchange . . . any manipulative or deceptive device or

28                                 12

**United States District Court**
For the Northern District of California

contrivance in contravention of such rules and regulations as the
[Securities and Exchange] Commission may prescribe . . . ." 15
U.S.C. § 78j(b).  One such rule prescribed by the Commission is
Rule 10b-5, which states that "[i]t shall be unlawful for any
person . . . [t]o engage in any act, practice, or course of
business which operates or would operate as a fraud or deceit upon
any person, in connection with the purchase or sale of any
security." 17 C.F.R. § 240.10b-5(c).  Plaintiffs must plead five
elements to establish a violation of Rule 10b-5.  Plaintiffs must
demonstrate "(1) a material misrepresentation or omission of fact,
(2) scienter, (3) a connection with the purchase or sale of a
security, (4) transaction and loss causation, and (5) economic
loss." In re Daou Sys., 411 F.3d 1006, 1014 (9th Cir. 2005).
Plaintiffs' pleading with respect to these elements, and scienter
in particular, "must satisfy the dual pleading requirements of
Federal Rule of Civil Procedure 9(b) and the PSLRA." Zucco
Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir.
2009).

    To allege fraud under Rule 9(b) of the Federal Rules of Civil
Procedure, "a party must state with particularity the
circumstances constituting fraud or mistake.  Malice, intent,
knowledge, and other conditions of a person's mind may be alleged
generally."  However, the PSLRA imposes a more exacting standard
with respect to pleading falsity and scienter in the context of
securities fraud. Zucco Partners, 552 F.3d at 990-91.  In
particular, in order to plead scienter, "the complaint shall, with
respect to each act or omission alleged to violate this title,

state with particularity facts giving rise to a strong inference
that the defendant acted with the required state of mind."  15
U.S.C. § 78u-4(b)(2).  The "required state of mind" for
establishing securities fraud is the knowing, intentional, or
deliberately reckless disclosure of false or misleading
statements.  See Daou, 411 F.3d at 1014-15.

The "strong inference" standard does not require that the
"inference that the defendant acted with scienter . . . be
irrefutable, i.e., of the 'smoking-gun' genre, or even the most
plausible of competing inferences . . . ." Tellabs, 551 U.S. at
324 (citation and quotation marks omitted).  Nevertheless, "to
determine whether a complaint's scienter allegations can survive
threshold inspection for sufficiency, a court governed by [the
PSLRA] must engage in a comparative evaluation; it must consider,
not only inferences urged by the plaintiff . . . but also
competing inferences rationally drawn from the facts alleged."
Id. at 314.  The plaintiff must plead facts such that "a
reasonable person would deem the inference of scienter cogent and
at least as compelling as any opposing inference one could draw
from the facts alleged." Id. at 324.  The Ninth Circuit has set
out a "dual inquiry" to determine whether a "strong inference"
exists: First, "determine whether any of the plaintiff's
allegations, standing alone, are sufficient to create a strong
inference of scienter; second, if no individual allegations are
sufficient, . . . conduct a 'holistic' review of the same
allegations to determine whether the insufficient allegations
combine to create a strong inference of intentional or deliberate

United States District Court
For the Northern District of California

1    recklessness." <u>Zucco Partners</u>, 552 F.3d at 992.

2

3    **IV.   DISCUSSION**

4         Defendants' Motion focuses primarily on whether Plaintiffs

5    have sufficiently plead scienter.  Defendants do not here

6    challenge the sufficiency of the CAC with respect to the

7    connection between the false statements and the purchase of

8    securities, loss causation, or damages.  Plaintiffs have plead a

9    number of facts that they hope can support a strong inference of

10   scienter.  The Court will address each of these facts separately

11   below, and then assess these facts holistically.[6]

12        **A.   <u>Violations of GAAP and Internal Accounting Policies</u>**

13        Plaintiffs point to the fact that Cadence violated GAAP, as

14   well as its own policies, to support an inference of scienter.

