1   COUGHLIN STOIA GELLER
       RUDMAN & ROBBINS LLP
2   SHAWN A. WILLIAMS (213113)
    SHIRLEY H. HUANG (206854)
3   JASON C. DAVIS (253370)
    100 Pine Street, Suite 2600
4   San Francisco, CA  94111
    Telephone:  415/288-4545
5   415/288-4534 (fax)
    shawnw@csgrr.com
6   shirleyh@csgrr.com
    jasond@csgrr.com
7
    Lead Counsel for Plaintiffs
8
                    UNITED STATES DISTRICT COURT
9
                    NORTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  In re CADENCE DESIGN SYSTEMS, INC. )<br>SECURITIES LITIGATION )<br> ) | No. C-08-4966 SC<br><br>CLASS ACTION |
| ─────────────────────────────── )<br>12 | |
| This Document Relates To: )<br>13  )<br>       CASE NOS. 08-4966 SC, 08-5027 SC, )<br>14     and 08-5273 SC )<br> ) | PLAINTIFFS' FIRST AMENDED<br>COMPLAINT FOR VIOLATIONS OF THE<br>FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |
| ─────────────────────────────── )<br>15 | |
| 16  ALASKA ELECTRICAL PENSION FUND, )<br>Individually and on Behalf of All Others )<br>17  Similarly Situated, )<br> )<br>18                         Lead Plaintiff, )<br> )<br>              vs. )<br>19  )<br>CADENCE DESIGN SYSTEMS, INC., )<br>20  MICHAEL J. FISTER, KEVIN S. )<br>PALATNIK, WILLIAM PORTER and )<br>21  KEVIN BUSHBY, )<br> )<br>22                         Defendants. )<br>─────────────────────────────── ) | |

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

**Page**

3    INTRODUCTION AND OVERVIEW ......................................................................1

4    JURISDICTION AND VENUE .........................................................................13

5    THE PARTIES...................................................................................14

6    CONTROL PERSONS .............................................................................15

7    CONFIDENTIAL SOURCES ........................................................................17

8    DEFENDANTS' FRAUDULENT SCHEME AND FALSE AND MISLEADING
     STATEMENTS DURING THE CLASS PERIOD ........................................................19
9

10      The SEC Warned the Company that It Cannot Qualify that Its Internal Controls as
        "Sufficiently Effective"; Cadence and Its Lawyers Falsely Reassured the SEC that
        Its Disclosure Controls Are Effective ........................................................25
11

12      Defendants' Admissions and Objective Facts Demonstrated that Defendants
        Knew or Deliberately Disregarded that the 1Q08 Financial Statements Were False
        and Misleading................................................................................26
13

14      Confidential Witness Reports Provided Substantial Facts Demonstrating
        Defendants' Knowledge or Deliberate Recklessness ..........................................30

15      Cadence Attempted to Buy Out Mentor Graphics in Order to Conceal Its
        Bookings and Revenue Bubble................................................................42
16

17      Cadence Issued 2Q08 False Financial Results and Partial Disclosure of the
        Company's True Financial Condition Causing Stock Price Decline; The Company
        Continued to Conceal Improper Revenue Recognition and Shocks Investors with
18      Switch Back to 90% Ratable Model ..........................................................45

19      The Company Quickly Amended Employment Agreements with Porter, Fister,
        Bushby and Others to Clarify Their Indemnification Rights....................................54
20

21      Defendants Admitted Knowledge of Important Accounting Regulations
        Governing Multiple-Element Transactions and Their Participating in the
        Negotiations of Such Deals..................................................................55
22

23      As Cadence's Stock Price Steeply Declined, Cadence Walked Away from Mentor
        Graphics Hostile Takeover Bid Because It Likely Could Not Raise Capital ...................57

24      Cadence Abruptly Terminated Its Top Executive Officers, Including the CEO;
        But Still Failed to Disclose False Financials ...............................................58
25

26      Cadence Announced that It Will Restate 1Q08 and 2Q08 Financial Statements,
        Which Caused Its Stock Price Plummeted but Still Artificially Inflated.........................61

27      Cadence Restated Both 1Q08 and 2Q08 Totaling More than $36 Million in
        Product Revenue, and Admitted that the Accounting Irregularities Were Larger in
28      Scope than Previously Indicated ............................................................63

Page

Defendants Admitted Again that the Accounting Was Straightforward and They Knew How to Apply It ................................................................................................67

Cadence Scrambled to Find a New CEO but Eventually Appointed Longtime Director Lip-Bu Tan ...........................................................................................68

POST-CLASS PERIOD ADMISSIONS ........................................................................72

The Company's Recognition Practices Were Published and Uncomplicated ..................75

CADENCE'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD ...............77

Cadence's Restatement ...............................................................................77

Cadence Overstated Revenue ........................................................................79

The 1Q08 Restatement .................................................................................80

The 2Q08 Restatement .................................................................................81

Defendants' Internal Accounting Controls .......................................................83

Other GAAP Violations ................................................................................87

LOSS CAUSATION/ECONOMIC LOSS ........................................................................89

NO SAFE HARBOR .................................................................................................93

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ...........93

CLASS ACTION ALLEGATIONS ...............................................................................94

COUNT I ...............................................................................................................95

For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ..................................................................................................95

COUNT II ..............................................................................................................96

For Violation of Section 20(a) of the Exchange Act Against All Defendants ..................96

PRAYER FOR RELIEF .............................................................................................96

JURY TRIAL DEMAND ...........................................................................................96

**INTRODUCTION AND OVERVIEW**

1.       This is a securities class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of Cadence Design Systems, Inc.'s ("Cadence" or the "Company") publicly traded securities between April 23, 2008 and December 10, 2008, inclusive (the "Class Period"), who were damaged thereby (the "Class").  The claims asserted herein are brought against Cadence and four of its current or former officers and directors: Michael J. Fister ("Fister"), President, Chief Executive Officer ("CEO") and a director during the Class Period until his termination from Cadence on October 15, 2008; Kevin S. Palatnik ("Palatnik"), Senior Vice President and Chief Financial Officer ("CFO") during the Class Period; William Porter ("Porter"), CFO until April 23, 2008 and Executive Vice President and Chief Administrative Officer ("CAO") during the Class Period until his termination from Cadence on October 15, 2008; and Kevin Bushby ("Bushby"), Executive Vice President, Worldwide Field Operations until his termination from Cadence on October 15, 2008 (collectively, the "Individual Defendants").

2.       Cadence is a Delaware corporation which develops electronic design automation ("EDA") software and hardware for the design and verification of semiconductor chips and systems for electronics companies worldwide.  The Company was founded in 1987 and is headquartered in San Jose, California.  The Company is traded on the NASDAQ (National Association of Securities Dealers Automated Quotation System) market under the symbol CDNS.

3.       During the Class Period, defendants engaged in a fraudulent scheme and multiple violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") (17 C.F.R. §240.10b-5), by making false and misleading public statements concerning the Company's current and future financial condition, and quarterly financial results.

4.       Specifically, plaintiffs allege that during the Class Period, Cadence and the Individual Defendants devised and carried out a fraudulent scheme to misrepresent and conceal the Company's true financial condition by causing the Company to materially overstate 1Q08 and 2Q08 revenue and earnings results.  Cadence and the Individual Defendants issued false and misleading statements in

1  press releases, analyst conference calls and quarterly reports filed with the SEC regarding the

2  Company's financials.

3       5.   In 2006, Cadence piloted an EDA card, which was an internet-based delivery

4  mechanism for Cadence's software that enables its customers to draw down on technology

5  electronically.  The Company told investors that EDA cards provided more flexibility for customers

6  to draw down and use Cadence software more quickly and efficiently.  The EDA cards essentially

7  worked as a debit card – which allowed the customers to purchase items within the catalog at the

8  prices specified therein up to the amount of cash that had been loaded onto the card.  Usage of the

9  EDA cards also allowed the Company to enter into more "Term" licenses which allowed for the

10  recognition of revenue upfront, as opposed to Subscription licenses.  In 2007, the EDA cards were

11  part of Cadence's Product Revenue.  As defined in the Company's Form 10-K for FY07, "Product

12  revenues include all fees earned from granting licenses to use our software, and from sales and leases

13  of our hardware products, and exclude revenues derived from maintenance and services." Exhibit 6

14  at 2.[1]  Up to and through 2H07, the Company's Product Revenue breakdown was approximately

15  75% Subscription (also referred to as "ratable" revenue), and 25% Term (also referred to as

16  "upfront" revenue).

17       6.   In 3Q07, in order to disguise its declining revenue stream and support the Company's

18  purported financial outlook, defendants announced a shift in the Company's mix of revenue from a

19  historical mix of 75% Subscription and 25% Term to a 50/50 ratio. Defendants later bragged that

20  success of the Company's EDA cards, for example, gold cards (allowing for upfront revenue

21  recognition) and platinum cards (requiring ratable revenue recognition) gave customers maximum

22  flexibility and that was the reason the quarterly revenue mix had shifted from a historical mix of

23  75% Subscription and 25% Term, to a mix of 60% Subscription and 40% Term in 3Q07.

24       7.   The 3Q07 revenue model change, however, had two dramatic effects.  First, it

25  obscured the Company's real sales and market share trends.  Second, by converting or renewing

26

27  [1]     All exhibits are attached to the Appendix of Exhibits in Support of Plaintiffs' First Amended
   Complaint for Violations of the Federal Securities Laws, filed concurrently herewith.

28

1  (prior to their expiration) Subscription licenses into Term licenses in order to recognize revenue

2  upfront, Cadence was robbing its future and creating a revenue bubble by pulling forward all future

3  revenue from multi-year contracts into one quarter when needed, putting Cadence in the

4  unsustainable position of constantly needing to book new, large contracts to realize revenue, at a

5  time when the number of customers in the EDA industry had already stagnated.

6       8.      Defendants assured investors who were skeptical of the new strategic approach that a

7  50% (subscription)/50% (Term) mix would continue into and throughout FY08, and that an increase

8  of Term licenses in the mix as opposed to Subscription licenses would allow the Company to

9  increase its run rate and sell more products to customers faster.  *See* Ex. 47 at 8.  Defendants made a

10  point, prior to the Class Period, of detailing the mix ratio so that investors knew how much revenue

11  was recorded upfront and how much was ratable.

12      9.      On November 6, 2007, at the Goldman Sachs Retreat Conference, Porter bragged

13  about the shift in mix toward Term agreements and confirmed that the Company provided the mix

14  every quarter:

15          *We talked about what our mix of business is, which we do every*
            *quarter . . . .*
16
            *[A]nd traditionally our mix of contracts, this is contracts booked in the quarter,*
17          *has been around 75% subscription-type contracts where the revenue goes over*
            *time, 25% upfront.*
18
            *In the third quarter, our mix of business was 50% upfront, 50% subscription over*
19          *time, and one of the main drivers of that was the success we've been having with*
            *something we call EDA cards.*
20
    Ex. 48 at 3.
21
        10.     On December 5, 2007, Porter appeared at the NASDAQ 20th Investor Program
22
    Conference.  Porter again discussed the details of the mix of Term versus Subscription licenses and
23
    explained again that more Term licenses could result in faster sales growth:
24
            Porter: *[T]raditionally we have licensed our software in what's called a*
25          *subscription . . . and the mix that we have traditionally used is about 75%*
            *subscription, about 25% term licenses which doesn't allow customers access to new*
26          *technology.*

27                          *      *      *

28

> *We think it also will allow us to sell more technology to our customers faster than they would under a traditional time based model*.

Ex. 49 at 4.

11.     Defendants knew but failed to disclose, however, that it was not a natural shift of customers from Subscription licenses to Term licenses. Instead, prior to 3Q07, and during the Class Period, the Sales staff was pressured to renew existing Subscription arrangement deals prior to expiration in order to lock customers into contracts for the next several years, even if that meant steep discounts.[2]

12.     According to confidential witnesses ("CWs") CW3, CW5, CW9, CW13 and CW14, defendants knew about the bookings and revenue bubble and their implication on the Company's future outlook in late 2007 and definitely by early 2008. *See* ¶78 *infra*. For example, CW5 reported that the internal data presented to defendants indicated that Cadence suffered a huge drop in the sales and market share by 1Q08. CW9, CW13 and CW14 reported that Cadence's Sales force was instructed by senior management to call customers to renew contracts early in exchange for steep discounts. On January 30, 2008, Cadence reported its 4Q07 and FY07 results. Ex. 1. While the Company met the analysts' expectation of earnings per share ("EPS"), it missed the 4Q07 revenue guidance by $3 million. Additionally, Cadence reduced the revenue forecasts for FY08 by approximately $200 million (from $1.71 billion to the range of $1.49 billion to $1.54 billion). In response, several analysts asked whether the reduction in forecast was a sign of Cadence's weakening competitiveness and whether the EDA cards were a "stopgap measure" or "rear guard action" – which defendants denied. Ex. 2 at 5. In addition, in a remarkable about face, the Company stated that it would *no longer disclose the mix* between Subscription ratable and Term. Defendants assured investors not to worry, the 2008 mix would be 50/50:

> The routeable [sic] mix has become more variable from quarter-to-quarter, and less meaningful to us as a metric. . . . *As a result, we're not going to be forecasting or reporting this going forward*.

---

[2]     Later, after the October 2008 disclosures, the Company conceded that changing the model to a 90% (Subscription)/10% (Term) ratio served to unlock the sales force so that it no longer had to "create separation" in order to do a term deal. *See* ¶119.

1   *Id.* at 4.

2          13.   Upon the negative news, Cadence's stock declined over 33% in one day, from $15.16

3   per share to $10.15 per share on January 31, 2008.  Several analysts issued reports following the

4   conference call, noting the weak guidance given by the management.  *See* Exs. 3-5.

5          14.   Following the January 2008 results, Cadence's business continued to deteriorate as no

6   major bookings were coming in and opportunities to renew existing licenses were sharply

7   diminishing.  As part of the scheme to defraud investors, and as the Company's outlook for 2008

8   began to decline, defendants intentionally sought to conceal the quarterly Subscription versus Term

9   mix (a metric they had previously discussed "every quarter") because it would indicate that

10  Cadence's financial condition and prospects for increasing backlog or converting backlog into FY08

11  revenue was not as defendants had represented.  Defendants also knew that disclosing increased mix

12  of Subscription versus Term agreements would reveal the truth which they had sharply denied, that

13  the Company had been borrowing from the future (renewing existing Subscription licenses early) in

14  order to meet current earnings expectations and depleting its revenue pipeline.[3]

15         15.   Going forward – throughout the Class Period – defendants refused to disclose the mix

16  in order to actively conceal the true facts.  *See, e.g.*, April 23, 2008 earnings conference call

17  (refusing to provide analyst with quarterly mix, "it's going to be around 50/50 . . . if we expect that

18  to dramatically change we will tell you") (Ex. 10 at 7); *see also* July 23, 2008 conference call ("Once

19  again ***from a ratability standpoint, . . . we're not going to get into the bookings ratability on a***

20  ***quarterly basis***.") (Ex. 20 at 10).

21         16.   On April 23, 2008, the Company reported revenues and earnings for its 1Q08.  The

22  financial statements were knowingly false.  In order to meet revenue and earnings guidance,

23  Cadence improperly recognized $24.8 million in Product Revenue on a multiple-element transaction

24  upfront in 1Q08 rather than recognizing the transaction ratably.  The deal involved a Japanese

25

26  [3]      Defendants also admitted that "traditionally, in our industry, where people have heard mix
27  changes, there have been bad things that have happened in terms of companies in the industry."  *See*
    Ex. 48 at 4.

28

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - C-08-4966 SC                                                                      - 5 -

1    customer, Fujitsu.  The $24.8 million deal represented 10% of the Company's reported revenue, and

2    more than 15% of the Company's reported Product Revenue for 1Q08.  These facts are admitted.

3    Because defendants negotiated, reviewed and approved contracts and revenue recognition,

4    defendants Fister, Porter, Palatnik and Bushby had knowledge of, or deliberately and recklessly

5    disregarded, the transaction at issue and the improper accounting of it.

6           17.     Knowing that the Company had met forecasts only by manipulating the accounting

7    rules and that its pipeline of possible renewal revenue was drying up, Cadence quietly approached its

8    rival, Mentor Graphics Corporation ("Mentor Graphics"), and proposed to buy out Mentor Graphics

9    for $1.6 billion in cash in order to secure future revenue streams.  The private discussions with

10   Mentor Graphics continued in April-May 2008, and after Mentor Graphics' management rejected the

11   offer, Cadence took the matter public by announcing its takeover bid for Mentor Graphics in June

12   2008.

13          18.     On July 23, 2008, Cadence issued its financial reports for its 2Q08.  Cadence's 2Q08

14   financials were also admittedly falsified.  *See* ¶¶103-104.  In 2Q08, to meet the Company's already

15   lowered forecast, defendants again manipulated the Company's financials by improperly recognizing

16   $12 million in Product Revenue upfront on a Subscription license it falsely characterized as a Term

17   license.  This deal involved Nvidia, and was orchestrated specifically by Bushby to restructure a

18   multiple-element transaction that had already been in place in 4Q07.  ¶110.  To close the revenue

19   gap, Bushby instructed his Sales Account Executives to restructure the multiple-element transaction

20   in such a way that it would allow a lump-sum revenue upfront.  *Id.*  Without the $12 million

21   improperly recognized in 2Q08, Cadence would have missed its forecast for 2Q08.  ¶108.  The

22   accounting manipulations permitted Cadence to report a net income of $5 million rather than a net

23   loss of $16.8 million, an overstatement of net income by 436%.  *Id.*  Furthermore, Cadence

24   improperly failed to book a liability related to the $18 million in cash received in 2Q08 by selling the

25   accounts receivable associated with the $24.8 million contract that was improperly recognized in

26   1Q08, in deliberate violation of Generally Accepted Accounting Principles ("GAAP").  ¶¶109, 144,

27   176.

28

19.     More significantly, Cadence slashed the revenue and earnings forecasts for the rest of FY08 by slashing it by another 26%, from $1.5 billion to $1.1 billion.  Cadence also surprised investors in a sharp reversal announcing that the Company would immediately return to a primarily Subscription-based model, recognizing most of its licensing revenue on a ratable basis.  ¶¶90-92. The market reacted harshly to the further lowering of guidance and the sudden business model change by massive sell-off of Cadence's stock, and the stock price dropped more than 30% from $10.27 per share on July 23, 2008, to $7.11 per share on July 24, 2008.

20.     Because of the stock price decline after the 2Q08 disclosure of the 2Q08 results, and on August 15, 2008, Cadence withdrew its hostile bid of Mentor Graphics.

21.     On October 15, 2008, the Company abruptly terminated Fister, Porter and Bushby. Ex. 31.  At least three witnesses reported that the Cadence Board of Directors ("Board") forced the executives to resign, *i.e.*, they got fired, in part, in connection with the false financials that the Company would have to restate.  Cadence's stock price dropped 15% in one day upon the announcement of the sudden departure of the key executives.

22.     On October 22, 2008, Cadence announced that it would restage revenues and earnings for 1Q08 and 2Q08.  The Company also admitted that its statements regarding its disclosure controls were false.  After the market closed, the Company issued a press release titled, "Cadence Announces Accounting Review and Postpones Release of Third Quarter 2008 Financial Results and Webcast; Reaffirms Third Quarter 2008 Guidance."  Ex. 34.  The release stated in part:

> Cadence Design Systems, Inc. . . . today announced that it is reviewing, in conjunction with the company's independent accountants and legal advisors, the recognition of revenue related to customer contracts signed during the first quarter of 2008.

> Cadence initiated the review after preliminarily determining during its regular review of its third quarter results that approximately $24 million of revenue relating to these contracts was recognized during the first quarter of 2008, but should have been recognized ratably over the duration of the contracts commencing in the second quarter of 2008.  Cadence expects to restate its financial statements for the first quarter of 2008 and the first half of 2008 to correct the revenue recognition with respect to these contracts.

*Id.*

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - C-08-4966 SC                                                                                      - 7 -

23.    As a result of this disclosure, Cadence's stock price dropped over 25% in one day from $4.32 per share to $3.22 per share, with over 25 million shares traded on October 23, 2008. The October 22, 2008 announcement was only a partial disclosure, as it did not fully reveal the extent of the fraud that necessitated the restatement and the extent of Cadence's true financial condition that had been concealed by defendants' scheme.

24.    On December 10, 2008, Cadence restated its financials for 1Q08 and 2Q08, revealing that the Company's accounting improprieties were worse than previously disclosed and were not limited to just one quarter. The Company admitted that in fact none of the $24.8 million in Product Revenue that was recognized in 1Q08 could be recognized until 4Q08 because part of the deal involved a product that had not even been made commercially available in 1Q08.

25.    The following chart shows the impact of the restatement and adjustments made to the Company's 1Q08 and 2Q08 financial results:

| (In $000's, except per share data) | | | | |
|---|---|---|---|---|
| | Originally Reported | Restated/ Adjusted[4] | Amount Overstated/ (Understated) | % Reported |
| **Quarter Ended 3/29/08:** | | | | |
| Total Revenue | 287,187 | 270,750 | 16,439 | 5.7% |
| Product Revenue | 156,193 | 133,954 | 22,239 | 14.2% |
| Net Loss | (18,747) | (35,023) | (16,276) | (86.8)% |
| Loss Per Share | $ (0.07) | $ (0.13) | $ (0.06) | (86.8)% |
| | | | | |
| **Quarter Ended 6/28/08:** | | | | |
| Total Revenue | 329,478 | 308,041 | 21,437 | 6.5% |
| Product Revenue | 195,444 | 175,039 | 20,405 | 10.4% |
| Net Income/(Loss) | 4,996 | (16,794) | 21,790 | 436.1% |
| Earnings/(Loss) Per Share | $ 0.02 | $ (0.07) | $ 0.09 | 458.0% |

26.    The allegations of the First Amended Complaint ("FAC") substantially supplement the prior allegations against defendants, in particular, detailing additional facts establishing that defendants knew or were deliberately reckless in not knowing that the 1Q08 and 2Q08 financial

---

[4]    Rather than restate a second time, in 4Q08 Cadence made a $5.8 million adjustment to reduce Product Revenue previously recognized in 1Q08. The tax effect related to this adjustment is not included in 1Q08 net loss or loss per share.

1   statements were false and misleading.  The FAC details facts establishing that defendants knew the

2   revenue and earnings forecasts for FY08, including interim quarters of 2Q08 and 3Q08 were

3   knowingly false and were without reasonable basis.  The FAC's scienter allegations are bolstered by

4   the combination of additional details of defendants' specific admissions, and additional confidential

5   witnesses that place knowledge of the facts squarely on defendants.

6          27.     For example, defendants plainly admit that the transactions in 1Q08 and 2Q08 that

7   were improperly designated as Term agreements allowing for upfront revenue recognition, were not

8   Term agreements at all.  ¶¶139-144.  Instead, they were Subscription agreements that required

9   ratable revenue recognition.  Defendants admit that the facts concerning the Subscription nature of

10  both agreements were known *at the time* they were entered into and when the revenue was recorded.

11  *Id.*  With respect to the 1Q08, $24.8 million deal, defendants admit that it was (a) "negotiated in

12  contemplation" of a later agreement which (b) would permit the customer to access software that

13  was not even developed at the time of contract execution.

14          [W]hen evaluated together, indicated that the software arrangements executed with
            this customer both in the first quarter and in the third quarter were negotiated in
15          contemplation of one another.  Accordingly, Cadence determined that the term
            license arrangement executed during the first quarter and the subscription license
16          arrangement executed during the third quarter collectively represented a multiple
            element arrangement.  Because the subscription arrangement provides the customer
17          with the right to use unspecified additional software products that become
            commercially available during the term of the arrangement, Cadence determined that
18          the revenue relating to this multiple element arrangement should be recognized
            during the term of the arrangement. . . .
19
20  Exs. 39, 44.

21          28.     Both of these factors plainly break any legal ability to recognize revenue upfront,

22  plainly violate GAAP *and* the plain language of the Company's internal revenue recognition policy.

23          29.     With respect to the 2Q08, $12 million deal, which was improperly designated as a

24  Term agreement, defendants admit that it was in fact a Subscription agreement not a Term

25  agreement which required ratable revenue recognition.  Defendants admit that these facts were

26  known to defendants at the time.  Defendants admit that the customer never wanted to cancel its

27  right to access currently unavailable software in order to enter into a Term agreement.  The

28  Company's admission is consistent with CW5's report that the customer Nvidia did not want to

1  cancel the multiple-element agreement – and that it was Bushby who instructed the restructure of the

2  contract so Cadence could recognize revenue.  *See also* Exs. 39, 45.

