1  GIBSON, DUNN & CRUTCHER LLP
   TIMOTHY K. ROAKE, SBN 99539
2  troake@gibsondunn.com
   SALLY J. BERENS, SBN 218880
3  sberens@gibsondunn.com
   1881 Page Mill Road
4  Palo Alto, California 94304
   Telephone: (650) 849-5300
5  Facsimile: (650) 849-5333

6  ETHAN D. DETTMER, SBN 196046
   edettmer@gibsondunn.com
7  MATTHEW S. KAHN, SBN 261679
   mkahn@gibsondunn.com
8  555 Mission Street, Suite 3000
   San Francisco, California 94105
9  Telephone: (415) 393-8200
   Facsimile: (415) 393-8306

10

11 Attorneys for Defendants
   CADENCE DESIGN SYSTEMS, INC.,
   MICHAEL J. FISTER, KEVIN S. PALATNIK,
12 WILLIAM PORTER and KEVIN BUSHBY

13

14                  UNITED STATES DISTRICT COURT

15             FOR THE NORTHERN DISTRICT OF CALIFORNIA

16                     SAN FRANCISCO DIVISION

17

| 18  In re CADENCE DESIGN SYSTEMS, INC. SECURITIES LITIGATION | CASE NO. C-08-4966 |
|---|---|
| 19 | CLASS ACTION |
| 20 | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| 21 This Document Relates To: | |
| 22      ALL ACTIONS. | |
| 23 | [Request for Judicial Notice; Declaration of Sarah A. Brown; [Proposed] Order Filed Concurrently Herewith] |
| 24 | |
| 25 | Date:   February 5, 2010 |
| 26 | Time:   10:00 a.m. |
| 27 | Place:  450 Golden Gate Avenue San Francisco, California |
|   | Judge:  The Honorable Samuel Conti |

28

Gibson, Dunn &
Crutcher LLP

**TABLE OF CONTENTS**

Page

NOTICE OF MOTION AND MOTION ...................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

I. ISSUES TO BE DECIDED ................................................................................. 1

II. INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

III. STATEMENT OF FACTS ............................................................................... 4

    A.    The Class Period Begins With Cadence Reporting Results Lower Than 2007 Results. ................................................................... 4

    B.    Cadence Makes And Withdraws A Bid To Purchase Mentor Graphics. ........................................................................................... 4

    C.    After Several Down Quarters, Cadence Announces A Management Change. .................................................................................. 5

    D.    Cadence Announces A Review Of Revenue Recognition For Certain Contracts, And That It Expects To Restate The Company's Q1 And Q2 2008 Financial Statements. ...................... 5

        1.    October 22, 2008 Announcement .......................................... 5

        2.    December 10, 2008 Restatement ............................................ 6

IV. ARGUMENT .................................................................................................... 8

    A.    Plaintiffs Must Satisfy Exacting Pleading Standards. .................... 8

    B.    Plaintiffs' Consolidated Complaint Did Not Adequately Plead Scienter. ............................................................................... 10

    C.    The Amended Complaint's Additional Allegations Do Not Tie The Defendants To Either The Subject Agreements Or To The Accounting Errors, And Therefore Do Not Support A Strong Inference Of Scienter. ................................................. 11

        1.    Confidential Witness Allegations Still Do Not Support An Inference of Scienter. ................................................. 12

            a.    No Facts Are Set Forth To Demonstrate That The CWs Have Personal Knowledge. ....................... 12

            b.    The New CW Statements Do Not Tie Any Individual Defendant To The Accounting Issues .......... 13

            c.    CW Statements Still Do Not Tie Any Individual Defendant To The Customers Or Deals At Issue ........ 14

Gibson, Dunn &
Crutcher LLP

i

**TABLE OF CONTENTS**
(continued)

Page

d.    Allegations Regarding The Contract Approval Process Are Still Insufficient. ................................................. 16

e.    Additional Statements Regarding Individual Defendants' Access to Cadence Records Systems Are Still Insufficient. ................................................. 18

f.    Plaintiffs' Bare Allegations That Certain Executives Were "Terminated" Does Not Support A Strong Inference Of Scienter. ............................... 19

g.    Plaintiffs' "Revenue Bubble" Allegations Are Insufficient. .......................................................................... 20

2.    Neither The Size And Supposed Importance Of The Restated Contracts, Nor The Individual Defendants' Positions Within The Company, Create A Strong Inference Of Scienter. ................................................... 20

a.    Plaintiffs' Allegations Do Not Establish That Defendants Had "Actual Knowledge" Of The Relevant Facts. .................................................... 21

b.    It Is Not "Absurd" That High-Level Executives Were Unaware Of The Undocumented Details Of Licensing Negotiations. ..................................... 21

3.    Cadence's Violation Of GAAP And Internal Accounting Rules Is Not Enough To Establish A Strong Inference Of Scienter. ............................................................. 23

4.    Plaintiffs' Group-Based Allegations Do Not Satisfy The PSLRA's Heightened Pleading Standard. ............................................. 23

5.    Viewed Holistically, Plaintiffs' Allegations Do Not Support An Inference Of Scienter As Compelling As Cadence's Explanations Of The Accounting Errors. ........................ 24

D.    Plaintiffs' Section 20(a) Claim Should Be Dismissed Because The Section 10(b) Claim Fails, And Because Plaintiffs Do Not Plead That Defendants Were "Control Persons." .......................................... 25

V. CONCLUSION ................................................................................. 25

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Ashcroft v. Iqbal*,
566 U.S. __, 129 S. Ct. 1937 (2009)............................................................................. 8

*Brodsky v. Yahoo! Inc.*,
592 F. Supp. 2d 1192 (N.D. Cal. 2008) ....................................................................... 13

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004)........................................................................... 24

*In re CornerStone Propane Partners, L.P.*,
355 F. Supp. 2d 1069 (N.D. Cal. 2005) ....................................................................... 20

*In re Dot Hill Sys. Corp. Sec. Litig.*,
2009 U.S. Dist. LEXIS 22022 (S.D. Cal. Mar. 18, 2009)............................................ 10

*In re Downey Sec. Litig.*,
2009 WL 736802 (C.D. Cal. Mar. 18, 2009) ................................................... 10, 20, 25

*In re Hansen Natural Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) ....................................................................... 10

*In re Int'l Rectifier Corp. Sec. Litig.*,
2008 WL 4555794 (C.D. Cal. May 23, 2008) .............................................................. 19

*In re Leapfrog Sec. Litig.*,
2006 U.S. Dist. LEXIS 56669 (N.D. Cal. Aug. 1, 2006)............................................... 8

*In re Lexar Media, Inc. Sec. Litig.*,
2005 WL 1566534 (N.D. Cal. July 5, 2005) ................................................................ 25

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ....................................................................... 23

*In re Silicon Graphics Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999)...................................................................................... 8, 9

*In re U.S. Aggregates, Inc. Sec. Litig.*,
235 F. Supp. 2d 1063 (N.D. Cal. 2002) ....................................................................... 13

*In re Verifone Holdings, Inc. Sec. Litig.*,
2009 U.S. Dist. LEXIS 44132 (N.D. Cal. May 26, 2009) ............................................ 22

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) ....................................................................... 20

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Jacobson v. Schwarzenegger,*
226 F.R.D. 395 (C.D. Cal. Feb. 15, 2005) ................................................................. 8

*Kelley v. Rambus, Inc.,*
2007 U.S. Dist. LEXIS 81616 (N.D. Cal. Oct. 15, 2007) ....................................... 8, 9

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
513 F.3d 702 (7th Cir. 2008) ................................................................................. 9, 23

*McHenry v. Renne,*
84 F.3d 1172 (9th Cir. 1995) ............................................................................... 8, 20

*Metzler Inv. GmbH v. Corinthian Colleges, Inc.,*
540 F.3d 1049 (9th Cir. 2008) ............................................................................. 8, 21

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,*
320 F.3d 920 (9th Cir. 2003) ................................................................................... 10

*Provenz v. Miller,*
102 F.3d 1478 (9th Cir. 1996) ............................................................................. 2, 23

*South Ferry LP v. Killinger,*
2009 U.S. Dist. LEXIS 91174 (W.D. Wash. Oct. 1, 2009) ...................................... 21

*South Ferry LP v. Killinger,*
542 F.3d 776 (9th Cir. 2008) ................................................................................... 21

