1   COUGHLIN STOIA GELLER
       RUDMAN & ROBBINS LLP
2   SHAWN A. WILLIAMS (213113)
    SHIRLEY H. HUANG (206854)
3   JASON C. DAVIS (253370)
    100 Pine Street, Suite 2600
4   San Francisco, CA 94111
    Telephone: 415/288-4545
5   415/288-4534 (fax)
    shawnw@csgrr.com
6   shirleyh@csgrr.com
    jasond@csgrr.com
7
    Lead Counsel for Plaintiffs
8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10

| 11  In re CADENCE DESIGN SYSTEMS, INC. | ) | No. C-08-4966 SC |
| SECURITIES LITIGATION | ) | |
| | ) | CLASS ACTION |
| 12 ———————————————————— | ) | |
| This Document Relates To: | ) | PLAINTIFFS' OPPOSITION TO |
| 13 | ) | DEFENDANTS' MOTION TO DISMISS |
| | ) | FIRST AMENDED COMPLAINT |
| Case Nos. 08-4966 SC, 08-5027 SC | ) | |
| 14   and 08-5273 SC | ) | DATE:           February 5, 2010 |
| ———————————————————— | ) | TIME:           10:00 a.m. |
| 15 | | COURTROOM: The Honorable Samuel |
| | | Conti |

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

**Page**

3  I.  INTRODUCTION ................................................................. 1

4  II.  STATEMENT OF FACTS ......................................................... 4

5  III.  LEGAL STANDARD ............................................................ 8

6  IV.  ARGUMENT ................................................................... 9

7  A.  The First Amended Complaint Pleads Multiple New Compelling
   Allegations Addressing the Court's Concerns and Sufficiently Raising a
8  Strong Inference of Scienter ........................................................ 9

9  1.  The New Witness-Based Allegations Corroborate that Bushby
   Negotiated the $24.8 Million Restated Fujitsu Deal at Fister's
10  Instruction in 1Q08 .................................................... 9

11  2.  Witness 15, the Former Sales Director, States that Bushby
   Orchestrated the Restructuring of the Nvidia Deal to Fill Revenue
12  Gap in 2Q08.......................................................... 13

13  3.  Defendants' Surreptitious Qualified Internal Controls
   Representation for 1Q08 Right After They Falsified the Financials
14  Bolsters the Inference of Scienter ...................................... 15

15  4.  Defendants' Deliberate Violation of Regulation S-K by Not
   Disclosing the Name of the 10% Customer for 1Q08 Further
16  Supports the Inference that They Tried to Conceal Their Scheme ........... 16

17  5.  Defendants Quickly Amended Their Indemnification Rights After
   They Falsified the 2Q08 Financials to Protect Themselves, Which
18  Raises a Strong Inference of Scienter that Defendants Do Not
   Address ............................................................. 16
19
   6.  The Whistle-Blowing Allegations Attributed to Witness 14, a
20  Former Sales Account Executive, Further Support a Strong
   Inference of Scienter that Defendants Do Not Address .................... 17
21
   7.  Witnesses Corroborate that Defendants Were Fired in Connection
22  with Events that Led to the Restatement of the Two Transactions at
   Issue ............................................................... 17
23
   8.  The Multiple Admissions by Defendants that They Created
24  Artificial Separation to Recognize Revenue Upfront and that They
   Understood the Simple Applicable GAAP and Internal Accounting
25  Policies Demonstrate that They Acted with the Scienter of Fraud ........... 19

26  9.  Additional Witness-Based Allegations that the Individual
   Defendants Directed Improper Pulling Forward of Future Revenue
27  and Had Access to Sales and Revenue Recognition Data, Further
   Support a Strong Inference of Scienter ................................. 20
28

1

2                                                                                            **Page**

3              10.    Defendants' Motive to Manipulate the Accounting for 1Q08 and
                      2Q08 in the Context of the Mentor Graphics Acquisition, Which
4                     the Court Has Already Found Compelling, Is Further Enhanced by
                      Their Motive to Hide the Revenue Bubble Created by Their
5                     Scheme ................................................................................................22

6              11.    The *South Ferry* Exceptions Apply to This Case Given the New
                      Allegations Set Forth in the Complaint .......................................23
7

8      B.    Defendants Are Liable for False Statements Made, Either as Speakers, or
             Under Group Published Doctrine.........................................................................24

9      C.    Plaintiffs Sufficiently State a Section 20(a) Claim Against All Defendants
             for Control Liability ............................................................................................25
10

11  V.     CONCLUSION..............................................................................................................25

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2
Page

3 **CASES**

4 *Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009) ..........................................................20
5

6 *Barrie v. Intervoice-Brite, Inc.*,
   397 F.3d 249 (5th Cir. 2005) ..........................................................................25

7 *Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) .....................................................................8, 22
8

9 *Branch v. Tunnell*,
   14 F.3d 449 (9th Cir. 1994) ............................................................................15

10 *Constr. Laborers Pension Trust of Greater St. Louis v. Neurocrine Biosciences, Inc.*,
    No. 07CV1111-IEG-RBB, 2008 U.S. Dist. LEXIS 38899
11  (S.D. Cal. May 13, 2008) ..................................................................................5

12 *Cooper v. Pickett*,
    137 F.3d 616 (9th Cir. 1998) ..........................................................................15
13

14 *Eminence Capital, L.L.C. v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ........................................................................25

15 *Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ...................................................................15, 25
16

17 *In re Adaptive Broadband Sec. Litig.*, No.
    C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887
18  (N.D. Cal. Apr. 2, 2002) ...........................................................................10, 25

19 *In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002)................................................................11, 12, 14

20 *In re Daou Sys.*,
    411 F.3d 1006 (9th Cir. 2005) ............................................................. *passim*
21

22 *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008),
    *cert. denied*, *Gilead Scic., Inc. v. St. Clare*, 129 S. Ct. 1993 (2009) ...........8, 18

23 *In re GlenFed, Inc. Sec. Litig.*,
    60 F.3d 591 (9th Cir. 1995) ............................................................................24
24

25 *In re Impax Labs, Inc. Sec. Litig.*,
    No. C 04-04802 JW, 2007 U.S. Dist. LEXIS 52356
26  (N.D. Cal. July 18, 2007)................................................................................17

27 *In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..........................................................14

28

**Page**

*In re PMI Group, Inc. Sec. Litig.*,
    No. C 08-1405 SI, 2009 U.S. Dist. LEXIS 101582
    (N.D. Cal. Nov. 2, 2009)..................................................................................24

*In re Silicon Graphics Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ...........................................................................8

*In re Sipex Corp. Sec. Litig.*,
    No. C 05-00392 WHA, 2005 U.S. Dist. LEXIS 30854
    N.D. Cal. Nov. 17, 2005).........................................................................17, 19

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)....................................................................11, 14

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ...........................................................14, 19, 22

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) .......................................................................9, 18

*South Ferry LP #2 v. Killinger*,
    No. C04-1599-JCC, 2009 U.S. Dist. LEXIS 91174
    (W.D. Wash. Oct. 1, 2009) .........................................................................22, 23

*South Ferry LP v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .......................................................................23, 24

*Teamsters Local 617 Pension & Funds v. Apollo Group, Inc.*,
    633 F. Supp. 2d 763 (D. Ariz. 2009) ..............................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...............................................................................8, 9, 18

*Workers of America Plan for Employees' Pensions and Death Benefits*
    *v. CSK Auto Corp.*,
    525 F. Supp. 2d 1116 (D. Ariz. 2007) .............................................................18

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ................................................................1, 23, 25


**STATUTES, RULES AND REGULATIONS**

17 C.F.R.
    §240.10b-5 .........................................................................................................8

Federal Rule of Civil Procedure
    Rule 9(b) ............................................................................................................8

I.     INTRODUCTION

This is a real case – not a strike suit whereby defendants can prevail by simply protesting loudly but never addressing the new particularized facts alleged that now easily surpass the PSLRA's heightened pleading standards and cure deficiencies articulated in the Court's September 11, 2009 Order Granting Motion to Dismiss ("Order"). Indeed, the Court previously found that, as plaintiffs alleged, as evidenced by the financial restatement, defendants admittedly violated GAAP as well as its own internal accounting policies. Order at 15. Thus, the falsity was not and is not at issue.[1] The Court concurrently found that with respect to scienter "plaintiffs have certainly created a strong inference that Defendants were aware of the 1Q and 2Q agreements generally." Order at 25.[2] However, the Court found the Consolidated Complaint failed to allege that defendants were aware of the details of the transactions at issue. Order at 16; *see also* Order at 19-20 (CW "statements do not link any Defendant with any particular customer or deal . . . or [show] they were familiar with the key details of the 1Q or 2Q agreements.").