15   Opp'n at 13-14, 16-17.  Cadence has admittedly done both of these

16   things, as evidenced by the financial restatements.  However, the

17   Ninth Circuit has repeatedly held that "the mere publication of

18   inaccurate accounting figures, or a failure to follow GAAP,

19   without more, does not establish scienter." <u>Provenz v. Miller</u>,

20   102 F.3d 1478, 1490 (9th Cir. 1996) (citation omitted).  Instead,

21   "plaintiffs must allege facts showing that . . . the defendants

22   knew specific facts at the time that rendered their accounting

23   determinations fraudulent." <u>Rudolph v. UTStarcom</u>, 560 F. Supp. 2d

24   880, 889 (N.D. Cal. 2008).

25   _____

26        [6] Because of the Court's conclusion with respect to scienter,
     it does not reach Defendants' limited argument with regard to
27   falsity.  <u>See</u> Mot. at 24.

28                                    15

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    In order to establish scienter in this particular case,

2  Plaintiffs must plead facts that supports an inference that

3  Defendants were actually aware that (or reckless with respect to

4  whether) the accounting was incorrect.[7]  In particular, Plaintiffs

5  must plead facts that suggests that Defendants were aware that it

6  was inappropriate to classify the 1Q and 2Q agreements as term

7  licenses.  Defendants would have known this only if they were

8  aware of certain details of the transactions.  With respect to the

9  1Q agreement, there must be a strong inference that Defendants

10  knew (or at least suspected) that the 1Q agreement was entered

11  into in contemplation of a future subscription license, or that it

12  involved a technology that was not yet released for commercial

13  use.  With respect to the 2Q agreement, Plaintiffs must allege

14  facts that suggest that Defendants knew (or at least suspected)

15  that the licensee intended to retain certain rights to use future

16  technology, which it had enjoyed under a subscription licenses

17  that it simultaneously cancelled.  Plaintiffs' allegations must,

18  when taken as a whole, give rise to a "strong inference" that

19  Defendants were aware of these details -- otherwise, Defendants

20  would have no way of knowing that the licenses were improperly

21

22

23 ────────────

24    [7] With respect to the scienter of Cadence itself, although the
Ninth Circuit has apparently left room for Plaintiffs to plead

25  "collective scienter" in some narrow circumstances, it has strongly
suggested that Plaintiffs must state facts that support a strong

26  inference that "at least *some* corporate official knew of the
falsity . . . ."  See Glazer Capital Mgmt., LP v. Magistri, 549

27  F.3d 736, 744-45 (9th Cir. 2008) (citation omitted) (emphasis in
original).

28

1  classified.[8]

2      B.  **Confidential Witness Accounts**

3      The CAC is liberally peppered with the claims of, and

4  asserted "corroboration" by, seven confidential witnesses ("CWs").

5  The Ninth Circuit recently recounted the standards for evaluating

6  complaints that rely upon CWs under the PSLRA.  "First, the

7  confidential witnesses whose statements are introduced to

8  establish scienter must be described with sufficient particularity

9  to establish their reliability and personal knowledge.  Second,

10 those statements which are reported by confidential witnesses with

11 sufficient reliability and personal knowledge must themselves be

12 indicative of scienter."  Zucco Partners, 552 F.3d at 995.

13 Conclusory allegations that a defendant "must have known" about

14 particular wrongdoing are, standing alone, generally insufficient.

15 See Zucco Partners, 552 F.3d at 998.

16     The CAC provides a detailed background, history, and the

17 title for each of the CWs.  CAC ¶ 45.  For example, CW1 is a

18 former Sales Administrator for Cadence, who held that position for

19 fifteen years, and received and entered orders from Cadence's

20 Sales/Finance organization.  Id. ¶ 45(a).  CW2 is a former Vice

21 President of Finance, who served for eight years, and who reported

22 to a Controller that reported to Palatnik.  Id. ¶ 45(a).  The

23 Court finds that the description of each CW is adequate to support

24

25     [8] Conceivably, one might also infer knowledge or recklessness
   if Plaintiffs had pled that Defendants had access to more
26 generalized signs of misconduct surrounding the transactions, such
   as warnings from accounts or disagreements among employees.
27 Plaintiffs plead no such facts, however.

28

**United States District Court**
For the Northern District of California

the generalized accounts that they provide.