3  *At the time of executing this term arrangement, there was a concurrent cancellation of a prior subscription arrangement.*

4

5  *[D]espite the cancellation of the subscription arrangement, the customer did not intend to substantively cancel its right to access future new technology because at the time the subscription license was cancelled, the customer intended to re-*

6  *establish its right to access future new technology at a later time.  As a result, Cadence determined that the term license agreement that was executed in the*

7  *second quarter of 2008 was, from an accounting perspective, in substance the continuation of the cancelled subscription arrangement, and revenue relating to*

8  *this arrangement should be recognized ratably over the term of the arrangement.*

9  Ex. 54.

10  30.    The FAC further details defendants' admissions that the improper revenue

11  recognition and false designation of Subscription agreements as Term agreements were a direct

12  result of defendants' instruction to create artificial separation between the customers' desire for

13  access to new software, *i.e.*, a Subscription contract, and current software.  Because defendants

14  wanted to shift the revenue mix from a primarily Subscription-based business to a Term-based

15  business, even when the customer wanted a Subscription deal and negotiated as such, Cadence

16  created an artificial separation to falsely designate contracts Term as opposed to Subscription:

17  *And we came out in January for the year, we saw 50-50, so primarily based on cards.  Going forward, we don't really view that card mix is going to change*.  So

18  the natural question is, if you had such a high mix of gold cards, synonymous with term agreements, revenue upfront, what's going to change going forward?  *And*

19  *unfortunately, that's where you get into the accounting of things*.

20  *In order to take revenue upfront on gold cards and term agreements, there are certain rules within accounting. When we had those discussions with customers,*

21  *quite often when we sold a gold card, we couldn't sell a subscription license or services with that.  We had to create separation*. . . .

22  *See* Ex. 25.

23  31.    The FAC further alleges long time director and current CEO Lip Bu Tan's admission

24  that the reason that the 1Q08 and 2Q08 contracts had to be restated was directly related to

25  defendants' shift from a primarily ratable or Subscription business, to an upfront Term-based model

26  that caused the revenue recognition irregularities.  *See* ¶131; Ex. 55.

27

28

> *Tan said that there had been differences in the past from the 90/10 licensing model Cadence now employs, and that restatements had been necessary.  He also said that the company was going to exercise discipline about these matters in the future*.

*See* Ex. 55.

32.     The FAC also admits that defendants understood that the proper application of the accounting rules all along – rules that their prior motion to dismiss sought to describe as complex – but simply ignores the rules to allow the Company to meet analysts' earnings expectations in a slowing industry cycle:

> *In order to take revenue upfront on gold cards and term agreements, there are certain rules within accounting. When we had those discussions with customers, quite often when we sold a gold card, we couldn't sell a subscription license or services with that.  We had to create separation. . . .  We're going forward and talking about releasing the handcuffs on our channel.  We're now giving them the ability to eliminate that separation. . . . [S]ell what you will*.

> *In accounting, that will be viewed as a single unit of an arrangement and all be accounted for ratably*.  So we will still sell gold cards but they will be treated from a rev rec standpoint when sold with other elements.  *It's called MEA, multiple element arrangements.  We'll account for that ratably*.

> Palatnik: The easiest way to create a ratable situation, if you will, is basically combining a gold card and a platinum card; or, if you will, a term agreement and a subscription agreement.  From an accounting standpoint, that by default becomes a multiple-element arrangement, and revenue is taken ratably *over the term*.

Ex. 25.

33.     There's more.  The FAC pleads specific admissions that further tend to support defendants' knowledge that the financial statements and their documents filed with the SEC were false and misleading.  First, after the Company announced its false 1Q08 financials, the Company filed its Form 10-Q with the SEC.  With respect to the Cadence required disclosure of the effectiveness of its disclosure controls, defendants stated that the Company's disclosure controls were only "sufficiently effective to," thereby qualifying the effectiveness of its disclosure controls with "sufficiently."  The SEC quickly admonished defendants for the qualification notifying them "the inclusion of such qualifying language does not conform to the requirements of Item 307 of Regulation S-K."  ¶¶67-71.  Defendants quickly corrected the Form 10-Q and promised not to make such a qualification again.  *Id.*  In truth, what would later be admitted, the internal controls were not effective and indeed had material weaknesses specifically in controls over revenue recognition.

1    Defendants' attempt to surreptitiously qualify the Company's disclosure of effectiveness suggests

2    knowledge. *Id.*

3           34.    In addition, the FAC alleges that after the Company reported its false 2Q08 financial

4    statements and announced a $400 million reduction in the Company's FY08 forecast, plus a sharp

5    reversal back to a primarily Subscription-based revenue recognition model, defendants and the

6    Board quickly amended the employment agreements of all of the defendants – ***each of whom would***

7    ***later be fired*** – to "clarify" and expand their indemnification rights in case they were sued by

8    shareholders. *See* ¶¶116-117.  These facts are not simple coincidences.

9           35.    Finally, the FAC has substantially more facts provided by confidential witnesses

10   demonstrating that defendants knew of the decline in sales and that the shift to primarily Term

11   agreements had cannibalized the Company's future revenue prospects and defendants knew it.  In

12   addition, confidential witnesses confirm defendants' knowledge of the 1Q08, $24.8 million

13   improperly recorded transaction and overall revenue reports-process demonstrating that defendants

14   knew or deliberately disregarded the fact that the financial statements were false.  For example,

15   CW12 reported that with respect to the $24.8 million deal with Fujitsu in 1Q08, defendant Bushby

16   was told by defendant Fister to do it and that Bushby ***was fired because of it***.

17          36.    Multiple witnesses report that the $24.8 million transaction was in fact with Japanese

18   customer Fujitsu and that the transaction was restated.  ¶74(a)-(f).  Additional witnesses confirm that

19   the shift to a Term agreement model was in fact a ploy to report satisfactory revenues and that

20   defendants instructed the Sales staff to renew contracts well before their expiration.  CW13 reported

21   that by the end of 2007 and early 2008, there were simply "no more contracts to renew and

22   defendants knew it."  ¶78(e).  CW5 reported that based on the internal data reports submitted to

23   defendants, they knew Cadence was losing sales and market share.  ¶78(k).  CW14 reported that in

24   September 2008, his boss Thomas Cooley "blew the whistle" on the recklessness of the defendants'

25   practices in pulling revenue forward using the Term agreement model which left the Company's

26   pipeline depleted.  CW14 said Bushby was then fired.  ¶78(j).

27          37.    This is just a summary of facts set forth below demonstrating that defendants knew of

28   the falsity of their Class Period representations and when they were made.

38.     The following chart illustrates how defendants' false and misleading statements and omissions caused the price of Cadence securities to be maintained at an inflated price and how Class members were damaged when the Company's relevant true financial and operating conditions began to be revealed to the market:



## JURISDICTION AND VENUE

39.     The claims asserted arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5). Jurisdiction is conferred by §27 of the Exchange Act. Venue is proper in this District pursuant to §27 of the Exchange Act. Cadence's headquarters are located in San Jose, California and false statements were made in this District and acts giving rise to the violations complained of occurred in this District.

**THE PARTIES**

40.     Lead plaintiff, Alaska Electrical Pension Fund, purchased or acquired Cadence's publicly traded securities during the Class Period and suffered damages as a result of the wrongful acts alleged herein.

41.     Defendant Cadence Design Systems, Inc. is a Delaware corporation which purports to develop electronic design automation software and hardware for electronics companies worldwide. The Company's headquarters are located in San Jose, California and its stock is traded under the symbol CDNS on the NASDAQ.  During the Class Period, Cadence had less than 5,000 employees.

42.     Defendant Michael J. Fister was, until his termination in October 2008, President, CEO and a Director of the Company.  In the Company's SEC filings, Fister, as the CEO, was identified as the chief operating decision maker, consistent with Statement of Financial Accounting Standards ("SFAS") No. 131 reporting requirement.  Fister participated in the Company's conference calls for 1Q08 and 2Q08, during which false and misleading statements concerning the Company's business and financial condition were made.

43.     Defendant Kevin S. Palatnik was, at all relevant times, a Senior Vice President and CFO of the Company.  Palatnik was appointed as the CFO on April 23, 2008.  Prior to that, Palatnik served as Senior Vice President and Corporate Controller, leading the Company's financial planning as well as its audit and compliance functions.  *See* Ex. 9 (Company's April 23, 2008 press release). Palatnik also held a number of senior financial and operational positions, including Corporate Vice President, Finance and Operations, and Corporate Vice President, Technical Field Operations.  In March 2006, Palatnik was appointed Corporate Controller, and in April 2007, was promoted to Senior Vice President and Controller.  As Controller, he led the Company's financial planning as well as its audit and compliance processes.  According to the Company's website, as the CFO, Palatnik is responsible for managing the Company's global finance organization, including Investor Relations, Information Technology, Workplace Resources, Operations and Controller functions. Palatnik participated in the Company's 2Q08 conference call as well as several technology conferences with analysts during the Class Period.

44.     Defendant William Porter was, until his termination in October 2008, Executive Vice President and CAO of the Company.  Prior to April 23, 2008, Porter served as CFO of Cadence since 1999 and was the Company's CFO when the improperly recognized $24.8 million transaction took place in 1Q08.   Porter is an active Certified Public Accountant in California.   Porter participated in the Company's April 23, 2008 conference call and several technology conferences with analysts during the Class Period.

45.     Defendant Kevin Bushby was, until his termination in October 2008, Executive Vice President, Worldwide Field Operations.  Bushby's duties and responsibilities prior to his termination included overseeing Cadence's Sales organization; he was in charge of Cadence's Sales during 1Q08 and 2Q08 when the Company deliberately and improperly recognized revenue on certain transactions that were later restated.

**CONTROL PERSONS**

46.     Because of the Individual Defendants' executive management positions at the Company, they had access to and knew of the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

47.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of Cadence, by virtue of their high-level positions with the Company, directly participated in the management of the Company; was directly involved in the day-to-day operations of the Company at the highest levels; and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements and financial condition, as alleged herein.  Said

1   defendants were involved in drafting, producing, reviewing and/or disseminating the false and

2   misleading statements and information alleged herein; were aware, or recklessly disregarded, that the

3   false and misleading statements were being issued regarding the Company; and approved or ratified

4   these statements, in violation of the federal securities laws.

5          48.     As officers and controlling persons of a publicly held Company whose common stock

6   was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ and

7   governed by the provisions of the federal securities laws, the Individual Defendants each had a duty

8   to promptly disseminate accurate and truthful information with respect to the Company's financial

9   condition and performance, growth, operations, financial statements, business, products, markets,

10  management, earnings, and present and future business prospects; and to correct any previously

11  issued statements that had become materially misleading or untrue, so that the market prices of the

12  Company's publicly traded securities would be based upon truthful and accurate information.  The

13  Individual Defendants' misrepresentations and omissions during the Class Period violated these

14  specific requirements and obligations.

15         49.     As alleged above, the Individual Defendants participated in the drafting, preparation,

16  and/or approval of the various press releases, shareholder reports, SEC filings and other public

17  statements/communications complained of herein; were aware of, or recklessly disregarded, the

18  misstatements contained therein and omissions therefrom; and were aware of their materially false

19  and misleading nature.  Each Individual Defendant was provided with copies of the documents

20  alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or

21  opportunity to prevent their issuance or cause them to be corrected.  In fact, the Individual

22  Defendants certified the accuracy of the quarterly results, and consented to the content of the

23  financials.  *See* Exs. 14, 24.  Accordingly, each of the Individual Defendants is responsible for the

24  accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the

25  representations contained therein.

26         50.     Because of their Board membership and/or executive and managerial positions with

27  Cadence, each of the Individual Defendants had access to the adverse undisclosed information about

28  Cadence's business, prospects and financial condition as particularized herein, and knew (or

1  recklessly disregarded) that these adverse facts rendered the positive representations made by or

2  about Cadence and its business issued or adopted by the Company materially false and misleading.

3  **CONFIDENTIAL SOURCES**

4      51.     The allegations included herein are based in part on information and belief and are

5  supported by firsthand accounts of former Cadence employees referred to herein as CWs.  The

6  information provided by the former employees is reliable and credible because (1) the witness

7  worked at Cadence's headquarters in the San Jose offices during the Class Period or was in a

8  position to know facts reported; (2)  the witness has personal knowledge of the information

9  provided; (3) the witness' job title, position and responsibilities show he/she has personal knowledge

10  of the information provided; (4) many of the witness accounts corroborate one another; and (5) the

11  witness accounts are corroborated by other information alleged herein.

12       (a)     CW1 is a former Sales Administrator with Cadence until November
13  2008.  For 15 years as a Sales Administrator at Cadence, CW1's duties involved
    receiving sales order from Cadence's Sales/Finance organization, and entering the
14  terms and details of the orders into Cadence's order management system so that the
    orders could be booked, fulfilled and revenue could be recognized.

15       (b)     CW2 is a former Vice President of Finance with Cadence for eight
16  years until January 4, 2009.  Prior to 2007, CW2 was in charge of Cadence's
    Sales/Finance group and responsible for setting the contract approval structure and
17  revenue recognition procedures at Cadence.  In 2007 and 2008, CW2 oversaw the
    Finance/Research and Development group.  In 2008, CW2 reported to Controller
18  Mike Doktorczyk, who reported to Palatnik.

19       (c)     CW3 is a former Senior Manager in the Marketing group who worked
20  at Cadence before, during and after the Class Period and reported to corporate Vice
    Presidents.  CW3 participated in executive-level conversations and meetings with
21  personnel from the Marketing, Sales and Finance Groups that involved all aspects of
    marketing, including products, prices, discounts, business models, and booking and
22  revenue considerations.  As a senior manager, CW3 worked closely with Cadence's
    Finance, Sales/Finance and Marketing groups, and has personal knowledge of the
23  Company's practice of managing upfront and ratable revenue and the bookings
24  bubble created by this practice.

25       (d)     CW4 is a former Director of Engineering with Cadence, based at the
    Company's facility in San Jose, from 1999 until November 2008.  During CW4's
26  tenure at Cadence, CW4 was involved in contract negotiations with customers.

27       (e)     CW5 is a former Senior Technical Marketing Manager at Cadence
28  from 2000 until May 2008.  By January 2008, CW5's position was transferred to the

Business Operations Group to within the Marketing Department, and was responsible for the collection of sales and marketing data from the Company's Sales personnel regarding the Company's 400 large customer accounts, including the names of the customers, types of licenses purchased, and what Cadence's products and what competitor products customers were purchasing. Additionally, CW5 and her supervisor Farid Mashayekh ("Mashayekh") collected customer segmentation data, indicating the market segment information for Cadence, which was presented by Mashayekh and distributed to the senior management via a quarterly market analysis report in PowerPoint format.

(f)     CW6 is a former Senior Product Marketing Manager from 2004 until November 2008 who was responsible for marketing Cadence's emulation accelerator. In CW6's marketing capacity, he/she visited with Cadence's customers, including Cadence's customers in Japan. Because CW6 worked closely with Cadence's Sales personnel on deals that involved his/her group's product, CW6 has personal knowledge of the contract negotiations, review and approval process at Cadence.

(g)     CW7 is a former Business Systems Analyst who worked at Cadence for over ten years until November 2008. As a Systems Business Analyst, CW7 worked closely with Cadence's IT organization and Sales/Finance organizations to define and create Cadence's Siebel CRM system – which was fundamentally used by Cadence to track sales opportunities and book deals and to ensure that the orders were fulfilled. CW7 has extensive personal knowledge of Cadence's IT systems, including Siebel CRM, eDA-on-TAP, SAP and Epiphany, and how Cadence, including the senior management, accessed and utilized these systems for forecasting, bookings and financial reporting.

(h)     CW8 is a former Cadence Account Executive between 2002 and November 2008. CW8 was responsible for sales of Cadence in the United States and North America. As an Account Executive, CW8 interacted with customers to present and execute sales. CW8 provided details of sales and contract approval process at the Company including the role of Sales personnel in the contract negotiations process.

(i)     CW9 is a former Group Marketing Director of the Company who interacted directly with defendants Porter, Fister and Bushby. CW9 reported that his/her team was responsible for organizing, coordinating and filming the Company's quarterly video and executive presentations for annual customer conferences called CDN-LIVE.

(j)     CW10 is a former Cadence Operations Director and was employed at the company from 2003 until early 2009. As Operations Director, CW10 was responsible for implementation of Cadence's front and design tools. CW10 was also responsible for supporting the Company's Sales force in promoting products to customers during the technical benchmarking stage of prospective sales.

(k)     CW11 is a former Staff Systems Engineer responsible for supporting the eDA-on-Tap application between 2000 and 2009. Specifically, CW11 was

1   responsible for maintaining the functionality of the system so that customers could
2   efficiently download software that was purchased form the Company.

3           (l)     CW12 is a consultant in the EDA industry who advises clients
4   including Cadence customers on strategic product analysis and design methods.
    CW12 regularly corresponds with industry executives and customers of Cadence
5   products.

6           (m)     CW13 is a former Cadence Product Marketing Director who was
7   employed at the Company between 2002 and 2008.  As Product Marketing Director,
    CW13 was responsible for making presentations to customers concerning Cadence's
8   Data Management Solutions line of products.  CW13 regularly worked closely with
    Cadence's Sales personnel, and thus, has knowledge of Cadence's contract renewal
9   and negotiation process, including Cadence's routine product discounting practices.

10          (n)     CW14 is a former Cadence Account Manager in the Company's Sales
11  organization which was headed by defendant Bushby, although he/she reported
    directly to Tom Cooley, Vice President of Technical Field Operations.

12          (o)     CW15 is a former Sales Director for North America from 2000 until
13  mid-2009 who reported to the Vice President of Sales for North America Thomas
    Cooley.  In that capacity, CW15 has personal knowledge of Cadence's Sales
14  organization, including the contract negotiation and renewal practices, and
    defendants' involvement in negotiating, reviewing, and/or approving the deals.
15  CW15 was also in attendance at the annual Sales Kick-off meeting in January of
    2008 where Fister told the entire Sales force that Fister and Bushby were involved in
16  the negotiation of every contract over $5 million.

17  **DEFENDANTS' FRAUDULENT SCHEME AND FALSE AND MISLEADING
    STATEMENTS DURING THE CLASS PERIOD**

18          52.     Defendants' false and misleading representations during the Class Period began with
19  its 1Q08 reported financial results revenue and earnings forecast for the remainder of FY08.  The
20  false 1Q08 revenue and earnings results were followed by a conference call hosted by defendants
21  and a series of analysts reports which repeated defendants' false statements concerning the 1Q08
22  financial results, the 2Q08 and FY08 revenue and earnings forecasts, and the propriety of the
23  Company's licensing and revenue recognition processes.   Each of the materially false
24  representations, individually and together, caused Cadence's stock price to be artificially inflated.

25          53.     <u>False and Misleading Statements</u>: On April 23, 2008, the Company issued a press
26  release announcing the Company's 1Q08 financial results. Ex. 9. The Company falsely stated that it

27
28

1  had, *on a GAAP basis*, $287 million in revenue in 1Q08, and had only suffered a ($0.07) per share

2  loss:

3  • **Total revenue of $287 million** . . . .

4  • **GAAP earnings per share for Q1 with the net loss of $0.07**. . . .

5  • **Total revenue for the first quarter was $287 million** . . . .

6  • **Product revenue was $156 million** . . . .

7  • **Revenue mix by geography in Q1 was 40% for the Americas, 22% for
      Europe, 26% for Japan and 12% for Asia, one customer accounted for**

8     **approximately 11% of total revenue**.

9  • **Investors are encouraged to look at GAAP results as the best measure of
      financial performance**.

10 *Id.*

11

12 54.    The April 23, 2008 press release reported revenue and earnings met Wall Street

13 analyst consensus expectations for the quarter. *See id.*

14 55.    <u>False and Misleading Statement</u>: In addition to falsely reporting the Company's 1Q08

15 financial results, the April 23, 2008 press release forecasted revenue and earnings results for 2Q08

16 and FY08, and falsely assured investors that the 2Q08 and FY08 forecast and results would indeed

17 be based upon performance measured under GAAP – thus Term licenses revenue would be

18 recognized upfront and Subscription licenses would be recognized ratably:

19 Business Outlook

20 • For the second quarter of 2008, the company expects total revenue in the
      range of $310 million to $320 million.

21 • **Second quarter GAAP net income per diluted share is expected to be in the
      range of $0.02 to $0.04**. . . .

22

23 • **For the full year 2008, the company expects total revenue in the range of
      $1.490 billion to $1.540 billion**.

24 • **On a GAAP basis, net income per diluted share for fiscal 2008 is expected
      to be in the range of $0.64 to $0.72**.

25 *Id.*

26 56.    <u>False and Misleading Statement</u>: During the 1Q08 conference call hosted by Porter

27 and Fister, defendants repeated the revenue and earnings forecasts, detailed the purported basis of

28

the 2Q08 and FY08 revenue and earnings forecast, and specifically stated (notwithstanding

knowledge that 1Q08 revenues were overstated by $16.4 million and earnings by $16 million)[5] that

the Company's "business strategy" of focusing on growing Term licenses through the use of EDA

cards, upfront revenue recognition had never been stronger.  Defendants added that Cadence was ***on

track*** to meet operating targets, *i.e.*, revenues and earnings for FY08.  Cadence also falsely assured

that its future reported results would be in compliance with GAAP:

- ***For Q2 we expect revenue to be in the range of $310 to $320 million***.

- ***GAAP EPS should be in the range of $0.02 to $0.04 and non-GAAP EPS in the range of $0.13 to $0.15***.

- ***For the year 2008 we expect revenue to be in the range of $1.49 to $1.54 billion, we*** expect ***backlog to grow to $2.1 billion at the end of 2008***. . . . ***GAAP EPS should be in the range of $0.64 to $0.72***. . . .

- ***For 2008, we expect to generate operating cash flow of at least $350 million***. . . .

- I am confident in our strategy . . . and ***we are on track to achieve our operating targets for the year.***

Ex. 10 at 5.

57.     Defendants also continued to conceal the truth about the 1Q08 revenue and earnings

results – which had only been achieved because the Company improperly booked as upfront revenue

$24.8 million from a Subscription license, improperly designated it as a Term license.   The

accounting violated GAAP and the Company's own revenue recognition policies.  *See also* ¶¶172-

174.  Defendants also assured investors that Cadence revenue stream from Subscription and Term

licenses would be balanced at 50/50 for FY08, and that investors need not be concerned with the

breakdown of the percentage each type of license contributed to the reported revenue.

58.     During the call, defendants continued to withhold the Subscription versus Term mix.

Securities analysts inquired about the Company's results and disclosures in 1Q08 and the strength of

its so-called backlog which would purportedly support the full year revenue and earnings forecast.

---

[5]     The amounts of overstatement were again modified in the Company's latest Form 10-K filed on March 2, 2009, when the Company disclosed further adjustments.  Ex. 56.

Ex. 10.  In addition, analysts questioned the Company's decision to withhold the percentage of

revenue from upfront bookings Term licenses recorded in 1Q08.  Investors and analysts were

particularly concerned that the Company might be recognizing more revenue upfront on its software

license deals in order to simply meet revenue and earnings estimates, and placing substantial risk on

future financial results.  *Id.*  Defendants fielded the questions but flatly and falsely rejected the idea

that Cadence's upfront revenue recognition strategy skewed the Company's true current and future

financial condition.

> Analyst: . . . I am just wondering if there's – since you guys are no longer giving percentage of ratable first some upfront booking, is there anything you can give us qualitatively to give us some confidence in the model as you progress through the year, any kind of color you can give us on that back half pipe line that should give us confidence that's achievable?
>
> . . . And to just sort of revisit that decision not to give the upfront versus ratable, it seems as you move to the back half, the fear will be that you could move to an exceptionally sort of upfront weighted model, which could allow you to achieve the numbers . . . .
>
> Porter: . . . ***In terms of mix, I do expect a balance between what you would consider subscription and term business for the year.  So, it's going to be around 50/50, I believe.  And then if we expect that to dramatically change we would let you know****.

*Id.* at 6-7.

59.      On the same day, April 23, 2008, the Company issued a press release announcing that

it had removed defendant Porter from his position as CFO and promoted defendant Palatnik, who

had to that date been head of the Company's financial planning audit and compliance functions.

Defendants claimed that the removal was "consistent with [the Company's] *succession plan*[]."  Ex.

9.  Defendant Porter, however, still remained in charge of the finance organization and legal group,

as Palatnik still reported to him.  *See id.*[6]

60.      On April 24, 2008, securities analysts noted that the 1Q08 reported results met or beat

analysts expectations, and repeated the Company's false and misleading 1Q08 revenue and earnings

---

[6]      The Company described the removal of Porter as consistent with the Company's succession plan, but that was in direct contrast with the later October 15, 2008 termination of Porter just days before the announcement that the Company would restate 1Q08 and 2Q08 financial results. According to three CWs, Porter, Fister and Bushby were fired because of the restatement.  *See* ¶127.

results and 2Q08 and FY08 forecasts through widely distributed analyst reports. Exs. 11-13. For

example, RBC Capital Markets issued a report titled, "Cadence Design Systems Reiterates guidance,

Beats expectations" and stating that the 1Q08 revenue and earnings results and increase in 2Q08

guidance should alleviate some investors concern about the Company's positions:

> *Management beat expectations of downside risk by reiterating CY08 guidance. Q1 print was at the high end of guidance. Q2 guidance was raised, slightly ahead of consensus.* . . .
>
> *After two quarters of surprises, merely meeting guidance, we believe, should help alleviate Street's negative sentiments.* . . .
>
> *Management reiterated CY08 revenue guidance of $1.49B-$1.54B* and *raised EPS guidance by 3c to $1.14-$1.22.* . . . *Q1 was reported as $287M/$0.04, at high end of guidance*.

Ex. 11.