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,*
365 F.3d 353 (5th Cir. 2004) ................................................................................. 9, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308, 127 S. Ct. 2499 (2007) ....................................................................... 9

*Winer Family Trust v. Queen,*
503 F.3d 319 (3d Cir. 2007) ................................................................................. 9, 23

*Zucco Partners, LLC v. Digimarc Corp.,*
552 F.3d 981 (9th Cir. 2009) ............................................................................. passim

**STATUTES**

15 U.S.C. § 78j(b) .......................................................................................... 1, 7, 10

15 U.S.C. § 78t(a) ........................................................................................ 1, 10, 24

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

15 U.S.C. § 78u-4...................................................................................................................... 8

**REGULATIONS**

17 C.F.R. § 240.10b-5................................................................................................................. 1

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that at 10:00 a.m. on February 5, 2010, or as soon thereafter as this matter may be heard in the courtroom of the Honorable Samuel Conti, 450 Golden Gate Avenue, San Francisco, California, Defendants Cadence Design Systems, Inc. ("Cadence" or the "Company"), Michael J. Fister, Kevin S. Palatnik, William Porter and Kevin Bushby (the "Individual Defendants," and collectively with Cadence, "Defendants") will and hereby do move for an order dismissing Plaintiffs' First Amended Complaint for Violation of the Federal Securities Laws ("Amended Complaint" or "FAC"), under the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

This motion is based on this Notice of Motion and Motion, Memorandum of Points and Authorities, Request for Judicial Notice, the accompanying Declaration of Sarah Brown, the Court's files in this action, the arguments of counsel, and any other matter that the Court may properly consider.

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.       ISSUES TO BE DECIDED

1.  Have Plaintiffs failed to plead particularized facts giving rise to a "strong inference" that Defendants acted with scienter, as required by Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), where they fail to plead specific facts showing that any Defendant knew or recklessly disregarded that the alleged false statements were false or misleading?

2.  Have Plaintiffs failed to state a claim for control person liability under Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78t(a)), where they fail to plead a primary violation of the securities laws and do not plead particularized facts showing that the Individual Defendants exercised control over the subject matter of the alleged fraud?

### II.      INTRODUCTION AND SUMMARY OF ARGUMENT

The Court's September 11, 2009 Order dismissing Plaintiffs' Consolidated Complaint (the "Order") was 27 pages long and could be read as a roadmap for what factual allegations Plaintiffs would need to allege to meet the PSLRA's heightened pleading standards.  Order [Doc # 48] at 16.

1

Plaintiffs have ignored the Court's guidance and either did not or could not set forth facts in accordance with that guidance.  The Amended Complaint should be dismissed with prejudice.

This Court held that the original Consolidated Complaint [Doc # 39] failed to allege that Defendants acted with scienter, because it did not "specifically tie[] any Defendant to the accounting determinations at issue."[1]  Order at 18.  Plaintiffs originally tried to show scienter by alleging (1) GAAP violations and internal accounting policy violations related to the upfront, rather than ratable, accounting for two agreements in Q1 and Q2 of 2008; (2) the resignation of several Cadence executives; and (3) that a motive existed to create a "rosy picture" of Cadence's financial state to improve the chances of acquiring Mentor Graphics Corporation ("Mentor").  *See, e.g.*, Doc # 39 at ¶¶ 54-56, 66-73, 92-97, 105-09, 123-39.  This Court held that such allegations did not establish a strong inference that Defendants were aware of the accounting errors in Cadence's Q1 and Q2 2008 financial statements at the time they were made.  Order at 25.  The Court also held that Plaintiffs' alleged confidential witnesses did not "provide any concrete allegations that Individual Defendants actually knew about the accounting errors [in connection with the recognition of revenue upfront], or that they were familiar with the key details of [the relevant customer agreements], such that they could have identified them as subscription contracts."  *Id*. at 20.  At bottom, "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."  *Id*. at 15 (citing *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (internal quotations omitted)).

The Court set forth the type of factual allegations that might overcome these deficiencies:  the Plaintiffs "must plead facts that suggest that Defendants were aware that it was inappropriate to classify the 1Q and 2Q agreements as term licenses."  *Id.* at 16.  Specifically:

> [T]here must be a strong inference that Defendants knew (or at least suspected) that the 1Q agreement was entered into in contemplation of a future subscription license, or that it involved a technology that was not yet released for commercial use.  [*Id.*]

---

[1]  The initial complaint was filed on October 29, 2008.  Doc # 1.  On March 4, 2009, the Court entered an order consolidating the three related cases, appointing Alaska Electrical Pension Fund as the lead plaintiff and approving the selection of lead counsel.  Doc # 36.  On April 24, 2009, Plaintiffs filed their Consolidated Complaint, and the Court dismissed it by Order dated September 11, 2009.  Doc # 39, 48.  On October 13, 2009, Plaintiffs filed their FAC.  Doc # 53.

Gibson, Dunn & Crutcher LLP

The Court also provided guidance on the restated contract in the Q2 2008 financial statements:

> Plaintiffs must allege facts that suggest that Defendants knew (or at least suspected) that the licensee intended to retain certain rights to use future technology, which it had enjoyed under a subscription license[] that it simultaneously cancelled.  [*Id.*]

Absent such details, amendment would be futile:

> Plaintiffs' allegations must, when taken as a whole, give rise to a "strong inference" that Defendants were aware of these details—otherwise, Defendants would have no way of knowing that the licenses were improperly classified.  [*Id.*]

Plaintiffs' new allegations do not address the deficiencies identified by the Court.  Plaintiffs have added hyperbole and argument, but the new "factual allegations" are few and vague:

- Plaintiffs add several new supposed CWs, including a "consultant in the EDA industry." As with the other CWs, no facts are set forth to show "personal knowledge" or to demonstrate that any Individual Defendant had specific knowledge about relevant facts at the time the accounting decisions were made.  FAC ¶ 51.

- Plaintiffs change their nomenclature and now claim that some of the Cadence senior executives were "terminated" instead of having resigned.  *See, e.g., id.* ¶¶ 42, 44, 45, 200.

- Plaintiffs supplement their allegations regarding Defendants' supposed motive to commit accounting fraud due to pressures to meet earnings expectations, continue a "revenue bubble," and acquire Mentor.  *Id.* ¶¶ 64-65, 78, 80, 86, 93.

- Plaintiffs originally claimed improper revenue recognition of a "$12 million deal" in Q2 2008 because "the customer did not intend to substantively cancel its right to access future new technology."  Consolidated Complaint [Doc # 39] at ¶¶ 10, 116, 135. Plaintiffs now claim that a person in sales told them that Cadence returned $9 million in cash to Nvidia in Q2 2008 and entered into "another" unspecified contract in an unspecified amount;  they do not explain how this alleged $9 million refund to Nvidia relates to a $12 million restatement, or how this related to the Q2 restatement.  FAC ¶ 110.

- Finally, Plaintiffs assert that Cadence changed its description of its internal controls as "sufficiently effective" to "effective" at the request of the SEC.  *Id.* ¶¶ 69-71.

These new allegations should not alter the Court's earlier conclusion:  Plaintiffs plead no specific facts tying any Defendant to the accounting determinations at issue, or showing that any Defendant knew the relevant facts about the disputed contracts when the accounting determinations were made. Because Plaintiffs were unable to follow the Court's guidance about how to plead their claims, those claims should now be dismissed with prejudice.

## III.     STATEMENT OF FACTS

### A.     The Class Period Begins With Cadence Reporting Results Lower Than 2007 Results.

Like the earlier iterations of the complaints, the Amended Complaint describes Cadence's financial difficulties *before* the April 23, 2008 start of their Class Period, but largely ignores the global credit crunch and deepening recession of late 2007 and early 2008 that are described in the exhibits. *Compare*, *e.g.*, FAC ¶ 13, with Exs. 4, 13, 16. The economic environment worsened throughout 2008, and Cadence's business—like that of its industry and the economy as a whole—declined. Cadence executives explicitly warned that they expected 2008 to be "a challenging year" due to the "difficult environment." Ex. 16 at 2.

Cadence's April 23, 2008 announcement of its Q1 loss of $0.07 per share and its July 23, 2008 announcement of Q2 earnings of $0.02 per share were below the company's earnings for those periods in 2007. The day after Cadence's Q1 2008 earnings announcement, Cadence's stock price rose slightly, increasing $0.15 per share, from $11.24 to $11.39. The day after Cadence's Q2 2008 earnings and revised guidance announcement, Cadence's stock price declined from $10.27 to $7.11. FAC ¶ 102. Analysts reported that the decline was a result of the downward guidance forecast and Q2 results. Exs. 21, 22. Commentators echoed management's warnings that customers remained "wary of the ongoing macro uncertainty" and noted that Cadence's guidance was weighted toward the second half of 2008. Ex. 12; *see also* Exs. 10 at 5-6, 13, 23, 35, & 41.