Plaintiffs' new allegations in the FAC[3] address and indeed cure all of the Court's earlier concerns providing detailed facts linking defendants to both the 1Q08 and 2Q08 transactions and alleging defendants' knowledge and negotiation of the restated transactions. The new allegations are much more than claims that defendants "must have known." *See* Order at 17. For example, with respect to the 1Q08 resulting transaction, confidential witnesses confirm it was a deal with Fujitsu and that defendant Kevin Bushby ("Bushby") negotiated the deal at the direction of defendant Michael J. Fister ("Fister") and was fired because of it. ¶¶74-75. The new allegations also detail

---

[1]     The Court previously held that the material falsity and loss causation are not disputed in this case. Order at 15. *See also* ¶¶195-205. Defendants also do not dispute them.

[2]     The Court ruled that plaintiffs' allegations "collectively" did not raise an inference that defendants intentionally falsified Cadence Design Systems, Inc.'s ("Cadence" or the "Company") financial reports. Order at 25. Respectfully, because the Company's financial statements were current statements of fact, plaintiffs need only demonstrate that the financial statements were made with deliberate recklessness. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).

[3]     "FAC" refers to Plaintiffs' First Amended Complaint for Violations of the Federal Securities Laws, filed October 14, 2009. All "Ex." and paragraph ("¶") references are to the FAC.

1   defendants' admission of knowledge that the 1Q08 transaction revenues simply could not be

2   recognized upfront.  Indeed, though the combined transactions with Fujitsu were months apart, they

3   were admittedly "***negotiated in contemplation of one another***," a fact that destroys upfront revenue

4   recognition.  ¶139.  With respect to the 2Q08 transaction, the FAC now also provides the details of

5   the 2Q08 restated transaction identifying the customer (Nvidia), the amount ($12 million) of

6   overstatement, and that defendant Bushby ordered the restructuring of the deal so that a lump sum

7   revenue could be recorded upfront in 2Q08 to make up for the revenue gap.  ¶110.

8          The FAC also adds powerful direct and circumstantial evidence of knowledge of falsity

9   including the hurried post 2Q08 amendment to defendants' indemnification agreements to "clarify"

10  provisions of advancement of expenses to executive officer to defend fraud proceedings like this one

11  (¶116), and the surreptitious inclusion of the "sufficiently" qualifier in the 1Q08 Form 10-Q before

12  the disclosure of the Company's real internal controls disclosure.

13         Finally, defendants' silence regarding the vast majority of the new detailed facts serves as a

14  tacit admission.  For example, the FAC alleges as follows:

15       (a)    Confidential Witness ("CW") 15 and CW8 reported that the 1Q08 restated
16                transaction was in fact with Fujitsu, corroborating CW2, CW3 and CW6 who
                  previously reported that the 1Q08 deal was with Fujitsu.  ¶74.

17       (b)    CW12, an EDA industry consultant, reports that Bushby negotiated the 1Q08 deal
18                with Fujitsu, was told to do it by Fister and was fired because of it.  ¶75.  CW14
                  confirms that Bushby was fired.  ¶36.

19       (c)    CW5, CW13 and CW15's corroborated reports that the Company shift from
20                primarily Subscription agreements (which required revenue recognition over time) to
                  Term agreements (which allowed recognition of revenue immediately) was
21                engineered by defendants to meet revenue expectations by pulling deals forward well
                  before their expiration.  Defendants also knew by the end of 2007 and beginning of
22                2008 there were no contracts left to renew.  ¶36.

23       (d)    Prior to the switch from Subscription agreements in September 2007 to Term
                  agreements, defendant Bushby told CW9 he was concerned about revenue flow
24                going forward. ¶78(b).  CW3 also warned defendant Kevin Palatnik ("Palatnik") of
                  the depleting pipeline. ¶78(c).  Further, Bushby was angered by analyst downgrades
25                in January 2008 (¶78(k)) promising that "we are going to show them." *Id*.

26       (e)    With respect to knowingly false forecasted revenue and earnings for FY08,
                  defendants, apart from knowing that the financials were falsely reported, actually
27                knew through detailed reports before 1Q08, sales were declining, and those reports
                  were provided to defendants Fister, Palatnik and the accounting team.  ¶¶79(d), 80.

28

(f)     Current CEO Lip Bu Tan admits that it was the shift from Subscription to Term agreements that caused the overstatement of revenues and the restatements.  ¶131.

(g)     Defendants violated SEC Regulation S-K Item 101 (§229.101) by not disclosing the name of the 10% customer (Fujitsu) in 1Q08.  ¶72(f).  Remarkably, defendants subsequently argued that plaintiffs' allegations were insufficient because the Consolidated Complaint did not definitively identify the customer.

(h)     Defendants, after issuing falsifying 1Q08 revenues, quickly amended defendants' employment agreement contracts to "clarify" rights to indemnification and the advancement of expenses if defendants are sued.  ¶116.  The timing of the amendment to the indemnification agreements is highly suspicious.

(i)     Defendants admit knowledge of and flouting of the accounting rules for revenue recognition and that they "created an artificial separation" from known Subscription agreements to make Term agreements in order to avoid "certain rules within accounting."  ¶30.  Defendants admit that they actually knew the applicable rules.  ¶¶119, 121, 122, 147 (compare defendants' prior motion to dismiss which claimed the accounting rules were complex).

(j)     CW13 and CW14 reports that defendant Bushby was intimately involved in details of sales each quarter, including how much each customer would pay up front or ratably.  ¶¶78(e)-(i).

(k)     Bushby as Executive VP of Worldwide Field Operations instructed salespeople how to structure deals and specifically liaised with Japan (Fujitsu) and ordered contracts to be drafted.  ¶¶18, 29, 78(h).

(l)     The restated 2Q08 deal was with customer Nvidia (a fact not alleged in the Consolidated Complaint) and was initially negotiated in 2007.  In 2Q08, defendant Bushby directed VP of sales Mike Ellow to restructure the Nvidia deal in order to count a lump sum revenue in 2Q08 to fill the revenue gap.  ¶110.

(m)     CW14 reports that in September 2008, the Vice President of North America Sales Thomas Cooley, blew the whistle on the management and alerted the Board of Directors defendants' practice of using the term licensing model and cannibalizing the Company's pipeline.  ¶78(j).

These new allegations, taken together, firmly establish that defendants and, in particular, defendant Bushby, knew the details of the specific transactions that were restated and defendants knew or deliberately disregarded that the financial statements were materially false and misleading. Moreover, the new facts particularly allege that defendants' specific intent and design to create artificial separation in order for deals to appear as Term agreements when in fact they were Subscription agreements that had to be recognized ratably.  The FAC meets the heightened pleading standards and should be upheld in its entirety.

## II.      STATEMENT OF FACTS[4]

The FAC details defendants' plain admissions that the transactions in 1Q08 and 2Q08 were improperly designated as Term agreements allowing for upfront revenue recognition, were not Term agreements at all.  ¶¶72(a)-(c), 139-144.  With respect to the 1Q08, $24.8 million deal, defendants admit that it was (a) "*negotiated in contemplation*" of a later agreement which (b) would permit the customer to access software that was not even developed at the time of contract execution.  ¶27; Exs. 39, 44.  The restated deal was a Japanese customer, Fujitsu – affirmatively confirmed by several of plaintiffs' witnesses (CW8 and CW15), further enhancing three other witnesses' (CW2, CW3 and CW6) accounts that it likely involved Fujitsu.  ¶¶74(a)-(g).  CW12, an EDA consultant who learned from a Fujitsu engineer, states that Bushby negotiated the transaction, was told by Fister to do it, and that Bushby was fired because of it.  ¶¶35, 75.  The Fujitsu deal involved an eight-year license agreement, which suggested that "they are mortgaging their future."  Ex. 52; ¶74(c), (h).  CW6, a Senior Product Marketing Manager, reports that the Company closed the deal in 1Q08 to fill a revenue gap.  ¶74(e).  CW8, a former Account Executive, reports that "Japan saved Q1."  ¶74(f). Based on Cadence's SEC filings, the reported revenue for Japan was restated from $75 million to $56 million, with the $24.8 million deal constituting close to 33% of the revenue in that quarter from Japan alone.  ¶74(g); Exs. 14, 44.  Furthermore, defendants violated Regulation S-K by not disclosing the name of the customer as required by the rule.  ¶¶72(f), 73.  Defendants' motion remains completely silent on these allegations.

After the Company announced its false 1Q08 financials, the Company filed its Form 10-Q with the SEC, qualifying that the Company's disclosure controls were only "sufficiently effective," even though, a quarter earlier, the certification represented the effectiveness of the internal controls without any qualification.  ¶¶33, 67, 70.  The SEC admonished defendants that "the inclusion of such qualifying language does not conform to the requirements of Item 307 of Regulation S-K."  ¶¶33,

---

[4]      The Court's September 11, 2009 Order largely summarized plaintiffs' allegations in the Consolidated Complaint (Order at 2-12); plaintiffs therefore will not repeat all of them here.  This section will focus on the additional allegations set forth in the FAC.