The next question is whether the CW accounts are actually indicative of scienter. No CW resembles a "whistle blower," or alleges that anyone within Cadence instructed them to do anything wrong. At most, several CWs suggest that several of the Individual Defendants "must have known" about the transactions generally, or must have approved of the transaction or the accounting for them at some level. Id. ¶ 59. To support this, the CWs describe the general accounting or approval practices within Cadence, as well as the various roles of the Individual Defendants. See, e.g., CAC ¶ 59.

No CW specifically ties any Defendant to the accounting determinations at issue. Several CWs suggest that the revenue recognition determinations would have been made in the San Jose office, and according to CW3, it was the Revenue Accounting group in particular who "ensured the revenue was documented as ratable or upfront." Id. ¶ 59(b). This group was overseen by a Vice President of Finance who reported to Palatnik. Id. CW4 states that, "given the size of the contracts" in question, "defendants had knowledge of them by at least approving the deals." Id. ¶ 59(c). CW2 suggests that deals of this magnitude "would definitely" have been reviewed by Porter as well as Palatnik. Id. ¶ 59(a). CW7 states that "Porter or Palatnik 'signed off on big stuff' in terms of revenue recognition." Id. ¶ 59(e). There is no indication of what "signing off" or approval within Cadence "would have" entailed, or what level of detail the Individual Defendants would have likely been exposed to.

18

**United States District Court**

For the Northern District of California

Similarly, CW1 and CW7 describe Cadence's forecasting bookings and financial reporting systems, which they claim the senior executives had access to.  Id. ¶ 62.  However, there is no description as to the level of detail in these systems (except to state vaguely that "Cadence had always been 'very meticulous' about deals coming in"), or whether the key facts that rendered Cadence's accounting inaccurate were actually included in these reports, or even whether these facts "would have" normally been reflected in the systems.  Id. ¶ 62(a).  None of the CWs suggest that these systems reflected that either of the licenses at issue were or should have been subscription licenses at any time.  The mere fact that these systems would have reflected that a $24.8 million deal was in the pipeline, and that it involved either a term or subscription license, would not have raised a red flag for Defendants.

Finally, several CWs claim that various Individual Defendants often worked closely with, or "put [their] time in with customers."  See id. ¶ 65.  For example, CW2 states that Fister was commonly involved in deal negotiations with customers and that Bushby was definitely involved in helping negotiate deals with customers.  Id. ¶ 59(a).  These statements do not link any Defendant with any particular customer or deal, however.  The closest that any CW comes is to suggest that "Fister and Porter regularly met with Japanese Customers."  Id. ¶ 65(a).  These statements do not offer any more than a basis for speculating that Individual Defendants may have worked, at some level, on the deals that involved the licenses that were incorrectly classified.

In summary, the CW reports do not provide any concrete allegations that Individual Defendants actually knew about the accounting errors, or that they were familiar with the key details of the 1Q or 2Q agreements, such that they could have identified them as subscription contracts.  Their value to Plaintiffs is diminished by this lack of detail -- it is difficult to discern exactly how familiar any Individual Defendant "must have been" with the key transactions, particularly given the fact that Individual Defendants may have only been connected to the 1Q and 2Q agreements through a long chain that "involved multiple personnel and levels of review."  CAC ¶ 98.[9]  Standing alone, these accounts cannot support a strong inference of scienter.  However, the Court will consider these accounts as part of its holistic review of the entire CAC, in Part IV.F, _infra_.  See _Tellabs_, 551 U.S. at 322 ("[C]ourts must consider the complaint in its entirety . . . .").

C.   **The Size and Importance of the 1Q and 2Q Agreements, and Individual Defendants' Position Within Cadence**

Plaintiffs argue that the restatements of revenue may, in and of themselves, provide evidence of scienter.  Opp'n at 14-16. They point to the size of the transactions in question -- the largest in 1Q and among the largest in 2Q -- as well as the

---

[9] To illustrate, according to CW2, a contract with a Japanese customer would first be reviewed by the CFO equivalent in Japan. CAC ¶ 59(a).  The company also retained translators that allowed the San Jose office to play an unspecified role, but which apparently were necessary to facilitate accounting for the contract.  _Id._  Then the contracts would be reviewed by accounting personnel in San Jose.  _Id._  After this step, the "contracts and associated accounting" would finally be reviewed by Palatnik.  _Id._

**United States District Court**
For the Northern District of California

Individual Defendants' positions within the company, and their hands-on approach to dealing with clients. Id. The Ninth Circuit has previously rejected complaints that allege that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers." Zucco Partners, 552 F.3d at 1000 (quoting In re Read-Rite Corp. Sec. Litig., 335 F.3d 843, 848 (9th Cir. 2003)). This argument is sometimes referred to as the "core operations inference." See South Ferry LP v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008). On its own, this inference generally does not suffice to state a claim under the PSLRA, however the Ninth Circuit has spelled out two exceptions, which Plaintiffs argue are both applicable to these facts. Opp'n at 14.