61.     On April 24, 2008, Needham & Co., LLC ("Needham") also issued a report titled,

"CDNS: In-Line 1Q08; Unchanged (and Still Back-End Loaded) '08 Guidance; Maintain Buy."

Ex. 12. The report explained that notwithstanding concerns about the Company's previously issued

outlook (issued after the 4Q07 and FY07 results) of declining revenues for FY08, the reported 1Q08

financial results had restored some investors' confidence in the future:

> We don't think Cadence changed anyone's mind as they delivered an inline 1Q08 and reaffirmed 2008 guidance, *but at least the company took a small step in restoring recently shattered investor confidence.*

*Id.*

62.     On April 24, 2008, JPMorgan Chase & Co. ("JPMorgan") issued a report regarding

the Company's 1Q08 reported results, noting that the Company had met revenue and earnings

expectations for the quarter. The report repeated defendants' reports of deferred revenue (scheduled

to be recognized in the back half of the fiscal year), which legitimized and provided the purported

basis for the Company's revenue and forecast for the remainder of FY08. Ex. 13. Unaware of the

facts that had been concealed by defendants concerning the true financial condition, including the

true impact of the mix of Subscription versus Term agreements, and the revenue recognition

manipulation resulting in the 1Q08 overstatement of a $24.8 million Subscription deal, JPMorgan

reported that the deferred revenue was the "saving grace" for the Company:

***Results for the quarter were in-line***.  We had said we thought the bar for the quarter was set low so even a beat would not tell us much about true health of the business, but in-line with such a low bar could be viewed negatively.  ***The saving grace, in our view, was the $30M increase in deferred revenue. . . .***

***Once again there was a customer that made up over 10% of revenue and that will continue to feed investor concerns about lumpiness and reliance on at least one large deal per quarter to make numbers***.

*Id.*

63.     Following the issuance of Cadence's false 1Q08 revenue and earnings results, Cadence's stock traded at artificially inflated prices between $9.00-$11.00 range between April 23, 2008 and July 23, 2008.  But for the false financial statements and false forecasts, the Company's stock price would have suffered a material significant decline, as it did when the Company issued its poor 4Q07 results, and later the truth began to be revealed about the Company's true financial condition in July 2008 and October 2008.

64.     <u>Reasons Why Statements in ¶¶53-62 Were False and Misleading and Defendants' Knowledge of Falsity or Deliberate Recklessness</u>:  Defendants' statements concerning the Company's (a) 1Q08 revenue and earnings results; (b) Product Revenue results; (c) 2Q08 and 3Q08 revenue and earnings forecast; and (d) the Company model of upfront and ratable revenue recognition were each false and misleading for the following reasons:  First, defendants have unequivocally admitted that the Company's 1Q08 revenue and earnings were materially false and misleading.  The Company has restated 1Q08 revenues and earnings results as detailed in ¶¶139-145; 172-174.  Specifically, 1Q08 reported Product Revenue was overstated 14.2%.  As detailed below, the Company improperly recognized $24.8 million revenue "upfront" on a multiple-element transaction Subscription license – incorrectly designated a Term license – that should not have been recognized until 4Q08 at the earliest.  The Company had not earned ***any*** of the $24.8 million.  The improper revenue recognition caused the reported earnings (losses) to be understated least (86.8%).

65.     In addition, as discussed below, because the 1Q08 reported revenue, in part, provided a purported basis for the Company 2Q08 and FY08 revenue and earnings forecasts, defendants had no reasonable basis for their April 23, 2008 2Q08 and FY08 revenue forecast and they knew it.

66.     <u>False and Misleading Form 10-Q Filed with the SEC</u>: On April 25, 2008, Cadence filed a Form 10-Q with the SEC signed by Fister and Palatnik setting forth the false 1Q08 financial results.[7]

67.     In addition, the Form 10-Q misrepresented whether the Company's internal controls were adequate in accordance with SEC rules.  With respect to control disclosures the Company, defendants apparently knowing that its internal controls suffered from material weaknesses, sought to qualify its disclosures regarding their effectiveness by including the word "sufficiently" prior to the word "effective":

> Based on their evaluation as of March 29, 2008, our CEO and CFO have concluded that our disclosure controls and procedures were ***sufficiently effective*** to ensure that the information required to be disclosed by us in our reports filed or submitted under the Exchange Act is recorded . . . .

Ex. 14 at 35.

68.     The Form 10-Q was also accompanied by false Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") certifications signed by Fister and Palatnik.  *See id.*

<u>The SEC Warned the Company that It Cannot Qualify that Its Internal Controls as "Sufficiently Effective"; Cadence and Its Lawyers Falsely Reassured the SEC that Its Disclosure Controls Are Effective</u>

69.     After the filing of the April 25, 2008 Form 10-Q, the SEC wrote to the Company regarding its disclosure concerning the Company's disclosure controls.  The SEC warned Cadence that *"sufficiently effective"* was not in compliance with SEC rules (specifically Item 307 of Regulation S-K), and ordered the Company to confirm that its controls "were effective" as of the end of the period.   In response, defendants' lawyers, on behalf of the Company, wrote the SEC (excerpting the SEC's admonition) stating that the disclosure controls were indeed effective.  *See* Ex. 50:

---

[7]     Additionally, the Form 10-Q referred back to the "Critical Accounting Estimates" section in its Form 10-K for FY07 filed with the SEC for an additional description of license type and timing of revenue recognition, identifying American Institute of Certified Public Accountant ("AICPA") Statement of Position ("SOP") 97-2 and its application to multiple-element transactions as critical to the way in which its revenue was recognized.

*We note your statement that your principal executive officer and principal financial officer have concluded that the company's disclosure controls and procedures are "sufficiently" effective. The inclusion of such qualifying language does not conform to the requirements of Item 307 of Regulation S-K.  Please confirm that your disclosure controls and procedures were effective as of the end of the period covered by this report and revise your future filings to remove this qualification.  You must clearly state whether the officers concluded that the company's disclosure controls and procedures were effective.*

*   *   *

*Cadence confirms that our certifying officers have concluded that our disclosure controls and procedures were effective for the quarterly period ended March 29, 2008.*

*Id.*

70.     Those statements regarding the Company's comments were patently false as now admitted by the Company.  *See* ¶¶143, 145 (admitting to material weaknesses in the Company's disclosure controls and specifically its revenue recognition controls).  Notably, the Company's Form 10-K filed only weeks earlier in February identified the controls as "effective" without the "sufficiently" qualification:

> Based on their evaluation as of December 29, 2007, our CEO and CFO have concluded that our disclosure controls *and procedures were effective* to provide reasonable assurance that the information required to be disclosed by us in our reports filed or submitted under the Exchange Act . . .

Ex. 6 at 55.

71.     The insertion of the qualification for the quarter in which the financials were materially manipulated further suggests defendants' knowledge of the material weakness in internal controls.

<u>Defendants' Admissions and Objective Facts Demonstrated that Defendants Knew or Deliberately Disregarded that the 1Q08 Financial Statements Were False and Misleading</u>

72.     The objective facts, including defendants' admissions in ¶¶139-145, 147, demonstrate that defendants knew, or were deliberately reckless in not knowing, that the 1Q08 financial statements and statements concerning its 1Q08 results were false and misleading when made.

(a)     <u>The Purported Term Agreement Executed and Recorded in 1Q08 Was Actually a Subscription Agreement</u>: Defendants admit that the 1Q08 $24.8 million purported Term agreement transaction was in fact a Subscription agreement and multiple-element transaction such

1  that **all of the revenue** recognized upfront was improper and in violation of GAAP.  ¶¶139, 142.

2  Defendants also admit that the facts that made the deal a Subscription agreement were known to

3  defendants at the time the deal was negotiated and entered into.  *Id.*

4            (b)    Defendants Admittedly "Negotiated" the Terms of the 1Q08 Agreement and

5  Thus Knew that the Revenue Could Be Recognized Upfront: The Company now admits that 1Q08

6  $24.8 million deal was not a Term arrangement at all but instead an obvious Subscription

7  arrangement.  *See* ¶139 ("[T]he Software arrangement that was executed with this customer, **was**

8  **negotiated in contemplation of a subscription arrangement** that was executed with the same

9  customer during the three months ended September 27, 2008.").  Exs. 39, 44.  Defendants admit that

10  it was thus a Subscription agreement and involved product that had not even been **commercially**

11  **available at the time**.  *Id.*  This was basic application of the internal accounting policy.  *Compare*

12  ¶159, 170; Ex. 6 at 29-30 (describing internal accounting policy for software not available at the

13  time the contract was entered into).   The facts and contingencies were admittedly known to

14  defendants at the time the false financials were published and were negotiated as part of the deal in

15  1Q08.

16            (c)    Defendants' Model Shift Forced Artificial Creation of Term Agreements:

17  Defendants also knew, or were deliberately reckless in not knowing, that the terms of the restated

18  transactions were, at the overall instruction of senior management, negotiated and designed to

19  "**create**" an artificial separation between currently available software and Subscription component

20  later developed software in order to book Term agreement revenue upfront.  Defendants admit they

21  created the artificial separation and understood the accounting consequences.  *See* ¶119 ("In order to

22  record revenue up front on gold cards and term agreements there are certain rules within

23  accounting. . . .  We couldn't sell a subscription license or service with **that we had to create a**

24  **separation**.")  Moreover, because of that artificial separation, defendants **knew** at the time what they

25  now admit, which is that (1) the 1Q08 was specifically negotiated to create a separation from what

26  they knew to be a multiple-element transaction for unavailable software; and (2) with respect to the

27  2Q08 $12 million deal that was restated, the customer did not want to cancel their subscription rights

28  to later available software, and they did not intend to create a Term agreement.  Thus, it was not a

1 cancellation of a Subscription agreement and execution of a Term agreement.  Instead it was a

2 "continuation of a Subscription agreement." *See* ¶155.  Therefore, defendants knew that it had to be

3 recognized ratably, not upfront but created an artificial separation in order to recognize the revenue.

4         (d)    <u>Defendants' Suspicious Qualification of the Effectiveness of Internal Control</u>

5 <u>Suggests Knowledge and Intent</u>: The Company knew or deliberately disregarded that its internal

6 controls were not effective and attempted to obscure knowledge of that fact as evidence by its own

7 qualification of its controls, and now admits that the Company had a material weakness in its

8 disclosure controls at the time the 1Q08 Form 10-Q was filed with the SEC.  Defendants now admit

9 that there was "material weakness in internal control over financial reporting" and "over the

10 application of revenue recognition criteria required by SOP 97-2," and specifically "from term

11 license agreements." *See* ¶¶143, 145 and Exs. 44 & 45.

12         (e)    <u>Cadence Manipulated Financials Results in Order to Meet Revenue and</u>

13 <u>Earnings Forecasts Numbers Further Demonstrating Knowledge and Intent</u>: The 1Q08 Cadence

14 revenue forecast was $280-$290 million in revenue and $0.03-$0.05 EPS.  Without the false creation

15 of a Term agreement from the $24.8 million improperly recognized deal, Cadence would have

16 missed its revenue forecast for 1Q08 by at least $15 million, and further missed its earnings forecast

17 by more than ($.06) respectively.  Exs. 1, 8.  Former SEC Chairman remarked that corporate motives

18 to beat analysts' expectations had resulted in many companies engaging in accounting "hocus

19 pocus":

20     The "Numbers Game"

21                     *       *       *

22         Increasingly, I have become concerned that the motivation to meet ***Wall***

23 ***Street earnings expectations may be overriding common sense business***
***practices. . . .   [W]ishful thinking may be winning the day over faithful***
***representation.***

24                     *       *       *

25

26     [C]ompanies try to meet or beat Wall Street earnings projections in order to grow
market capitalization and increase the value of stock options. ***Their ability to do this***
***depends on achieving the earnings expectations of analysts.***

27

28 Ex. 46 at 1-3.

(f)     The 1Q08 Purported Term Transaction Was the Largest Recognized Revenue Transaction of 1Q08 – More than 10% – Requiring Detailed Disclosure Under SEC Rules: The revenue recorded from the 1Q08 $24.8 million transaction was in fact the largest revenue recognized transaction in the quarter.[8]  The Company thus knew or was deliberately reckless in not knowing the detailed negotiations creating artificial separation of Term and Subscription and the material overstatement of the financial results because the transaction represented more than 10% of the Company's overall *revenue recorded* during the quarter.  As such, defendants were not only required to know and understand the basis for the recognition of revenue in the quarter, but SEC Regulation S-K Item 101 §229.101 required that the Company to specifically disclose the details concerning such transactions including the name of the customer:

> (vii) The dependence of the segment upon a single customer, or a few customers, the loss of any one or more of which would have a material adverse effect on the segment.
>
> ***The name of any customer and its relationship, if any, with the registrant or its subsidiaries shall be disclosed if sales to the customer by one or more segments are made in an aggregate amount equal to 10 percent or more of the registrant's consolidated revenues . . . .***

Ex. 58.

73.     The Company told investors that sales with one customer represented 11% of the Company's 1Q08 revenues.  Ex. 14.  However, SEC Regulation S-K, Item 101 §229.101(c)(vii), specifically requires the disclosure of the customer which the Company never did.  Thus, apart from knowing or deliberately disregarding the structure of the contract, the Company violated Regulation S-K by not disclosing the name of the customer as required by the rule.

---

[8]     The Court indicated that this transaction was not shown to have been the largest transaction after revenue was properly adjusted.  September 11, 2009 Order Granting Motion to Dismiss at 7.  However, after the restatement, defendants modified the disclosure after the restatement in the amended Form 10-Q for 1Q08: "Taking into account the restatement adjustments noted in Note 2, no one customer accounted for 10% or more of total revenue during the three months ended March 29, 2008."  Ex. 44 at 18.  Thus, the detail of the restated transaction confirms that the restatement involved the one customer who originally accounted for 11% of the Company's reported revenue for the quarter prior to the restatement, the largest customer for that quarter.

(a)    The Overstated "Product Revenue" During the Class Period Was the Core of the Company's Business: The revenue overstatement had an even larger impact on the Company's Product Revenues.  Product Revenue was indeed at the ***core*** of the Company's business and revenue stream because according to the Company, Product Revenue drives maintenance and service revenue, *i.e.*, Cadence had to sell its products first before selling any ancillary or related maintenance/services.[9]  Cadence's reporting of Product Revenue was a key metric – as it also served as an indicator of Cadence's market share in the various EDA product spaces.  Of the $287 million of revenue recognized for 1Q08, ***$156 million was recognized for Product Revenue***.[10]  Without the Q108 $24.8 million deal overstatement of Product Revenue, the Company would have reported a ***45% decline*** for Product Revenue from the same period in 2007.  The restatement of $24.8 million is not only nearly 10% of the total revenue and 15% of the Product Revenue reported; the impact of it on the income/loss would have been tremendous, as the Company already initially reported a loss of $19 million.

Confidential Witness Reports Provided Substantial Facts Demonstrating Defendants' Knowledge or Deliberate Recklessness

74.    Multiple former employee witnesses provided details of the Company's sales, contract negotiation, revenue recognition and pipeline review processes confirming that defendants knew or were deliberately reckless in not knowing that the financial statements issued during the Class Period were materially false and misleading as well as the SEC documents and quarterly and FY08 forecasts.  Confidential employee witnesses reported that given the contract review and approval processes at Cadence, and the amount of revenue being recognized on the 1Q08 and 2Q08

---

[9]    In the Company's Form 10-K for 2007, the Company described its maintenance revenue as derived from "technical support to our customers to facilitate their use of our software and hardware products." Ex. 6 at 6.  In 2007, maintenance revenue was 24% of its total revenue reported.  Service revenue, which consisted 8% of its total revenue in 2007, came from fee-based services, which "may be sold separately or sold and performed in conjunction with the sale, lease or license of our products." *Id.* at 7.

[10]    After other adjustments, the Company admitted that the Product Revenue was overstated by 14.2%.

1  contract, the Individual Defendants knew, structured and approved of the terms and the upfront

2  revenue recognition.

3         (a) <u>The 1Q08 Contract Was a Transaction with a Japanese Customer – Fujitsu</u>: At

4  least five witnesses report that the 1Q08 transaction that was restated was a deal with a Japanese

5  customer (Fujitsu), and that defendants were certain to have been part of the negotiation process and

6  structuring of the agreement. The $24.8 million transaction represented more than ***30%*** of the $75

7  million revenue reported from Japan. It was also the Company's largest revenue transaction in the

8  quarter.

9         (b) CW15, a former Sales Director, reported that the restated $24.8 million

10  transaction involved Fujitsu.

11         (c) CW2, a former Vice President of Finance who provided facts concerning the

12  Company's contract approval process including for sales to Japanese customers, stated that Cadence

13  had offered an eight-year agreement with Fujitsu in 1Q08. CW2 also stated that the $24.8 million

14  restated transaction was likely the largest deal booked in the quarter.

15         (d) CW3, a Senior Manager in the Marketing Group, also reported that the

16  restated transaction relating to the 1Q08 financial results was likely a 1Q08 deal that the Company

17  had entered into with Fujitsu.

18         (e) CW6, a Senior Product Marketing, reported that in 1Q08, the Company was

19  experiencing a revenue gap and that Cadence had purportedly closed a deal in 1Q08 with Fujitsu.

20         (f) CW8, a former Sales Account Executive, reported that after the restatement

21  announcement, the internal discussion was that the restated transaction involved a 1Q08 deal with

22  Fujitsu. CW8 further reported that that was consistent with his/her personal perspective in 1Q08

23  during which he/she described United States and North American sales as being particularly weak,

24  and that he/she heard that "***Japan saved Q1***."

25         (g) The revenue reported for Japan was restated from $75 million to $56 million,

26  further supporting the witnesses' accounts that the restated transaction involved a Japanese customer.

27  Exs. 14, 44.

28

1    (h)    These CW reports are corroborated by a later June 18, 2008 Electronics

2    Design, Strategy, News ("EDN") article (discussed later in ¶85) which describes the fact that (i) the

3    Company entered into an eight-year deal with Fujitsu, and (ii) all of the revenue would be

4    recognized in 2008.  The article did not reveal accounting manipulation.

5    75.    The Individual Defendants Controlled the Contracts Negotiation and Approval

6    Process and Revenue Recognition: Reports of five confidential witnesses corroborate one another

7    and demonstrate that because of the approval structure in place for sales including international

8    sales, in combination with the amount of revenue recorded on the 1Q08 restated transaction,

9    defendants knew or were deliberately reckless in not knowing that the deal was not a Term

10   Agreement but instead a Subscription Agreement that required ratable revenue recognition. Indeed,

11   one witness, CW12, a consultant and advisor to multiple EDN industry companies, confirmed that

12   Bushby, head of Worldwide Sales, negotiated the 1Q08 Fujitsu deal, was "told to do it" by Fister and

13   was fired because of the event that gave rise to the restatement.

14          (a)    According to CW8, based on his/her firsthand experience, defendants Bushby,

15   Porter and Palatnik were all participants in how sales agreements were structured, and specifically

16   whether they were Term or Subscription agreements, and thus how much revenue would be

17   recognized.  With respect to Sales agreements with Japanese customers, CW8 stated that it was

18   Bushby who was in direct contact with Japanese executives regarding the terms and conditions of

19   sales.  According to CW8, it was defendant Bushby in particular who would instruct the Sales people

20   how to structure the Sales agreements, monitor the deal progress until it was finalized, and at which

21   point, give approval to draw up the Sales contract.

22          (b)    CW8 also described the Account Executive or salesperson responsibilities

23   with regard to negotiating contracts and terms of agreement with customers.  First, CW8 explained

24   further that Sales personnel at Cadence were not the contract negotiators nor the people who

25   designed the terms of the agreements.  Instead, CW8 described the Sales personnel acted more like

26   liaisons with customers cultivating the relationship, simply determining what products the customer

27   needed and when they needed it or would buy them.  However, according to CW8, the negotiation of

28   terms and "architecting" all other financial aspects of the deals, especially large deals, was not done

by the Sales persons but was done by the "big guns."  According to CW8, because of the way in which the Company's Sales organizations and senior level authority was structured, it was impossible for a line-level Sales person to offer a customer terms or conditions that would not be in the contract.  Thus, a Sales person did not have the authority to make side agreements, and no Sales person would deviate from the terms provided by Sales Operations.

(c)     According to CW2, a former Vice President of Finance who was responsible for the Sales/Finance group and setting up the contract approval structure prior to the Class Period, confirmed that the contract approval process remained the same in 2008.  CW2 also provided details concerning the way that Japanese customer contracts were approved, and reported that the Company's contracts with Japanese customers were first reviewed by the CFO equivalent for Cadence in Japan.  According to CW2, the finance executives in the San Jose headquarters would streamline negotiations of legal terms and conditions *of all contracts*, including those with Japanese customers, rather than relying only on the "sales guys" to communicate the details of the contracts. The accounting personnel in San Jose determined how much revenue would or could be recognized from the transaction.   The Company also retained an independent translator because U.S. Sales/Finance wanted to know exactly what the ultimate contract said.  The contracts and associated accounting were next reviewed by the Controller at the time (Palatnik in 1Q08).

(d)     CW2 reported that generally Sales personnel were instructed as a matter of policy that if any side letter contingencies were found in any of the deals they were working on, the deal would be revoked and that would be grounds for termination.  According to CW2, this control was imposed upon the Sales personnel during the period when CW2 was Vice President of Finance and that Sales personnel "***knew not to do it***."  He/she further stated that never during his/her tenure had Sales personnel attempted to get undisclosed side agreements through, further indicating that defendants would have negotiated or been aware of any such agreements.   CW2 added that defendant Bushby was definitely involved in helping negotiate deals with customers and that Fister was also commonly involved in deal negotiations with customers.  Further, because of the structure and process for international deals, CW2 reported that for a deal as large as the $24.8 million deal recorded in 1Q08, it would definitely have been reviewed and approved by the then-CFO Porter.

1      (e)    CW6, a Senior Product Marketing manager who was regularly involved in the

2 sales process, corroborated CW2 and reported that the Finance and Accounting operations at

3 Cadence's headquarters, not the international offices, determined revenue recognition on the

4 international agreements signed.

5      (f)    CW3, a former Senior Manager of the Marketing group, corroborated the

6 reports of CW2 and CW6 that that revenue recognition decisions would be made at the San Jose

7 headquarters. According to CW3, contracts were evaluated according to: (1) contract size (revenue);

8 (2) the terms of the contract; (3) whether or how much revenue could be realized upfront or ratably;

9 (4) as well as the amount of discount being extended. CW3 explained that the review and approval

10 process was based on the size of the contracts because large contracts were "not boilerplate" but

11 instead "very unique" and required considerable review and analysis. According to CW3, the review

12 process generally began with a transaction/contract being received and reviewed by the senior

13 Sales/Finance organization. Depending on the nature of the deal, there would be "back and forth"

14 with Sales personnel all the way to Porter and Palatnik. The Sales/Finance organization would send

15 it to the Revenue Accounting that ensured the revenue was documented as ratable or upfront. The

16 Head of the Revenue Accounting group, John Hall (Vice President), also reported to the CFO –

17 Palatnik and/or Porter.

18      (g)    CW12, an industry consultant in the EDA industry advising clients with

19 strategic product analysis and design methodologies, reported that in 1Q08 Cadence had entered into

20 an eight-year license with Fujitsu (a fact that he/she had learned from a Fujitsu engineer), and that

21 Fujitsu had "backed out of that deal" sometime in 2Q08 because it was it highly likely that the

22 Fujitsu deal was, in fact, the deal that was restated.

23      (h)    CW12 further reported that Cadence had in fact been attempting to enter into

24 similar long-term deals in late 2007 with other customers, some of which contacted CW12 to ask

25 him/her if he/she thought "they should take the deals," which CW12 advised that they not do. For

26 instance, CW12 said that Harris Semiconductor was approached to do an eight-year license

27 agreement with Cadence in 4Q07 and did not do it on CW12's advice. CW12 further stated that an

28 eight-year deal reflected "a sales force that was out of control." CW12 said *he/she knows that*

1  *Kevin Bushby was fired for the events that gave rise to the need for Cadence to restate earnings*

2  *and that Bushby had been "told to do it"* – *i.e.*, arrange the 1Q08 deal that resulted in the $24.8

3  million of restated revenues – by defendant Fister.

4  (i)  <u>The Sheer Magnitude of Revenue Recorded on Single Restated Transactions</u>

5  <u>Required Top Management Approval</u>: According to CW 15, a former Sales Director who attended

6  the Company's Sales Kick-off meeting in January 2008, Fister told the Sales organization that he

7  was involved in every deal over $5 million.  CW15 also reported Fister saying, "Kevin [Bushby] and

8  I are involved in every large transaction" at that kick-off meeting, in response to a question from a

9  Sales personnel whether Fister knew what was being done with the deals, *i.e.*, the renegotiations.

10  Thus, given that Fister and Bushby were involved with deals over $5 million, they were involved

11  with the $24.8 million deal at issue.

12  (j)  According to CW4, a former Director of Engineering in the Company's San

13  Jose Headquarters, who occasionally negotiated contracts that involved Custom Integrated Circuits

14  ("CIC") products, given the amount of revenue recorded with the restated transactions ($24.8 million

15  and $12 million), and the manner in which Sales agreements were approved, defendants had to have

16  approved the deals in order for such large amounts of revenue to have been recorded.  CW4 reported

17  that product contracts were initially negotiated with customers by Cadence Sales personnel.