### B.     Cadence Makes And Withdraws A Bid To Purchase Mentor Graphics.

In April 2008, Cadence privately proposed to buy a competitor, Mentor. FAC ¶ 81. In late May, Mentor's board of directors rejected the offer. On June 17, 2008, Cadence publicly announced a proposal to purchase Mentor. *Id.* ¶ 83. Two months later, and after attempts to reach agreement with Mentor and conduct due diligence, Cadence decided to withdraw its bid noting that Mentor's "board and management were unwilling to engage in substantive discussions…." Ex. 27. Analysts wrote that the credit crunch made it hard to raise debt to fund the acquisition, and that the Federal Trade Commission was scrutinizing the deal, obstacles acknowledged by Mentor and the media. Exs. 27, 28. As one report noted, "[t]he withdrawal was no big surprise" given "the challenging

market conditions facing the semiconductor sector at large." Ex. 27. The market reacted favorably to the bid's withdrawal, and Cadence's stock price rose from $7.16 to $7.64 on the news. *Id.*

### C. After Several Down Quarters, Cadence Announces A Management Change.

On October 15, 2008, members of Cadence's management team, including Messrs. Fister, Bushby and Porter, announced their departure from the Company.[2] FAC ¶ 126. Mr. Palatnik remained as Senior Vice President and CFO. *Id.* There was no suggestion that the departures were related to improper revenue recognition or the Company's subsequent restatement.[3] To the contrary, one analyst report indicated that management turnover was not surprising given Cadence's struggling business, and that there had been rumors of a restructuring. Ex. 32. The media reported that "Cadence's board had been arguing for six months over the company's direction" under then-current management, and quoted an analyst as saying "[i]t's going to be a terrible year [for Cadence]"—a fact that has "been apparent since late 2007." Ex. 33.

### D. Cadence Announces A Review Of Revenue Recognition For Certain Contracts, And That It Expects To Restate The Company's Q1 And Q2 2008 Financial Statements.

#### 1. October 22, 2008 Announcement

On October 22, 2008, Cadence announced that it was postponing release of third quarter financial results and reviewing revenue recognition related to customer contracts signed in Q1 2008. FAC ¶ 132; Ex. 34. Cadence initiated the review after "preliminarily determining during its regular review of the third quarter results that approximately $24 million of revenue" from one contract should have been recognized over the duration of the contract, rather than recognized up front in Q1 2008.[4] *Id.* Cadence's stock price initially fell following this announcement but regained its October 22, 2008 level within two weeks. Brown Decl., Ex. 1. Analysts viewed the $24 million

---

[2] At the time, Mr. Fister was President and CEO and a director of Cadence; Mr. Porter was Executive Vice President and Chief Administrative Officer; and Mr. Bushby was Executive Vice President, Worldwide Field Operations. FAC ¶¶ 40-45.

[3] Footnote 6 of the FAC states that three CWs claimed that "Porter, Fister and Bushby were fired because of the restatement," citing as support the FAC's own paragraph 127. Paragraph 127 says absolutely nothing about the restatement, and only claims that plaintiffs were told that "Fister, Porter and Bushby were indeed fired." FAC ¶ 127.

[4] This Court reviewed the relevant accounting treatment in its September 11, 2009 Order at 3-4.

Gibson, Dunn & Crutcher LLP

restatement as "small" (Ex. 35), particularly because all of the revenue would be recognized, just over a longer period, "resulting in minimal changes to quarters after 1Q08." Ex. 36.

### 2.      December 10, 2008 Restatement

On December 10, 2008, Cadence announced its third quarter 2008 results, completion of the previously announced review by Cadence's Audit Committee with assistance from independent counsel and other advisors, and the restatement of the first two quarters of 2008. Ex. 39. The Audit Committee reported its judgment that revenue had been recognized improperly in two customer contracts, and that such revenue should have been recognized over the duration of each contract, rather than up front. *Id.* The Audit Committee concluded that the restatement was not the result of "illegal conduct on the part of any of Cadence's directors, officers, or other employees." *Id.*

> During the first quarter of 2008, Cadence executed a term license arrangement with a customer (the "Q1 Contract") and, during the third quarter of 2008, Cadence executed a subscription license arrangement with the same customer. As part of its regular quarterly review process for the third quarter, Cadence identified certain factors that, when evaluated together, indicated that the software arrangements executed with this customer both in the first quarter and the third quarter were negotiated in contemplation of one another.

*Id.* Upon learning these facts, pursuant to relevant accounting guidance, the accounting personnel made the judgment that the two contracts, considered together, constituted a "Multiple-Element Arrangement" that was, in substance, a subscription arrangement. Thus, revenue should not have been recognized immediately, but rather over the duration of the arrangement.[5] Ex. 39; Ex. 44 at 5; Ex. 45 at 5-6.

As part of the investigation into the Q1 Contract, Cadence reviewed other transactions, including one that occurred during Q2 2008, in which a Cadence customer "concurrently cancelled a subscription arrangement and executed both a term license arrangement and hardware arrangement" (the "Q2 Contract"). Ex. 39 at 3. After its review of the Q2 Contract, "Cadence determined that,

---

[5]  The FAC resorts to argument in place of factual allegations in claiming that these and other post-restatement assertions should be construed as "admissions" that Defendants knew about the misapplication of accounting standards at the time that the revenue was originally booked. FAC ¶¶ 29-30. These supposed "post-class period admissions" (FAC ¶¶ 157-58) were made after a special committee investigation conducted well after the events in question, and are not statements of what the Defendants knew at the time the agreements were executed.

despite the cancellation of the subscription arrangement, the customer did not intend to substantively cancel its right to access future new technology at a later time." *Id*.  As a result, Cadence determined that the $12 million in revenue initially recognized up front should have been recognized over the duration of the Q2 Contract. *Id*.  This adjustment was made only after Cadence accounting personnel learned additional information regarding the Q2 Contract as part of the investigation. *Id*.

In the same press release, Cadence announced financial results and guidance.  Cadence realized a net loss of $169 million, or ($0.67) per share on a diluted basis, compared to net income of $73 million, or $0.24 per share on a diluted basis, in the same period in 2007.  Ex. 39.  The Company reduced its guidance for the fourth quarter, stating that it expected total revenue in the range of $215 million to $225 million and a net loss per diluted share of ($0.29) to ($0.27). *Id*.

Analysts reacted mildly to Cadence's restatement, with one analyst describing the end of the internal investigation as a "positive development," noting that the accounting issues were "isolated to a few contracts, resulting in a modest revenue restatement," and observing that the delay in recognition of revenue for the Q1 and Q2 Contracts actually improved Cadence's backlog.  Ex. 43.  Analysts expressed far more concern about the deteriorating macroeconomic environment and its effect on Cadence's business, noting a "very tough environment."  Ex. 41-43.  Cadence's stock price declined from $3.93 on December 10 to $3.04 on December 11.  FAC ¶ 151.  Less than one month later, the Company's stock price had returned to its December 10, 2008 level.  Brown Decl., Ex. 1.

Plaintiffs nowhere allege facts suggesting that any Individual Defendant, any member of Cadence's senior management, or even Cadence's accounting personnel knew of the facts discovered in the third quarter regarding the Q1 and Q2 Contracts when Cadence made its initial revenue recognition judgments on those contracts.  Plaintiffs have set forth no facts to contradict Cadence's descriptions of the errors as being a result of communication and control failures.  Order at 10-11 (citing December 10, 2008 Press Release at 11; Q1 2008 10-Q/A at 39).

# IV.     ARGUMENT

## A.     Plaintiffs Must Satisfy Exacting Pleading Standards.

To adequately plead a Section 10(b) claim, Plaintiffs must allege, among other things, that Defendants made false or misleading statements of fact, and that those false or misleading statements were made with scienter, "a form of intentional or knowing misconduct." *Zucco Partners*, *LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (quoting *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999)).   Even the *least* rigorous showing of scienter—"deliberate recklessness"—involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (quoting *In re Silicon Graphics*, 183 F. 3d at 976).