1    67-71, Exs. 6, 14.  Defendants later admitted, the internal controls were **not** effective and indeed had

2    material weaknesses over revenue recognition.   ¶¶70, 143, 145.   Defendants' attempt to

3    surreptitiously qualify the Company's disclosure effectiveness suggests knowledge.  ¶¶67-71.[5]

4           The 1Q08 $24.8 million contract with Fujitsu was the largest transaction of that quarter.[6]

5    Defendants now do not dispute this.  The revenue overstatement represented close to 10% of its total

6    revenue and 15% of its Product Revenue for 1Q08.  ¶73(a).  As a result, Cadence understated its net

7    loss by as much as 86.8%.  ¶¶25, 165, 172-174.  But for the transaction, Cadence would not have

8    met its revenue projections for 1Q08.  *See also* Order at 5-8.

9           In addition, confidential witnesses corroboratively confirm defendants' knowledge of or

10   deliberate recklessness in not knowing the 1Q08 $24.8 million improperly recorded deal at the time

11   the revenue was booked.  *See* ¶75.  At least five witnesses corroborate that defendants, not lower-

12   level Sales personnel, controlled the contract negotiations and were heavily involved in the

13   negotiation of terms and "architecting" all financial aspects of the deal.  *Id.*  According to CW8, a

14   former veteran Account Executive, the Sales personnel at Cadence did not have the authority to

15   negotiate contracts or design the terms of the agreements.  ¶75(b).  Because the way the Sales

16   organization and senior level authority were structured, it was **impossible** for a line-level Sales

17   person to offer a customer terms or conditions without defendants' approval.  *Id.*  CW2, the former

18   Vice President of Finance, also states that Sales personnel "knew not to do it."  ¶75(d).  Moreover,

19   according to CW15, Fister told the entire Sales organization in January 2008 at the Company's Sales

20   kick-off meeting that Fister and Bushby were involved in contracts over $5 million.  ¶75(i).

21

22

─────────────────────

23   [5]      Defendants' Statement of Facts section contains mostly defendants' characterizations that are
     not pled in the FAC.  Defendants' self-serving spins cannot be considered in evaluating the
24   sufficiency of the FAC because they are not alleged or referenced to in the FAC.  *Constr. Laborers
     Pension Trust of Greater St. Louis v. Neurocrine Biosciences, Inc.*, No. 07CV1111-IEG-RBB, 2008
25   U.S. Dist. LEXIS 38899 (S.D. Cal. May 13, 2008) (declining to take judicial notice of facts that are
     subject to reasonable dispute and striking information not pled in the complaint).

26   [6]      The Court previously noted that there is no indication that the $24.8 million deal was the
     largest deal of 1Q08.  Order at 7 n.4.  The FAC expressly addresses the Court's concern.  *See* FAC at
27   29 n.8.

28

1    The FAC also pleads multiple new facts provided by confidential witnesses demonstrating

2    that defendants knew of the decline in sales and that their artificial shift to primarily Term agreement

3    model had cannibalized the Company's future revenue prospects.  ¶¶35, 78.  These witnesses

4    confirmed that the shift to a Term agreement model was in fact a ploy to report satisfactory revenues

5    and that defendants instructed the Sales staff to renew contracts well before their expiration in order

6    to pull in more revenue.  ¶¶36, 78.  CW5's report, which included sales and marketing data,

7    informed to defendants that Cadence was losing sales and market share by early 2008.  ¶78(k).

8    CW13, a Marketing Director, also reported that by the end of 2007 and early 2008, there were

9    simply "no more contracts to renew and defendants knew it."  ¶¶36, 78(e).  *CW3*, a former Senior

10   Manager who worked closely with Cadence's Finance Sales/Finance and Marketing groups, ***warned***

11   ***Palatnik*** of the risk of the bookings bubble.  Palatnik responded, "Don't worry."  ¶78(c).  ***Bushby***

12   ***confided in CW9***, a former Group Marketing Director, that he was concerned about revenue flows

13   going forward.  ¶78(b).  CW9 indicates that the shift from primarily Subscription model to a Term

14   model was not natural customer demand but manufactured by defendants to support revenue

15   forecast.  *Id.*  CW9 and CW10 (an Operations Director) corroborate that the Company's Sales

16   personnel were consistently pressured to renew customer contracts prior to the date that existing

17   contracts expired.  *Id.*  CW14 (an Account Manager) reports that in September 2008, his supervisor,

18   Vice President for North America Thomas Cooley, "blew the whistle" on the recklessness of the

19   defendants' practices by prematurely renewing licenses and leaving the Company's pipeline

20   depleted.  ¶¶36, 78(j).  CW14 states that Bushby was then fired.  *Id.*

21   With respect to the 2Q08 $12 million restated deal, defendants admit that it was in fact a

22   Subscription agreement, not a Term agreement.  ¶29.  Exs. 39, 45, 54.  Defendants admit knowledge

23   of the transaction, stating that the 2Q08 transaction was a new Term license and a concurrent

24   cancellation of a Subscription license, such that ***"at the time the subscription license was cancelled***

25   ***the customer intended to re-establish its right to access future new technology at a later time."***

26   ¶¶106, 140, 155, 175.  The FAC expressly identifies Nvidia as the restated Q2 deal, which

27   defendants do not dispute.  ¶¶18, 110.  Corroborating the Company's own admissions, CW15 states

28   the Nvidia deal was orchestrated by defendant Bushby who instructed Cadence's sales team,

1    including Mike Ellow, to restructure a MEA deal that was already in place in 2007 by separating

2    different elements of a MEA because Cadence needed to fill revenue gap.  ¶¶29, 106, 110; Exs. 39,

3    54.  The timing of the orchestrated Nvidia transaction also supports scienter.

4          By July 2008, Cadence was in the midst of a hostile take-over attempt of Mentor Graphics.

5    ¶83.  The attempt to buy out Mentor was Cadence's last attempt to get new customers and inject

6    more upfront revenue.  ¶80.  Five witnesses (CW3, CW5, CW9, CW13 and CW14) reported that

7    defendants knew of the Company's depleting pipeline from reports gathered.  ¶¶78, 80.  Moreover,

8    because Cadence needed to finance the Mentor Graphics' hostile Cadence stock, timing was crucial

9    for Cadence not to miss its own projections.  ¶¶83-84, 86; Order at 23.

10         With the manufactured upfront revenue from the Nvidia deal, Cadence overstated reported

11   earnings for 2Q08 at *least 458%*.  ¶104.  But for the $12 million deliberately improperly recognized

12   in 2Q08, Cadence would have missed its projections for 2Q08.  ¶108.  Cadence restated its 2Q08

13   revenue at $308 million, and reported a net loss of $16.7 million and ($0.07) earning loss per share, a

14   436% overstatement in net income.  *See* ¶¶108, 165, 175.

15         Six days after the Company reported its false 2Q08 financial statements, a $400 million

16   reduction in the Company's FY08 forecast, and a sharp reversal back to a primarily Subscription-

17   based ratable revenue model, defendants rushed to further insulate themselves by amending the

18   indemnification rights in their employment agreements.  ¶¶34, 116-117.  Three months later, Fister,

19   William Porter ("Porter") and Bushby were fired.  ¶¶34, 36, 75, 75(h), 75(i), 127.

20         The FAC further details defendants' stunning admissions that the improper revenue

21   recognition and false designation of Subscription agreements as Term agreements were a direct

22   result of defendants' directive to create artificial "separation" in order to pull the revenues upfront, in

23   violation of GAAP and the Company's own stated revenue recognition policies.  ¶¶119-122.  Indeed,

24   defendants admitted that they understood that the proper application of the accounting rules all along

25   – rules that their prior motion to dismiss sought to describe as complex – but deliberately and

26   recklessly disregarded them.  ¶¶32, 119, 121, 122; Exs. 25 and 29 (detailing Palatnik's explanation

27   during conference calls regarding Cadence's business model and how Cadence recognized revenue).

28   ¶157; Ex. 55.  Even Cadence's long time director and current CEO Lip Bu Tan later admitted that

1    the restatement was directly related to defendants' deliberate recklessness that caused the revenue

2    recognition irregularities. ¶¶31, 131;  Ex. 55.