First, the inference may be combined with allegations regarding management's role in the company that are "particular and suggest that the defendants had actual access to the disputed information . . . ." Zucco Partners, 552 F.3d at 1000 (quotation marks and citation omitted). Plaintiffs recite several comments from CWs and Individual Defendants alike to suggest that Individual Defendants "spent time" with customers. See, e.g., CAC ¶ 65. They also describe the general roles that Individual Defendants had within the approval process, largely through CW accounts. See Part IV.B, supra. The Court has already discussed this information, and it concludes that, in and of itself, Plaintiffs have insufficiently described roles that would give rise to a strong inference that Defendants possessed the relevant

United States District Court
For the Northern District of California

facts.  None of these statements suggest that any defendant was deeply involved in the details of any particular transaction, or was involved with the customers in question, such that they were likely to know first hand the facts that were key to categorizing the 1Q and 2Q agreements.

The second exception that may allow plaintiffs to rely on the "core operations inference" allows an inference of scienter "where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." Id. at 1001.  This is not such a case.  This is not a situation in which key customers threatened to halt or discontinue key contracts, such that the management must have been put on notice.  C.f. Berson v. Applied Signal Tech., Inc., 527 F.3d 982 (9th Cir. 2008) (finding it "absurd" to suggest that management was unaware of major government stop-work orders, where company relied exclusively on government for revenues).  Rather, this is a case in which the details of licensing negotiations, and the relationship of license agreements with other arrangements, affected the way that the agreements should have been accounted for.  As the Ninth Circuit stated in Zucco Partners, the "misrepresentations are largely definitional, [so] the falsity of the original representations would not be immediately obvious to corporate management" unless they were familiar with the details of the underlying agreements.  552 F.3d at 1001 (rejecting core operations inference and contrasting Berson).  Consequently, the Court concludes that the core operations inference cannot apply here, although the Court shall consider the size of the

misstatements and the fact of the restatements in the context of the entire CAC.

####     D.    **Defendants' Motive to Manipulate the Accounting**

Plaintiffs point out that Defendants had a strong incentive to meet Wall Street expectations and Cadence's own guidance. Opp'n at 18-19.  As previously noted, Cadence would have missed its own guidance in 1Q and 2Q if it had not been for the accounting errors.  See Part II.B-C, supra.  Plaintiffs also claim that Cadence needed to present a "rosy picture" in order to acquire the debt necessary to consummate the acquisition of Mentor Graphics.  CAC ¶ 69-71.

Although the CAC here articulates a coherent explanation for why Defendants may have committed fraud, this is not enough to state a claim for securities fraud under the PSLRA. "[A]llegations of a motive to present better financial statements to secure credit or to engage in similar business activities are insufficient to establish a strong inference of scienter."  In re Calpine Corp. Secs. Litig., 288 F. Supp. 2d 1054, 1087 (N.D. Cal. 2003) (citing Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1038 (9th Cir. 2002); In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1097 (9th Cir. 2002)).  These facts certainly make the inference of scienter more compelling than it otherwise would have been, but they do not suffice to make a strong showing of scienter.  See In re Silicon Graphics Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999)("[A]lthough facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a strong

23

**United States District Court**
For the Northern District of California

1    inference of deliberate recklessness.").

2         **E.   The Resignation of Executive Officers**

3         Plaintiffs claim that the resignation of six executive

4    officers in October of 2008, which came one week prior to

5    Cadence's announcement that it would need to restate its financial

6    statements, strengthens the inference of scienter.  Opp'n at 22.