18  However, CW4 reported that any contracts with Cadence's top 30 major customer accounts required

19  approval by division heads and the CFO, *i.e.*, Porter or Palatnik.  Even further, CW4 reported that

20  contracts for the Company's top three or four largest revenue deals in any given quarter required the

21  approval of Palatnik and Porter.

22  (k)  CW1, a former Sales Administrator whose responsibilities included entering

23  Sales contracts into Cadence's systems after the contracts had been negotiated and approved, states

24  that large-value contracts such as the $24.8 million and large discounts required defendant Palatnik's

25  approval.

26  (l)  CW7, a former Business Systems Analyst, whose job was to keep Cadence's

27  Siebel system running – the system that kept track of details of sales opportunities and booked sales

28  – reported that either Porter or Palatnik "signed off on big stuff" in terms of revenue recognition.

1   CW7 reported that Cadence executives had always been "very meticulous" about deals coming in

2   any given quarter and how much revenue was going to be booked.  CW7 reported that as deals were

3   reviewed, they may even require adjustment in the system that would impact how much the

4   customer would be paying upfront and thus how much could be booked as revenue.  In fact,

5   according to CW7, even small deals during any given quarter were adjusted when it was determined

6   that the nature of a transaction was such that revenue should not yet be recorded as revenue.  It was

7   because of this review process that it seemed implausible that a $24.8 million deal recorded upfront

8   could go through undetected.  CW7 also remarked that a deal this size would be huge for both the

9   Company and the Sales team responsible for the deal.  Indeed, CW7 stated that a deal amounting to

10  $24 million revenue for a single deal was "huge . . . that's a big deal."  According to CW7, when the

11  deals were booked, the information and revenue detail of the transaction were booked in Cadence's

12  SAP system, and financial data related to booked revenue from SAP was also entered into a system

13  called Epiphany, at which time that information was to loop back around and be entered into the

14  Siebel system.  CW7 states that Cadence used the Siebel CRM system to track sales opportunities

15  and book deals, and to ensure that orders were fulfilled.  The Japanese Sales force, like all of the

16  Cadence Sales force, entered details into the Siebel system, including: (1) a potential value of the

17  contract and (2) when the contract would be expected to close.  At that point, the deal became part of

18  the Company's overall pipeline, and defendants would utilize the Siebel system to evaluate the deals

19  in the pipeline.

20          (m)     Finally, CW7 corroborated that defendant Bushby was undoubtedly involved

21  in evaluating deals and the manner in which revenue was to be recognized.

22          76.     Defendants Actually Knew that Its Revenue and Earnings Forecasts for 2Q08, 3Q08

23  and FY08 Were False When Made:  Defendants actually knew or recklessly disregarded that the

24  2Q08 and FY08 forecast they provided the market was false and misleading because the forecast was

25  based on the false financials reported for 1Q08, and thus they had no basis for making the 2Q08,

26  3Q08 and FY08 projections.  The Individual Defendants knew the status of current transactions and

27  what or how much was available to pull forward from the pipeline to meet expectations.  Defendants

28  had access to the Company's forecasting bookings and financial reporting systems which kept track

of the state of pending or anticipated contract negotiations, as well as the terms of the contracts (*i.e.*, Term versus Subscription).  Defendants also knew exactly how much revenue they needed to meet analyst expectations based on their regular monitoring of the various systems in place, and how much bookings was in the pipeline.

77.    Defendants admitted to control and review the Company's own pipeline with granularity.  During the 1Q08 conference call, in which Fister and Porter were present, Fister stated:

> **When we plan the pipeline, and like I say we do this with a lot of visibility, in some appreciating detail, we took into account the time shift** . . . .

Ex. 10 at 8.

78.    Several former employee witnesses reported that defendants knew about the bookings and revenue bubble and their implication on the Company's future outlook.

(a)    According to CW10, a former Operations Director, when defendant Fister and his "associates" were hired by Cadence, the Company model began to change and the number of fixed Term contracts increased.  CW10 said that the management of Cadence sought to have more Term contracts so more revenue could be recognized upfront.  CW10 said that in 2007 he/she heard that the management was planning to sell Cadence to a private firm and, therefore, needed to find ways to increase the Company's revenues.  According to CW10, even Cadence's Sales force was instructed and encouraged by senior management to sell more Term contracts.

(b)    Similarly, CW9, a former Marketing Director, reported that in 2007, prior to the Company shifting its focus from 75% Subscription (ratable) contracts, to 50% Term and 50% Subscription, defendant Bushby confided in him/her directly that Bushby was very concerned about revenue flows going forward and needed to find new ways to maintain revenue flow.  CW9's report indicates that the shift from primarily Subscription model to a Term model was not natural customer demand but manufactured by defendants to support revenue forecast.  CW9 corroborated the report of CW10 that the Company's Sales personnel were consistently pressured to renew customer contracts ***prior*** to the date that existing contracts expired.  According to CW9, the pressure to get renewals prior to expiration of contracts caused a significant amount of stress for the Sales personnel and the Company.

1          (c)     CW3, the former Senior Manager who was responsible for list prices for

2   Cadence products had personal knowledge of Cadence's marketing and business operations,

3   establishing that defendants actually knew of the bookings decline early in 1Q08 caused by early

4   renewals of contracts and steep discounts.  According to CW3, by late 2007, Cadence realized that it

5   was not going to be acquired by any private equity firm and had exacerbated the existing

6   revenue/bookings bubble problem by pulling in so much revenue forward in mid-2007.  In order to

7   keep reporting significant upfront revenue, Cadence had to extend very significant discounts to

8   customers as part of renegotiating existing Subscription contracts.  CW3 further explained that

9   Cadence's biggest problem from the shift to the Term licensing model was that recognizing as much

10  revenue upfront as possible required that Cadence constantly sign new contracts or renew existing

11  contracts in order to continue reporting as much (or more) revenue as had been reported in prior

12  periods.  But recognizing revenue upfront on long-term contracts meant that Cadence needed to

13  renew those contracts before the scheduled expiration of the contracts, removing them from future

14  predictable renewals.  And customers were only willing to renew these contracts if they received

15  incentives, such as significant discounts (sometimes 90%), or free maintenance or services.  Thus,

16  the new business model (*i.e.*, shifting its licensing model from Subscription to Term licenses for new

17  renewal contracts) that was implemented in mid-2007 also compromised Cadence's maintenance and

18  service revenue stream.  The consistent renewal of these transactions prior to expiration caused

19  future revenues to be drawn forward at the expense of revenue streams that would have been

20  reported later had the agreement not been renewed prematurely.  CW3 **_warned defendant Palatnik_**

21  of the risk of regularly renewing or converting Subscription licenses to Term licenses and the

22  bookings bubble that it was creating.  Palatnik responded, "Don't worry."

23          (d)     CW5, a former Senior Technical Marketing Manager whose responsibilities

24  included collecting Cadence's sales and market segment data in late 2007 and early 2008, reported

25  that as a result of reports he/she helped prepare, defendants actually knew about the imploding

26  bookings and revenue bubble by 1Q08.  CW5 stated that as early as 4Q07, the data for the first

27  quarter of 2008 had been collected, and even then it indicated that the annualized sales numbers were

28  declining compared to the prior year data, and there was a downturn in almost all Cadence customer

1    accounts, based on the "annualized run-rate" projected for 2008 to the "annualized run-rate" that was

2    projected for 2007.  According to CW5, Cadence's internal data analysis indicated a huge drop in

3    sales and market share by 1Q08.  Similarly, the sales data collected in the first quarter of 2008

4    indicated that Cadence was losing some of its strategic deals, including a huge drop in the sales

5    numbers for IBM, one of Cadence's largest accounts.  ***CW5 stated that his/her boss Mashayekh***

6    ***submitted these data points to defendants in a final quarterly market analysis report in***

7    ***PowerPoint presentation to the CEO, the CFO, all Vice President-level personnel and the***

8    ***Company's accounting team***.

9              (e)       According to CW13, a former Product Marketing Director, the Company

10   Term Agreement model required the Sales personnel to repeatedly renew customer contracts before

11   they expired.  CW13 reported that the Company would renew contracts a couple of quarters before a

12   contract expired.  Then it would be three quarters before an expiration and the time before expiry

13   kept increasing.  CW13 reported that he/she saw the Company renew contracts even one year before

14   expiration.  In order to convince customers to renew, the Company had to provide huge discounts.

15   ***According to CW13, the Company reached the point where it could no longer get customers to***

16   ***renew and at the end of 2007, "there were no more customers left to renew."***

17             (f)       Corroborating CW13's account, CW14, a former Account Manger, reported

18   that prior to the Class Period the Sales force was instructed by senior management and specifically

19   Bushby to call on customers to let them renew their contracts early.  According to CW14, huge

20   discounts were provided to customers in order to get them to renew early and even more discounts

21   were provided if customers paid cash upfront instead of making payments over the life of the

22   contract.  According to CW14, that would essentially convert a Subscription contract to a Term

23   contract to allow for upfront revenue recognition.  CW14 reported that the early renewal policies

24   were defendants' way of making the Company appear more solvent than it actually was.

25             (g)       CW14 reported that he/she knew that defendants Bushby and Fister

26   specifically negotiated contracts and reported that in 4Q07, December 2007, Fister and Bushby met

27   with executives from Advanced Micro Devices ("AMD"), a Canadian company and offered a 99.1%

28   discount to renew the contract before the end of the year.  CW14 understood that the AMD

1  transaction was wholly motivated by Fister and Bushby's personal interest, and that closure of the

2  deal put their bonus levels for 2007 at a significant multiplier.

3            (h)      CW14 further added that Bushby was intimately involved in the review of

4  sales including the details of sales in any given quarter.  Bushby also instructed the Sales force on

5  changes to be made to the details of specific deals if necessary.  In fact, Bushby, according to CW14,

6  specifically inquired as to how much each customer was going to pay upfront and how much would

7  be paid ratably.  Instructions to make sure that certain deals closed before the end of the quarter

8  would come directly from Bushby.

9            (i)      CW14 also stated that defendant Bushby approved product discounts offered

10  by Cadence's Account Executives to customers in order to close sales deals.  In fact, Bushby held

11  weekly telephone calls with his direct reports, including Thomas Cooley, Vice President of Sales for

12  North America, and all Account Executives.  During the weekly calls, the participants discussed the

13  status and details of pending contracts and product discounts that needed to be offered to close them;

14  Bushby's verbal approval for the discounts was needed in order to close the deals.

15            (j)      CW14 further reported, that in both 1Q08 and 2Q08, account managers were

16  struggling across the board to make sales and that weak sales would be evident in review of the

17  Company's run rate.  According to CW14, in September 2008, Cooley met specifically with the

18  Board and "blew the whistle" on senior management, and told the Board that the shift to Term

19  agreement was cannibalizing the future by pulling contract renewals forward.  In addition, Cooley

20  warned the Board that such practices were going to get the Company in serious trouble.  CW14

21  reported that Bushby was fired and that Cooley replaced him.

22            (k)      CW5 reported that defendant Bushby ran the Company's Sales organization

23  and all Sales employees ultimately reported to Bushby, including some Business Managers in the

24  Engineering Services Group who were included under contract negotiations.  CW5 stated that

25  Bushby dictated Sales targets to the Business Managers, which they had to achieve.  According to

26  CW5, he/she heard that after the January 2008 earnings report which communicated a revenue miss

27  and a lowered FY08 outlook, Cadence employees internally discussed that the Board were

28  considering firing both Fister and Bushby.  Further, CW5 reported that he/she attended an all

1   employees meeting held just after the Company's stock fell following the Company's January 30,

2   2008 earnings conference and analysts downgraded Cadence stock.  At the meeting, management

3   and particularly defendant Bushby told employees that "the earnings were down."  CW5 reported

4   that Bushby was angry that Wall Street analysts had downgraded the Company's stock and that it

5   had caused the stock price to decline.  CW5 recalled that Bushby during the meeting stated that the

6   analysts were "***not qualified to wipe my nose***" and "***we are going to show them***."

7          (l)     CW1, a former Sales Administrator whose job required CW1 to upload

8   information into systems, stated the eDA-on-Tap and Siebel systems tracked whether certain

9   contracts were characterized as "Term" or "Subscription" contracts.  CW1 further stated that

10  defendants had access to both systems and thus knew how much revenue the Company could

11  recognize on the contracts.  The scanned copies of the contracts were uploaded into the two systems

12  and therefore actual copies of the contracts could be viewed within the systems.  The eDA-on-Tap

13  system designated contracts as Pool A or Pool B, one for Subscription contracts and the other for

14  Term contracts.  The eDA-on-Tap system showed the full dollar amount of a contract, as well as the

15  kinds of remix rights that the customers had purchased.  The Siebel system contained the same kind

16  of data as the eDA-on-Tap system, but was more of a forecasting tool which showed prospective

17  deals to which the Sales personnel assigned a percentage likelihood of when the deal was likely to

18  close.

19         (m)     CW11, a former Staff Engineer responsible for maintenance of the eDA-on-

20  Tap system, described the system and the information it contained.  CW11 had access to the system

21  and the information therein.  CW11 stated that Sales support, Contract Management and Revenue

22  recognition had access and used the database extensively.  CW11 stated that defendants Porter and

23  Palatnik also had access to the eDA-on-Ttap system.  Anyone who entered into the system could see

24  the customer names, the number of months remaining on the current contracts that the customer was

25  in, the type of contract they had, whether it be Term or Subscription, and prices of the products

26  contracted.  According to CW11, the Finance organization used the eDA-on-Tap system to approve

27  contracts and the Revenue Accounting group would use the information to determine how much

28

1  revenue should be recognized under each contract.  CW14, a former Account Manager, corroborates

2  CW11's description of the eDA-on-TAP system, and defendants' access to it.

3       79.   Defendants Regularly Met Personally with Customers: Several witnesses reported

4  that Fister, Bushby and Porter regularly met with customers to negotiate contracts and thus they

5  knew the terms of the contracts.

6            (a)   CW1 said that Fister "puts his time in with customers."  According to CW1,

7  there were news briefs routinely sent to Company employees, particularly regarding "higher-end

8  deals," that mentioned that Fister and particular Sales representatives had participated in closing the

9  deals.  CW6 reported that Fister and Porter regularly met with Japanese customers.  CW2 also said

10  that Bushby, as the head of the Sales group, was routinely involved in deal negotiations with

11  customers.

12            (b)   Porter's and Bushby's knowledge of the large deals, including the restated

13  $24.8 million deal at issue, is further supported by Porter's statement in response to an analyst's

14  question during the April 23, 2008 conference call concerning Cadence's Product Revenue decline,

15  in which Porter responded, "*I can tell you me and Kevin [Bushby] are out there everyday upfront

16  and personal, we know where we are going.*"  Ex. 10 at 13.  "Kevin Palatnik, . . . he is a great guy,

17  *has been driving lot of the financial machine* for the last two years as a Controller . . . ."  *Id.*  At the

18  March 3, 2008 Morgan Stanley Technology Conference, Fister again stated: ". . . I myself spend a

19  lot of time with companies of [sic] big and small."  Ex. 7 at 7.

20  Cadence Attempted to Buy Out Mentor Graphics in Order to Conceal Its Bookings and Revenue
    Bubble

21

22       80.   As corroborated by several witnesses during 2007, 1Q08 and 2Q08, as Cadence's

23  bookings and pipeline continued to deteriorate, defendants knew that manipulating the reported

24  financials and pulling revenue from the future was only a short-term solution to continue to report

25  acceptable financials.  CW3 and CW10 reported that the Company in late 2007 was trying to merge

26  with another company or be bought by a private firm, before the bookings bubble burst.  CW3,

27  CW5, CW9, CW13 and CW14 reported that defendants knew of the declining pipeline from reports

28  gathered and CW5, in particular, presented the actual data to defendant in 4Q07 and 1Q08.  *See* ¶78.

In an attempt to get a fresh pool of customers and inject more upfront revenue, defendants set out an ambitious plan to acquire one of its main rivals, Mentor Graphics.  Indeed, defendants knew that Mentor Graphics was the only other industry participant that had a primarily Term agreement model, recognizing most of its revenue upfront.  According to CW3, Cadence's attempt to acquire Mentor Graphics was an act of desperation that – had it succeeded – would have enabled Cadence to convert Mentor Graphics' revenues upfront by renegotiating all Mentor Graphics' contracts upon the acquisition, and thereby Cadence could have bought itself another year or so before the consequences of the revenue/bookings bubble overtook the Company.

81.     On April 16, 2008, Fister secretly approached the CEO of Mentor Graphics about combining Cadence and Mentor Graphics via an acquisition.  In April and May 2008, defendants Fister and Porter met with Mentor Graphics' executives to discuss the terms of Cadence's proposal.  ***Without doing any due diligence at all***, Porter and Fister offered $16.00 per share in cash, a significant premium, with the transaction valued at $1.6 billion.  In late May, Mentor Graphics rejected the proposal and informed Cadence that it ***did not want to pursue any further discussion***.  Ex. 51.

82.     <u>False and Misleading Statements</u>: On May 21, 2008, at the JPMorgan Technology Conference where Palatnik and Porter met with analysts, Palatnik again reiterated false forecasts for 2Q08 and FY08 and reassured that the Company's outlook remained the same:

> [T]here's also been no change in guidance that Bill gave in the April call from the January call at the top-line level.

Ex. 16 at 5.

83.     On June 17, 2008, in a surprise move to investors and industry watchers, Cadence issued a press release and held a conference call to announce its hostile takeover bid, whereby Cadence made it known publicly, especially to the investors of Mentor Graphics, that it had submitted a proposal to the Board of Directors of Mentor Graphics to acquire it for $16.00 per share in cash, a 30% premium of Mentor Graphic's stock price at the time.  Ex. 17.  More significantly, Cadence indicated that it might pay for Mentor Graphics with cash by raising debt.

84.     On June 18, 2008, Cowen & Company ("Cowen") issued a report titled, "Potential deal for MENT just beginning" (Ex. 18):

**Potential deal for MENT just beginning . . .**

Conclusion: CDNS went public with an offer to buy MENT for $16/sh cash ($1.6B EV) after MENT mgmt rejected its proposal.  This deal represents a premium of 30% and values MENT at ~ 15.4x FY09 (Jan) consensus EPS and 1.7x EV/'F09 revs.  ***CDNS plans to raise about $1.1B in debt to fund the deal***. . . .

*          *          *

***Cadence has approximately $500M in cash that it could use; it proposes to raise an additional $1.1B in debt to fund this transaction.  Cadence has already had some discussions with banks; we surmise it believes it can raise debt at somewhere at 6% or better.***

*Id.*

85.     A June 18, 2008 article titled, "Cadence stalks Mentor: a possible explanation. (And no, it's not strategic.)," reported that Cadence was attempting to buy Mentor Graphic's future revenue stream and noting rumors that Cadence had entered into an eight-year license to recognize as much upfront as possible:

One possible answer comes from word on the show floor and in the suites at DAC last week.  ***According to the stories, Cadence has been trying to stave off a significant drop in revenue by offering very long-term–up to eight-year-license agreements to its major accounts, and recognizing much of the revenue in this year.  In some cases, the word is, these license agreements even cover as-yet-undeveloped future products***.

*          *          *

And that may explain the offer.  ***Cadence may be trying to acquire not Mentor's technology, nor its customer base, but simply its future revenue stream***. . . .

***Could it be true that Cadence is offering eight-year license agreements? "Yes," Smith confirmed, "Cadence is offering an eight-year agreement to at least one customer, Fujitsu."* . . . *"If so, they are mortgaging their future," Smith said***.

Ex. 52.

86.     The two companies and their respective advisors agreed to meet on August 15, 2008.  It was critical that Cadence portray a rosy picture of its financial and operating conditions in 1Q08 and 2Q08.  In order to appear as an eligible suitor to Mentor Graphics' board and investors, and to raise the necessary financing to buy Mentor Graphics, defendants knew that  Cadence could not

1    afford to miss a quarter of its own guidance, especially when the Company had substantially lowered

2    the guidance at the outset of 2008.  Further, because it might require raising debit, defendants were

3    motivated to maintain the artificial inflation of Cadence's stock price by carrying out the fraudulent

4    scheme described herein.

5    <u>Cadence Issued 2Q08 False Financial Results and Partial Disclosure of the Company's True</u>
     <u>Financial Condition Causing Stock Price Decline; The Company Continued to Conceal Improper</u>

6    <u>Revenue Recognition and Shocks Investors with Switch Back to 90% Ratable Model</u>

7         87.    <u>False and Misleading Statement</u>: On July 23, 2008, the Company issued its 2Q08

8    revenue and earnings results in a press release titled, "Cadence Reports Q2 Revenue of $329

9    Million." Ex. 19.  The Company falsely reported that it had earned (on a GAAP basis) $329 million

10   revenue and $0.02 per share.  The Company and the Individual Defendants knew but failed to

11   disclose that it had improperly recorded revenue in violation of GAAP and SOP 97-2:

12        Cadence Design Systems, Inc. . . . today reported second quarter 2008
          revenue of $329 million, compared to revenue of $391 million reported for the same
13        period in 2007. ***On a GAAP basis, Cadence recognized net income of $5 million, or
          $0.02 per share on a diluted basis, in the second quarter of 2008*** . . . .

14
                           *        *        *
15

16        "***Although we achieved our Q2 numbers, it was more difficult than we
          planned***.  Customers are demanding still more flexibility in when, what and how
17        they purchase software and hardware," said Mike Fister, chief executive officer. "As
          a result ***we've made the decision to lower our outlook and transition to an
18        approximately ninety-percent ratable license mix***."

19   *Id.*

20        88.    On the same day, July 23, 2008, defendants hosted a conference call with the analysts

21   during which defendants Fister and Palatnik repeated the Company's false financial results for 2Q08.

22   Ex. 20.

23        89.    On July 23, 2008, the Company reported its 2Q08 revenue and earnings results.  The

24   Company falsely reported that it had earned $329 million in revenues and $0.02 EPS, as detailed

25   below.  *See* Exs. 19-20.

26        90.    The Company also shocked investors with two material disclosures which sent the

27   stock price plummeting:

28

1           (a)     First, defendants revealed that the FY08 earnings forecast would be slashed by

2 at least ***$400 million from $1.5 billion to $1.1 billion***.  Because this was after the 2Q08 financials,

3 all $400 million would be from the back half of the year, the Company assured investors was intact.

4 This disclosure was in direct contrast with previous assurances by the Company that the second half

5 of FY08 would be stronger and back-end loaded, not withstanding analysts previous concerns

6 (falsely allayed by defendants) that the Company's revenue and business model put substantial risk

7 on its future results.

8           (b)     More importantly, defendants abruptly reversed the revenue mix back to 90%

9 Subscription and 10% Term, as opposed to a 50/50 mix, in radical contrast to the change only two

10 quarters earlier, a clear acknowledgement that the Company's model shift had depleted the pipeline.

11 Defendants nevertheless continued to deny that fact.

12       91.     Securities analysts immediately questioned the lowered revenue and earnings

13 guidance and the Company's business model change during the 2Q08 conference call because it was

14 starkly inconsistent with the way defendants had previously characterized the Company's financial

15 outlook.  Ex. 20 at 4-8.  Defendants Fister and Palatnik continued to conceal the true facts

16 concerning false financial results of 1Q08 and 2Q08 (which resulted from improper revenue

17 recognition pulling revenue from future periods), and Cadence's true financial and business outlook,

18 and falsely denied any Company specific factors related to the lowered forecast and instead blamed

19 the "market conditions" as the reason for the changes.  For example, Richard Valera, an analyst at

20 Needham asked about the sharp decline in bookings:

21         [C]learly a quarter ago, presumably, you were expecting to do something on the
         order of $1.5 billion or so of bookings, so did the environment deteriorate that
22         quickly that your bookings outlook could have gone from $1.5 billion down to $1.1
         billion in one quarter or any color around that would be helpful?
23
*Id.* at 5.
24
25       92.     The Company continued to actively conceal the revenue mix and again shut down any

25 inquiry or requested disclosure of the mix between Term and Subscription:

26         Palatnik: ***Once again, from a ratability standpoint we're only going to report***
27         ***backlog once a year, so we're not going to get into the bookings ratability on a***
         ***quarterly basis***.
28

1   *Id.* at 10.

2      93.   <u>False and Misleading Statement</u>: Finally, with respect to the Company's forecast for

3   the remainder of the fiscal year 2008, defendants particularly forecast 3Q08 revenue to be $235

4   million and EPS to be ($0.50-$0.54):

5      ***The outlook reflects the shift to a 90% ratable mix and lower business levels for the
       remainder of the year. For Q3, we expect revenue to be in the range of 235 to $245***

6      ***million.*** . . . For 2008, we expect weighted average contract life to be in the range of
       three to four years. We expect to be break even for the non-GAAP operating margin

7      on an annual basis for 2008. ***GAAP EPS should be in the range of a loss of $0.50 to
       $0.54*** . . . .

8   *Id.* at 4.