Under the PSLRA's heightened pleading standards, Plaintiffs must allege these elements with particularity.[6]   Conclusory allegations, unsupported by specific facts, do not suffice.[7]   *Metzler Inv.*

---

[6]  Plaintiffs fail to state a claim even under Rule 8, which requires plaintiffs to state a *plausible*—as opposed to merely *possible*—claim for relief.  *Ashcroft v. Iqbal*, 566 U.S. __, 129 S. Ct. 1937, 1949-50 (2009).  Plaintiffs' many legal conclusions couched as factual allegations are *not* presumed true, and need not be considered by the Court on a motion to dismiss.  *Id.* at 1949-50, 1954.

[7]   This heightened pleading standard is "not an invitation to disregard Rule 8's requirement of simplicity, directness, and clarity." *McHenry v. Renne*, 84 F.3d 1172, 1178 (9th Cir. 1995); *see also In re Leapfrog Sec. Litig.*, 2006 U.S. Dist. LEXIS 56669, at *12 (N.D. Cal. Aug. 1, 2006) (dismissing complaint for failure to provide simple, concise allegations); *Kelley v. Rambus, Inc.*, 2007 U.S. Dist. LEXIS 81616, at *7 (N.D. Cal. Oct. 15, 2007) ("The heightened pleading standard is not an invitation to adopt a 'kitchen sink' approach to a pleading."). Plaintiffs include an inordinate volume of argumentative, redundant, conclusory and sometimes illogical allegations.  *See*, *e.g.*, "[t]he allegations of the [FAC] substantially supplement the prior allegations" (FAC ¶ 26);  "the FAC also admits [sic] that defendants understood . . ." (*id.* ¶ 32);  "Defendants admit that the facts concerning the Subscription nature of both agreements were known *at the time* they were entered into and when the revenue was recorded."  (FAC ¶ 27 (citing Cadence's December 2008 announcement explaining that these facts were discovered in Q3—well after the agreements were executed and revenue determinations made)); *see also id.* ¶¶ 26, 33, 34-37.  "The Federal Rules require that averments 'be simple, concise, and direct,'" not "argumentative, prolix, replete with redundancy, and largely irrelevant."  *McHenry*, 84 F.3d at 1177; s*ee also Jacobson v. Schwarzenegger*, 226 F.R.D. 395, 397 (C.D. Cal. Feb. 15, 2005) (dismissing complaint that included "historical narrative, legal argument," irrelevant newspaper articles and websites).

Gibson, Dunn & Crutcher LLP

1   *GmbH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061, 1070 (9th Cir. 2008).  In particular, the

2   Complaint must "state with particularity facts giving rise to a *strong* inference that [Defendants]

3   acted with the required state of mind," *i.e.*, scienter.   15 U.S.C. § 78u-4(b)(2) (emphasis added).

4   Scienter allegations are inadequate unless "a reasonable person would deem the inference of scienter

5   *cogent and at least as compelling* as any opposing inference one could draw from the facts alleged."

6   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2510 (2007) (emphasis

7   added).  Courts engage in an "inherently comparative" inquiry when evaluating scienter allegations,

8   and "must take into account plausible opposing inferences" arising from the facts alleged.  *Id.* at

9   2509.  In other words, this Court should *not* view Plaintiffs' allegations in the light most favorable to

10  them.  More exacting scrutiny is required.

11      The Ninth Circuit employs a two-step analysis for assessing scienter allegations.  A court first

12  must "determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a

13  strong inference of scienter."  *Zucco Partners*, 552 F.3d at 992.  "[I]f no individual allegations are

14  sufficient, [the court must] conduct a 'holistic' review of the same allegations to determine whether

15  the insufficient allegations combine to create a strong inference of intentional conduct or deliberate

16  recklessness."  *Id.*  "[T]he plaintiff must plead 'a highly unreasonable omission [or misstatement],

17  involving not merely simple, or even inexcusable negligence, but an extreme departure from the

18  standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either

19  known to the defendant or is so obvious that the actor must have been aware of it.'"  *Id.* (quoting *In*

20  *re Silicon Graphics*, 183 F.3d at 976).  As this Court held: "In order to establish scienter in this

21  particular case, Plaintiffs must plead facts that support[] an inference that Defendants were actually

22  aware that (or reckless with respect to whether) the accounting was incorrect."  Order at 16.

23      Plaintiffs must establish this awareness for *each* Defendant, as the PSLRA does not permit so-

24  called group pleading.  *See, e.g., Kelley v. Rambus, Inc.*, 2008 WL 5170598, at *6 (N.D. Cal. Dec. 9,

25  2008) ("The group pleading doctrine was eliminated by the PSLRA."); *see also Makor Issues &*

26  *Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008); *Winer Family Trust v. Queen*, 503

27  F.3d 319, 337 (3d Cir. 2007); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 363-

28

Gibson, Dunn &
Crutcher LLP

1   65 (5th Cir. 2004).[8]

2       Plaintiffs' Section 20(a) claim must allege "a primary violation of federal securities law," and

3   "that the defendant exercised actual power or control over the primary violator."  *No. 84 Employer-*

4   *Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir.

5   2003) (citation omitted).  The claim must be dismissed if Plaintiffs' alleged primary violation (*i.e.*,

6   their Section 10(b) claim) is dismissed, or if the Complaint does not adequately plead control over

7   corporate actions.  *See Zucco Partners*, 552 F.3d at 990.

8   **B.       Plaintiffs' Consolidated Complaint Did Not Adequately Plead Scienter.**

9       In its September 11, 2009 Order, this Court held that the allegations of the Consolidated

10  Complaint, individually and collectively, did not establish the requisite strong inference of scienter

11  and therefore did not state a claim under Section 10(b).  The Court discussed and rejected each of

12  Plaintiffs' individual scienter allegations, holding that:

13  - Cadence's violation of GAAP and/or its internal accounting policies did not, without
14    more, establish scienter.  Order at 15.

15  - Plaintiffs' CW accounts were not indicative of scienter because "the CW reports d[id] not
16    provide any concrete allegations that Individual Defendants actually knew about the
      accounting errors, or that they were familiar with the key details of the 1Q or 2Q
17    agreements, such that they could have identified them as subscription contracts."  *Id.* at
      20.

18

19  _____

20  [8] Plaintiffs do not identify any public statements made by Mr. Bushby, and as to other Defendants,
    Plaintiffs frequently fail to allege which Defendants made which statements.  *See, e.g.*, FAC ¶¶ 53-
21  59.  Courts routinely dismiss defendants who are not alleged to have made a false or misleading
    statement.  *In re Downey Sec. Litig.*, 2009 U.S. Dist LEXIS 83443, at *11-16 (N.D. Cal. Aug. 21,
22  2009).  Nonetheless, Plaintiffs urge the Court to "treat the Individual Defendants as a group for
    pleading purposes."  FAC ¶ 47; *but see, e.g.*, *In re Dot Hill Sys. Corp. Sec. Litig.*, 2009 U.S. Dist.
23  LEXIS 22022, at *34-36 (S.D. Cal. Mar. 18, 2009) (rejecting "group published information doctrine"
    because "group pleading" did not survive PSLRA).  Plaintiffs' reliance on the inapplicable "group
24  published doctrine" to attribute the allegedly false statements to Mr. Bushby means he must be
    dismissed from this case.  For the same reason, Plaintiffs cannot connect other Defendants to
25  statements they are not particularly alleged to have made.  *See In re Hansen Natural Corp. Sec.
    Litig.*, 527 F. Supp. 2d 1142, 1153-1154 (C.D. Cal. 2007) (holding that because group pleading is
26  impermissible under PSLRA plaintiff "failed to set forth . . . the alleged misstatements with the
    requisite particularity," where complaint contained "no specific allegations" regarding defendants'
27  role in making the allegedly false statements).

28

- The size and importance of the Q1 and Q2 agreements, and the Individual Defendants' positions within Cadence, do not establish scienter. *Id*. at 21-23. The so-called "Core Operations Inference" does not apply because (1) Plaintiffs' allegations did not "suggest that any defendant was deeply involved in the details of any particular transaction, or was involved with the customers in question, such that they were likely to know first hand the facts that were key to categorizing the 1Q and 2Q agreements," and (2) the relevant facts were not "of such prominence that it would be absurd to suggest that management was without knowledge of [them]." *Id.* at 22 (internal quotations omitted).