3    **III.    LEGAL STANDARD**[7]

4          In concerning a motion to dismiss, the court must accept plaintiffs' allegations as true and

5    construe them in the light most favorable to plaintiffs.  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049,

6    1055 (9th Cir. 2008), *cert. denied*, *Gilead Scic., Inc. v. St. Clare*, 129 S. Ct. 1993 (2009).  To

7    establish a securities fraud claim under §10(b) and Rule 10(b)(5) under the PSLRA, plaintiffs must

8    demonstrate (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with

9    the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss.  *In re*

10   *Daou Sys.*, 411 F.3d 1006, 1014 (9th Cir. 2005).  Plaintiffs' pleading with respect to these elements,

11   and scienter in particular, "must satisfy the dual pleading requirements of Federal Rule of Civil

12   Procedure 9(b) and the PSLRA."  Order at 13.

13         The required state of mind under §10(b) is "deliberate recklessness."  *In re Silicon Graphics*

14   *Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999).  The Court "must consider the complaint in its

15   entirety" and determine "whether ***all*** of the facts alleged, taken collectively give rise to a strong

16   inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

17   standard."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14, 321-23 (2007)

18   (emphasis in original).  The "strong inference" standard does not require that the "inference that the

19   defendant acted with scienter . . . be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most

20   plausible of competing inferences . . . ."  Order at 14 (citing *Tellabs*, 551 U.S. at 324).  The Court

21   must evaluate whether, taken collectively, plaintiffs' allegations raise a strong inference "that

22   defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of

23   misleading investors."  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).  The

24   plaintiff must plead facts such that "a reasonable person would deem the inference of scienter cogent

25   and at least as compelling as any opposing inference one could draw from the facts alleged."

26   _____

27   [7]      The Court's Order addressed extensively the legal standard applicable to the pending motion.
     Order at 12-15.  Plaintiffs will not repeat them here.

28

1 | *Tellabs*, 551 U.S. at 324; *see also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir.

2 | 2009) (Reversing dismissal where the inference that defendants acted intentionally or with deliberate

3 | recklessness is at least as compelling as the innocent inference.).

4 | **IV.    ARGUMENT**

5 |    **A.    The First Amended Complaint Pleads Multiple New Compelling
       Allegations Addressing the Court's Concerns and Sufficiently Raising
6 |       a Strong Inference of Scienter**

7 |        Previously, the Court held that "[t]he fact that the 1Q and 2Q agreements were quite large

8 | does lend credence to Plaintiffs' argument, as one would expect Cadence personnel to be more

9 | thorough in such situations." Order at 25. The Court also held that "Plaintiffs have also established

10 | coherent motive to commit fraud." *Id.* Finally, the Court held that "Plaintiffs have certainly created

11 | a strong inference that Defendants were aware of the 1Q and 2Q agreements generally." *Id.* But the

12 | Court found the inference of a specific intent to defraud weaker than an inference of negligence.

13 | Order at 25-26. Taking the Court Order as guidance, the new allegations address the Court's

14 | concerns by curing the deficiencies noted, with corroborated witness accounts and defendants' own

15 | admissions to make this a strong compelling case of fraud.

16 |    **1.    The New Witness-Based Allegations Corroborate that Bushby
       Negotiated the $24.8 Million Restated Fujitsu Deal at Fister's
17 |       Instruction in 1Q08**

18 |        As with the description of CW1-7 which the Court held was adequate to support the

19 | generalized accounts that they provide, the FAC sufficiently pleads the basis of CW8-15's personal

20 | knowledge, including each of the witnesses' background, history, and title. Order at 17-18; ¶¶51(h)-

21 | (o).[8] *Daou*, 411 F.3d at 1015-16 (complaint described confidential witnesses "with sufficient

22 |

23 | _____

   [8]    CW8 is a former Cadence Account Executive for six years until November 2008 who had
24 | personal knowledge of details of sales and contract approval process at Cadence. ¶51(h). CW9 is a
   former Group Marketing Director who had direct interaction with defendants Porter, Fister and
25 | Bushby, and in particular with whom Bushby confided that he was very concerned about revenue
   flows going forward and needed to find new ways to maintain revenue flow. ¶¶51(i) and 78(b).
26 | CW10 is a former Cadence Operations Director for seven years until 2009 who was responsible for
   supporting the Company's Sales force, and thus, has personal knowledge of Cadence's sales process.
27 | ¶51(j). CW11 is a former Staff Systems Engineer who was personally responsible for supporting the
   eDA-on-Tap application for 9 years at Cadence, including the Class Period. ¶51(k). CW12 is a
28 | consultant in the EDA industry who advises clients, including Cadence customers, on EDA products.

1  particularity to support the probability" that they knew about the fraud); *In re Adaptive Broadband*

2  *Sec. Litig.*, No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887, at *33-*37 (N.D. Cal. Apr. 2, 2002)

3  (Plaintiffs provided sufficient details including the period during which the witness had been

4  employed, a clear explanation of the witness' job duties, and how the witness came to know the

5  information he or she describes.). *See generally*, ¶51. Significantly, defendant's current motion

6  does not take any specific issue regarding the reliability of CW1-7 and CW9-11.

7         The Court's Order previously criticized the lack of details concerning "exactly how familiar

8  any Individual Defendant must have been with the key transactions, particularly given . . . a long

9  chain that involved multiple personnel and levels of review." Order at 20. The FAC now pleads

10  sufficient facts to address the Court's concern, bridging the gap by detailing defendants' knowledge

11  or deliberate recklessness by putting defendants squarely at the top of that long chain of review,

12  making the final decisions in structuring and approving the deals. *See, e.g.*, ¶¶75, 78, 110.

13         With respect to the 1Q08 restated deal, five former Cadence employees reported that it was

14  with Fujitsu. ¶74. Notably, defendants no longer dispute this time that Fujitsu is the customer

15  involved in the restated deal. CW12, a well-respected consultant in the EDA industry, states that the

16  Fujitsu deal was negotiated by Bushby at Fister's instruction. ¶¶51(l), 75. The FAC provides

17  sufficient details about the basis of CW12's knowledge for the Court to assess that CW12 was in the

18  position to know the information – CW12 had learned from a Fujitsu engineer that Cadence had

19  entered into a eight-year license with Fujitsu in 1Q08, which Fujitsu "backed out" in 2Q08. ¶75(g).

20  Defendants quibble that CW12 cannot be relied upon because he was an outside consultant. Defs'

21  MTD at 12.[9] Plaintiffs did not proffer CW12 to show the accounting improprieties at Cadence.

22  

23  ¶51(l). CW13 is a former Cadence Product Marketing Director for 6 years who regularly worked
    with Cadence's Sales, and thus has personal knowledge of the contract renewal and negotiation

24  process at the Company. ¶51(m). CW14 is a former Cadence Account Manager in Cadence's Sales
    who reported directly to Tom Cooley, the VP who blew the whistle on the defendants. ¶¶51(n),

25  78(j). CW15 is a former Sales Director for North America for 9 years who has personal knowledge
    of Cadence's Sales organization, including knowledge of Bushby's directive in 2Q08 to renegotiate

26  the Nvidia deal to make up the revenue gap for the quarter. ¶¶51(o), 110.

27  [9]      "Defs' MTD" refers to Defendants' Motion to Dismiss First Amended Complaint;
    Memorandum of Points and Authorities in Support Thereof, filed November 20, 2009.

28

1    Rather, CW12 is offered to corroborate with five other former employees' accounts that Bushby

2    negotiated the largest licensing deal for 1Q08 at Fister's direction. ¶¶75(g)-(h).[10] CW12's accounts

3    should be credited because they are collaborated by other sources. *Daou*, 411 F.3d at 1015 (adopting

4    *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000), augmented by *In re Cabletron Sys., Inc.*, 311 F.3d 11,

5    29-30 (1st Cir. 2002) for assessing reliability of the confidential witnesses in the Ninth Circuit,

6    which "involves an evaluation . . . of the level of detail provided by the confidential sources, the

7    corroborative nature of the other facts alleged (including from other sources), the coherence and

8    plausibility of the allegations, the number of sources, the reliability of the sources, and similar

9    indicia." *Id.*

10          Indeed, CW12's accounts are corroborated by a number of former Cadence employees who

11    have personal knowledge of the Company's Sales organization who independently confirm that

12    Fister, Porter, Bushby, and Palatnik were involved in large deals and certainly the largest customer

13    for the quarter.[11] CW15 reports that at the annual sales kick-off meeting in January 2008, Fister told

14    Cadence's Sales organization that Fister and Bushby were involved in every large deal over $5

15    million.  ¶75(i).  CW4 reports that contracts for top 30 customers and top three or four largest

16    revenue deals for each quarter required Palatnik and Porter's approval.  ¶75(j).  CW14, a former

17    Cadence Account Manager, reports that Bushby was intimately involved in the review of sales

18    including details of sales in any given quarter.  ¶78(h).  This witness, in particular, describes in

19    particularity Bushby's involvement in the contract approval process, Bushby held weekly telephone

20

21    [10]     Plaintiffs believe that the reliability of CW12 is sufficiently pled, especially given that his
22    accounts are corroborated by other sources.  Because more detail concerning CW12 will no doubt
       have the effect of indentifying the witness by name, if necessary, plaintiffs propose that can offer
23    additional information concerning CW12 be provided to the Court *in camera*.  Plaintiffs' offer would
       protect CW12's identity in case the FAC is dismissed and prevent the witness from being
24    blackballed since he still works in the EDA industry as a consultant.  Of course, if the defendants'
       motion to dismiss is denied, plaintiffs would, at the appropriate time or as required by the Court,
25    have to disclose the identity of the confidential witnesses.