7    "Where a resignation occurs slightly before or after the defendant

8    corporation issues a restatement, a plaintiff must plead facts

9    refuting the reasonable assumption that the resignation occurred

10   as a result of [the] restatement's issuance itself in order for a

11   resignation to be strongly indicative of scienter.  Zucco

12   Partners, 552 F.3d at 1002 (citing In re U.S. Aggregates, Inc.

13   Sec. Litig., 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002)).  In

14   other words, "a plaintiff must allege sufficient information to

15   differentiate between a suspicious change in personnel and a

16   benign one."  Id.

17        Here, Plaintiffs cite a number of facts suggesting that the

18   three Individual Defendants who resigned were forced out.  For

19   example, none of the three were at retirement age, and none

20   announced post-resignation plans.  CAC ¶ 108.  However, as

21   Plaintiffs have amply demonstrated, Cadence's performance leading

22   up to the restatement had not been stellar, and immediately after

23   the resignations, an analyst commented that the "leadership paid

24   the price for its poor performance this year."  Appendix to CAC,

25   Ex. 33.  It is therefore quite plausible to infer that the

26   resignations, however forced, were the result of the company's

27   poor performance and management.  This could have been accentuated

28

24

by the discovery of an innocent or negligent accounting failure,
just as it could have followed the exposure of fraud.  The Court
finds that the resignations were not, in and of themselves,
strongly indicative of scienter.

**F.   "Holistic" Review**

When taken collectively, Plaintiffs' allegations do not raise
a strong inference that Defendants intentionally falsified
Cadence's financial reports.  The fact that the 1Q and 2Q
agreements were quite large does lend credence to Plaintiffs'
argument, as one would expect Cadence personnel to be more
thorough in such situations.  Plaintiffs have also established a
coherent motive to commit fraud.  Finally, Plaintiffs have
certainly created a strong inference that Defendants were aware of
the 1Q and 2Q agreements generally.  However, the inference of
scienter is fatally undermined by Plaintiffs' inability to connect
any of the Individual Defendants, or any particular person at
Cadence, with the 1Q and 2Q agreements, except in remote or
speculative ways that may or may not have entailed knowledge of
the specific facts that rendered the accounting classifications
incorrect.  This deficiency leaves a gap, for which Plaintiffs
provide little more than motive and opportunity to bridge.  There
is little basis to infer that any Defendant had knowledge of the
facts that rendered the recognition of revenue improper (unless
one were to presume that the Defendants had knowledge of all of
the details that surround all of the company's major agreements).

The Court finds that the inference of a specific intent to
defraud the public remains weaker than the inference that, as

25

United States District Court

For the Northern District of California

Cadence claimed, there was simply a control deficiency within the troubled Company, which was not discovered until the accountants started reviewing the 3Q agreement that, as it turned out, was connected with the 1Q agreement.  Plaintiffs' first cause of action, for violation of Sections 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, is therefore DISMISSED.[10]

**G.    Control Liability**

Plaintiffs also bring a claim against Individual Defendants for control liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Under this section, "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates a primary violation of federal securities law and that the defendant exercised actual power or control over the primary violator."  Zucco Partners, 552 F.3d at 990 (citation and quotation marks omitted).

"Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b)."  Id. (citing In re Verifone Sec. Litig., 11 F.3d 865, 872 (9th Cir. 1993).  Plaintiffs have failed to plead a primary violation of securities laws or regulations.  Plaintiffs' second cause of action for violation of Section 20(a) of the Exchange

---

[10] Because the Court resolves this Motion on the basis of scienter, it does not reach Defendants' Request for Judicial Notice, Docket No. 43 Ex. 2.  This request relates to Cadence's share price over the proposed class period, and the Court finds these facts to be unrelated to the question of scienter.

26

1   Act, 15 U.S.C. §§ 78t(a), is therefore DISMISSED.

2

3   **V.**   **CONCLUSION**

4        Because Plaintiffs have failed to allege facts that give rise

5   to a strong inference that Defendants intentionally falsified

6   Cadence's financial data, the Consolidated Amended Complaint is

7   hereby DISMISSED WITHOUT PREJUDICE.  Plaintiffs may file a Second

8   Amendment Complaint within thirty (30) days of this Order.

9

10        IT IS SO ORDERED.

11

12        September 11, 2009

13                                    _____

14                                    UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                     27

**United States District Court**
For the Northern District of California