9      94.   Mahesh Sangeneria, an analyst from RBC Capital Markets, was skeptical about the

10  scripted explanations for the sudden drastic reduction in forecast and the abrupt business model

11  change:

12     I think ***we have been in this environment for awhile, but what degraded, and again
       I will say the same thing that, yes, things are bad, but I can't get from***

13     ***semiconductor companies or any in other Companies that things are gotten so
       much worse what you're forecasting*** . . . .

14
       Can you give us a little bit more color on what was the thought process in

15     changing going back to the 90% ratable model? You just recently went from 70%
       plus to 50% kind of and now you're going back to 90.

16

17  *Id.* at 5-6.

18     95.   Defendant Palatnik responded to the question again falsely suggesting that revenue

19  and earnings in 2Q08 were legitimate – though achieved with significant challenges – but again

20  failed to disclose that the Company for two consecutive quarters had artificially inflated its reported

21  revenue and earnings results in violation of GAAP and SOP 97-2.

22     96.   Moreover, rather than disclosing the financial condition of the Company, Fister

23  falsely reassured the analysts that the Company's forecast had been conservative and taken into

24  account that it was projecting FY08 to be a back-end loaded year. *Id.* at 5.

25     97.   When Jay Vleeschhouwer again inquired about the timing of the revenue model

26  change, Palatnik again blamed the market conditions as the cause of the model change, even though

27  he knew and would later admit the EDA business model which focused on increasing Term

28  arrangements over Subscription arrangements had created a bookings and revenue bubble. *See, e.g.,*

¶119. Palatnik instead stated that Cadence's 2Q08 results were good, and did not disclose that the reported financials were in fact manipulated: "***We're very happy with the numbers we publish for Q2 . . . .***" *Id.* at 8.

98.    When Terence Whalen, a Citigroup analyst, again asked for the percentage of bookings on ratable versus upfront to determine and clarify Cadence's pipeline, defendants again refused to provide the breakdown, concealing material facts concerning the Company's financial condition:

> ***Yes.  Once again, from a ratability standpoint we're only going to report backlog once a year, so we're not going to get into the bookings ratability on a quarterly basis***.

*Id.* at 10.

99.    Following the July 23, 2008 announcement, several analysts immediately downgraded the stock.  RBC Capital Markets analysts issued a report on July 24, 2008 (Ex. 22) stating that it was surprised by Cadence's lowered forecast and the sudden change in its revenue model:

> ***Management reduced CY08 revenue midpoint by a hefty $370M, 25% of original guidance.  Equally surprising, it changed the revenue model from upfront to 90% ratable***. . . .
>
> *       *       *
>
> ***We were not prepared for the severity of the shortfall***, even though we had previewed softness in Q2 bookings, backlog draw-down and moderate risk to CY08 guidance. . . .
>
> ***We find the timing of the transition to a ratable revenue model peculiar. After several quarters of assuring investors that an upfront model offered superior visibility into orders, the U-turn suggests to us a management arguably in something of a turmoil.***

*Id.*

100.    On July 24, 2008, Cowen issued a report highlighting the sharp shift and return to a primarily ratable Subscription model. and noting that it still had ***"no idea"*** what the mix was in Q2 – because defendants continued to conceal it:

> ***What's shocking is that only several quarters after CDNS abandoned its ratable model for a 50%/50 subs mix; it's now doubled back and decided to move to a 90% model . . . .  A complete about-face***. . . .

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - C-08-4966 SC                                                                                          - 48 -

1   **Q2 EPS of $0.14 on $329M vs. $0.14 on $316M.** Made the Q but suggested
2   environment got much more difficult at the end, and H2 looked more uncertain so
    they reset. No idea on subs mix in Q2.

3   *While macros are v difficult and semis under pressure to conserve $$, we do*
    *not expect LAVA or SNPS to reflect this "dramatic" change. We still think a lot of*
4   *this is CDNS specific* . . . .

5   Ex. 23.

6       101.    Needham also issued an analyst report on July 24, 2008, entitled "CDNS: Massive

7   Guide Down on Model Shift and Bookings Reset; Right Long Term Move, But Ugly Near Term;

8   Maintain Hold." Ex. 21. The report noted, "While industry conditions have likely gotten tougher on

9   the margin, *we believe 90%-plus of Cadence's problems are company specific*." *Id.*

10      102.    The slashed forecast at the model shift disclosures caused shares of Cadence's stock

11  to plunge from $10.27 to $7.11 per share, or 31%, on July 24, 2008. By comparison, the S&P

12  MidCap 400 Index dropped only 3%, the S&P 400 Information Technology Index dropped by only

13  2.7%, and the NASDAQ Index dropped under 2% on the same day. The reporting of its (false)

14  2Q08 results and reduced revenue outlook, however, only partially revealed the true financial and

15  operating conditions of Cadence, as defendants still concealed that its 1Q08 and 2Q08 reported

16  financials were manipulated to meet the Wall Street estimates (and to prevent a further decline).

17  Moreover, defendants were still concealing from the market the bookings and revenue holes created

18  by its business model that essentially left the Company's pipeline depleted by mid-2008.

19      103.    <u>Reasons Why These Statements in ¶¶87-93, 95-96 Were Knowingly False and</u>

20  <u>Misleading and Defendants' Knowledge or Deliberate Recklessness</u>: The July 23 statements

21  concerning the Company's (a) 2Q08 revenue and earnings results; (b) Product Revenue results; (c)

22  3Q08 revenue and earnings forecast; and (d) its policy of upfront revenue recognition were each

23  false and misleading when made for the following reasons: First, defendants have unequivocally

24  admitted that the Company's 2Q08 revenue and earnings were materially false and misleading. The

25  Company has restated 2Q08 revenues and earnings results.

26      104.    As detailed below in ¶¶110-113, the Company improperly recognized revenue

27  "upfront" on a multiple-element transaction that should have been recognized ratably. Cadence's

28  accounting for this $12 million transaction in 2Q08 was booked entirely upfront, in direct violation

of GAAP and the Company's own revenue recognition policies.  The reported earnings were also *overstated by at least 458%*, after all other adjustments were made.

105.    Defendants knew, or deliberately disregarded, that the 2Q08 $12 million transaction was a multiple-element transaction such that *all of the revenue* recognized during the quarter was improper and in violation of GAAP.  Indeed, Cadence had not *earned* that $12 million in 2Q08.

106.    Defendants admit knowledge of the transaction and negotiation of the $12 million transaction, stating that the 2Q08 transaction was purportedly a new Term license and a concurrent cancellation of a Subscription license.  ¶¶140, 155, 175.

> Cadence reexamined a transaction that occurred during the second quarter of 2008 in which it concurrently cancelled a subscription arrangement and executed both a term license arrangement and hardware arrangement with a customer. Specifically, Cadence determined that, despite the cancellation of the subscription arrangement, the customer did not intend to substantively cancel its right to access future new technology because *at the time the subscription license was cancelled the customer intended to re-establish its right to access future new technology at a later time.*

Ex. 39.

107.    Of course this was routine from a revenue recognition standpoint and the Company's own revenue policies.  *See* ¶¶159, 170 (describing revenue recognition policy on such transaction); Ex. 6 at 29-30.

108.    But for the $12 million in revenue that was improperly recognized in 2Q08, Cadence would have missed its projections for 2Q08, which was projected in the range of $310 million to $320 million on April 23, 2008, and reaffirmed during the May 8, 2008 Merrill Lynch Technology Conference and the May 21, 2008 JPMorgan Technology Conference.  Exs. 15-16.  Cadence was only able to report revenue and earnings in the range of what they had told the market because it falsified its financials and improperly recognized revenue on this transaction in violation of GAAP.  Cadence restated its 2Q08 revenue at $308 million.  Had Cadence not falsified its 2Q08 financials, it would have reported a net loss of $16.7 million and ($0.07) earning loss per share rather than a net income of $4.9 million and EPS of $0.02.  This alone represents a 436% overstatement in net income.  *See* ¶¶165, 175.

109.     Furthermore, Cadence improperly recorded $18 million in cash from the accounts receivable sold from the improperly recognized $24.8 million transactions in 2Q08.  As it later admitted (and restated), the Company did not have the accounts receivable to sell in the first place, and could not have sold the receivables for cash for this particular transaction that they knew could not be recognized upfront in 1Q08.  This reporting of additional cash was important because Cadence needed and wanted to appear as "***cash rich***" in the ongoing negotiation with Mentor Graphics.  In fact, by the time that Cadence reported its 2Q08 financials, the shareholders of Mentor Graphics were contemplating Cadence's hostile takeover bid which made it more appealing that Cadence reported more cash in its financials.

110.     According to CW15, a former Sales Director who worked closely with senior Sales executives at Cadence, the restated deal for 2Q08 involved Nvidia.  CW15 reported that the deal with Nvidia was originally negotiated in 2007 and consummated in 4Q07 as a 5-year multiple-element transaction that had software, services, and hardware components, and that it required the Company to recognize the revenue ratably.  Nvidia had in fact paid $9 million in cash for in connection with the hardware portion of that multiple-element agreement, and that the contract required Cadence to upgrade the hardware when the later version of the hardware becomes available. In 2Q08, however, Cadence needed additional revenue.  According to CW15, Bushby specifically gave instructions to VP of Sales Mike Ellow who communicated Bushby's instructions to Chris Cronk and Neil Zaman, the Account Executives who handled the Nvidia account, to re-structure the transaction with Nvidia that was already in place because Cadence needed to "count this deal as revenue" in that quarter.  In essence, Bushby wanted to be able to recognize the revenue on the Nvidia deal all at once, instead of ratably.  As a result of the restructure directed by Bushby, Cadence returned the $9 million cash to Nvidia that had already been paid as part of the multiple-element agreement, and entered into another contract, although Cadence still remained "on the hook" to deliver the new hardware systems.

111.     As described in more detail in ¶75 *supra*, the reports of several confidential witnesses confirm that defendants knew or deliberately disregarded the appropriate revenue recognition on this restated transaction because defendants' express approval was needed in a contract of this

1   magnitude.  CW15, a former Sales Director, reported that Fister and Bushby was involved in every
2   deal over $5 million.  Fister had stated so at the sale kick-off meeting.  CW3, a former Senior
3   Manager of the Marketing group, corroborated the report of CW2, a former Vice President of
4   Finance, that that revenue recognition decisions would have involved multiple personnel and levels
5   of review, and would have escalated to the Individual Defendants given the size of the contract
6   involved.  According to CW3, because contracts even as large as $12 million were "not boilerplate,"
7   it would have required considerable review and analysis.  CW1, a former Sales Administrator who
8   regularly input contract information into Cadence's systems, reported also that $12 million would
9   have been considered as a large-value contract in a given quarter.  CW4, a former Director of
10  Engineering in the Company's San Jose office, corroborated CW1 and CW3 that contracts with the
11  purported value of $12 million would have to be approved by the CFO Palatnik and the relevant
12  divisional heads.  CW8, a former Sales Account Executive, also stated that Cadence had an
13  executive review process that required the signatures of the CFO and the Vice President of Sales,
14  and that no contract would have been generated unless the deal had been approved at the highest
15  levels of the Sales group.

16      112.     Other witnesses corroborate that defendants were involved and approved the revenue
17  recognition of the deals signed.  CW7, a former Business Systems Analyst reported that Porter or
18  Palatnik "signed off on big stuff" in terms of revenue recognition, and that Bushby was undoubtedly
19  involved in evaluating deals and the manner in which revenue was to be recognized because he was
20  in charge of the Sales group.  CW8 reported that Bushby, Palatnik and Porter were all involved in
21  structuring the deals, and thus, knew the revenue recognition impact based on how deals were
22  structured.  CW1, CW7, CW11 and CW14 also independently stated that the senior executives,
23  including the Individual Defendants, had access to the Company's forecasting bookings, and
24  financial reporting systems which kept track of the state of pending or anticipated contract
25  negotiations, as well as the terms of the contracts (*i.e.*, Term versus Subscription), so that defendants
26  knew exactly how much revenue they needed to meet analyst expectations based on their regular
27  monitoring of the various systems in place, and how many bookings were in the pipeline, as
28  described in ¶78 *supra*.

1        113.    Several witnesses also independently state that the defendants were intimately

2  involved with structuring deals, including negotiating with customers on the terms of the contracts

3  and/or approving discounts.  CW8, a former Sales Account Executive, stated that the negotiation of

4  terms and "architecting" and other financial aspects of the deals was done by the Vice Presidents in

5  Cadence's Sales Operations group, and that based on CW8's firsthand experience, Bushby, Palatnik

6  and Bushby were all involved in and made the decisions regarding how deals were structured.  CW2,

7  a former Vice President of Finance, stated that Bushby was definitely involved with deal negotiation,

8  and that Fister was commonly involved in that process as well.  Accordingly to CW1, a former Sales

9  Administrator, the Company's own news briefs that were routinely sent to Company employees

10  mentioned that Fister had been responsible for closing "higher-end deals."   CW14 stated that

11  defendant Bushby who ran the Company's Sales organization held weekly meetings so that he could

12  be appraised of the status of all deals in the pipeline and to make decision on the deal terms in order

13  to close them.  CW15 stated that Fister himself told all Sales personnel that Fister and Bushby were

14  involved in deals over $5 million.

15        114.    Furthermore, defendants actually knew or recklessly disregarded that the 3Q08 and

16  FY08 guidance they provided the market was false and misleading because the forecast was based

17  on the false financials reported for 1Q08 and 2Q08.  Because defendants knew that the 1Q08

18  reported financials were false and misleading, they had no basis for making the 3Q08 projections

19  and FY08 projections.  The Individual Defendants' knowledge or deliberate recklessness regarding

20  the falsity of the financial results reported is further supported by defendants' repeated assurance that

21  they closely monitored the Company's financial outlooks, including their access to information

22  about pending contracts, including the timing of the contracts to come in, as described in ¶¶77-78

23  *supra*, and in subsequent admissions of their knowledge of the applicable accounting rules.

24        115.    <u>False and Misleading Statement</u>: On July 29, 2008, Cadence filed a Form 10-Q with

25  the SEC signed by Fister and Palatnik setting forth the financial results described in the above

26  paragraph. Ex. 24.  The Form 10-Q was accompanied by certifications signed by defendants Fister

27  and Palatnik.  *Id.*  Additionally, in the Form 10-Q, the Company stated:

28

1    Product revenue associated with term and perpetual licenses is generally recognized
     at the beginning of the license period, whereas product revenue associated with
2    subscription licenses is recognized over multiple periods during the term of the
     license.  In order to provide our customers with the desired flexibility, our license
3    mix will change to a higher proportion of licenses that require ratable revenue
     recognition which will result in a decrease in our expected revenue for the second
4    half of fiscal year 2008.

5    *Id.* at 22.

6    <u>The Company Quickly Amended Employment Agreements with Porter, Fister, Bushby and
     Others to Clarify Their Indemnification Rights</u>

7    
8            116.    On July, 29, 2009, six days after reporting the materially overstated results for 2Q08,

     the abrupt reversal in revenue mix model and false forecasts for 3Q08, the Company announced that
9
     it had amended the employment agreements of all its officers and directors to "clarify the procedures
10
     required under the agreement for determining entitlement to indemnification and obtaining
11
     indemnification and expense advancement."  *See* Ex. 53.
12
            On July 29, 2008, the Board of Directors (the "Board") of Cadence Design
13          Systems, Inc. ("Cadence") approved amendments to Cadence's form of director and
            officer indemnification agreement.  ***The amendments clarify the procedures
14          required under the agreement for determining entitlement to indemnification and
            obtaining indemnification and expense advancement.***  All of Cadence's directors
15          and executive officers have executed or will execute the new form of indemnification
            agreement, which supersedes their previously existing indemnification agreement.
16
     *Id.*
17
            117.    The quick indemnification amendments further suggest defendants' acknowledgment
18
     that fraud was afoot, as defendants expanded the scope of the prior indemnification agreement, as
19
     follows (in relevant portions):
20
            A.      The Company is aware that competent and experienced persons are
21          increasingly reluctant to serve as directors or officers of corporations unless they are
            protected by comprehensive liability insurance and indemnification, due to increased
22          exposure to litigation costs and risks resulting from their service to such
            corporations;
23
                            *       *       *
24
            C.      "The Company believes that its directors and officers and the directors and
25          officers of its subsidiaries should be able to serve as such, and in such other
            capacities as the Company may request, as the case may be, free from undue concern
26          about the risk of large judgments and other expenses that may be incurred as a result
            of the good faith performance of their duties to the Company or its subsidiaries;
27
                            *       *       *
28

     PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
     LAWS - C-08-4966 SC                                                                    - 54 -

1
2
3
4
E.    "Based upon their experience as business managers, the Board of Directors of the Company (the "Board") has concluded that, to retain and attract talented and experienced individuals to serve as directors and certain officers of the Company and its subsidiaries and to encourage such individuals to take the business risks necessary for the success of the Company and its subsidiaries, it is necessary, and in the best interests of the Company and its stockholders, for the Company to contractually indemnify such individuals, and to assume for itself maximum liability for claims against such persons in connection with their service.

5
6
<u>Defendants Admitted Knowledge of Important Accounting Regulations Governing Multiple-Element Transactions and Their Participating in the Negotiations of Such Deals</u>

7
8
9
10
11
118.    Even following the July 2008 disclosures further lowering forecasts and the shift in business model, defendants' market statements further demonstrate their knowledge of the accounting rules governing the multiple-element transactions and how, Cadence's Term and Subscription agreements implicate the accounting rules, thus affecting the amount of revenue that could or could not be recognized upfront.

12
13
14
15
16
119.    For example, during the August 7, 2008 RBC Capital Markets 2008 Technology, Media & Communications Conference (Ex. 25), when Palatnik met with the analysts to discuss revenue recognition and explain how contracts are negotiated and when Term agreements can be recognized upfront, he admitted that the Company created artificial separation (acknowledgement that they were not true terms contracts) in order to recognize revenue upfront:

17
18
19
*And we came out in January for the year, we saw 50-50, so primarily based on cards.  Going forward, we don't really view that card mix is going to change*.  So the natural question is, if you had such a high mix of gold cards, synonymous with term agreements, revenue upfront, what's going to change going forward?  *And unfortunately, that's where you get into the accounting of things*.

20
21
22
*In order to take revenue upfront on gold cards and term agreements, there are certain rules within accounting. When we had those discussions with customers, quite often when we sold a gold card, we couldn't sell a subscription license or services with that. We had to create separation*. . . . We're going forward and talking about releasing the handcuffs on our channel.  *We're now giving them the ability to eliminate that separation*. . . . sell what you will.

23
24
25
*In accounting, that will be viewed as a single unit of an arrangement and all be accounted for ratably.*  So we will still sell gold cards but they will be treated from a rev rec standpoint when sold with other elements. *It's called MEA, multiple element arrangements.  We'll account for that ratably.*

26
*Id.* at 5.

27
28

120.     In August 2008, defendant Palatnik spoke at RBC Capital Markets 2008 Technology Media & Communications Conference.   During the conference, he discussed, and indeed foreshadowed, the accounting complication resulting from policies renewals of Term licenses.  *Id.*

121.     During the September 3, 2008 Citigroup Global Technology Conference, analysts again bombarded Palatnik with questions about the sudden decision to change the revenue model in 2Q08.  Ex. 29.  During the September 2008 conference call, defendant Palatnik explained that the change from a prospective 50/50 model of ratable U.S. ***Subscription unlocks the Sales force*** (demonstrating that it was executive management that controlled how the sale force negotiated deals).   Further, Palatnik's responses, again, demonstrate his and the Company's complete understanding of the applicable accounting rules for multiple-element arrangement contracts, and that contrary to defendants' prior explanations that it was the customers who demanded the change, Palatnik admitted that it was merely Cadence's accounting for multiple-element arrangement contracts that changed:

> ***Let me talk specifically about 90/10.  90% of the licenses will be ratable, 10% product revenue from upfront licenses.  In terms of how we describe that, term licenses and gold cards, are basically product revenue upfront, subscription licenses, and platinum cards are both ratable.  And the reason they are ratable is there are delivery points or conditions over time, such that we haven't completed delivery*** . . . .

> ***In moving to 90/10 actually, it unlocks the sales force.  When we were dependent on let's say more revenue upfront [i.e., 50/50], if our sales force sold a term license or a gold card into our customer base.  The accountants assets to separate the discussion between a term license and a subscription license for some period of time***.

> Going back a year, 18 months.  It used to be 30-day separation, then it went to 45 days, then it went to one quarter, and then it actually went to two-quarter separation. ***Otherwise, in substance, the accountants would argue that it is a ratable arrangement.  So by moving to 90/10 actually it unlocks our salesforce to have a consistent discussion with customers***, such that if they have $10 million of budget to spend, they can commit some funds to current technology, either through a term license or a gold card and future technology through a subscription of our platinum card and may even pick up a services agreement as well.  ***That's entitled MEA accounting or multiple element arrangement.  So a single arrangement with multiple elements.  Under MEA accounting it is all accounted for ratably.***

> They [customers] are only interested with their dollars, what can I buy from current technology or license from current technology?  What can I devote to future technology?  So the customer discussion doesn't change.  ***It's only the accounting on Cadence side that now when a gold card and a platinum card are sold together it will be accounted for ratably***.

1 | *Id.* at 4.

2 |   122.   Palatnik's statements are a clear admission of:

3 |     (a)   defendants' knowledge of the accounting rules;

4 |     (b)   management requiring Sales staff to create artificial separation to
5 | make a Term license even when it knew the Company and customers intended for a
Subscription license; and

6 |     (c)   defendants' clear understanding of multiple-element transactions and
7 | when a deal must be accounted for accordingly.  Knowledge of basic accounting
rules, and his and the Company's financial staff's role in the negotiations of the
8 | contracts requiring the "separation" in order for the Company to recognize revenue
upfront.

9 |

10 | <u>As Cadence's Stock Price Steeply Declined, Cadence Walked Away from Mentor Graphics Hostile Takeover Bid Because It Likely Could Not Raise Capital</u>

11 |   123.   On August 15, 2008, Cadence withdrew its bid for Mentor Graphics, right before the

12 | pre-scheduled meeting with Mentor Graphics.  Even though Cadence publicly cited to Mentor

13 | Graphics' unwillingness to negotiate as the reason for the withdrawal, several media and analyst

14 | reports observed that it was a "save face" tactic by Cadence because it would have been difficult for

15 | Cadence to obtain financing on the deal given its dismal 2Q08 results, FY08 guidance and plunging

16 | stock price.  *See* Exs. 26-28 (August 15, 2008 article "Cadence could find it tough to raise debt for

17 | bid"; August 18, 2008 article titled, "Cadence drops pursuit of Mentor – Debt financing challenges

18 | help scuttle the unsolicited $1.6 billion bid."; August 25, 2008 article titled, "What a difference a day

19 | makes; How the Cadence/Mentor deal went south").

20 |   124.   One week later, on September 10, 2008, at the Deutsche Bank Securities Technology

21 | Conference in which Palatnik participated, analysts continued to question the Company's sudden

22 | revenue model change.  Ex. 30.  Rather than admitting that Cadence was in fact using its licensing

23 | business model to pull revenue forward as needed to cover revenue gaps, Palatnik again insisted that

24 | the change was driven by customers:

25 |     Unidentified Audience Member Analyst: I wanted to talk a little bit about your
business model.  And Cadence had been really a very consistent business model for
26 | three plus years, maintaining kind of 75%, 25% mix subscription and upfront.  And
then I guess about year-and-a-half ago, it went to sort of 50/50.  The EDA Cards
27 | became kind of popular.  Now with the reset, you're going to 90/10 – 90%
subscription, 10% upfront. ***So one thing that investors don't like is change and
28 | surprises***; ***so if you could talk about why the business had been fairly consistent for***

*that time, why it's shifted back to 50/50, now back to 90-10, and what's really the thought there*? . . .

Kevin S. Palatnik: Q1, Q2 experience. When we looked at our Q1 discussions, when we looked at our Q2 discussions, we looked at our second half of business; *we did agonize over changes our business model and moving to a 90/10. . . . Part of the drivers of that, I think, were to unlock the potential in the sales force, to give us more pricing leverage*.

*Id.* at 2-3.

125.    Palatnik further subtly blamed Fister and Porter for the problems stating that when he became CFO, it was Palatnik that pushed to return to a 90/10 Model:

I could not envision a situation where we would move back from a ratable experience or highly ratable model to more upfront revenue. It just creates more volatility in the financial model . . . *I was appointed CFO in April. I was a good piece of the driver of change to the 90/10 model*.

*Id.* at 3.

Cadence Abruptly Terminated Its Top Executive Officers, Including the CEO; But Still Failed to Disclose False Financials

126.    On October 15, 2008, the Company issued a press release announcing mass terminations of top executive officers including defendants Fister, Bushby and Porter. Ex. 31. Each of these individuals was a key executive associated with the sales and financial performance. The release, titled "Cadence Board of Directors Creates Interim Office of the Chief Executive; Michael Fister Resigns," stated in part:

Cadence Design Systems, Inc. . . . today announced that its Board of Directors has formed an Interim Office of the Chief Executive to oversee the day-to-day running of the company's operations, effective immediately. The Interim Office of the Chief Executive includes: John B. Shoven, Ph.D., Chairman of the Board of Directors of Cadence, who has been appointed to the position of Interim Executive Chairman, Lip-Bu Tan, a director of Cadence since 2004, who has been appointed Interim Vice Chairman of Cadence's Board, and Kevin S. Palatnik, Senior Vice President and Chief Financial Officer. Charlie Huang, Senior Vice President – Business Development, has been named Chief of Staff of the Interim Office of the Chief Executive.