- Plaintiffs' explanation of Defendants' supposed motive for committing fraud (*i.e.*, to meet Wall Street expectations and Cadence's own guidance, and "to present a 'rosy picture' in order to acquire the debt necessary to consummate the acquisition of Mentor Graphics") is not, without more, sufficient to establish a strong inference of scienter. *Id.* at 23.

- The resignations of certain Cadence executives "were not, in and of themselves, strongly indicative of scienter" because it is "quite plausible to infer that the resignations, however forced, were the result of the company's poor performance and management" and not a response to the alleged fraud. *Id.* at 24-25.

Finally, the Court conducted a "holistic review" of Plaintiffs' scienter allegations and found that even "[w]hen taken collectively, Plaintiffs' allegations do not raise a strong inference that Defendants intentionally falsified Cadence's financial reports." *Id.* at 25. The Court held that Plaintiffs' scienter allegations were "fatally undermined by Plaintiffs' inability to connect any of the Individual Defendants, or any particular person at Cadence, with the 1Q and 2Q agreements, except in remote or speculative ways that may or may not have entailed knowledge of the specific facts that rendered the accounting classifications incorrect," a deficiency which "leaves a gap, for which Plaintiffs provide little more than motive and opportunity to bridge." *Id.*

**C.     The Amended Complaint's Additional Allegations Do Not Tie The Defendants To Either The Subject Agreements Or To The Accounting Errors, And Therefore Do Not Support A Strong Inference Of Scienter.**

Like the Consolidated Complaint, the Amended Complaint does not "bridge the gap" between any Defendant and knowledge of the alleged fraud, and therefore cannot establish a strong inference of scienter. As this Court held, to establish scienter and survive a motion to dismiss, Plaintiffs must allege facts creating a strong inference that Defendants "knew (or at least suspected)," at the time the initial revenue determinations and subsequent public statements were made, that: (1) "the 1Q agreement was entered into in contemplation of a future subscription license, or that it involved technology that was not yet released for commercial use;" and/or (2) the Q2 customer "intended to

11

Gibson, Dunn & Crutcher LLP

retain certain rights to use future technology, which it had enjoyed under a subscription license[] that it simultaneously cancelled."  Order at 16.

The Amended Complaint alleges no such facts.  Although Plaintiffs rehash and expand their speculative "motive and opportunity" allegations, and submit additional supposed CW accounts, they remain unable "to connect any of the Individual Defendants, or any particular person at Cadence, with the 1Q and 2Q agreements, except in remote or speculative ways that may or may not have entailed knowledge of the specific facts that rendered the accounting classifications incorrect."  Order at 25.  Supplementing speculation with additional speculation does not substitute for what Plaintiffs must, but cannot, allege:  that any Defendant knew the relevant facts at the relevant time.

1.      **Confidential Witness Allegations Still Do Not Support An Inference of Scienter.**

a.      **No Facts Are Set Forth To Demonstrate That The CWs Have Personal Knowledge.**

To establish scienter, confidential witness statements must be reliable and made with personal knowledge.  *Zucco Partners*, 552 F. 3d at 995.  But the CWs here make unfounded statements based, at most, on hearsay and speculation.[9]  Most egregious is CW12, "a consultant in the EDA industry who advises clients including Cadence customers on strategic product analysis and design methods." FAC ¶ 51(*l*).  No allegation is made that CW12 had any contact, written or oral, with any Defendant, ever worked at or visited Cadence, or had any personal knowledge regarding either the two agreements that were restated after an internal investigation or Cadence's revenue recognition process.  Rather, CW12 is said to "advise[] clients including Cadence customers on strategic product analysis and design methods" and correspond, not with Cadence or any Individual Defendant, but "with industry executives and customers of Cadence products."  CW12 was "simply not positioned to know the information alleged," and reports only "unreliable hearsay."  *Zucco Partners*, 552 F.3d at 996; *see* FAC ¶ 76(h) (CW12 allegedly reported that he "knows that Kevin Bushby was fired for the events that gave rise to the need for Cadence to restate earnings and that Bushby had been 'told to do it' . . . by defendant Fister").  CW12 does nothing but underscore the desperation of Plaintiffs'

9    A compilation of the CW allegations, quoted from the FAC, is attached for the Court's convenience as Exhibit A.

amended pleading.

Like the previously alleged CWs, the new CWs lack personal knowledge of the Q1 or Q2 Contracts and the revenue recognition determinations at issue. The CWs are not alleged to have played any role "in [Cadence's] revenue recognition process, or . . . any first-hand knowledge of the Defendants' accounting decisions." *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1201 (N.D. Cal. 2008). Thus, their statements regarding such topics are not credible and cannot support scienter. *See id.*; *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) (rejecting scienter allegations in accounting fraud claim because "none of the confidential witnesses have any first-hand knowledge of [defendant's] accounting decisions").

> **b.** **The New CW Statements Do Not Tie Any Individual Defendant To The Accounting Issues.**

Accepting *arguendo* that the CWs could have had personal knowledge, the CWs' new statements are still not "actually indicative of scienter." Order at 18. Merely alleging that the Individual Defendants "knew" about the existence of the Q1 and Q2 Contracts, or that they were "involved" in their negotiation, is insufficient. Plaintiffs must establish that Individual Defendants knew (or were reckless in not knowing) the specific details regarding the Q1 and Q2 Contracts that would require their revenue to be recognized over time, rather than up front, *at the time* the revenue recognition determinations were made. Order at 16, 25. But no CW statements establish these facts.

Several new CWs claim experience in Cadence's sales department and with some of the "process" allegedly used at Cadence. CW8 is a former Cadence Account Executive "responsible for sales of Cadence in the United States and North America." FAC ¶ 51(h). CW13 is a "former Cadence Product Marketing Director . . . [who] regularly worked with Cadence sales personnel, and thus, has knowledge of Cadence's contract renewal and negotiation process." *Id.* ¶ 51(m). CW14 is a "former Cadence Account Manager in the Company's Sales organization which was headed by defendant Bushby." *Id.* ¶ 51(n). CW15 is a "former Sales Director for North America from 2000 until mid-2009." *Id.* ¶ 51(o). But *not one* is alleged to have worked on the Q1 or Q2 Contracts at issue. Not one is alleged to have worked on the revenue recognition for either contract. Not one is alleged to have received any information, written or oral, tying any Defendant to the facts that later

13

1   caused Cadence to issue a restatement.

2     Instead, the new CWs allegedly advised Plaintiffs of irrelevant facets of Cadence's business.

3   CW14, for example, states that he or she knows Defendants Bushby and Fister negotiated a 2007

4   contract with Advanced Micro Devices.  *Id*. ¶ 78(g).  But that contract is not at issue here.  CW14,

5   alleged to have worked in engineering, purportedly provides generic statements that "Bushby was

6   intimately involved in the review of sales" (*id*. ¶ 78(h)) and that Bushby "instructed" Sales personnel

7   regarding the overall structure of deals (*id*. ¶¶ 78(g), 113).  But CW14 does not explain the level of

8   detail available to Bushby when he was "intimately involved" in the "review" of sales, nor is there

9   any claim attributed to CW14 that Bushby gave "instructions" with respect to the two contracts at

10  issue, nor that Bushby or any other Defendant knew facts indicating that the resulting revenue would

11  be improperly recognized.  Just like the CW statements this Court has previously rejected, the new

12  CW statements fail to bridge the gap between the Defendants and the revenue recognition

13  determinations at the heart of the restatement—the sole bases of the purported fraud.

###   c.    CW Statements Still Do Not Tie Any Individual Defendant To The Customers Or Deals At Issue.

14

15    The new CW statements also fail to "link any Defendant with any particular customer or

16  deal." Order at 19.  The FAC attempts to tie Defendant Bushby to "Japanese customers" by claiming

17  that CW8 reported that Bushby "was in direct contact with Japanese executives regarding the terms

18  and conditions of sales." FAC ¶ 75(a).  But CW8 does not state that Bushby or any other Defendant

19  was involved in the Q1 Contract, or even that Bushby had any contact with any Japanese customers

20  relating to that specific contract.  The references to CW8 do "not offer any more than a basis for

21  speculating that Individual Defendants *may* have worked, at some level, on the deals that involved the

22  licenses that were incorrectly classified." Order at 19 (emphasis added).