26    [11]     Defendants do not dispute that Fujitsu was the only customer that accounted for more than
       10% of Cadence's 1Q08 revenue, as originally reported.  Indeed, defendants' motion does not
27    address at all the new allegations concerning defendants' violation of Regulation S-K by not
       disclosing the name of the customer as required by the rule.  ¶¶72(f), 73.

28

1   calls with his direct reports, including Thomas Cooley, Vice President of Sales for North America,

2   and all Account Executives, which CW14 participated.  ¶¶78(i), 113.  During the weekly calls, the

3   participants discussed the status and details of pending contracts, and Bushby's verbal approval was

4   needed before the contracts could be generated.  *Id.*  According to CW14, Bushby also specifically

5   inquired as to how much each customer was going to pay upfront and gave instructions to make sure

6   that certain deals closed before the end of the quarter.  ¶78(h).  CW14 provides the level of detail

7   about each transaction that Bushby "would have likely been exposed."  Order at 18.

8       And there is more.  CW8, a former veteran Cadence Account Executive, elaborated on the

9   limited role that the Sales personnel played during contract negotiation with customers, and that the

10  top-level executives "big guns" such as Bushby, Fister and Porter's involvement in "architecting"

11  the deals.  ¶¶51(h), 75(b).  CW8 reported that Bushby, Porter and Palatnik were heavily involved

12  with structuring sales agreements, including whether they were Term or Subscription agreements.

13  ¶¶75(a), 112-113.  Moreover, according to CW8, Cadence had an executive review process that

14  required the signatures of CFO (Porter for 1Q08 deal, and Palatnik for 2Q08 deal) and the VP of

15  Sales, and that no contract would have been generated without Bushby's approval.  ¶¶75(b), 111.

16  Consistent with CW14's accounts, CW8 reports Bushby instructed the Sales how to structure the

17  Sales agreements, monitored the deal progress until it was finalized, and gave approval to draw up

18  the Sales contract.  ¶75(a).  Given the hierarchical structure that was in place, CW8 reported that it

19  was ***impossible*** for a line-level Sales person to offer a customer terms or conditions that would not

20  be in the contract was not known to the senior executives.  ¶75(b).

21      Faced with particularized allegations from CW8, defendants resort to the general attack that

22  CW8 provides no factual basis for his "firsthand" knowledge.  Defs' MTD at 17-18.  But the FAC

23  pleads with particularity the basis for CW8's personal knowledge.  ¶51(h).  As a former veteran

24  Account Executive for six years, CW8's allegations describe the details of the sales and contract

25  approval process at the Company, including the roles of Sales personnel in the contract negotiations

26  process and defendants' authorities in negotiating and approving deals because that was CW8's job.

27  *Id.*  That CW8's accounts are corroborated by other witnesses further enhance CW8's reliability.

28  *Daou*, 411 F.3d at 1015; *Cabletron*, 311 F.3d at 29.  Rather than addressing the substantive

1   allegations, defendants also try to conjure up a different inference that side letters were not tolerated

2   at Cadence and that the senior executives would not have tolerated such practices if they knew.

3   Defs' MTD at 18.  But there is no fact supporting this innocent inference, especially given that CW8,

4   CW2 and CW4, explicitly report defendants negotiated and approved the terms of the deals,

5   including side agreements or contingencies associated with the contracts.  ¶¶75(b), 75(d) 75(j).  The

6   details from these witnesses address the Court's concerns as to what "signing off" or approval within

7   Cadence would have entailed, and put knowledge of the details of the restated transactions squarely

8   on defendants.  Order at 18.  *See also Daou*, 411 F.3d at 1023 (finding an even stronger inference

9   where plaintiffs alleged that the top executives actually directed the improper revenue recognition in

10  violation of GAAP and their own accounting practices).

11          **2.      Witness 15, the Former Sales Director, States that Bushby
                       Orchestrated the Restructuring of the Nvidia Deal to Fill**
12                     **Revenue Gap in 2Q08**

13          In the Order, the Court asked for concrete allegations that defendants "were familiar with the

14  key details of the 1Q or 2Q agreements" to support a strong inference of scienter.  Order at 20.  The

15  new allegations in the FAC concerning the 2Q08 restated Nvidia transaction provide just that.

16          According to CW15, defendant Bushby orchestrated the Nvidia deal in 2Q08 to be

17  improperly accounted for in order to close the revenue gap for the quarter.  ¶110.  The deal with

18  Nvidia was originally negotiated in 2007 as a 5-year MEA that required Cadence to recognize the

19  revenue ratably and to upgrade the hardware when the later version of the hardware becomes

20  available.  *Id.*  According to CW15, Bushby instructed Sales personnel Ellow, Cronk and Zaman

21  who handled the Nvidia account to re-structure an MEA that was already in place because Cadence

22  needed to "count this deal as revenue" immediately.  *Id.*  As a result of Bushby's directive, Cadence

23  separated the different components of the MEA, entered into another contract to allow the revenue

24  from that deal be recognized upfront, although Cadence still remained "on the hook" to deliver the

25  new hardware systems as originally contemplated.  *Id.*  CW15's account is corroborated by

26  defendants' own admission that "***at the time*** the subscription license was cancelled ***the customer***

27  ***intended*** to re-establish its right to access future new technology . . . ."  ¶140; Ex. 39.  Bushby's

28  instruction to create "artificial separation" of different components of a MEA is further corroborated

1    by Palatnik's own admission during the Class Period that defendants manipulated Cadence's

2    licensing model in order to recognize revenue up front.  *See, e.g.*, ¶119.  (Palatnik's discussion of

3    "artificial separation" of MEAs).  *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248,

4    1273 (N.D. Cal. 2000) ("[W]hen significant GAAP violations are described with particularity in the

5    complaint, they may provide powerful indirect evidence of scienter.  After all, books do not cook

6    themselves.").   Additionally, CW15's account is corroborated by CW9's report that Cadence's

7    conversion from primarily Subscription to Term licenses was not natural customer demand but

8    manufactured by defendants to support revenue forecast.  ¶78(b).  These corroborated witness

9    accounts and defendants' admission collectively raise a strong inference of scienter.  *Daou*, 411 F.3d

10   at 1015; *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231, 1234 (9th

11   Cir. 2004).  Notably, defendants do not dispute that the restated 2Q08 deal was Nvidia.

12        Defendants again say nothing about the substantive allegations other than CW15 was simply

13   not positioned to know because CW15 "*actually involved* in this deal or had communications with

14   any Defendant about the actual restated deal."  Defs' MTD at 15 (italics in original).  CW15 is a

15   former Sales Director of Cadence's Sales organization for 9 years who worked closely with senior

16   sales executives and reported to Thomas Cooley, the whistle blower.  ¶¶51(o), 78(i), 110.  CW15

17   was in the position to know defendants' involvement in negotiating, reviewing and approving the

18   deals, and Fister and Bushby's proclamation that they were involved with contracts over $5 million.

19   *Id.*  Moreover, that CW15's accounts are corroborated by other sources further support CW15's

20   reliability.  *Daou*, 411 F.3d at 1015; *Novak*, 216 F.3d at 314; *Cabletron*, 311 F.3d at 29-30.

21        In desperate draw, defendants contend that there is nothing inherently wrong with

22   restructuring the Nvidia contract.  Defs' MTD at 22.  Defendants completely ignore plaintiffs'

23   incriminating allegations that Bushby orchestrated the restructure of the contract for the sole purpose

24   of filling the revenue gap in 2Q08.  ¶112.  The restructuring did not have any legitimate business

25   purpose – it was done to manufacture revenue that Cadence had not earned in violation of GAAP

26   and the Company's own revenue recognition policies.  These are compelling facts that defendants

27   completely fail to address.