The formation of the Interim Office of the Chief Executive followed Michael Fister's resignation as President, Chief Executive Officer and a director of the company, by mutual agreement between Mr. Fister and the Board.

*           *           *

The company also announced that Kevin Bushby has resigned as Executive Vice President – Worldwide Field Operations, effective immediately. . . .

> The company also announced the resignations of James S. Miller, Jr., Executive Vice President – Products and Technologies Organization, [former CFO] William Porter, Executive Vice President and Chief Administrative Officer, and R.L. Smith McKeithen, Executive Vice President – Corporate Affairs, effective immediately.

*Id.*

127.    At least three confidential witnesses (CW3, CW12 and CW14) separately report that Fister, Porter and Bushby were indeed fired.

128.    On the same day, October 15, 2008, Needham analysts issued a report, noting that the terminations might be an indication that the true financial condition of the Company had been worse than had been feared by investors or disclosed during the 2Q08 conference call:

> CDNS: Out with Old . . . Then What?; CDNS Clean Out Exec Team as Initial Phase of Major Restructuring (Intraday @ 3:15PM $4.65). . . . ***Mostly, not that surprising. While the breadth of the resignations is surprising, the loss of Fister is not. . . .  A sign things are worse than feared?***
>
> ***The obvious initial concern on seeing such sweeping management changes is that things are worse than the already grim outlook provided on the 2Q call.***

Ex. 32.

129.    TheStreet.com published an article, echoing the market's suspicion that the Company had been concealing its true financial and operating condition by manipulating its business model and the way that the Company recognized revenue on long-term contracts.  Ex. 33.  The report also noted the failure of the takeover bid of Mentor Graphics:

> Cadence Design Systems' (CDNS: NYSE) leadership paid the price for its poor performance this year.
>
> ***Shares in the design software maker fell 55 cents, or 10.4%, to $4.75 in recent trading after the resignations of Cadence's top executives were announced earlier Wednesday.***
>
> *          *          *
>
> ***Fister shifted the company away from industry-standard two- or- three-year contracts to five-year agreements, enabling it to book more revenue up front***, Smith says.  The shift to longer contracts "insulated their actual earnings for three years. ***At the end of three years, the bubble popped***," he says.
>
> *          *          *
>
> What Fister did was to launch a hostile takeover bid in June for Mentor.  But ***Cadence backed off Aug. 15 after it could not arrange financing on beneficial terms.***

*Id.*

130.     Following the October 15, 2008 announcement of the terminations of the senior management, Cadence's stock price immediately declined by 15%, from $5.30 per share to $4.50 per share on October 15, 2008, and declined another 5% the next day on October 16, 2008, to close at $4.30 per share.

131.     The sudden massive terminations in top senior management supports a strong inference of scienter.  Fister, Bushby and Porter's sudden terminations were not typical of Cadence's hiring and termination patterns.  In fact, all of these executives had an employment agreement in place which obligated them to remain as Cadence's employee until the end of their employment contracts, which were all subject to renewal upon Cadence's Board's approval.  Only a few months before their sudden terminations, Fister, Bushby and Porter's employment contracts were amended, as reported in the Company's Form 8-K filed on August 1, 2008.  *See* Ex. 53.  None of them appeared to be at retirement age, as Fister was 53, Bushby 52, and Porter 53, in 2008.  None of them announced any other personal or professional opportunities that they were going to pursue.  CW3, a former Senior Manager who was involved with Cadence's Finance, Operations and Marketing, reported that Cadence's Board asked the senior management to resign in part because of the false financials in 1Q08 and 2Q08 that gave rise to the need to restate.  In April 2008, the Company changed Porter's position to Chief Administrative Officer giving him even broader responsibilities and said that the change in position was part of the Company's succession plan.  On October 15, 2008, the Company said nothing of the sort suggesting that Porter was fired.  In addition, the February 2009 comments of Lip Bu Tan further suggest that the improper revenue recognition was a direct result of the focus on recording revenue upfront by Fister, Porter, Bushby and the other defendants.

> ***Tan said that there had been differences in the past from the 90/10 licensing model Cadence now employs, and that restatements had been necessary.  He also said that the company was going to exercise discipline about these matters in the future***.

Ex. 55.

<u>Cadence Announced that It Will Restate 1Q08 and 2Q08 Financial Statements, Which Caused Its
Stock Price Plummeted but Still Artificially Inflated</u>

132.  On October 22, 2008, notwithstanding the Company's publicly reported policy of recognizing revenue ratably on multiple-element transactions, and despite falsely assuring investors the Company's financial reporting was accurate (even when pressed by analysts that it appeared that the Company may be improperly pulling revenue forward), the Company, after the market closed, issued a press release (Ex. 34) announcing an accounting review and that it would have to restate revenues for the first and second quarters of 2008:

> **Cadence Announces Accounting Review and Postpones Release of Third Quarter 2008 Financial Results and Webcast; Reaffirms Third Quarter 2008 Guidance**
>
> Cadence Design Systems, Inc. . . . today announced that it is reviewing, in conjunction with the ***company's independent accountants and legal advisors, the recognition of revenue related to customer contracts signed during the first quarter of 2008***.
>
> Cadence initiated the review after preliminarily determining during its regular review of its third quarter results that approximately $24 million of revenue relating to these contracts was recognized during the first quarter of 2008, but should have been recognized ratably over the duration of the contracts commencing in the second quarter of 2008.  ***Cadence expects to restate its financial statements for the first quarter of 2008 and the first half of 2008 to correct the revenue recognition with respect to these contracts***.

*Id.*

133.  On October 22, 2008, Deutsche Bank issued a report, noting the restatement announcement and the shake up at senior levels of the Company:

> When it rains it pours. . . .  Cadence (CDNS) announced postponement of 3Q results following discovery of revenue recognition issues regarding 1Q08 contracts. ***While the identified dollar amount of $24m is small, it raises concerns over further rev rec issues and adds to the overall cloud hanging over the company including the recent top management shake-up***.

Ex. 35.

134.  On October 23, 2008, RBC Capital Markets issued a report indicating that the revenue recognition failures could even be worse than reported.  Titled, "Can of worms," the report highlighted:

> We could be looking at a slippery slope if the review extends beyond 1Q08. ***A review covering periods involving changes to revenue recognition models could open a can of worms***. . . .

1       *This latest wrinkle only adds to company-specific negativity.  The senior
        management staff exited the Company last week leaving behind, we believe a
2       leadership vacuum and loss of continuity.*

3   Ex. 37.

4       135.   JPMorgan analysts in an October 23, 2008 report titled, "Restating 1H08 Revenue;

5   Reiterates 3Q08: Lowering Estimates," accepted defendants' disclosure as truth and at face value

6   incorrectly, noting that the only problem was the 1Q08 transaction.  JPMorgan did also note however

7   that in light of recent terminations, investors will wonder whether management did something

8   wrong.

9       VSOE issue we believe: $24M of contracts recognized in 1Q08 now need to
        be recognized ratably over contract life starting in 2Q08.  The problem was
10      discovered reviewing results for 3Q08, which suggests to us that certain contracts in
        the quarter triggered VSOE issues with related deals in 1Q08.  *There are no
11      contracts in 2Q08 impacted so we think this is an isolated incident.*

12                              *       *       *

13      *The recent resignation of five members of management will have investors
        immediately wondering if there is a connection or issue of prior management
14      doing something wrong in 1Q08 to cause this situation.*

15  Ex. 36.

16      136.   On October 24, 2008, *Zacks Equity Research* also issued an article noting that the

17  termination of Fister was unexpected and the delay of 3Q08 results:

18      Bear of the Day: Cadence Design Systems (Nasdaq: CDNS).  Cadence appears to be
        in big trouble as the company's *CEO resigned unexpectedly amid mounting
19      financial problems and disappointing results.  Adding to the upheaval, the
        company delayed its Q308 earnings results, expected to be released on October
20      22nd, on improper accounting issues related to contract revenues signed during
        Q1.*

21  Ex. 38.

22      137.   Following these disclosures, Cadence's stock price declined over 32% from a close of

23  $4.32 per share on October 22, 2008 to $2.90 per share on October 24, 2008.  Between October 24,

24  2008 and December 10, 2008, Cadence's stock price remained artificially inflated at around $3.00-

25  $4.00 per share.

26

27

28

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - C-08-4966 SC                                                    - 62 -

Cadence Restated Both 1Q08 and 2Q08 Totaling More than $36 Million in Product Revenue, and Admitted that the Accounting Irregularities Were Larger in Scope than Previously Indicated

138. On December 10, 2008, Cadence issued a press release detailing 3Q08 results and the restatement. The Company reported its results short of its forecasted $232 million in revenue, and $(.50-.54) in EPS in July 2008. The Company reported its 3Q08 results as follows:

Third Quarter 2008 Results

Cadence reported third quarter 2008 revenue of $232 million, compared to revenue of $401 million reported for the same period in 2007. On a GAAP basis, Cadence recognized a net loss of $169 million, or $(0.67) per share on a diluted basis, in the third quarter of 2008 . . . .

Ex. 39.

139. The Company reported startling details regarding the Company's 1Q08 and 2Q08 financial results, further revealing that the financial condition for its previous quarters was far worse than it had revealed on April 24, July 23, and October 15 and 22, 2008. *Id.* In fact, the restatement would span two quarters, $36 million in Product Revenue, $18 million in cash, other accounting errors and an admission of material weaknesses in the Company's financial reporting.

*As announced on October 22, 2008, Cadence will be restating its quarterly financial statements for the periods ending March 29, 2008 and June 28, 2008. Cadence will adjust $24.8 million of product revenue recognized in the first quarter of 2008 and $12.0 million of product revenue recognized in the second quarter of 2008. This revenue will be instead realized over the term of relevant arrangement.*

During the first quarter of 2008, Cadence executed a term license arrangement with a customer and, during the third quarter of 2008, Cadence executed a subscription license arrangement with the same customer. . . . *Cadence identified certain factors that, when evaluated together, indicated that the software arrangements executed with this customer both in first quarter and in the third quarter were negotiated in contemplation of one another.*

Accordingly, Cadence determined that the term license arrangement executed during the first quarter and the subscription license arrangement executed during the third quarter collectively represented a multiple element arrangement. Because the subscription arrangement provides *the customer with the right to use unspecified additional software products that become commercially available during the term of the arrangement, Cadence determined that the revenue relating to this multiple element arrangement should be recognized during the term of the arrangement, beginning in the fourth quarter of 2008.*

*Id.*

1   140.   The December 10, 2008 press release also informed investors that the Company's

2   1Q08 and 2Q08 statements and confirmations that the Company's internal controls were effective

3   were in fact false.  Indeed, defendants admitted that revenue recognition controls over Term licenses

4   were not designed to be effective:

> [A]s a result of the investigation, the Company has identified a material weakness relating to the insufficient design and ineffective operation of certain internal controls over the recognition of revenue from term license agreements. . . .
>
> As part of the remediation efforts that Cadence has begun implementing in response to the identified material weakness, Cadence reexamined a transaction that occurred during the second quarter of 2008 in which in concurrently cancelled a subscription arrangement and executed both a term license arrangement and hardware arrangement with a customer.  Specifically, Cadence determined that, despite the cancellation of the subscription arrangement, the customer did not intend to substantively cancel its right to access future new technology because *at the time the subscription license was cancelled the customer intended to re-establish its right to access future new technology at a later time.  Accordingly, Cadence has determined that $12.0 million of revenue originally recognized in the second quarter of 2008 relating to the term license and hardware arrangement should be recognized ratably over the term of the arrangement, consistent with the way in which revenue was recognized on the cancelled subscription arrangement.*

14   *Id.*

15   141.   The announcement and press release disclosed even more about the Company and the

16   overall strategy of writing substantially more Term contracts in order to recognize more revenue

17   upfront, the same strategy that resulted in the improper recognition of revenue in both 1Q08 and

18   2Q08.

19   142.   On December 10, 2008, defendants hosted a conference call with investors in which

20   Palatnik repeated the statement in the press release and added more details about the restatement:

> The results of the audit committee's investigation into the restatement issues are summarized as follows.  *During the first quarter of 2008, Cadence executed a term license arrangement with a customer*, and during the third quarter of 2008 Cadence executed a subscription license arrangement with the same customer.  As part of our regular quarterly review process for the third quarter, we identified certain factors that, when evaluated together, indicated that *the software arrangements executed with this customer both in the first quarter and in the third quarter were negotiated in contemplation of one another.*
>
> *Because the subscription arrangement provides the customer with the right to use unspecified additional software products that become commercially available during the term of the arrangement, we determined that the revenue relating to this multiple element arrangement should be recognized during the term of the arrangement, beginning in the fourth quarter of 2008.*

1                              *       *       *

2          Finally, because we're re restating our quarterly report on Form 10-Q for the
   quarters ended March 29, 2008, and June [28], 2008, Cadence has also recorded two
3  other revenue adjustments that were previously disclosed in our quarterly report on
   Form 10-Q for the quarter ended June 28, 2008, initially filed on July 29, 2008.  We
4  determined that product revenue for two contracts totaling $8.4 million recognized
   during Q2 2008 should have been recognized during Q1 2008.  The net result of all
5  the adjustments is an approximate decrease of $16.4 million to previously reported
   Q1 2008 revenue and an approximate decrease of $21.4 million to previously
6  recorded Q2 2008 revenue.  A reconciliation of Cadence's previously reported and
   restated statements of operations for the quarter ended March 29, 2008 and the
7  quarter and six months ended June 28, 2008 is included with the third quarter
   earnings press release.

8  Ex. 40 at 6.

9          143.    The Company's December 10, 2008 press release also stated:

10         . . . as a result of the investigation, the Company has identified a material
11  weakness relating to the insufficient design and ineffective operation of certain
   internal controls over the recognition of revenue from term license agreements. . . .

12         As part of the remediation efforts that Cadence has begun implementing in
13  response to the identified material weakness, Cadence reexamined a transaction that
   occurred during the second quarter of 2008 in which it concurrently cancelled a
14  subscription arrangement and executed both a term license arrangement and
   hardware arrangement with a customer.  Specifically, Cadence determined that,
15  despite the cancellation of the subscription arrangement, the customer did not intend
   to substantively cancel its right to access future new technology because at the time
16  the subscription license was cancelled the customer intended to re-establish its right
   to access future new technology at a later time.  Accordingly, Cadence has
17  determined that $12.0 million of revenue originally recognized in the second quarter
   of 2008 relating to the term license and hardware arrangement should be recognized
18  ratably over the term of the arrangement, consistent with the way in which revenue
   was recognized on the cancelled subscription arrangement.

19  Ex. 39.

20         144.    In the Amended Form 10-Q for 1Q08 filed on December 11, 2008, the Company

21  provided additional details on the Company's restatement, and the scope of the Company's

22  accounting shenanigans:

23         In connection with [the $24.8 million transaction in 1Q08], *Cadence entered*
24  *into an agreement to sell $18.0 million of the receivable to a financing institution,*
   *and Cadence received the cash for this receivable sale during the three months*
25  *ended June 28, 2008.  Cadence has restated its Condensed Consolidated Statement*
   *of Cash Flows for the six months ended June 28, 2008 to reflect this cash receipt*
26  *as Cash flows from financing activities and its Condensed Consolidated Balance*
   *Sheet as of June 28, 2008 to reflect the amount due to the financing institution as*
27  *a liability*.

28

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - C-08-4966 SC                                                          - 65 -

*This restatement also corrects revenue recognition for one arrangement identified during Cadence's remediation efforts described in Item 4 – Controls and Procedures under which $12.0 million of Product revenue was recognized during the three and six months ended June 28, 2008, but should be recognized during the term of the arrangement, beginning in the third quarter of 2008.*

Since Cadence is restating its Quarterly Report on Form 10-Q for the quarter ended June 28, 2008 for these two revenue arrangements, Cadence has also recorded two other ***Product revenue*** adjustments, in the aggregate amount of $8.4 million, that were previously disclosed in Cadence's Quarterly Report on Form 10-Q for the quarter ended June 28, 2008, initially filed with the SEC on July 29, 2008. In addition, Cadence has recorded an adjustment to reduce Cost of product by $2.5 million for a hardware arrangement during the three and six months ended June 28, 2008.

\* \* \*

*In the course of this review, Cadence determined that with respect to one customer, despite the cancellation of the subscription arrangement, the customer did not intend to substantively cancel its right to access future new technology because at the time the subscription license was cancelled, the customer intended to re-establish its right to access future new technology at a later time. Accordingly, Cadence has determined that Product revenue of $12.0 million originally recognized in the three and six months ended June 28, 2008 in connection with this term license agreement and a hardware arrangement with this customer should be recognized ratably over the term of the arrangement, consistent with how revenue was being recognized on the cancelled subscription arrangement.*

Ex. 45.

145.     Contrary to Fister's and Palatnik's Sarbanes-Oxley certifications, in connection with the restatement, the Company also admitted to a material weakness in Cadence's internal control over financial reporting:

In the course of this reevaluation in connection with the restatement, our management identified a material weakness in internal control over financial reporting. . . .

*There was a material weakness in our internal controls over the application of revenue recognition criteria required by SOP 97-2 "Software Revenue Recognition" in the context of multiple-element software arrangements.*

\* \* \*

* *Controls were not adequately designed to facilitate communication of all information pertinent* to the negotiations with customers between the sales and sales finance organizations and the personnel responsible for determining the appropriate recognition of the revenue related to such license agreements.

* [C]ontrols relative to the sales and sales finance organizations reviewing, analyzing and evaluating available information pertinent to revenue recognition for term license agreements were not operating effectively.

> As a result of the material weakness in internal control over financial reporting, our management did not detect that revenue from three term license arrangements was improperly recognized.

*Id.* at 50.

146.    Following these disclosures, on December 10, 2008, Cadence's stock price dropped over 22%, from $3.93 to $3.04 per share on December 11, 2008, with over 21 million shares traded.

Defendants Admitted Again that the Accounting Was Straightforward and They Knew How to Apply It

147.    Defendants knew that the accounting for multiple-element transactions was simple, and that there was indeed a clear line between a Term license and a Subscription license that materially impacted whether the Company could recognize revenue upfront.    During the December 10, 2008 conference call, defendant Palatnik was asked about the shift in strategy from mostly a Term agreement model back to a mostly Subscription ratable agreement model, and whether the Company had made any progress in moving customers back to Subscription contracts. Palatnik responded in the affirmative stating that ***it was easy to do and that all one had to do was combine a Term contract with a Subscription contract*** and that would automatically trigger an overall Subscription contract and thus multiple-element accounting:

> Analyst: How have you effected the shift in mix in the business?  How have you gotten customers to move towards subscriptions from term deals . . . .  How have you been getting customers to move towards subscriptions?
>
> Palatnik: Sure.  ***The easiest way to create a ratable situation, if you will, is basically combining a gold card and a platinum card; or, if you will, a term agreement and a subscription agreement.  From an accounting standpoint, that by default becomes a multiple-element arrangement, and revenue is taken ratably*** over the term.

*See* Ex. 40 at 14.[11]

---

[11]    Defendants, including Palatnik, in their motion to dismiss filed on June 8, 2009, insisted the accounting for Term and Subscription Contracts is a "highly technical and complex" web of "interrelated accounting judgments" making it virtually impossible for one to correctly apply the accounting rules.  Defendants' Reply Brief in Support of Their Motion to Dismiss Consolidated Complaint at 9-12.

Cadence Scrambled to Find a New CEO but Eventually Appointed Longtime Director Lip-Bu Tan

148.     As evidenced from the Company's failure or inability to immediately appoint a new CEO, the termination of defendant Fister was indeed an abrupt termination and not simply related to a transition plan, but more plausibly and directly related to the material weaknesses over revenue recognition and the need to restate revenue. Indeed as of December 10, 2008, the state of the detailed restatement announcement (six weeks after the terminations), the Company had yet to appoint a new CEO. Further, at the time, Lip Bu Tan, Interim Vice Chairman, told investors that he and Shoven were heading the search for a new CEO including working with an executive search company. During the December 10, 2008 conference call, analysts noted the critical nature of finding a new CEO:

> We are moving quickly and we are exercising necessary patience to find the right CEO to lead the Company forward.

> *             *             *

> I was wondering if you could give us a little bit more color on the CEO search in terms of, have you reviewed any candidates thus far in terms of the Board, and is there any update you can give us in terms of what your thoughts are on timing of naming a new CEO?

> **Lip-Bu Tan** – Cadence Design Systems - Interim Vice Chairman, member of the Interim Office of the Chief Executive

> ***Dr. Shoven and I, we are leading the search for the appointment of CEO, as I mentioned in my prepared remarks, and we are engaging a search firm, Heidrick & Struggles***.

> ***We basically want to look for the best candidate*** in a timely fashion and exercise the necessary patience to find the right CEO. We do not comment on the timetable for the search.

> *             *             *

> Do you guys have a target time period for choosing the new CEO? Because, as you can all imagine, trying to finalize on the Company in a reasonable time frame, I would imagine, is kind of critical for the Company's prospects going forward.

> **Lip-Bu Tan** – *Cadence Design Systems - Interim Vice Chairman, member of the Interim Office of the Chief Executive*

> I mentioned ***earlier, we're trying to find the best candidate***, and we don't have a timetable. But we exercise the necessary patience to find the right CEO.

Ex. 40.

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - C-08-4966 SC                                                                 - 68 -

149.   In January 2009, the Company, apparently unable to find a new CEO, appointed the very same Lip Bu Tan to the position of CEO.  Tan had been Vice Chairman of the Company for five years and had been leading the search for a new CEO as noted above.

150.   Additionally, contrary to Fister's and Palatnik's Sarbanes-Oxley certifications for Cadence's 1Q08 and 2Q08 reported financial results, the Company admitted to a series of material weaknesses in internal control over financial reporting.  Specifically, contrary to the repeated representations of the Company's compliance with SOP 97-2 for multiple-element software arrangements, the Company admitted in fact that it had not had the adequate internal control in place for compliance.  *See also* Exs. 44-45.

151.   In response to the December 10, 2008 revenue and earnings miss and detailed restatement, Cadence's stock price declined over 22% on December 11, 2008 from $3.93 per share to $3.04 per share, with more than 21 million shares traded, compared to only 8 million volume on December 10, 2008.  By comparison, the NASDAQ Index declined slightly more than 3%, the S&P MidCap 400 Index dropped 4%, and the S&P 400 Information Technology Index dropped 3%, indicating that the cause of the decline was due to the Company-specific disclosures as opposed to market factors.

152.   On December 11, 2008, Needham issued a report discussing the restatement. Ex. 41. It further indicated that because 1Q and 2Q08 revenues and earnings had been restated, it was more likely that forecasted future results would be required:

> CDNS: Reports 3Q08; Accounting Issues Resolved; '09 Guidance Cut; Stock Looks Cheap Relative to Long-Term, But Remain on Sidelines for Now; Hold.
>
> *        *        *
>
> Accounting restatement resolved/contained.  The restatement involved reduction of 1Q08 revenue by $16.4M and 2Q08 revenue by $21.4M . . . .
>
> **'08/'09 guidance cut (to rock-bottom?).**  For '08, CFO/bookings now at $50M/$775-800M vs. $175M/$1.1B before and for '09 now at $800-900M bookings and break-even CFO vs. $250M CFO before.  Implied '09 revenue is $800-900M vs. ~$1.1B earlier.

*Id.*

153.    RBC Capital Markets issued a report on December 11, 2008, titled, "Struggling through":

> While management reported completion of the accounting **review, business fundamentals continue to deteriorate**.  CY08 guidance midpoint was lowered by 10%, implied CY09 revenue was down 20% from expectations. . . .

> Our d/g thesis is intact: a) broken order pipeline places severe pressure on CY08/09 top line, b) macro issues whittle orders down further and limit cash collection from customers, c) **inconsistency in operations, the recent revenue issue is yet another example, will likely add additional uncertainties.  We are reducing our estimates wile maintaining our $4 price target and Underperform rating.**

Ex. 42.

154.    Deutsche Bank also issued a report on December 11, 2008, telling the investors, "No reason to hurry into this one":

> Cadence Design (CDNS) released 3Q results yesterday following a seven-week internal review of several revenue recognition issues.  **The review resulted in a $37m revenue re-statement and the issues were isolated to two contracts, clearing the way for CDNS to get current with SEC filings.  Despite the removal of this overhang, we maintain our Hold rating due to the sharp reduction in 4Q and 2009 guidance,** uncertainty around the demand environment and lack of a permanent CEO.

Ex. 43.