23    Likewise, references to Plaintiffs' CW15, a former North America Sales Director, attempt to

24  connect Defendant Bushby to the Q2 customer that CW15 describes as Nvidia.  FAC ¶ 110.  There is

25  no claim, of course, that CW15 had any involvement in the Q2 "$12 million" of prematurely

26  recognized revenue (FAC ¶ 81), let alone that CW15 knew whether the purported $9 million cash

27  refund to Nvidia had anything to do with the Q2 restatement reversing $12 million of revenue

28

recognized up front.  Even if one were to conclude that this alleged $9 million cash refund to Nvidia, alleged to relate to a 2007 deal, had something to do with the $12 million of restated revenue, CW15 does not state that he or she was *actually involved* in this deal or had communications with any Defendant about the actual restated deal, and instead recites hearsay that Sales personnel (*not* CW15) were instructed by Defendant Bushby to "re-structure the transaction . . . because Cadence needed to 'count this deal as revenue in that quarter.'"  *Id.*  CW15 does not state that he or she was personally involved in either the actual restated deal or the Nvidia deal described, nor that he or she saw, heard, or witnessed the claimed "facts."  Thus, CW15 was "simply not positioned to know the information alleged."  *Zucco Partners*, 552 F.3d 996.

Even assuming, *arguendo*, that CW15 has the requisite personal knowledge, the FAC alleges only that CW15 claims that Bushby provided instructions regarding the generic structure of the Nvidia deal.  Again, no factual allegations are set forth to tie this supposed Nvidia "deal" to the actual restated agreement with another company.  But even if that connection had been established, CW15 does not state that Bushby gave these alleged "instructions" knowing that the Q2 customer intended to maintain access to future technologies or otherwise knew that the restructuring would render the accounting treatment incorrect.  FAC ¶ 110.

As noted, Plaintiffs never allege any plausible facts that an alleged Q4 2007 deal with Nvidia and a later $9 million cash refund is related to the Q2 2008 restatement of $12 million of product revenue.  In its Q2 2008 restatement, Cadence explained that it had recognized $47 million of product revenue during the second quarter resulting from "concurrent cancellation[s] of a subscription agreement[s] and execution of a term license agreement[s]."  Ex. 45 at 5.  Cadence determined that $12 million related to a "term license and hardware agreement should be recognized ratably . . . ."  *See* Ex. 39 at 3.  The FAC contains CW15's speculation that the restatement resulted from a restructured deal with Nvidia, in which Cadence allegedly cancelled a 2007 deal, refunded $9 million in cash, and "entered into another contract," which somehow became a $12 million restatement.  FAC ¶ 110.  There is no factual allegation that CW15 was involved with, or otherwise had any personal knowledge regarding, an Nvidia deal, let alone the restated deal.  Such imprecise allegations are insufficient to create an inference of scienter.

1

### d.     Allegations Regarding The Contract Approval Process Are Still Insufficient.

New CW statements regarding Cadence's "sales, contract negotiation, revenue recognition, and pipeline review process" do not create an inference of scienter.  FAC ¶ 74; *see also* FAC ¶ 75(a)-(m). CW statements that Defendants were "involved" in the negotiation and approval of contracts is not enough.  *See* Order at 18.  At most, these statements imply that Defendants were, at some level, involved with contracts, negotiations, and sales.  *See, e.g.*, FAC ¶ 75(m) (speculating that Bushby was "involved in evaluating [unspecified] deals and the manner in which revenue was to be recognized"); ¶ 75(a) (generalizing that Bushby, Porter and Palatnik "were all participants in how [unidentified] sales agreements were structured"); ¶ 75(d) (stating that Bushby was "involved in helping negotiate deals with [unspecified] customers"); ¶ 111 (stating that the CFO and Vice President "approved" unidentified contracts).

CW2, a former Vice President of Finance (who Plaintiffs do not claim has any specific knowledge of the allegedly improper revenue recognition issues despite alleged experience in the finance department), purportedly adds that "the finance executives . . . would streamline negotiations of all legal terms and conditions of all contracts . . . rather than relying on the 'sales guys' to communicate the details of the contracts."  FAC ¶ 75(c).  This statement does not indicate that Cadence management discussed terms with customers or sales persons, and "streamlining" negotiations is a far cry from claiming that any Defendant knew at the time that revenue would have to be recognized over time instead of up front.  There is no claim that CW2 advised that any Defendant knew specific details rendering recognition of revenue from Q1 and Q2 Contracts improper, and certainly there are no facts to show that CW2 was in a position to know what the Individual Defendants "knew."  To the contrary, Plaintiffs claim that CW2 stated that it was "[t]he accounting personnel in San Jose who determined how much revenue would be recognized from the transaction," not the Individual Defendants.  *Id.*

Plaintiffs try to buttress their claim that CW7 indicated that that Defendants Porter and Palatnik "signed off on 'big stuff' in terms of revenue recognition" by adding that Cadence executives "had always been 'very meticulous' about deals coming in . . . and how much revenue was going to be booked" and that "because of this review process it seemed implausible that a

16

"$24.8 million deal recorded upfront could go undetected." FAC ¶ 75(*l*). Plaintiffs do not allege what, if anything, CW7 allegedly told them about what specific types of information Individual Defendants reviewed. Plaintiffs still provide "no indication of what 'signing off' . . . 'would have' entailed, or what level of detail the Individual Defendants would have likely been exposed to." Order at 18.

CW4, a former Director of Engineering, allegedly advised Plaintiffs that "given the amount of revenue recorded with the restated transactions ($24.8 million and $12 million), and the manner in which Sales agreements were *approved*, defendants *had to have approved the deals* in order for such large amounts of revenue to be recorded." FAC ¶ 75(j) (emphasis added). Putting aside the number of assumptions in the claim, this reference to CW4 does not define what "approving" contracts entailed typically or, more importantly, in the case of the two contracts at issue. *See* Order at 18.

CW8, a former Account Executive who worked in that capacity at the time of the Q1 and Q2 transactions at issue, allegedly told Plaintiffs that "defendants Bushby, Porter and Palatnik were all participants in how sales agreements were structured, and specifically whether they were Term or Subscription agreements" and that Bushby would "instruct the Sales people how to structure the Sales agreements, monitor the deal progress until it was finalized, and at which point, give approval to draw up the Sales contract." FAC ¶ 75(a). CW8 allegedly told Plaintiffs that "the negotiation of terms and 'architecting all other financial aspects of the deals, especially large deals, was not done by the Sales person, but was done by the 'big guns.'" *Id*. ¶ 75(b). Plaintiffs also claim that "based on firsthand experience, Bushby, Palatnik, and Bushby [*sic*] were involved in and made the decisions regarding how deals were structured." *Id*. ¶ 113. Reference to "big guns" is hardly pleading with particularity. Moreover, CW8 provides no factual basis for this "firsthand" knowledge, and there is no claim that CW8 participated in or witnessed any transaction or communication, or how it came to be that he or she knew that the Defendants "made the decisions regarding how deals were structured," let alone what "structure" he or she meant or what "deals" he or she was referring to. Moreover, CW8's alleged statement that Bushby gave "instructions" does not establish that he knew the details of the two transactions that would later require restatement.

1    Finally, CW8 is claimed to have stated that Defendants, and not salespeople, must have been

2 knowledgeable of the revenue recognition issues because "Sales personnel . . . were not the contract

3 negotiators."  FAC ¶ 75(b).[10]  The FAC goes on to claim that the sales force would never enter into

4 side agreements:  CW8 allegedly advised that a sales person would never have offered a customer

5 "terms or conditions that would not be in the contract" (*e.g.*, the cancellation of a subscription

6 agreement where the customer did not substantively intend to cancel its right to access future new

7 technology).  "[N]o Sales person would deviate from the terms provided by Sales Operations."  *Id*.

8 CW8's alleged claim that a salesperson would never deviate from Company protocol does not create

9 an inference that Cadence executives knew about the alleged breach of policy, but instead leads to the

10 inference that side letters were not tolerated at Cadence and that senior executives would not have

11 tolerated such practices if they had come to their attention.  *See* FAC ¶ 78(d) (stating that "if side

12 letter contingencies were found in any of the deals . . . the deal would be revoked and that would be

13 grounds for termination").

14    Even with new CW statements about the contract negotiation and approval process, Plaintiffs

15 still provide only general allegations regarding what "involvement," "approval," and "participating"

16 entail.  No CW provides information regarding the "level of detail the Individual Defendants would

17 have likely been exposed to."  Order at 18.  The new CW statements do not establish "exactly how

18 familiar any Individual Defendant was with the key transactions.  The Individual Defendants have

19 only been connected with the 1Q and 2Q agreements through a long chain that 'involved multiple

20 personnel and levels of review.'"  Order at 20.