28

1
2

### 3.   Defendants' Surreptitious Qualified Internal Controls Representation for 1Q08 Right After They Falsified the Financials Bolsters the Inference of Scienter

3        The FAC adds new allegations that defendants had represented to the SEC that its internal

4    controls as "effective" in the Form 10-K filed in February 28, 2008, followed by the qualified

5    representation regarding Cadence's internal controls as "sufficiently effective" when they filed the

6    Form 10-Q for 1Q08, then flopped back to represent its internal controls as "effective" after the SEC

7    admonished it, and finally admitted to material weaknesses in internal controls as part of the

8    restatement.   ¶¶67-70; Ex. 50.  That defendants went back and forth, indecisive about how to

9    represent Cadence's internal controls, shows that defendants were at least aware of it.  Indeed, the

10   Form 10-Q was accompanied by false Sarbanes-Oxley certifications signed by Fister and Palatnik,

11   which further support the inference of their scienter.  ¶68.  *Howard v. Everex Sys., Inc.*, 228 F.3d

12   1057, 1061 (9th Cir. 2000) (defendants' knowledge can be inferred from signature to the SEC

13   filings).   Moreover, the assertion of qualification for the quarter in which the financials were

14   materially manipulated suggests defendants' knowledge.  ¶¶67-71.

15        Avoiding these new allegations, defendants try to raise a factual dispute by asking the Court

16   to look at what is not pled or referenced in the FAC.  They offer that Cadence's eight prior quarterly

17   filings used the same "sufficiently effective" language.  Defs' MTD at 23.[12]  Defendant's prior

18   quarterly representations are irrelevant to refute the facts alleged in the FAC.  They do not address

19   why defendants went back and forth in their internal controls certification *during* the Class Period.

20   Moreover, defendants may not rely on materials not referenced in the complaint to dispute the

21   complaint's factual allegations.  *Cooper v. Pickett*, 137 F.3d 616, 622 (9th Cir. 1998); *Branch v.

22   Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994).  Plaintiffs therefore request that the Court strike the

23   exhibits and references thereto.  In any event, defendants' attempt to introduce defendants' qualified

24   internal controls from the previous quarters support the inference that defendants knew that

25

26   [12]     Defendants' exhibits and any references to them in defendants' motion should be stricken
     because they are not referenced in the FAC.  *See* Plaintiffs' Response to Defendants' Request for
27   Judicial Notice and Motion to Strike Exhibits Attached to the Declaration of Sarah A. Brown in
     Support of Defendants' Motion to Dismiss and References Thereto, concurrently filed herewith.

28

1  Cadence's internal controls were not effective even before the Class Period, which enhances, not

2  diminishes, the inference of scienter.

3          **4.    Defendants' Deliberate Violation of Regulation S-K by Not
                    Disclosing the Name of the 10% Customer for 1Q08 Further**

4          **Supports the Inference that They Tried to Conceal Their
                    Scheme**

5          The FAC added new allegations that defendants violated Regulation S-K, Item 101

6  §229.101(c)(vii), which specifically requires the disclosure of the customer that had more than 10%

7  of the Company's overall revenue recorded during the quarter. ¶72(f).  In the SEC filing for 1Q08,

8  the Company only reported that sales with one customer represented 11% of that quarter, without

9  disclosing the required details concerning the transactions including the name of the customer.  ¶73;

10  Ex. 58.  As detailed in the FAC, Cadence's largest customer for 1Q08 was indeed the customer

11  involved in the restated 1Q08 transaction.  FAC at 29 n.8.  Faced with allegations concerning an

12  explicit Regulation S-K violation, defendants concede as such by remaining completely quiet.  Their

13  silence now is a stark contrast to their previous motion to dismiss in which they had the audacity to

14  contend that plaintiffs failed to identify the name of the customer involved in the restated transaction

15  in the face of their deliberate Regulation S-K's disclosure violation.  The uncontested Regulation S-

16  K violation is indicia of scienter.

17          **5.    Defendants Quickly Amended Their Indemnification Rights
                    After They Falsified the 2Q08 Financials to Protect**

18          **Themselves, Which Raises a Strong Inference of Scienter that
                    Defendants Do Not Address**

19

20          The FAC offers new facts that defendants suspiciously amended their employment

21  agreements right after they knowingly or with deliberate recklessness falsified the financials for

22  2008, which, again, defendants do not address at all.  Six days after the Company reported its false

23  financial results for 2Q08, defendants rushed to amend their employment agreements to "clarify" the

24  procedures for indemnification and expense advancement.  ¶¶116-117.  The timing of this

25  "clarification" is highly suspicious – they rushed to insulate themselves in case they are sued for

26  fraud. Ex. 53.  Defendants, again, have no response to these new allegations.

27

28

6.    **The Whistle-Blowing Allegations Attributed to Witness 14, a Former Sales Account Executive, Further Support a Strong Inference of Scienter that Defendants Do Not Address**

In the Order, the Court also suggested that "whistle blowing" allegations may be indicative of scienter. Order at 18. The FAC now offers CW14 who provides specific whistle blowing details that led to the firing of the executives. According to CW14 who reported to Cooley, in September 2008, Cooley met with the Board and "blew the whistle" on senior management, and told the Board that the artificial shift to Term agreement was cannibalizing the future by pulling contract renewals forward, depleting the Company's pipeline. ¶¶36, 78(j). CW14 reports that Bushby was fired and that Cooley replaced him. ¶78(j). One month after the whistle-blower, Cadence announced mass terminations of top executives, including Fister, Bushby, and Porter. ¶126. The chronology of the events, including the timing of the whistleblow followed by massive terminations and the restatement strongly demonstrate defendants' scienter. Defendants, again, remain silent on these allegations.

7.    **Witnesses Corroborate that Defendants Were Fired in Connection with Events that Led to the Restatement of the Two Transactions at Issue**

The FAC offers further witness-based accounts that defendants' terminations were related to the fraud. Three witnesses (CW3, CW12 and CW14) reported that Fister, Porter and Bushby were fired. ¶¶127, 131. CW3 reported that the Board asked the senior management to resign in part because of the false financials in 1Q08 and 2Q08 that give rise to the need to restate. ¶131. CW12 reported that Bushby had been "told to do it" by Fister to improperly account for the $24.8 million deal in 1Q08, and that Bushby was fired for the events that gave rise to the need to restate earnings. ¶75(h). Moreover, CW14 reported that in September 2008, CW14's supervisor Cooley met with Cadence's board and blew the whistle on senior management's practice of cannibalizing Cadence's future pipeline. ¶78(j). Bushby got fired and Cooley replaced him. *Id.* These facts support a strong inference of scienter. *In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 U.S. Dist. LEXIS 30854, at *3-*4 (N.D. Cal. Nov. 17, 2005); *In re Impax Labs, Inc. Sec. Litig.*, No. C 04-04802 JW, 2007 U.S. Dist. LEXIS 52356, at *26-*27 (N.D. Cal. July 18, 2007) ("corporate reshuffling" occurs in tandem with restatement, adds to scienter.").

1    Again avoiding these additional allegations concerning defendants' firings, defendants

2 merely again offer their commentary that defendants were terminated due to Cadence's declining

3 performance. Defs' MTD at 19-20. Citing to analyst reports (Exs. 32 and 33), defendants claim that

4 there was no suggestion from the analysts that the departures were related to improper revenue

5 recognition or the Company's subsequent restatement. Defs' MTD at 5. Yet the analysts' reports

6 are irrelevant because the analysts were repeating what they were told by Cadence. Indeed,

7 defendants cannot point to what the analysts did not know, or what plaintiffs did not allege, to raise a

8 factual dispute to challenge the sufficiency of the pleading. Defendants cannot rewrite the FAC

9 allegations with unsupported conjectures that have been undermined by plaintiffs' witnesses and the

10 Company's own admissions. At the pleading stage, plaintiffs' allegations are to be accepted as true.

11 *Tellabs*, 551 U.S. at 321-23; *Gilead*, 536 F.3d at 1055.

12    This Court previously recognized that the allegations in the Consolidated Complaint

13 concerning defendants' resignations were not, in and of themselves, strong indicative of scienter.

14 Order at 24-25. The Court, however, held that the allegations concerning defendants' forced

15 resignations raise an inference that is ***just as likely*** that they were not fired. *Id*. The Court held that

16 plaintiffs' allegations "just as it could have followed the exposure of fraud." *Id*. Under *Tellabs* and

17 the Ninth Circuit authorities, if the inferences are tie, the tie goes to plaintiffs. *See Tellabs*, 551 U.S.

18 at 324; *Siracusano*, 585 F.3d at 1167.[13] Thus, even under the Court's previous analysis where there

19 was a tie, plaintiffs' inference prevails. But given the FAC now adds at least three witnesses'

20 corroboration that defendants were fired in connection with the events that caused the restatement,

21 the new allegations break the tie to support a strong inference of scienter.

22

23

24

_____

25 [13]    "'[T]he Supreme Court [in *Tellabs*] has now made clear, . . . that a tie goes to the Plaintiff[]'

26 in terms of competing inferences as to scienter." *Teamsters Local 617 Pension & Funds v. Apollo Group, Inc.*, 633 F. Supp. 2d 763 , 792 (D. Ariz. 2009) (second and third alterations in original); *see*

27 *Workers of America Plan for Employees' Pensions and Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007).