155.    On December 12, 2008, the Company sent a letter to the SEC in response to the SEC specific request for information regarding the substance and the nature of the terms of the contracts that resulted in the restatement.  *See* Ex. 54.  The letter which was drafted and signed by Gibson Dunn, lawyers for the individual defendants in this case, described the contracts that they entered into in 1Q08 and 2Q08 that ultimately had to be restated.  The letter description of the $12 million transaction in June 2008 admits that the Company simply did not apply its reported accounting rules.  While the December 12, 2008 letter endeavored to make the explanation essentially incomprehensible, one basic premise is clear.  The $12 million incorrectly accounted for as a "Term Agreement" with a concurrent cancellation of a Subscription agreement, which would allow for upfront revenue recognition, was never a Term agreement and cancellation of a Subscription agreement at all.  Instead, it was simply a **continuation of a Subscription agreement** that was required to be recognized **ratable over time**, not upfront.  It further admitted that all of these facts and contract details were known to the Company **at the time they recognized the revenue in June**

1   *2008*. As alleged above, but for the improper revenue recognition, the Company would have missed

2   its revenue and earnings forecasts for the quarter.  *See supra*.

3           During the three and six months ended June 28, 2008, $12.0 million of
    revenue was recognized. ***At the time of executing this term arrangement, there was***
4   ***a concurrent cancellation of a prior subscription arrangement***.  However, Cadence
    determined that the new arrangement was a stand alone term license arrangement and
5   all revenue recognition criteria required by Statement of Position, or SOP, 97-2,
    "Software Revenue Recognition," and related software revenue recognition guidance
6   had been met during the second quarter of 2008.

7           As part of the remediation efforts that Cadence began implementing in
    response to the findings of the previously announced investigation, Cadence
8   reviewed contracts[12] in which there had been a concurrent cancellation of a
    subscription arrangement and execution of a term license agreement in the second
9   quarter of 2008.  During the course of this review, Cadence determined that with
    ***respect to one customer, despite the cancellation of the subscription arrangement,***
10  ***the customer did not intend to substantively cancel its right to access future new***
    ***technology because at the time the subscription license was cancelled, the customer***
11  ***intended to re-establish its right to access future new technology at a later time.  As***
    ***a result, Cadence determined that the term license agreement that was executed in***
12  ***the second quarter of 2008 was, from an accounting perspective, in substance the***
    ***continuation of the cancelled subscription arrangement, and revenue relating to***
13  ***this arrangement should be recognized ratably over the term of the arrangement.***

14  *Id.*

15          156.    The December 12, 2008 letter to the SEC also sought to explain the 1Q08 transaction

16  that had to be restated.  To the extent that the statements to the SEC are admissions of the Company,

17  the statements cannot be accepted as true in any way favorable to Cadence.  In any event, the

18  Company admitted that ***at*** the time the contract was executed and in fact ***before*** the contract was

19  executed, it was "***negotiated***" with the contingency or probability of a later Subscription contract.[13]

20  Thus, during the negotiation process the Company knew that the deal was a multiple-element

21  transaction, and moreover, it would allow the customer to use additional software which was not yet

22  available, *i.e.*, a Subscription deal that could not be recognized upfront.[14]

23  

---

24  [12]     It is notable that defendants did not say that there was a side letter.  It was in fact the prior
25  strategy of pushing customers into agreements to recognize revenue upfront that caused this.

26  [13]     As described in ¶75, defendants negotiated and approved the terms of the contract, given the
    size of the deal.

27  [14]     This so-called description is more doubletalk by the lawyers for the defendants which simply
28  does not make sense.  Here, they are saying that despite the cancellation of the subscription

---

During the first and second quarters of 2008, $24.8 million of product revenue and $1.0 million of maintenance revenue, respectively, was recognized. At the time of executing the transaction Cadence determined that the arrangement was a stand alone term license arrangement and that all revenue recognition criteria required by Statement of Position, or SOP, 97-2, "Software Revenue Recognition," and related software revenue recognition guidance had been met during the first quarter of 2008.

During the preparation of the condensed consolidated financial statements for the three months ended September 27, 2008, Cadence identified certain factors that, when evaluated together, indicated that the software arrangement that was executed with this customer during the three months ended March 29, 2008 was negotiated in contemplation of a subscription arrangement that *was executed with the same customer during the three months ended September 27, 2008*.[15] Accordingly, based on Technical Practice Aid, or TPA, 5100.39, "Software Revenue Recognition for Multiple-Element Arrangements," Cadence determined that the term license arrangement executed during the three months ended March 29, 2008 and the subscription license arrangement executed during the three months ended September 27, 2008 collectively represented a multiple element arrangement. *Because the subscription arrangement provides the customer with the right to use unspecified additional software products that become commercially available during the term of the arrangement . . . .*

*Id.*

## POST-CLASS PERIOD ADMISSIONS

157.    On February 5, 2009, EDN issued an article that attributed statement to Director and the new CEO Tan. Tan admitted that because of the differences from the 90/10 models in the past, put in place by Fister and Porter, *i.e.*, the Term upfront model, restatements were necessary. The statements put the responsibility for the restatements on the revenue recognition policies or practices on the prior management, *i.e.*, Fister, Porter, Bushby and Palatnik:

**A new hand on the helm at Cadence**

\*        \*        \*

***Tan said that there had been differences in the past from the 90/10 licensing model Cadence now employs, and that restatements had been necessary.***

---

arrangement, the customer did not intend to really cancel "its right to access future new technology," *i.e.*, the customer did not intend to cancel the subscription arrangement. Therefore "Cadence determined that it was" a continuation of a cancelled subscription arrangement. The only complexity is what the lawyers for the defendant told the SEC. If one compares the Company's reported revenue recognition policy it is rather simple.

[15]    The only way defendants would not know of this at the time is if they did not negotiate the contract.

*He also said that the company was going to exercise discipline about these matters in the future.*

\*        \*        \*

Just as things were getting quiet after the shock of the revenue restatement and executive changes, Cadence dropped another explosive device on the financial wires this week: an enormous – $1.36 billion, or nearly an entire year's revenue – write-down of the value of goodwill, intangible assets, and fixed assets.

\*        \*        \*

*In some ways, without explicitly criticizing previous administrations, the accumulated intangibles on the balance sheet represent baggage from the past. "This is a good time to get rid of old baggage," Tan said.*

Ex. 55.

158.    On May 27, 2009, the Company held a conference call with analysts, during which the Company again admitted the control the defendants had over the Sales force, the knowledge that the combination of a Term agreement with a Subscription agreement required ratable revenue recognition and that it was the shift to Term agreements that put the Company in a weaker position:

All right, let me leave it there just for those that are unfamiliar with the Company; been around a long time, 20 years as of last year. But very important questions from Raj, what happened? Because we have seen a very significant shift in our business in the last couple of years. *And specific to 2008 underwent a tremendous amount of change and fortunately that is all behind us at this point, but let's talk about some of those change factors.*

We revised our outlook downward twice last year. We changed our business model to a highly ratable model. It's called a 90/10; 90% of our business on the income and order side would be recognized ratably or say differently. The revenue from the contracts would be recognized over the term of the contract, whereas we had much more reliance on upfront revenue, product fees being recognized up front in prior models.

In a 90/10 model that suppresses the current or near-term revenue, it puts revenue in backlog to be recognized over the duration of the contract and that is why you see a depression, if you will, of revenues this year. This is our trough year and so to Raj's point we had been north, significantly north of $1 billion in years past. And in fact in 2007 was our peak year; we did over $1.6 billion of revenue. Our guidance for this year is between $830 million and $870 million for the full year.

*So what happened? Well, clearly, a large contributor to that decrease had been the change in the model. But similarly in changing that model and becoming much more ratable or ratably-oriented we told our sales force that we wanted to be patient.*

We didn't feel in the past we were getting the right value for the software and so we said we need to be patient. *We have more leverage by waiting to the natural*

*expiry of the contract. The customer needs software and we want to sell it to them; that is our strongest negotiation point.*

\*       \*       \*

Clearly, *we changed our model in July of last year to a 90/10 and rather than recognizing more revenue upfront, put more of it in backlog to be recognized over time, our revenues in the near term get suppressed.*

\*       \*       \*

**Kevin Palatnik  - Cadence Design Systems, Inc. - SVP & CFO**

*A majority of licenses and what most people talk about are subscription and term arrangements. For a subscription arrangement it basically offers the right to unspecified future technology during the term of the arrangement.* What that means is if you buy a license today if Cadence comes out with new technology a year from now or two years from now, assuming it's a three-year duration for that contract, or even if we acquire technology you have access to that new technology. *As such from an accounting standpoint if you offer unspecified future technology you have to recognize both the product fees and the maintenance fees, which are bundled. You have to recognize that over time.*

Whereas some customers are looking for price protection, they buy term licenses. Term licenses offer them a price book of all the technology currently, no future technology. *And with term license as a result delivery is complete, you can recognize all the product fees up front, but maintenance, which you deliver over time, you recognize that ratably in effect or over the contract duration.*

Subs in terms primary license types, and by moving to a 90/10 model what that suggests is we are going to recognize 90% of *our licenses more subscriptive and 10% of our licenses product fees upfront.*

\*       \*       \*

*So what happened?* Is that market segment share driven? We believe not. *As we talked earlier, it has to do with the model, it has to do with the ability of selling incremental technology in this current economic environment and it has to do with our want to get more value for the software that we offer. That want is being patient, waiting to the natural expiry.*

\*       \*       \*

*But what I can tell you is clearly the marching orders we gave our sales force both when we changed our model and in January when I went to the sales kick off and said here is what we are going to do going forward* – we are going to be patient, we are going to get the right value.

\*       \*       \*

But *as I look forward, most important to me is to move to the 90/10, highly subscriptive model, be disciplined about recognizing revenue in such form such that we can build these layers and be much more predictable going forward.*

\*       \*       \*

*Actually, we think in the subscription model it gives us more flexible to work with the customer. When we had a highly revenuable upfront model -- and last January we announced a 50/50 model, 50% revenue upfront, 50% over time -- that put us in I believe a weaker position than we are today. Because when we sold a term arrangement we couldn't taint that and we told the salesforce you need to provide time -- 30 days, 60 days, 90 days -- between selling a term license and going back to the same customer and selling a subscription license.*

*In the higher subscriptive model, the 90/10 model, we lift those constraints off the salesforce and sell anything, sell subscription license, sell a term license. When you do both of those in the same period you recognize them ratably. Sell a term license with services you will recognize that ratably. It gives the sales force much more flexibility.*

Ex. 57 at 2-11.

The Company's Recognition Practices Were Published and Uncomplicated

159.     The Company described its revenue recognition policies and practices with respect to its software license sales, and particularly its Subscription and Term licenses sold with EDA cards in its Form 10-K filed with the SEC as late as February 26, 2008. The Form 10-K also described the revenue recognition on where a Subscription license agreement is terminated and a new Term license agreement is entered into. The Company's revenue recognition policies stated that it applied GAAP, specifically AICPA SOP 97-2 revenue recognition requirements for ratable recognition of multiple-element transactions. The Company assured investors that its revenue recognition practices were compliant with GAAP and SOP 97-2. *See* Form 10-K filed on February 26, 2008 (Ex. 6):

Revenue Recognition

We apply the provisions of Statement of Position, or SOP, 97-2, "Software Revenue Recognition," as amended by SOP 98-9, "Modification of SOP 97-2, Software Revenue Recognition, With Respect to Certain Transactions," to all software licensing transactions and to all product revenue transactions where the software is not incidental. . . . We recognize revenue when persuasive evidence of an arrangement exists, the product has been delivered, the fee is fixed or determinable, collection of the resulting receivable is probable, and vendor-specific objective evidence of fair value, or VSOE, exists.

*Id.* at 29.

160.     With respect to Subscription licenses, the Company reported that such licenses (because they allowed customers access to yet unavailable software) would be recognized ratably over the term of the agreement:

*Subscription licenses* – [Cadence's] subscription license arrangements offer [Cadence's] customers the right to:

- • Access and use all software products delivered at the outset of an arrangement throughout the entire term of the arrangement, generally two to four years, with no rights to return;

- • Use unspecified additional software products that become commercially available during the term of the arrangement.

\*        \*        \*

In general, ***revenue associated with subscription licenses is recognized ratably over the term of the license commencing*** upon the later of the effective date of the arrangement or delivery of the software product. . . .

***In the event that a subscription license arrangement is terminated by mutual agreement and a new term license arrangement is entered into either concurrently with or subsequent to the termination of the subscription license arrangement, the revenue associated with the new term license arrangement is recognized upon the later of the effective date of the arrangement or delivery of the software product, assuming all other criteria in SOP 97-2 have been met.***

*Id.* at 30.

161.    The Form 10-K also described the revenue recognition process for Term agreement on which the Company reported that revenue is recognized upfront:

*Term licenses* – [Cadence's] term license arrangements offer [Cadence's] customers the right to:

- • Access and use all software products delivered at the outset of an arrangement throughout the entire term of the arrangement, generally two to four years, with no rights to return.

\*        \*        \*

In general, ***revenue associated with the term licenses is recognized upon the later of the effective date of the arrangement or delivery of the software product***.[16]

*Id.*

162.    In sum, the accounting for transactions as either Term or Subscription licenses were identical but for the timing of delivery of software.  In particular, Subscription licenses are centered on the fact that customers will have access (at a later date) to software that had not yet been released

---

[16]     In the Forms 10-Q for 1Q08 and 2Q08, Cadence repeatedly assured investors that its revenue recognition process complied with GAAP, and referred to this section in the Form 10-K as the Company's revenue recognition policies.

1    at the time the agreement was entered into. Thus, it has not been delivered and revenue could not be

2    recognized.

3    **CADENCE'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD**

4           163.    In order to inflate the price of Cadence stock, defendants caused the Company to

5    falsely report its financial results for the quarters ended March 29, 2008 (1Q08) and June 28, 2008

6    (2Q08), filed with its Forms 10-Q, as well as financial results included in press releases and other

7    SEC filings throughout the Class Period. Defendants violated GAAP and SEC rules because said

8    financial information was not prepared in conformity with applicable GAAP and SEC requirements,

9    nor was the financial information a fair presentation of the Company's operations. Defendants did

10   so primarily by improperly overstating revenue by recognizing it prematurely. As a result,

11   Cadence's revenue, net income and EPS were materially overstated in 1Q08 and 2Q08.

12          164.    As noted above, these accounting improprieties violated GAAP and SEC rules.

13   GAAP are those principles recognized by the accounting profession as the conventions, rules and

14   procedures necessary to define accepted accounting practice at a particular time. SEC Regulation

15   S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not

16   prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote

17   or other disclosure. Regulation S-X requires that interim financial statements must also comply with

18   GAAP. 17 C.F.R. §210.10-01(a).

19   Cadence's Restatement

20          165.    There is no dispute about the falsity of Cadence's financial statements. Defendants

21   have admitted the falsity, described the need to "correct" revenue recognition and restated the

22   previously reported numbers. As a result of the accounting errors as alleged herein during the Class

23   Period, Cadence was ultimately forced to restate its previously released financial statements for the

24   first two quarters of FY08 to comply with GAAP.[17]  This restatement was material and had a

25   significant impact on revenue, net income and EPS, as illustrated in the table below:

26   _____

27   [17]      In connection with the restatements, Cadence disclosed on December 11, 2008 that it had

28   also identified improper revenue recognition relating to a term license agreement that had been

| (In $000's, except per share data) | | | | |
|---|---|---|---|---|
| | Originally Reported | Restated/ Adjusted[18] | Amount Overstated/ (Understated) | % Reported Amount Overstated/ (Understated) |
| **Quarter Ended 3/29/08:** | | | | |
| Product Revenue | 156,193 | 133,954 | 22,239 | 14.2% |
| Net Loss | (18,747) | (35,023) | (16,276) | (86.8)% |
| Loss Per Share | $ (0.07) | $ (0.13) | $ (0.06) | (86.8)% |
| **Quarter Ended 6/28/08:** | | | | |
| Product Revenue | 195,444 | 175,039 | 20,405 | 10.4% |
| Net Income/(Loss) | 4,996 | (16,794) | 21,790 | 436.1% |
| Earnings/(Loss) Per Share | $ 0.02 | $ (0.07) | $ 0.09 | 458.0% |

166.    The fact that Cadence restated its previous financial statements is an admission that: (i) the financial results originally issued during the Class Period and its public statements regarding those results were materially false and misleading; and (ii) the financial statements reported during the Class Period were incorrect based on information available to defendants at the time the results were originally reported.

167.    As noted by the SEC, "GAAP only allows a restatement of prior financial statements based upon information 'that existed at the time the financial statements were prepared,'" and "restatements should not be used to make any adjustments to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared."[19]   The Financial Accounting Standards Board ("FASB"), the governing body that promulgated the accounting rules regarding restatements of prior financial statements has defined

---

preliminarily recognized in the quarterly period ended September 27, 2008 (3Q08).  This resulted in adjustments to the preliminary condensed consolidated financial statements for the three and nine months periods ended September 27, 2008.

[18]    Rather than restate a second time, in 4Q08 Cadence made a $5.8 million adjustment to reduce Product Revenue previously recognized in 1Q08.  The tax effect related to this adjustment is not included in 1Q08 net loss or loss per share.

[19]    Brief of the United States Securities and Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *in Limine* to Exclude Evidence of the Restatement and Restatement Report, *In re Sunbeam Sec. Litig.*, No. 98-cv-8258-DMM, at 11, 13 (S.D. Fla. Feb. 22, 2002) ("Sunbeam Brief"), *available at* http://www.sec.gov/litigation/briefs/sunbeam.htm.

1   "restatement" as "the process of revising previously issued financial statements to reflect the

2   correction of an error in those financial statements." *See* SFAS No. 154, ¶2.  FASB has also defined

3   the "errors" that may be corrected through a restatement: "an error in recognition, measurement,

4   presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in

5   the application of GAAP, or oversight or misuse of facts *that existed at the time that the financial*

6   *statements were prepared*." *Id.*  Indeed, as alleged herein, the restatement at issue here was not due

7   to a simple mathematical error, honest misapplication of a standard or oversight; rather, as admitted

8   by defendants, it was due to accounting errors that plaintiffs allege were due to intentional misuse of

9   the facts that were known at the time.

10          168.    The SEC has reiterated its position that, in its investigations of restated financial

11   statements, it often finds that the persons responsible for the improper accounting acted with

12   scienter:

13          [T]he Commission often seeks to enter into evidence restated financial statements,
            and the documentation behind those restatements, in its securities fraud enforcement
14          actions in order, *inter alia*, *to prove the falsity and materiality of the original*
            *financial statements [and] to demonstrate that persons responsible for the original*
15          *misstatements acted with scienter* . . . .

16   Sunbeam Brief at 1.

17   <u>Cadence Overstated Revenue</u>

18          169.    During the Class Period, Cadence overstated its Product Revenue, resulting in inflated

19   net earnings and/or understated losses.  Cadence primarily accomplished this by improperly

20   recognizing all revenue relating to various license agreements prematurely at the time of delivery,

21   rather than ratably over the Term of the contract as required by GAAP.

22          170.    Cadence licenses software using three different license types: Subscription licenses,

23   Term licenses and perpetual licenses.  Cadence's Subscription license arrangements provide the

24   customer access to and use of all software products delivered at the outset of the arrangement and the

25   ability to use additional unspecified software products that may become commercially available

26   during the term of the arrangement.  According to Cadence's SEC filings, "In general, revenue

27   associated with subscription licenses is recognized ratably over the term of the license commencing

28   upon the later of the effective date of the arrangement or delivery of the software product." *See, e.g.*,

1  Ex. 6 at 30.  Cadence's Term license arrangements provide the customer access to and use of all

2  software products delivered at the outset of the arrangement only.  According to Cadence's SEC

3  filings, "In general, revenue associated with term licenses is recognized upon the later of the

4  effective date of the arrangement or delivery of the software product." *Id.*  Perpetual licenses do not

5  relate to the allegations in this case, so we will not address them at this time.

6        171.     Defendants have admitted in the restated SEC filings and in the 2008 Form 10-K that

7  revenue was prematurely recognized in 1Q08 and 2Q08 as Term licenses when it should have been

8  recognized ratably as Subscription licenses for at least three deals.  In doing so, defendants violated

9  their own stated revenue recognition policy and GAAP, resulting in material misstatements of the

10  financial statements.

11  The 1Q08 Restatement

12        172.     During 1Q08, Cadence executed a Term license arrangement and defendants

13  recognized the entire $24.8 million of Product Revenue in 1Q08 after review by defendant Porter,

14  according to CW2.  However, this Term license was really just one part of a larger agreement.  The

15  Term license arrangement was negotiated in contemplation of a Subscription license arrangement

16  with the same Japanese customer; and conversely, the Subscription license was negotiated in

17  contemplation of the Term license.[20]  These agreements were so closely related that they were, in

18  effect, parts of a single arrangement in accordance with GAAP.  *See* Technical Practice Aid ("TPA")

19  TIS §5100.39, *Software Revenue Recognition for Multiple-Element Arrangements*.  As such, the

20  arrangement was in substance a Subscription, and thus the entire fee should have been recognized

21  ratably during the term of the arrangement, beginning with 4Q08, as admitted by Cadence.  This is in

22  accordance with GAAP which requires "all software product-related revenue from the arrangement

23  should be recognized ratably over the term of the arrangement beginning with the delivery of the

24  first product" in accounting for a Subscription, provided all other revenue recognition requirements

25  have been met (*i.e.*, persuasive evidence of an arrangement exists, the vendor's fee is fixed or

26

27  [20]     The related Subscription license arrangement was ultimately entered into in 3Q08.

28

1   determinable, and collectability is probable).  *See* SOP 97-2, *Software Revenue Recognition*, ¶¶8, 49.

2   As a result of defendants' improper accounting for this transaction, $24.8 million was improperly

3   recognized as revenue in 1Q08.

4          173.     Additionally, also in violation of SOP 97-2, defendants recognized $5.8 million of

5   Product Revenue for a software arrangement in 1Q08, but Cadence belatedly announced on March 2,

6   2009 that the revenue on this arrangement should have been recognized on a ratable basis.  As such,

7   during 4Q08, Cadence recorded an adjustment reducing Product Revenue by $5.8 million to

8   "correct" the amount of Product Revenue previously improperly recognized during 1Q08.

9   Defendants chose not to restate 1Q08 a second time, but instead made an adjustment in 4Q08,

10  claiming that the correction was not considered material to the consolidated financial statements.

11  The $5.8 million adjustment represented an overstatement of 4.3% of 1Q08 Product Revenue.  This

12  improper revenue recognition exacerbates the problems previously announced in the restatement.

13         174.     As a result of defendants' improper revenue recognition relating to these

14  arrangements, 1Q08 Product Revenue as originally reported was overstated 14.2% and the net loss

15  was understated 86.8%.[21]  *See* table, ¶165.

16  The 2Q08 Restatement

17         175.     One of the transactions resulting in the 2Q08 restatement involved $12 million of

18  improperly recognized Product Revenue.  During 2Q08, a customer of Cadence cancelled an existing

19  Subscription license and concurrently executed a $12 million Term license arrangement.  Despite the

20  cancellation of the Subscription, the customer did not intend to substantively cancel its right to

21  access future new technology.  At the time the Subscription license was cancelled, defendants knew

22  the customer intended to re-establish its right to access future new technology because it would not

23  have restated if the information had not existed at the time, in accordance with SFAS No. 154, ¶5.

24

25

---

26  [21]     The $24.8 million restated plus the $5.8 million adjusted of Product Revenue improperly

27  recognized in 1Q08 as discussed above was partially offset by an $8.4 million increase as defendants restated revenue previously recognized in 2Q08 to 1Q08.

28

1   Effectively, while the form of the agreement had changed, the substance had not.[22] The arrangement

2   was still going to be treated as a Subscription license and, thus, required revenue recognition on a

3   ratable basis.  As such, Product Revenue of $12 million was improperly recognized in 2Q08 in

4   connection with this Term license agreement and a hardware arrangement and was restated in order

5   to recognize it ratably over the term of the arrangement, consistent with how revenue was being

6   recognized on the cancelled Subscription arrangement.

7           176.    Also contributing to the 2Q08 restatement was improper accounting for factored

8   receivables relating to the $24.8 million arrangement negotiated in 1Q08 which was discussed in the

9   previous section.  *See* ¶¶18, 109, 144.  In connection with the $24.8 million arrangement, defendants

10   entered into an agreement to sell $18 million of the accounts receivable to a financing institution,

11   and Cadence received the cash for this receivable sale during 2Q08.  Because the sold receivable is

12   considered part of the Subscription license arrangement, the transaction was no longer deemed a true

13   sale in accordance with SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets*

14   *and Extinguishments of Liabilities*, which makes it clear that a company cannot sell a financial asset

15   that it does not have control over.  Since revenue was unable to be recognized on the $24.8 million

16   arrangement in 1Q08, there was no associated receivable in Cadence's control for defendants to sell.

17   Effectively, the factoring transaction was a financing and was restated as such.  In the restatement,

18   Cadence recorded a liability of $18 million due to the financing institution, $1.5 million of which is a

19   current liability.  The $18 million of cash received from the financing institution which had been

20   improperly recorded as part of cash flows from operating activities was restated to cash flows from

21   financing activities.  Additionally, the Company's receivables balance as of June 28, 2008 was

22

23

24   _____
     [22]       By recording revenue on the term license in 2Q08, defendants violated one of the most basic
25   concepts of GAAP – recording the form of the transaction over the substance of the transaction.
     Qualitative Characteristics of Accounting Information states: "Substance over form is an idea that
26   also has its proponents, but it is not included because it would be redundant.  The quality of
     reliability and, in particular, of representational faithfulness leaves no room for accounting
27   representations that subordinate substance to form."  *See* Statement of Financial Accounting
     Concepts ("SFAC") No. 2, ¶160.
28

1   reduced by approximately $6.9 million, as that was the amount remaining on the balance sheet (*i.e.*,

2   the amount that had not been "sold" to the financing institution) of the $24.8 million receivable.