21    **e.** **Additional Statements Regarding Individual Defendants' Access to Cadence Records Systems Are Still Insufficient.**

22

23    New CW allegations regarding Individual Defendants' access to Cadence's records systems

24 add nothing to the previously insufficient allegations on the same topic.  "The mere fact that

25 [Cadence's] systems [to which Individual Defendants had access] would have reflected that a

26

27 [10] These inconsistent statements are properly disregarded.  *Compare* FAC ¶ 75(b) *with* FAC ¶ 75(j)

28 (stating that "product contracts were initially negotiated with customers by Cadence sales personnel."); *see also id.* ¶ 78(d-f).

1    $24.8 million deal was in the pipeline, and that it involved either a term or subscription license,

2    would not have raised a red flag for Defendants."  Order at 19.  In an apparent attempt to address this

3    part of the Order, CW11 is now claimed to have advised that "Porter and Palatnik had access to the

4    system" and "could see the customer names, the number of months remaining on the current

5    contracts . . . the type of contracts they had, whether it be Term or Subscription, and prices of the

6    products contracted."  FAC ¶ 78(m).  This information was then allegedly "used to determine how

7    much revenue should be recognized under each contract."  *Id; see also id.* ¶ 112, ¶ 75(l).  The FAC

8    does not allege who made that revenue determination or how CW11 would have personal knowledge

9    about what Porter and Palatnik actually saw on either of the contracts.  These new CW statements do

10   not demonstrate that Cadence senior management had access to specific details necessary to make

11   them aware of improper revenue recognition.

> ### f.    Plaintiffs' Bare Allegations That Certain Executives Were "Terminated" Does Not Support A Strong Inference Of Scienter.

13          The Amended Complaint changes every reference to Messrs. Porter, Fister, and Bushby's

14   "resignations" in the original Consolidated Complaint to read "terminations."  *See, e.g.,* FAC ¶¶ 42,

15   44, 45, 200; *see also id.* ¶ 127 (conclusory allegation that Fister, Porter and Bushby "were indeed

16   fired").  Similarly, the Amended Complaint adds a conclusory claim by an "analyst . . . who advises

17   clients on strategic product analysis and design methods" that Bushby was "fired for the events that

18   gave rise to the need for Cadence to restate earnings" and that Bushby had been told to "arrange" the

19   Q1 deal (in some unspecified manner) by Fister.[11]  FAC ¶¶ 51(l) and 75(h).

20          But this Court already held that allegations that executives were terminated do not result in an

21   inference of scienter: in light of Cadence's declining performance and restructuring, the more

22   plausible inference is that the "resignations, however forced, were the result of the company's poor

23   performance and management."  Order at 24-25; *see* FAC Ex. 33 ("[Cadence's] leadership paid the

24   price for its poor performance this year.").  *See also Zucco Partners*, 552 F.3d at 1002; *In re Int'l*

---

26   [11]  CW14 also alleges that in September 2008, Thomas Cooley "blew the whistle" on Defendants'

27   reliance on term agreements to recognize revenue upfront at the potential expense of future revenues
     and that Bushby was subsequently terminated.  FAC ¶ 78(i).  Even if true, this would be nothing

28   more than a "mismanagement" claim, and not supportive of a fraud claim.

Gibson, Dunn &
Crutcher LLP

*Rectifier Corp. Sec. Litig.*, 2008 WL 4555794, at *16 (C.D. Cal. May 23, 2008).  "Most major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions."  *In re CornerStone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005).  Plaintiffs have added nothing to change this conclusion.

### g.   Plaintiffs' "Revenue Bubble" Allegations Are Insufficient.

The CWs make irrelevant and confusing allegations about a "revenue bubble."  *See*, *e.g.*, FAC ¶¶ 64-65, 78, 93.  These claims appear to be an attempt to establish that the Company's forecasts for the second quarter of 2008 and "the remainder of fiscal year 2008" (*id.* ¶ 93) were false because the Company was facing a "revenue bubble" that would eventually "burst."  But in order for Plaintiffs' allegations to be sufficient, they would need to plead that senior management knew that revenue from the $24.8 million Q1 2008 transaction and $12 million from the Q2 2008 transaction was improperly recognized when the forecasts were made, and had actual knowledge that the Company's earnings forecasts were inflated.  As described throughout this motion, Plaintiffs simply fail to establish any such knowledge.  Thus, any allegations regarding false forecasts are irrelevant and must be disregarded.  *See McHenry*, 84 F.3d at 1177.

Plaintiffs use these same allegations to try to bolster the motive allegations this Court has already found insufficient.  Plaintiffs claim that Defendants sought to use the "revenue bubble" to paint a "rosy picture" of Cadence to improve prospects for its acquisition of Mentor.  FAC ¶ 86.  But allegations of Defendants' motive for committing fraud (to meet Wall Street expectations and appear financially sound for purposes of the Mentor takeover) are insufficient, without much more, to create a strong inference of scienter.  Order at 23.  *See also In re Wet Seal*, *Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1174 (C.D. Cal. 2007) (quotations omitted); *CornerStone*, 355 F. Supp. 2d at 1091.  As a matter of law, Plaintiffs' allegations of "motive and opportunity" do not adequately plead scienter.

### 2.   Neither The Size And Supposed Importance Of The Restated Contracts, Nor The Individual Defendants' Positions Within The Company, Create A Strong Inference Of Scienter.

Cadence's restatement is not itself a basis to infer scienter.  *See*, *e.g.*, *In re Downey Sec. Litig.*, 2009 U.S. Dist. LEXIS 25007, at *34 (C.D. Cal. Mar. 18, 2009).  "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least

20

absent some additional allegation of *specific information* conveyed to management and related to the fraud." *Metzler*, 540 F.3d at 1068 (emphasis added). Rather, the so-called "core operations" inference alleged by Plaintiffs creates a strong inference of scienter only under two limited exceptions, which one court recently described as the "Actual Knowledge" and "Absurdity" analyses. *South Ferry LP v. Killinger*, 2009 U.S. Dist. LEXIS 91174, at *17 (W.D. Wash. Oct. 1, 2009) (decision on remand). As this Court already held (Order at 21-22), neither exception applies here.

### a. Plaintiffs' Allegations Do Not Establish That Defendants Had "Actual Knowledge" Of The Relevant Facts.

Under the "Actual Knowledge" exception, the core operations inference may support an inference of scienter if it is combined with particularized allegations that are sufficiently detailed to establish Defendants' actual knowledge of the relevant information. *Zucco Partners*, 441 F.3d at 1000; *South Ferry LP v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). But as this Court previously held, Plaintiffs' generic allegations that Defendants "spent time" with customers or were generally involved with the sales negotiation process do not establish that any Defendant actually knew, or deliberately disregarded, the relevant facts at the relevant time. "None of [the CW] statements suggest that any defendant was deeply involved in the details of any particular transaction, or was involved with the customers in question, *such that they were likely to know first hand the facts that were key to categorizing the 1Q and 2Q agreements*." Order at 22 (emphasis added). General involvement or access to information is not enough; Plaintiffs must—but do not—allege *facts*.

### b. It Is Not "Absurd" That High-Level Executives Were Unaware Of The Undocumented Details Of Licensing Negotiations.

Under the "Absurdity" exception, the core operations inference may support an inference of scienter where "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Zucco Partners*, 552 F.3d at 1000. This "narrow exception" applies in an "exceedingly rare category of cases." *South Ferry*, 542 F.3d at 785 n.3; *Zucco Partners*, 552 F.3d at 1001. This Court held "[t]his is not such a case." Order at 22.

Plaintiffs' additional irrelevant and generic allegations—such as the claim that CW8 asserted that Bushby "would instruct the Sales people how to structure Sales agreements, monitor the deal progress until it was finalized, and at which point, give approval to draw up the Sales contract" (FAC

1    ¶ 75(a)), the claim that Bushby "instructed" sales personnel to restructure the Q2 Contract as a term

2    contract and was generally aware of how much revenue from a particular deal would be recognized

3    upfront (*id.* ¶ 78(h), 110), or the claim that "defendants were intimately involved with structuring

4    deals, including negotiating with customers on the terms of contracts and/or approving discounts" (*id.*

5    ¶ 79, 113)—do nothing to bolster Plaintiffs' claim that Defendants "must have known" the relevant

6    facts, which this Court previously rejected.  Order at 25-26; *see also Zucco Partners*, 552 F.3d at

7    1001 (rejecting claims that defendants "must have known" the falsity of accounting decisions because

8    "the alleged misrepresentations d[id] not concern especially prominent facts" and "would not be

9    immediately apparent to corporate management"); *In re Verifone Holdings*, *Inc. Sec. Litig.*, 2009 U.S.