28

8.   **The Multiple Admissions by Defendants that They Created Artificial Separation to Recognize Revenue Upfront and that They Understood the Simple Applicable GAAP and Internal Accounting Policies Demonstrate that They Acted with the Scienter of Fraud**

Admissions by defendants can provide powerful evidence of scienter.  *Nursing Home*, 380 F.3d at 1231, 1234 (Defendant's admission and corroborated witness accounts raise a strong inference of scienter.)  The FAC details multiple admissions that demonstrate defendants' scienter, which defendants, again, do not address.  The new allegations of defendants' admissions include: (1) the Company's admissions in the December 10, 2008 disclosures; (2) post-class period admissions by new CEO Tan regarding the old management's practice of pulling revenue forward using term license that caused the accounting irregularities; and (3) defendants' statements showing that they created artificial separation of deals that were negotiated and contemplated together in order to characterize them as Term contracts so revenue could be recognized up front (¶72(c)), and defendants' clear understanding of the accounting rules and their understanding of how the simple accounting rules applied (¶¶118-122).

First, defendants say nothing about the admissions by the Company on December 10, 2008 regarding the two restated deals.  ¶¶138-145. The Ninth Circuit is clear that scienter can be inferred from the restatement.  *Daou*, 411 F.3d at 1016 ("'overstating of revenues may state a claim for securities fraud, as under GAAP, "revenue must be ***earned*** before it can be recognized"'").  Moreover, with respect to the $24.8 million restated deal, the Company admitted that the software arrangements executed in 1Q08 and 3Q08 were ***"negotiated in contemplation of one another."*** ¶142.  The Company further admitted that the $12.8 million restatement for 2Q08 was needed because ***"at the time the subscription license was cancelled the customer intended to re-establish its right to access future new technology at a later time."***  ¶140.  Furthermore, the Company admitted to material internal controls weaknesses and the implementation of remedial steps to address them.  These admissions raise a strong inference of scienter.  *See Sipex*, 2005 U.S. Dist. LEXIS 30854, at *3-*4.

Second, defendants also say nothing about post-Class Period admissions by the Company and its new CEO that directly implicate defendants.  New CEO Tan suggested the restatement was

necessitated by the improper revenue recognition practice at the direction of the old management under Fister, Porter, Bushby and Palatnik.  ¶157; Ex. 55.  Tan further promised that the Company was "going to exercise discipline about these matters in the future" which strongly implied that the old management under defendants' reign were at least deliberately reckless in straying from the rules.  *Id.*  Defendants again are completely silent on these new allegations.

Finally, defendants do not address the FAC's new allegations that defendants created "artificial" separation of MEAs and prematurely renewed Subscription contracts and converted them to Term contracts to pull revenue forward, based on witnesses and defendants' admissions.  Contrary to defendants' previous assertions that the accounting rules are complex and complicated, the FAC pleads that the rules are straight-forward (¶¶159-162) and that defendants understood them.  ¶¶30, 118-122; Ex. 25.[14]  Defendants' violations of simple accounting rules and the Company's own accounting principles are further indicia of fraud.  *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1187 (S.D. Cal. 2009) (scienter is sufficiently pleaded when a simple accounting principle is violated, supported by corroborated witness accounts and defendants' admissions).

### 9.   Additional Witness-Based Allegations that the Individual Defendants Directed Improper Pulling Forward of Future Revenue and Had Access to Sales and Revenue Recognition Data, Further Support a Strong Inference of Scienter

Further following the Court's directive to provide "level of detail the Individual Defendants would have likely been exposed to" (Order at 18), the FAC provides additional information from several independent sources (CW1, CW7, CW11, and CW14) to address the Court's concerns by describing the level of details in the eDA-on-Tap and Siebel systems, and the level of information that defendants had access to.  ¶¶75(l), 78(l)-(m), 112.  Specifically, the former Business Systems Analyst (CW7) reported that the Siebel system details: (1) a potential value of the contract, and (2) when the contract would be expected to close.  ¶75(l).  In addition to CW1 and CW7, the FAC proffers two more witnesses, CW11 and CW14, to further corroborate that the senior executives had

---

[14]     The Court's straightforward summary of Cadence's accounting (Order at 2-4) also suggests that the accounting rules are not as complicated as defendants cried about.

1    access to Cadence's forecasting bookings and financial reporting systems.  ¶¶75(l), 78(l)-(m), 112.

2    According to these four witnesses, the systems kept track of the state of pending or anticipated

3    contract negotiations, as well as the terms of contracts, so that defendants knew exactly how much

4    revenue is needed to meet analyst expectation.  ¶¶78(l)-(m), 112.  Plainly, it was no coincidence that

5    but for the deliberate improper revenue recognized from the Fujitsu and Nvidia deals that Cadence

6    would have missed its projections for the first two quarters of 2008.

7         In the Order, the Court found that "none of the CWs suggest that these systems reflected that

8    either of the licenses at issue were or should have been subscription licenses at any time."  Order at

9    19.  Several witnesses address this point.  CW1, the former Sales Administrator whose job was to

10   upload information into the systems, reports that the systems kept track whether contracts were

11   "Term" or "Subscription."  ¶78(l).  CW11, the former Staff Engineer whose job was to maintain the

12   eDA-on-tap system, specifies that Porter and Palatnik who used the system extensively could see the

13   customer names, whether it be Term or Subscription contracts and how much revenue should be

14   recognized under each contract.  ¶78(m).  CW14, a former Account Manager, corroborates CW11's

15   information.  *Id.*

16        Moreover, the FAC describes defendants' access to information compiled by CW5, a former

17   Marketing Manager whose job included collecting Cadence's sales and market segment data in late

18   2007 and early 2008.  ¶78(d).  CW5's report showing the implosion of bookings and revenue bubble

19   by 1Q08 was presented to Fister, Porter, Bushby, and Palatnik.  *Id.*  This witness account is further

20   supported by CW3, a former Senior Manager in the Marketing group who participated in executive-

21   level meetings and had personal knowledge of the Company's practice of managing upfront and

22   ratable revenue and bookings bubble created by this practice.  ¶¶51(c), 78(c).  Importantly, ***CW3***

23   ***warned Palatnik*** of the risk of associated with the practice.  ¶78(c).

24        Moreover, defendants themselves stated that they closely monitored the Company's pipeline

25   with granularity, with Fister and Porter telling the analysts "when we plan the pipeline, and like I say

26   we do this with a lot of visibility, in some appreciating detail, we took into account the time shift."

27   ¶77; Ex. 10 at 8.  "Specific admissions from top executives that they . . . monitored portions of the

28   company's database are factors in favor of inferring scienter in light of improper accounting

1   reports." *Daou*, 411 F.3d at 1022; *Nursing Home*, 380 F.3d at 1234. *See also Applied Signal*, 527

2   F.3d at 987 (scienter is supported when CEO described his company's, and his own, superlative

3   access to sales data); *South Ferry LP #2 v. Killinger*, No. C04-1599-JCC, 2009 U.S. Dist. LEXIS

4   91174, at *34-*35 (W.D. Wash. Oct. 1, 2009) (decision on remand) (where an executive

5   "maintained that he knew what he was talking about," the court is allowed to infer knowledge, "if he

6   did not in fact have such knowledge, it would be at least actionably reckless . . . .")).

7                    **10.    Defendants' Motive to Manipulate the Accounting for 1Q08**
                             **and 2Q08 in the Context of the Mentor Graphics Acquisition,**
8                            **Which the Court Has Already Found Compelling, Is Further**
                             **Enhanced by Their Motive to Hide the Revenue Bubble**
9                            **Created by Their Scheme**

10          The Court previously recognized that defendants had a strong incentive to meet Wall Street

11  expectations and Cadence's own guidance, and that Cadence needed to present a "rosy picture" in

12  order to acquire the debt necessary to consummate the Mentor Graphics acquisition. Order at 23.