3        177.    Defendants also restated the following in 2Q08: (i) a $1 million reduction of

4   maintenance revenue related to the $24.8 million 1Q08 arrangement which should have been

5   recognized during the term of the arrangement beginning in 4Q08; and (ii) a $2.5 million reduction

6   of cost of product for a hardware arrangement; and (iii) an $8.4 million reduction to Product

7   Revenue.

8        178.    As a result of defendants' improper revenue recognition relating to the above

9   arrangements, 2Q08 Product Revenue as originally reported was overstated 10.4% and net income

10   was overstated 436.1%, going from net income to a net loss position.  *See* table, ¶165.

11        179.    Defendants knew or were reckless in not knowing that the arrangements discussed

12   above as part of the 1Q08 and 2Q08 restatements were effectively Subscription licenses for which

13   revenue should not have been recognized upfront but rather ratably.  Defendants deliberately ignored

14   the substance of the transactions and instead improperly recognized revenue based on the contrived

15   form.  Accordingly, defendants knew or were reckless in not knowing that revenue and earnings

16   were inflated throughout the Class Period.

17   <u>Defendants' Internal Accounting Controls</u>

18        180.    Internal control[23] is a process, carried out by an entity's board of directors,

19   management and other personnel, designed to provide reasonable assurance that, among other things,

20   the financial statements are reliable and accurate and that a company complies with applicable laws

21   and regulations.

22

23

24

---

25   [23]    AICPA Professional Standards AU §319.06, *Internal Control in a Financial Statement Audit*,

26   defines internal control as "a process – effected by an entity's board of directors, management, and other personnel – designed to provide reasonable assurance regarding the achievement of objectives

27   in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations."

28

181.   Management of any public company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15 and 15d-15(f) under the Exchange Act.

182.   Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; [and] (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP] . . . ."  These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets. *SEC v. World-Wide Coin Invs., Ltd.*, 567 F. Supp. 724, 750-51 (N.D. Ga. 1983).

183.   Notwithstanding the allegations above and the indicators of scienter herein, defendants knew or were reckless in not knowing that its system of internal accounting controls governing revenue recognition was inadequate.  According to Cadence's SEC filings, under the supervision and with the participation of management, including defendants Fister and Palatnik, evaluations were carried out each quarter regarding the effectiveness of the design and operation of the Company's disclosure controls and procedures; thus, defendants were fully aware of Cadence's control procedures.  As of the end of 1Q08 and 2Q08, defendants Fister and Palatnik positively concluded that based on their evaluations, Cadence's "disclosure controls and procedures were sufficiently[24] effective to ensure that the information required to be disclosed by Cadence in Cadence's reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and is accumulated and ***communicated to [Cadence's] management, including the CEO and CFO***, as appropriate to allow

---

[24]   The 2Q08 Form 10-Q does not state "sufficiently" here.

1    timely decisions regarding required disclosure." *See* Part I, Item 4 Controls and Procedures of the

2    1Q08 Form 10-Q (Ex. 14 at 35) and 2Q08 Form 10-Q (Ex. 24 at 43); *see also* certifications signed

3    by each of these defendants pursuant to Rule 13a-14 of the Exchange Act as presented in these

4    Forms 10-Q.

5         184.   Subsequently, after the restatement was announced, defendants were forced to change

6    their story. Defendants disclosed that during a reevaluation of the effectiveness of the design and

7    operation of Cadence's disclosure controls and procedures as of the end of 1Q08, 2Q08 and 3Q08,

8    management identified significant control deficiencies that constituted material weaknesses[25] in the

9    Company's internal control over financial reporting, specifically related to "the application of

10   revenue recognition criteria required by SOP 97-2 'Software Revenue Recognition' in the context of

11   multiple-element software arrangements." Ex. 45 at 50. The material weakness related to both the

12   insufficient design and ineffective operation of certain internal controls over the recognition of

13   revenue from Term license agreements. Thus, the certifications made by defendants Fister and

14   Palatnik in the 1Q08 and 2Q08 quarterly SEC filings that Cadence's disclosure controls and

15   procedures were sufficiently effective, were false and misleading when made. Additionally, CW2

16   states that Cadence's need to restate meant under Sarbanes-Oxley Act of 2002 that the Company

17   lacked an adequate internal control that should have prevented the problematic revenue from being

18   recognized.

19        185.   Throughout the Class Period, defendants were aware of the deficiencies and

20   inadequacies of Cadence's internal controls. Despite this knowledge, Cadence did not comply with

21   the following requirements for internal control over financial reporting: Rules 13a-15 and 15d-15(f)

22   under the Exchange Act, §§302, 404 and 906 of the Sarbanes-Oxley Act of 2002, and Item 308 of

23   Regulation S-K.

24

25   _____

26   [25]   AICPA Professional Standards AU §325.06, *Communicating Internal Control Related
     Matters Identified in an Audit*, defines a material weakness as "a significant deficiency, or a
27   combination of significant deficiencies, that results in more than a remote likelihood that a material
     misstatement of the annual or interim financial statements will not be prevented or detected."

28

186.    For example, Cadence violated §13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning various items such as its revenues, receivables, liabilities and net income.    It overstated revenue, receivables and net income, and understated liabilities. Moreover, Cadence's inaccurate and false records were not isolated or unique instances because they were improperly maintained for multiple reporting periods throughout FY08.

187.    In addition, Cadence violated §13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities.  Defendants failed to ensure that adequate controls were in place to ensure that Cadence was properly recognizing revenue.  Defendants failed to ensure that transactions were reported in accordance with Cadence's own policies and with GAAP.

188.    Under §302 of the Sarbanes-Oxley, the principal officers of the Company are required to certify that: they are responsible for establishing, maintaining and regularly evaluating the effectiveness of the issuer's internal controls; they have made certain disclosures to the issuer's auditors and the audit committee of the board of directors about the issuer's internal controls; and they have included information in the issuer's quarterly and annual reports about their evaluation.

189.    Under §906 of the Sarbanes-Oxley, the CEO and the CFO must certify each periodic report containing financial statements filed by an issuer with the SEC pursuant to §13(a) or 15(d) of the Exchange Act, 15 U.S.C. §78m(a) or §78o(d), and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer.

190.    Under Item 308, *Internal Control Over Financial Reporting*, of Regulation S-K, management is required to provide a report of the registrant's internal control over financial reporting (as defined in Rule 13a-15 or Rule 15d-15(f) under the Exchange Act) that contains: (a) a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the registrant; (b) a statement identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting as required by Rule 13a-15(c) or Rule 15d-15 under the Exchange Act; (c) management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the

1   end of the registrant's most recent fiscal year, including a statement as to whether or not internal

2   control over financial reporting is effective – this discussion must include disclosure of any material

3   weakness in the registrant's internal control over financial reporting identified by management and

4   management is not permitted to conclude that the registrant's internal control over financial

5   reporting is effective if there are one or more material weaknesses in the registrant's internal control

6   over financial reporting; and (d) a statement that the registered public accounting firm that audited

7   the financial statements included in the annual report containing the disclosure required by this Item

8   has issued an attestation report on management's assessment of the registrant's internal control over

9   financial reporting.

10         191.   During the Class Period, defendants violated the requirements for internal control

11   over financial reporting alleged above as follows:

12         (a)   Cadence's Forms 10-Q contained certifications required by Rules 13a-14 of

13   the Exchange Act.  The certifications for the periods ended March 29, 2008 and June 28, 2008 were

14   signed by defendants Fister and Palatnik.  Exs. 14, 24.  The certifications signed by Fister and

15   Palatnik knowingly or recklessly were false or misleading given defendants' later admissions about

16   Cadence's financial reports and internal controls;

17         (b)   Defendants failed to establish and maintain an adequate system of internal

18   controls, and failed to regularly evaluate the status of those controls or the lack thereof; and

19         (c)   Defendants did not maintain effective process and transaction level controls.

20         192.   Defendants' failure to strengthen Cadence's known inadequate internal controls

21   rendered Cadence's financial reporting inherently unreliable and contributed to the Company's

22   inability to prepare financial statements that complied with GAAP.  Nonetheless, as detailed above,

23   throughout the Class Period, the Company regularly issued quarterly financial statements without

24   ever disclosing the known existence of the significant and material deficiencies in its internal

25   accounting controls and falsely asserted that its financial statements complied with GAAP.

26   Other GAAP Violations

27         193.   In addition to the GAAP and SEC violations described above, the Company also

28   violated the following fundamental GAAP principles:

1    (a)    The principle that interim financial reporting should be based upon the same

2    accounting principles and practices used to prepare annual financial statements was violated

3    (Accounting Principles Board Opinion No. 28, ¶10);

4    (b)    The principle that revenues generally are not recognized until realized or

5    realizable and earned (SFAC No. 5, ¶¶83-84);

6    (c)    The principle that financial reporting should provide information that is useful

7    to present and potential investors and creditors and other users in making rational investment, credit

8    and similar decisions was violated (SFAC No. 1, ¶34);

9    (d)    The principle that financial reporting should provide information about the

10   economic resources of an enterprise, the claims to those resources, and effects of transactions, events

11   and circumstances that change resources and claims to those resources was violated (SFAC No. 1,

12   ¶40);

13   (e)    The principle that financial reporting should provide information about how

14   management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

15   for the use of enterprise resources entrusted to it was violated.  To the extent that management offers

16   securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

17   accountability to prospective investors and to the public in general (SFAC No. 1, ¶50);

18   (f)    The principle that financial reporting should provide information about an

19   enterprise's financial performance during a period was violated.  Investors and creditors often use

20   information about the past to help in assessing the prospects of an enterprise.  Thus, although

21   investment and credit decisions reflect investors' expectations about future enterprise performance,

22   those expectations are commonly based at least partly on evaluations of past enterprise performance

23   (SFAC No. 1, ¶42);

24   (g)    The principle that financial reporting should be reliable in that it represents

25   what it purports to represent was violated.  That information should be reliable as well as relevant is

26   a notion that is central to accounting (SFAC No. 2, ¶¶58-59);

27

28

1           (h)     The principle of completeness, which means that nothing is left out of the

2 information that may be necessary to insure that it validly represents underlying events and

3 conditions was violated (SFAC No. 2, ¶79); and

4           (i)     The principle that conservatism be used as a prudent reaction to uncertainty to

5 try to ensure that uncertainties and risks inherent in business situations are adequately considered

6 was violated.  The best way to avoid injury to investors is to try to ensure that what is reported

7 represents what it purports to represent (SFAC No. 2, ¶¶95, 97).

8        194.    Additionally, defendants' improper accounting for revenue was material, given the

9 SEC's guidance on materiality.  SEC Staff Accounting Bulletin ("SAB") Topic 1M, *Materiality*,

10 summarizes GAAP definitions of materiality.  SAB Topic 1M represents the codification of certain

11 SABs, including SAB No. 99, Materiality, as of May 9, 2003.  SAB No. 99 became effective August

12 12, 1999.  SAB Topic 1M says, *inter alia*, "[a] matter is 'material' if there is a substantial likelihood

13 that a reasonable person would consider it important."  It also stresses that materiality requires

14 qualitative, as well as quantitative, considerations.  For example, considerations such as whether a

15 misstatement changes income into a loss or whether the misstatement arises from an item capable of

16 precise measurement are factors that should be taken into account in determining the materiality of

17 the misstatement.

18                        **LOSS CAUSATION/ECONOMIC LOSS**

19        195.    During the Class Period, as detailed herein, defendants made false and misleading

20 statements concerning the current and future financial condition of the Company and engaged in a

21 scheme to deceive investors regarding the same.  These materially false representations caused

22 Cadence's stock to trade at an inflated level and operated as a fraud or deceit on the Class.  Later,

23 when the relevant truth regarding the Company's reported revenue, earnings and prospects began to

24 be disclosed, Cadence's stock price declined, as the prior artificial inflation came out of the stock

25 price over time.  As a result, plaintiffs and other members of the Class suffered economic loss, *i.e.*,

26 damages, under the federal securities laws.

27        196.    Throughout the Class Period, it was part of defendants' scheme to present a

28 misleading picture of Cadence's financial condition and prospects by failing to truthfully disclose

that the Company's sales and revenue were the result of improperly recognizing revenue in a manner that was inconsistent with GAAP, SOP 97-2 and the Company's own revenue recognition policy. The Company's publicly reported quarterly earnings results for 1Q08 and 2Q08 were materially overstated because defendants caused the Company to pull future revenue forward by improperly recognizing $36.8 million in 1H08 in violation of GAAP and SOP 97-2. But for these deliberate accounting improprieties, Cadence would have missed its own guidance for 1Q08 and 2Q08.

197. Defendants' false and misleading financial statements, including false forecasts of 2Q08 revenue and earnings, had the intended effect. Following the statements regarding the Company's 1Q08 results, defendants' false and misleading statements caused Cadence's stock to trade at artificially inflated prices throughout the Class Period, causing Cadence's stock to trade as high as $11.67 per share on May 29, 2008. Between April 23, 2008 and July 23, 2008, Cadence's stock continued to trade between $9.59 per share and $11.67 per share. Later, when the relevant true facts of the Company's financial and operating conditions, which had been concealed by defendants' fraudulent scheme, began to be revealed to the market, Cadence's stock price began a continuous and precipitous decline as the prior artificial inflation began to come out of Cadence's stock price.

198. On July 23, 2008, while Cadence reported revenue and earnings results purportedly (but falsely) within Wall Street analyst expectations, Cadence revealed that it was reducing its FY08 guidance by another $400 million. The Company also disclosed that it would sharply change its revenue model for recognizing licensing contracts inconsistent with prior representations. Shares of Cadence suffered an immediate 30.8% drop to $7.11 per share on July 24, 2008, with more than 33 million shares traded. By comparison, the S&P MidCap 400 Index dropped only 3%, the S&P 400 Information Technology Index dropped by only 2.7%, and the NASDAQ Index dropped under 2% on the same day. Some analysts observed that the drastic downturn was company-specific, as other semiconductor or EDA companies were not experiencing the same expected decline in their forecast and revenue that Cadence was reporting. The July 23, 2008 disclosures, however, only partially revealed the true financial and operating conditions of Cadence – while defendants continued to conceal that in fact, Cadence only met its revenue and earnings guidance by improperly recognizing revenue upfront rather than ratably in violation of GAAP.

199.    Following the July 23, 2008 disclosures, Cadence's stock price continued to decline as the market expressed concerns as to how Cadence could starkly change its guidance and licensing revenue model.  For instance, at the September 3, 2008 Citigroup Global Technology Conference and the September 10, 2008 Deutsche Bank Securities Technology Conference, analysts again and again asked Cadence to clarify its outlook and the implication of the model change, which effectively changed the Company's revenue recognition on licensing revenues, on the Company's reporting of revenue.  Exs. 29-30.  Despite defendants' attempt to explain the sudden changes, and while investors remained concerned about the implications of the change on the Company's business and financial outlook, Cadence's stock price steadily declined but still traded at an inflated level.

200.    On October 15, 2008, the Company announced the sudden terminations of key executives, including defendants Fister, Porter and Bushby.  Following the announcement of the major exodus of the senior management, Cadence's stock price dropped by 15%, from $5.30 per share to $4.50 per share on October 15, 2008, and continued to drop another 5% to close at $4.30 per share on October 16, 2008.  One analyst immediately issued a report, asking whether the massive terminations of the top executives was "[a] sign things are worse than feared?"  Ex. 32.  In the two days that Cadence's stock lost over 18% in value, the S&P MidCap 400 Index dropped 6%, the S&P Information Technology Index dropped 6%, and the NASDAQ Index dropped 3%.

201.    On October 22, 2008, after the close of the market, instead of announcing its 3Q08 results, Cadence announced that it would have to restate its financial results for 1H08 due to improper revenue recognition of certain transactions.  As a result of this disclosure, Cadence's stock price dropped over 25% on October 23, 2008, from $4.32 per share to $3.22 per share, on more than 25 million shares traded compared to a volume of 4 million shares traded on October 22, 2008.  This decline in Cadence's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.  By comparison, the NASDAQ Index dropped no more than 1% while the S&P MidCap 400 Index dropped less than 3%, and the S&P 400 Information Technology Index dropped slightly over 3% on the same day.

202.    Several analysts immediately issued negative reports on Cadence, highlighting that "[w]hen it rains it pours. . . .  [W]hile the identified dollar amount of $24m is small, it raises

1   concerns over further [revenue recognition] issues and adds to the overall cloud hanging over the

2   company including the recent top management shake-up." Ex. 35.  Another analyst downgraded the

3   stock, noting the announcement of intent to restate as "[t]his latest wrinkle only adds to company-

4   specific negativity."  Ex. 37.

5        203.    Following the analyst reports issued on October 22-24, 2008, Cadence's stock price

6   continued to drop, closing at $2.90 per share on October 24, 2008.  Between October 24, 2008 and

7   December 10, 2008, Cadence's stock price hovered around $3-$4 per share, as investors waited to

8   see the scope of the restatement and the 3Q08 results as well as the Company's projected outlook for

9   4Q08 and FY09.

10       204.    On December 10, 2008, Cadence reported its 3Q08 results, along with the details of

11  the restatement.   The restatement revealed to the market that the true financial and operating

12  condition of the Company was far worse than it had previously revealed on July 23, October 15 and

13  22, 2008.  As detailed in the restatement, the Company improperly recognized $24.8 million of

14  Product Revenue in 1Q08 (the largest transaction of that quarter) and $12 million of Product

15  Revenue in 2Q08.   Additionally, contrary to defendants Fister's and Porter's Sarbanes-Oxley

16  certifications during the Class Period, the Company admitted to material weaknesses in internal

17  controls over financial reporting.  Following the Company's December 10, 2008 disclosures, as a

18  direct result of defendants' admissions and the revelations regarding the truth about Cadence's

19  misstatement of its financial results, Cadence's stock price dropped over 22% in one day from $3.93

20  per share to $3.04 per share, with more than 21 million shares traded on December 11, 2008.  By

21  comparison, the NASDAQ Index dropped slightly above 3%, the S&P MidCap 400 Index dropped

22  4%, and the S&P 400 Information Technology Index dropped 3% on the same day.

23       205.    Like other members of the Class of purchasers of Cadence stock who purchased at

24  artificially inflated prices during the Class Period, lead plaintiff suffered an economic loss, *i.e.*,

25  damages, when Cadence's stock price continued to decline following the Company's several partial

26  disclosures on July 23, 2008, October 15, 2008, October 23, 2008, and finally on December 10,

27  2008, regarding defendants' scheme to conceal Cadence's failing business outlook and true financial

28  condition.

1

**NO SAFE HARBOR**

2    206.    Cadence's verbal "Safe Harbor" warnings accompanying its oral forward-looking

3  statements ("FLS") issued during the Class Period were ineffective to shield those statements from

4  liability.

5    207.    The defendants are also liable for any false or misleading FLS pleaded because, at the

6  time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

7  authorized and/or approved by an executive officer of Cadence who knew that the FLS was false.

8  None of the historic or present tense statements made by defendants were assumptions underlying or

9  relating to any plan, projection or statement of future economic performance, as they were not stated

10 to be such assumptions underlying or relating to any projection or statement of future economic

11 performance when made, nor were any of the projections or forecasts made by defendants expressly

12 related to or stated to be dependent on those historic or present tense statements when made.

13  **APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

14    208.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-

15 market doctrine in that, among other things:

16        (a)    Defendants made public misrepresentations or failed to disclose material facts

17 during the Class Period;

18        (b)    The omissions and misrepresentations were material;

19        (c)    The Company's stock traded in an efficient market;

20        (d)    The misrepresentations alleged would tend to induce a reasonable investor to

21 misjudge the value of the Company's stock; and

22        (e)    Plaintiffs and other members of the Class purchased Cadence common stock

23 between the time defendants misrepresented or failed to disclose material facts and the time the true

24 facts were disclosed, without knowledge of the misrepresented or omitted facts.

25    209.    At all relevant times, the market for Cadence common stock was efficient for the

26 following reasons, among others:

27        (a)    As a regulated issuer, Cadence filed periodic public reports with the SEC; and

28

1    (b)     Cadence regularly communicated with public investors via established market

2  communication mechanisms, including through regular disseminations of press releases on the major

3  newswire services and through other wide-ranging public disclosures, such as communications with

4  the financial press, securities analysts and other similar reporting services.

5                            **CLASS ACTION ALLEGATIONS**

6    210.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

7  of Civil Procedure on behalf of all persons who purchased Cadence common stock during the Class

8  Period.  Excluded from the Class are defendants, directors and officers of Cadence and their families

9  and affiliates.

10    211.    The members of the Class are so numerous that joinder of all members is

11  impracticable.  The disposition of their claims in a class action will provide substantial benefits to

12  the parties and the Court.  Cadence had more than 250 million shares of stock outstanding, owned by

13  thousands of persons.

14    212.    There is a well-defined community of interest in the questions of law and fact

15  involved in this case.  Questions of law and fact common to the members of the Class which

16  predominate over questions which may affect individual Class members include:

17    (a)     Whether the Exchange Act was violated by defendants;

18    (b)     Whether defendants omitted and/or misrepresented material facts;

19    (c)     Whether defendants' statements omitted material facts necessary in order to

20  make the statements made, in light of the circumstances under which they were made, not

21  misleading;

22    (d)     Whether defendants knew or recklessly disregarded that their statements were

23  false and misleading;

24    (e)     Whether the price of Cadence common stock was artificially inflated; and

25    (f)     The extent of damage sustained by Class members and the appropriate

26  measure of damages.

27    213.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class

28  sustained damages from defendants' wrongful conduct.

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - C-08-4966 SC                                                                                                                - 94 -

214.     Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

215.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

216.     Plaintiffs incorporate all of the above, ¶¶1-215, by reference.

217.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

218.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Cadence common stock during the Class Period.

219.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cadence common stock.  Plaintiffs and the Class would not have purchased Cadence common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

220.    As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Cadence common stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against All Defendants

221.    Plaintiffs incorporate all of the above, ¶¶1-220, by reference.

222.    The Individual Defendants acted as controlling persons of Cadence within the meaning of §20 of the Exchange Act.  By virtue of their positions and their power to control public statements about Cadence, the Individual Defendants had the power and ability to control the actions of Cadence and its employees.  Cadence controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding plaintiffs and the members of the Class damages and interest;

C.    Awarding plaintiffs reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues.

DATED:  October 13, 2009                COUGHLIN STOIA GELLER
                                                RUDMAN & ROBBINS LLP
                                        SHAWN A. WILLIAMS
                                        SHIRLEY H. HUANG
                                        JASON C. DAVIS

                                        _____
                                                /s/
                                        SHAWN A. WILLIAMS

100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

S:\CasesSD\Cadence 08\CPT00061926 1st Amended.doc

1

<u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on October 14, 2009, I electronically filed the foregoing with the Clerk

3   of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4   addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5   mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6   participants indicated on the attached Manual Notice List.

7      I further certify that I caused this document to be forwarded to the following designated

8   Internet site at:  http://securities.stanford.edu/.

9      I certify under penalty of perjury under the laws of the United States of America that the

10   foregoing is true and correct.  Executed on October 14, 2009.

11

12                                                                 /s/
                                                           SHAWN A. WILLIAMS

13                                              COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
14                                              100 Pine Street, 26th Floor
                                                San Francisco, CA  94111
15                                              Telephone:  415/288-4545
                                                415/288-4534 (fax)
16                                              E-mail:shawnw@csgrr.com

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:08-cv-04966-SC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey A. Berens**
  jeff@dyerberens.com

- **Peter Arthur Binkow**
  info@glancylaw.com,pbinkow@glancylaw.com

- **Ethan D. Dettmer**
  edettmer@gibsondunn.com,psaunders@gibsondunn.com,mjanky@gibsondunn.com

- **Robert J. Dyer , III**
  bob@dyerberens.com

- **Lionel Z. Glancy**
  info@glancylaw.com

- **Michael M. Goldberg**
  info@glancylaw.com

- **Shirley H. Huang**
  shirleyh@csgrr.com,jdecena@csgrr.com,vcordial@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Matthew Stewart Kahn**
  MKahn@gibsondunn.com

- **Matthew Paul Montgomery**
  mattm@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Blair Allen Nicholas**
  blairn@blbglaw.com,denab@blbglaw.com,kayem@blbglaw.com,kristinas@blbglaw.com

- **Brian O. O'Mara**
  bo'mara@csgrr.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Karen T. Rogers**
  krogers@milberg.com,schang@milberg.com,cchaffins@milberg.com

- **Jeff S. Westerman**
  jwesterman@milberg.com,cchaffins@milberg.com

- **Shawn A. Williams**
  shawnw@csgrr.com,jdecena@csgrr.com,vcordial@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Catherine J. Kowalewski
Coughlin Stoia Geller Rudman & Robbins LLP
655 W Broadway #1900
San Diego, CA 92101
```