10   Dist. LEXIS 44132, at *24 (N.D. Cal. May 26, 2009).

11        Plaintiffs' implausible and inconsistent allegation that Cadence's "big guns," as opposed to

12   Cadence's sales force, negotiated the terms for every contract is likewise unsupported and

13   unsupportable.  Although Plaintiffs point to Bushby's supposed instruction to restructure a contract

14   with Nvidia, their allegations do not support an inference of scienter.  FAC ¶ 110.  First, Plaintiffs

15   have failed to allege facts indicating that the restated Q2 agreement was even with Nvidia.  *Supra*, at

16   14-15.  Further, even if that extremely suspect claim had any support, there is nothing inherently

17   wrong with restructuring a contract.  Such restructuring is problematic *only if* Bushby (or another

18   Cadence official) was aware that the other party wanted to retain the rights to future technology that it

19   had given up when it cancelled  the subscription license.

20        Likewise, Plaintiffs do not allege any facts describing the nature of the Defendants'

21   involvement (if any) with the approval of the relevant contracts or the related revenue recognition

22   decisions.  *Supra*, at 12-14.  As previously held by this Court, this lack of detail "makes it difficult to

23   discern exactly how familiar any Individual Defendant "must have been" with the key transaction,

24   particularly given that Individual Defendants "may have only been connected to the 1Q and 2Q

25   agreements through a long chain" of personnel and levels of approval.  Order at 20.

26

27

28

### 3.  Cadence's Violation Of GAAP And Internal Accounting Rules Is Not Enough To Establish A Strong Inference Of Scienter.

Plaintiffs concede that "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (citation omitted); Opp'n to Mot. to Dismiss Consolidated Compl. [Doc # 45] at 13. Plaintiffs suggest that Cadence's statement in its Q1 10-Q that its internal controls were "sufficiently effective" implies Defendants' knowledge of a material weakness in Cadence's internal controls relating to revenue recognition at that time. But Cadence's *eight* prior quarterly filings (dating back to May 2005) used the same "sufficiently effective" language. Brown Decl. Exs. 2-10. It was not "inserted" specially for the Q1 10-Q, as Plaintiffs' suggest. FAC ¶¶ 33, 67. Its inclusion in the 10-Q reveals nothing about Defendants' knowledge of facts relevant to, or state of mind at the time of, the challenged accounting determinations. In any event, Cadence's later discovery of inadequate internal controls does not create a strong inference of scienter. *See, e.g., In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1157-58 (C.D. Cal. 2007) ("'[A]llegations that Defendants had deficient internal controls . . . do[] not create a strong inference that Defendants knowingly [made] false or misleading statements.'" (citation omitted)).

### 4.  Plaintiffs' Group-Based Allegations Do Not Satisfy The PSLRA's Heightened Pleading Standard.

Plaintiffs' scienter allegations also fail to distinguish between the Defendants, frequently alleging that "Defendants" knew this, or that "Defendants" recklessly disregarded that. *See, e.g.*, FAC ¶¶ 72(c), 74, 76. Plaintiffs' reliance on the "group pleading doctrine" to establish the strong inference of scienter is inconsistent with the PSLRA. *See Tellabs II*, 513 F.3d at 710; *Winer*, 503 F.3d at 337; *Southland*, 365 F.3d at 363-65. A majority of district courts in this Circuit have rejected the doctrine. *See, e.g., In re New Century*, 588 F. Supp. 2d 1206, 1223 (C.D. Cal. 2008) ("the majority of reported district court cases in the Ninth Circuit appear to hold that the doctrine is no longer viable"). Even if the group pleading doctrine did apply, Plaintiffs fail to plead that *any* relevant Cadence employee—the Individual Defendants, anyone else in senior management, or anyone responsible for accounting decisions—knew the facts about the Q1 and Q2 Contracts that led the Company to adjust the timing of their respective revenue recognition at the time the Contracts

Gibson, Dunn & Crutcher LLP

were negotiated.  *See*, *e.g.*, *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) (plaintiffs must "allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made.").

     **5.**     **Viewed Holistically, Plaintiffs' Allegations Do Not Support An Inference Of Scienter As Compelling As Cadence's Explanations Of The Accounting Errors.**

As this Court previously held, "[w]hen taken collectively, Plaintiffs' allegations do not raise a strong inference that Defendants intentionally falsified Cadence's financial reports."  Order at 25.  At most, Plaintiffs' allegations establish that Defendants knew about the Q1 and Q2 Contracts, were part of the general approval process for these contracts, and had the unremarkable desire to improve Cadence's earnings and meet Wall Street expectations.  Plaintiffs remain unable to establish that any Individual Defendant knew specific facts that rendered the accounting classifications incorrect *at the time they were made*.  Plaintiffs assume that Defendants knew every detail of Cadence's contacts with customers—an assumption that is absurd on its face, and which this Court previously rejected.  Order at 25.  Indeed, Plaintiffs concede that Defendants would not have known the relevant facts "at the time . . . if they did not negotiate the contract."  FAC at 72 n.15.  Plaintiffs have simply not alleged facts establishing that any Defendant was involved with the Q1 and Q2 Contracts, except in general, "remote or speculative ways that may or may not have entailed knowledge of the specific facts that rendered the accounting classifications incorrect."  Order at 25.[12]

Any inference of scienter remains weaker than the more plausible explanation that, as Cadence has acknowledged, there was a control deficiency "which was not discovered until the accountants started reviewing the 3Q agreement that, as it turned out, was connected with the 1Q agreement."  Order at 26.  The facts alleged establish only that Cadence discovered an error and corrected it, nothing more.  This is not enough under the PSLRA to state a claim for securities fraud.

---

[12]  The closest Plaintiffs come to pleading scienter at all is CW15's statement that Defendant Bushby "[instructed those] who handled the Nvidia account[] to re-structure the transaction . . . ." FAC ¶ 111. However, as discussed above, there is no showing that the Nvidia account was the Q2 account that was later restated, and there are no facts alleged to show Bushby understood his alleged instructions would result in an accounting misstatement.

1

**D.    Plaintiffs' Section 20(a) Claim Should Be Dismissed Because The Section 10(b) Claim Fails, And Because Plaintiffs Do Not Plead That Defendants Were "Control Persons."**

2

3    The Section 20(a) claim must also be dismissed because the underlying claim fails.  *See*, *e.g.*,

4    *Zucco Partners*, 552 F.3d at 990; *In re Lexar Media*, *Inc. Sec. Litig.*, 2005 WL 1566534, at *4 (N.D.

5    Cal. July 5, 2005).    Additionally, under Section 20(a), Plaintiffs must allege Defendants were

6    "control persons" with reference to the fraudulent conduct alleged in the primary violation.    But

7    Plaintiffs' "control" allegations are generalized, conclusory, and unsupported by factual allegations.

8    FAC ¶¶ 46-50, 222.    Such "boilerplate" allegations are insufficient to state a claim.    *See In re*

9    *Downey Sec. Litig.*, 2009 WL 736802, at *15 (C.D. Cal. Mar. 18, 2009).

10                                   **V.    CONCLUSION**

11    This Court gave Plaintiffs explicit directions on how to properly plead scienter.  Plaintiffs did

12    not follow these instructions, because they cannot.  Instead, they have demonstrated, yet again, that

13    they are unable to satisfy the PSLRA's heightened pleading requirements.  Defendants' motion to

14    dismiss should be granted without leave to amend.

15                                        Respectfully submitted,

16    DATED:  November 20, 2009
                                         GIBSON, DUNN & CRUTCHER LLP

17

18                                       By: _____/s/ Ethan D. Dettmer_____.
                                             Ethan D. Dettmer

19
                                         Attorneys for Defendants
20                                       CADENCE DESIGN SYSTEMS, INC.,
                                         MICHAEL J. FISTER, KEVIN S. PALATNIK,
21                                       WILLIAM PORTER and KEVIN BUSHBY

22    100752136_8.DOC

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

Motion to Dismiss First Amended Complaint                              Case No. C-08-4966