13  The Court held that plaintiffs' Consolidated Complaint articulated a "coherent explanation for why

14  Defendants may have committed fraud," and that "Plaintiffs have also established a coherent motive

15  to commit fraud." Order at 23, 25. The FAC provides additional powerful motive allegations

16  concerning the revenue and booking bubble (¶78), corroborated by a handful of witnesses (CW3,

17  CW5, CW9, CW10, CW13 and CW14).

18          The FAC alleges that in 2007 defendant ***Bushby confided in CW9, a former Group***

19  ***Marketing Director, directly that Bushby was very concerned about revenue flows going forward***

20  ***and needed to find new ways to maintain revenue flow.*** ¶78(b). CW9 reported that the shift from

21  primarily Subscription model to a Term model was not natural customer demand but manufactured

22  by defendants to support revenue forecast. *Id.* (This is entirely consistent with defendants' own

23  explanation regarding the artificial creation of separation of the contracts. ¶¶119, 121). CW13 and

24  CW14 corroborate that the Sales force was instructed by senior management and specifically Bushby

25  to call on customers to renew contracts early. ¶¶12, 78(f). CW9, CW10, CW13, and CW14 all

26  reported that the Company's Sales personnel were consistently pressured to renew customer

27  contracts prior to the date that existing contracts expired, (¶¶78(a)-(f)) and that directive from the top

28  caused a significant amount of stress for the Sales personnel and the Company. *Id.* CW13 reported

that at the end of 2007, "there were no more customers left to renew." ¶78(e). CW14 reported that the early renewal policies were defendants' way of making the Company appear more solvent than it actually was. ¶78(f).[15] According to CW9, CW5, CW13, and CW14, defendants knew of the declining pipelines from reports, and they knew about the bookings and revenue bubble and the implication on the Company's future outlook in late 2007 and definitely by early 2008. ¶¶12, 78, 80. These allegations are relevant and further support plaintiffs' already strong motive allegations.

### 11.    The *South Ferry* Exceptions Apply to This Case Given the New Allegations Set Forth in the Complaint

As this Court previously noted, the Ninth Circuit has spelled out two exceptions to the "core operations inference" that may satisfy the pleading standard to state a claim under the PSLRA. Order at 21 (citing *South Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008); *Zucco Partners*, 552 F.3d at 1000 (recognizing the two *South Ferry* exceptions). Even though this Court previously held that the case did not fall into the exceptions, plaintiffs respectfully request that the Court reconsider the application of the exceptions in light of the supplemental allegations in the FAC.

As this Court previously recognized, the core operations inference may be combined with allegations regarding management's role in the company that are "particular and suggest that the defendants had actual access to the disputed information . . . ." Order at 21 (citing *Zucco Partners*, 552 F.3d at 1000). The additional facts in the FAC, as highlighted above, now supplement particularized facts that, when combined with the defendants' actual access to the disputed information, give rise to a strong inference of scienter. Specifically, as discussed above in §II, §IV, A.1.2.9, the FAC now provides additional facts concerning defendants' specific roles at Cadence, including allegations that the defendants controlled the contracts negotiation, approval and revenue recognition process at Cadence. *See* ¶¶75, 78. These witness accounts, in combination with particularized allegations concerning defendants' access to the disputed information, warrant the

---

[15]    Defendants try to belittle CW14's account, contending that the AMD contract is not at issue. Defs' MTD at 14. That misses the point. Bushby and Fister's involvement with AMD (¶78(g)) is consistent with plaintiffs' allegations that Fister and Bushby were hands-on executives who negotiated contracts – thus, raising further inference that defendants either knew or recklessly disregarded the big contracts with Fujitsu and Nvidia.

application of the *South Ferry's* core business inference exception.  542 F.3d at 784.  Defendants'
motion, again, does not address the new allegations and simply recycles their old argument as if the
new allegations were not pled.  Defs' MTD at 21.

Previously, the Court held that this is not such a case to find it "absurd" to suggest that the
management was without knowledge of the matter.  Order at 22.  The Court should reconsider this
exception in light of plaintiffs' new allegations that defendants were familiar with the details of the
underlying agreements.  See §II, §IV, A.1.2.9.  Given: (1) defendants' access to information; (2)
their role in controlling the contract negotiation, review, and approval process; (3) the size of the
restated contracts (the Fujitsu deal was the largest deal for 1Q08 and the Nvidia deal was one of the
largest deals for 2Q08); (4) Fister and Bushby's involvement in contracts over $5 million; and (5)
but for the revenue from these two manipulated deals Cadence would have missed its own
projections which would have devastating effects on the Company and in the context of the Mentor
Graphics acquisition, it would be absurd to suggest that they were without knowledge of the 1Q08
and 2Q08 restated deals.  *South Ferry*, 542 F.3d at 784 ("the federal courts certainly need not close
their eyes to circumstances that are probative of scienter viewed with a practical and common-sense
perspective.").  *See In re PMI Group, Inc. Sec. Litig.*, No. C 08-1405 SI, 2009 U.S. Dist. LEXIS
101582 (N.D. Cal. Nov. 2, 2009) (Judge Illston upholding a securities fraud complaint in part based
on the new allegations about defendants' management and oversight as well as their duty to know
and access to the disputed information).

**B.      Defendants Are Liable for False Statements Made, Either as
          Speakers, or Under Group Published Doctrine**

In a footnote, defendants state that plaintiffs do not identify any public statements made by
Bushby.  Defs' MTD at 10 n.8.  Bushby is liable for the group published statements made, as he no
doubt had direct involvement and control over the day-to-day affairs of Cadence.  *See also* ¶¶46-50.
Under the group published doctrine, "where the false and misleading information is conveyed in
prospectuses, registration statements, annual reports, press releases, or other 'group-published
information,' it is reasonable to presume that these are the collective actions of the officers."  *In re
GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995).  While citing to other district court's

opinions (Defs' Mem. at 10, fn. 8), defendants overlook this Court opinion in *Adaptive Broadband* in which it accepted the doctrine, noting that where the defendants "were the highest ranking officers," "the Court has no trouble inferring that the press releases and SEC filings that contain the false statements were issued with their blessing." 2002 U.S. Dist. LEXIS 5887, at *54-*55. All defendants are responsible for the false statements made in the Company's press releases and SEC filings issued for 1Q08 and 2Q08 under this doctrine. ¶¶55, 66, 87.

Moreover, the FAC clearly identifies the speaker/source of the false statements made for non-group published statements made. *See* ¶¶56, 58, 82, 88, 93. Because Fister, Porter and Palatnik were present during the Company's conference calls, they are liable for all false statement made during those conference calls for those they attended either as the speaker, or by silent adoption of the false statements made. *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 262 (5th Cir. 2005) (Where "one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it, even if it is not alleged which defendant spoke and which defendant failed to speak, the fraud is sufficiently pleaded as to each defendant.").

### C. Plaintiffs Sufficiently State a Section 20(a) Claim Against All Defendants for Control Liability

As plaintiffs have adequately alleged a primary violation, plaintiffs' §20(a) claim should be upheld since the FAC contains detailed allegations that the defendants exercised actual power or control over the "primary violator." Order at 26-27 (citing *Zucco Partners*, 552 F.3d at 990); *see also Howard*, 228 F.3d at 1065.

### V. CONCLUSION

For reasons set forth, defendants' motion to dismiss should be denied. If the Court grants any part of defendants' motion, plaintiffs request leave to amend. *Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

DATED:  December 23, 2009                    Respectfully submitted,


_____
        s/ Shirley H. Huang
        SHIRLEY H. HUANG

1

2

3

4

5

6

7   S:\CasesSD\Cadence 08\secy\MOT00063513.doc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
SHIRLEY H. HUANG
JASON C. DAVIS
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I further certify that I caused this document to be forwarded to the following Designated Internet Site at: http://securities.stanford.edu.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 23, 2009.

        s/ Shirley H. Huang
        SHIRLEY H. HUANG
        COUGHLIN STOIA GELLER
              RUDMAN & ROBBINS LLP
        100 Pine Street, 26th Floor
        San Francisco, CA  94111
        Telephone:  415/288-4545
        415/288-4534 (fax)
        E-mail: shuang@csgrr.com

## Mailing Information for a Case 3:08-cv-04966-SC

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey A. Berens**
  jeff@dyerberens.com

- **Peter Arthur Binkow**
  info@glancylaw.com,pbinkow@glancylaw.com

- **Ethan D. Dettmer**
  edettmer@gibsondunn.com,psaunders@gibsondunn.com,mjanky@gibsondunn.com

- **Robert J. Dyer , III**
  bob@dyerberens.com

- **Lionel Z. Glancy**
  info@glancylaw.com

- **Michael M. Goldberg**
  info@glancylaw.com

- **Shirley H. Huang**
  shirleyh@csgrr.com,jdecena@csgrr.com,vcordial@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Matthew Stewart Kahn**
  MKahn@gibsondunn.com

- **Matthew Paul Montgomery**
  mattm@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Blair Allen Nicholas**
  blairn@blbglaw.com,denab@blbglaw.com,kayem@blbglaw.com,kristinas@blbglaw.com

- **Brian O. O'Mara**
  bo'mara@csgrr.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Karen T. Rogers**
  krogers@milberg.com,schang@milberg.com,cchaffins@milberg.com

- **Jeff S. Westerman**
  jwesterman@milberg.com,mbowman@milberg.com,cchaffins@milberg.com

- **Shawn A. Williams**
  shawnw@csgrr.com,jdecena@csgrr.com,travisd@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Catherine J. Kowalewski
Coughlin Stoia Geller Rudman & Robbins LLP
655 W Broadway #1900
San Diego, CA 92101
```