<div style="text-align:left; writing-mode:vertical">**United States District Court**
For the Northern District of California</div>

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re CADENCE DESIGN SYSTEMS, INC. SECURITIES LITIGATION | ) Case No. 08-4966 SC )  ) ORDER DENYING MOTION TO ) DISMISS |
| This Order Relates to: | ) )  ) |
| CASE NOS. 08-4966 SC, 08-5027 SC, and 08-5273 SC | ) )  ) |

## I.    **INTRODUCTION**

Now before the Court is a Motion to Dismiss the First Amended Complaint, filed by Defendant Cadence Design Systems, Inc. ("Cadence"), as well as Cadence's former CEO, Michael J. Fister ("Fister"), Senior Vice President and CFO Kevin Palatnik ("Palatnik"), former Executive Vice President and CAO William Porter ("Porter"), and former Executive Vice President of Worldwide Field Operations, Kevin Bushby ("Bushby;" collectively with other individuals, "Individual Defendants," and with Cadence, "Defendants").  Docket No. 57 ("Motion").  Plaintiffs, including lead plaintiff Alaska Electrical Pension Fund, submitted the First Amended Complaint after this Court granted Defendants' prior motion to dismiss the Consolidated Amended Complaint.  Docket Nos. 53 ("FAC"), 48 ("MTD Order"), 39 ("CAC").  The Motion is fully briefed.  Docket Nos. 62 ("Opp'n"), 65 ("Reply").

Having considered all of the papers submitted, the Court

concludes that this matter is appropriate for decision without oral argument.  The Court is satisfied that the additional allegations and details pled by the FAC are now sufficient to meet the requirements set out in the Public Securities Litigation Reform Act ("PSLRA").  The Motion is therefore DENIED.

## II.   BACKGROUND

The Court has previously set out the factual background for this suit, as well as the legal standards for pleading claims under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), in light of the PSLRA.  MTD Order at 2-15. Plaintiffs allege that Defendants made a number of misstatements related to Cadence's earnings in the first and second quarters of 2008 ("1Q" and "2Q," respectively).  Statements of Cadence's earning for these periods were false because Cadence had improperly accounted for two major transactions, one in 1Q and one in 2Q (the "1Q agreement" and the "2Q agreement").  After an accounting investigation in late 2008, Cadence acknowledged that its earnings statements were greatly overstated, and it issued restatements to correct its earlier false representations.

It is helpful to recount the structure of Cadence's business dealings, as well as the proper accounting treatment for those transactions.  When licensing its electronic design automation technology to its customers, Cadence enters into two relevant types of licenses:  term licenses and subscription licenses.  As described in Cadence's 10-K for the fiscal year of 2007, a term license allows Cadence's customers to "[a]ccess and use all software products delivered at the outset of an arrangement

2

throughout the entire term of the arrangement, generally [for] two to four years, with no rights to return." Appendix to FAC, Docket No. 54, Ex. 6 ("2007 10-K") at 30. In other words, a term license typically allows a customer to use a defined set of already-available software. Subscription licenses, on the other hand, are more open ended, and allow "access and use [of] all software products delivered at the outset of an arrangement," and the additional right to "[u]se unspecified additional software products that become commercially available during the term of the arrangement." Id. The accounting treatment for term and subscription licenses differs dramatically in terms of when revenue is supposed to be recognized, according to both Generally Accepted Accounting Principles ("GAAP") and Cadence's internal accounting policies (which purport to follow GAAP). Id. at 29-30. For a term license, revenue "is recognized upon the later of the effective date of the arrangement or delivery of the software product." Id. at 30. That is, a term license may give Cadence the ability to recognize revenue from the license immediately. Revenue from a subscription license, on the other hand, must be recognized ratably over the entire term of the license. Id.

Initially, Cadence improperly classified both the 1Q and the 2Q agreements as term agreements, and recognized all of the revenue from these transactions up front instead of ratably. See generally Appendix to FAC Ex. 39 ("Dec. 10 Press Release"). Both of these agreements should have been classified as subscription agreements, and Cadence should not have immediately recognized the revenue. Id.

The FAC provides a bit more detail than the CAC about the 1Q

agreement.  The FAC confirms that the client involved in the 1Q

agreement was Fujitsu.  See FAC ¶¶ 16, 74.  As this Court

previously noted, the crucial detail that rendered Cadence's

initial accounting treatment of this agreement improper was the

fact that the agreement was negotiated "in contemplation" of a

later subscription agreement (the "3Q agreement"), and included or

contemplated the right to as-of-yet unreleased software.  MTD Order

at 16.  These factors indicate a subscription license, rather than

a term license.  Cadence recounted in its press release following

its accounting investigation in late 2008:

> [T]he term license arrangement executed during
> the first quarter and the subscription license
> arrangement executed during the third quarter
> collectively represented a multiple element
> arrangement.  Because the subscription
> arrangement provides the customer with the right
> to use unspecified additional software products
> that become commercially available during the
> term of the arrangement, Cadence determined that
> the revenue relating to this multiple element
> arrangement should be recognized during the term
> of the arrangement, beginning in the fourth
> quarter of 2008.

Dec. 10 Press Release at 10.  Because of the improper accounting,

Cadence recognized $24.8 million in up-front revenue, making the 1Q

agreement the largest single transaction of that quarter.  FAC

¶ 16.

The FAC identifies Nvidia as the client involved in the 2Q

agreement.  FAC ¶¶ 18, 110.  The 2Q agreement involved the

simultaneous cancellation of a subscription license and the

execution of a term license arrangement.  See Dec. 10 Press Release

at 11.  Cadence later:

> determined that, despite the cancellation of the
> subscription arrangement, the customer did not
> intend to substantively cancel its right to

access future new technology because at the time the subscription license was cancelled the customer intended to reestablish its right to access future new technology at a later time. Accordingly, . . . $12.0 million of revenue originally recognized in the second quarter of 2008 relating to the term license and hardware arrangement should be recognized ratably over the term of the arrangement, consistent with the way in which revenue was recognized on the cancelled subscription arrangement.

Id.  The crucial detail that rendered Cadence's initial accounting treatment of this agreement erroneous was the fact that Nvidia intended to retain certain rights to use future technology, which Nvidia had enjoyed under the subscription license that it simultaneously cancelled.  See MTD Order at 16.

This Court decided the previous motion to dismiss in Defendants' favor, finding that Plaintiffs had failed to properly allege scienter on the part of the Individual Defendants or any other Cadence officer.  Although Plaintiffs effectively alleged that Defendants had both the motive and the opportunity to commit fraud, there were no allegations that strongly supported an inference that any Defendant was sufficiently familiar with the details of the 1Q or 2Q agreements, such that they could recognize that Cadence's accounting treatment of these agreements was incorrect.  Id. at 25-26.  The Court concluded that none of the pled facts supported an inference that could "bridge the gap" between the key details of the agreements and the Individual Defendants.  Id.  Below, the Court discusses the key allegations, as newly pled or recontextualized by the FAC, that sufficiently narrow the gap and create a strong inference of scienter.

///

///

**III. <u>DISCUSSION</u>**

This Court previously examined the majority of facts alleged in the FAC, on an individual basis, when it examined the CAC in its previous Order.  No single new allegation in the FAC constitutes a "smoking gun" that, taken alone, supports a strong inference of scienter.  However, Plaintiffs need not produce a "smoking gun" to meet their burden.  See <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 324 (2007).  They must plead facts such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  <u>Id.</u> at 324.  Below, the Court recounts key specific facts alleged by the FAC, and the inferences regarding the Individual Defendants' scienter that can be drawn from these new allegations.  The Court recounts only those particular allegations that, when considered together, can convincingly contribute to the conclusion that the inference of fraud or reckless conduct is at least as likely as the inference of negligence or innocent mistake.

**A.   <u>Bushby Played a Role in the 1Q and 2Q Agreements</u>**

The first factor that contributes to the Court's finding that Plaintiffs have met their burden is the presence of new allegations that tie executive management more closely to the 1Q and 2Q agreements.  In the CAC, which the Court previously examined, Plaintiffs had generally pled that certain Individual Defendants were involved in negotiating unspecified contracts with clients, but the CAC was bereft of any concrete indication that anyone besides Cadence's "sales personnel" were involved specifically in the 1Q or 2Q agreements.  See CAC ¶ 59(c).  Based on the CAC, it

United States District Court
For the Northern District of California

appeared quite possible that involvement by executive officers was filtered through a long chain of mid-level reviewers.  Any inference that Individual Defendants were familiar enough with the details of the 1Q and 2Q agreements to recognize the accounting errors would have been mere speculation.  See MTD Order at 20 n.9. Now, the FAC ties Bushby -- one of Cadence's executive officers -- directly to the 2Q agreement, and additional allegations suggest that Bushby was likely involved in the 1Q agreement as well.

Plaintiffs have added the detailed allegations of eight additional confidential witnesses ("CW") to the FAC.  In order to establish scienter through the accounts of confidential witnesses, "the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge.  Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter."  Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009).  To determine whether the witnesses "would possess the information alleged," courts must consider "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia."  Id. at 995 (citation and internal quotation marks omitted).

CW15 confirms that the 2Q agreement involved Nvidia, and he[1]

_____

[1] For the sake of simplicity, the Court will use "he" when referring to all confidential witnesses.

United States District Court
For the Northern District of California

describes the structure and incentives of the Nvidia agreement in
considerable detail. See FAC ¶¶ 74(b), 110. CW15 states that
"Bushby specifically gave instructions to VP of Sales Mike Ellow
who communicated Bushby's instructions to Chris Cronk and Neil
Zaman, the Account Executives who handled the Nvidia account, to
re-structure the transaction with Nvidia that was already in place
because Cadence needed to 'count this deal as revenue' in that
quarter." Id. ¶ 110. He also claims that the initial agreement,
which Cadence sought to renegotiate, involved a 5-year multi-
element transaction, that Nvidia had paid $9 million up front for
hardware that Cadence was obliged to update, and that Cadence
returned this $9 million as part of the renegotiations. Id.
Plaintiffs claim that CW15 is "a former Sales Director for North
America," who worked under Bushby but reported directly to Thomas
Cooley. Id. ¶ 51(o). As a sales director, it is plausible that he
had personal knowledge of this information. The level of detail
provided by his statement lends his account a significant amount of
credibility. See Zucco Partners, 552 F.3d at 995. That Bushby
would be involved in the transaction is already plausible in its
own right. The 2Q agreement was very large, worth around $12
million, and one of the larger transactions during the 2Q08 period.
See FAC ¶ 18. CW15 also reports that he attended a meeting of the
entire sales force in January of 2008, where Fister stated that he
and Bushby were "involved" in "every contract over $5 million."
Id. ¶ 51(o). The Court finds that the level of detail provided by
CW15, coupled with the coherence and plausibility of the
allegations, provide an adequate basis for reliability at this
stage of the litigation. C.f. Zucco Partners, 552 F.3d at 995.

1    CW15's statements nudge Plaintiffs' allegations as to Bushby's

2    involvement beyond the realm of mere speculation.

3         The FAC's allegations with respect to Bushby's involvement in

4    the 1Q agreement are significantly less direct.  The 1Q agreement

5    -- worth roughly $24.8 million -- was the largest transaction of

6    the quarter and represented over 10% of the company's reported

7    revenue for that quarter.  FAC ¶ 16.  This makes it plausible that

8    the company's top management was involved at some level of the

9    negotiations, particularly in light of the fact that Fister had

10   represented that he and Bushby were involved in all transactions of

11   such size.  Id. ¶ 51(o).  Although this alone may be insufficient

12   to conclude that the Individual Defendants were closely involved,

13   Plaintiffs offer one additional bit of corroborative evidence, to

14   which this Court extends limited consideration.  CW12 claims that

15   Bushby "negotiated the 1Q08 Fujitsu deal, was 'told to do it' by

16   Fister and was fired because of the event that gave rise to the

17   restatement."  Id. ¶ 75.

18        The credibility of CW12 is problematic.  The FAC does not

19   suggest that CW12 was ever a Cadence employee -- rather, he was a

20   consultant who focused on Cadence's industry and counseled

21   Cadence's clients.  See FAC ¶ 51(l).  His account is therefore most

22   likely hearsay -- at least some of his information was gleaned from

23   discussions with a Fujitsu engineer.  Id. ¶ 75(g).  Although

24   confidential witnesses who claim "personal knowledge" of a fact are

25   preferable, this is not a hard-and-fast requirement:  "[T]he fact

26   that a confidential witness reports hearsay does not automatically

27   disqualify his statement from consideration in the scienter

28   calculus.  However, a hearsay statement . . . may indicate that a

9

**United States District Court**
For the Northern District of California

1   confidential witnesses' report is not sufficiently reliable,

2   plausible, or coherent to warrant further consideration . . . ."

3   Zucco Partners, 552 F.3d at 997 n.4.  The Court finds that CW12's

4   account is worth noting -- that is to say, it should not be

5   entirely discounted.  As an established industry consultant,[2]

6   CW12's livelihood depends upon his access to reliable, specific

7   industry information, and his role as a consultant to Cadence's

8   clients could plausibly give him access to information about

9   Cadence's business dealings.  Bushby's involvement would have been

10  clear to anyone else working on the transaction; it is a fact that

11  an industry consultant could have credibly learned in the regular

12  course of his business without relying on multiple layers of

13  hearsay.[3]  When taken in light of the other evidence related to the

14  scope of the deal, and Fister's statement that he or Bushby would

15  be involved in any transaction of this size, CW12's statements are

16  sufficiently plausible and coherent to support an inference that

17  Bushby was involved at some level in the 1Q agreement.

18       Having established that Bushby was likely involved in the 1Q

19  and 2Q agreements, and the negotiations that led up to them, the

20  next question is whether Bushby's involvement in the transactions

21  ─────────────

[2] Following the submission of Defendants' Reply, Plaintiffs sought
22  to submit an additional declaration, under seal, that establishes
    CW12's identity and his standing as a consultant in the electronic
23  design automation industry.  Docket No. 66.  Defendants submitted
    an Opposition.  Docket No. 69.  This Court GRANTS Plaintiffs'
24  request to submit this declaration under seal.  The Court is
    persuaded that the declaration's contents, read in light of the
25  FAC, suggest that CW12 had access to reliable information about
    Cadence's activities.  CW12's position as a consultant to Cadence's
26  customers significantly strengthens this inference.

27  [3] Notably, this Court finds the contention that Bushby "was 'told
    to do it' by Fister," or that Bushby and Fister were fired because
28  of the transaction, to be significantly less credible.  It does not
    rely upon these claims.

is indicative of scienter. The Court finds that it is. CW8, an
Account Executive for the U.S. and North America during the
relevant time period, describes the general role that Bushby
typically played in contract negotiations. FAC ¶¶ 51(h), 75(a).
As an Account Executive, he would presumably be familiar with
Bushby's general role in negotiating deals with large clients. CW8
downplays the role of the lower sales personnel, stating that they
typically "acted more like liaisons with customers . . . simply
determining what products the customer needed and when they needed
it or would buy them. . . . [T]he negotiation of terms and
'architecting' all other financial aspects of the deals, especially
large deals, was not done by the Sales persons but was done by the
'big guns.'" Id. ¶ 75(b). Although the term "big guns" is
regrettably vague, CW8 does state that "Bushby in particular . . .
would instruct the Sales people how to structure the Sales
agreements, monitor the deal progress until it was finalized, and
at which point, give approval to draw up the Sales contract." Id.
¶ 75(a). CW8's account is corroborated by that of CW14, a former
Account Manager, who stated that "Bushby was intimately involved in
the review of sales including the details of sales in any given
quarter," and "specifically inquired as to how much each customer
was going to pay upfront and how much would be paid ratably." Id.
¶ 78(h). Although these statements remain general in nature, they
do detract from the likelihood that Bushby's role in such large
agreements was limited or remote, and therefore strengthen the
inference of scienter.

The FAC now gives rise to a strong inference that Bushby was
involved in the 1Q and 2Q agreements. Plaintiffs needn't prove

**United States District Court**
For the Northern District of California

that Bushby was involved in the face-to-face negotiations between Cadence and its clients -- given the Court's findings in the next section, they need only show that he was directly involved in some level of the agreements' formation.  His involvement frees Plaintiffs from the burden of establishing that the key details of these transactions had to percolate up to the executive officers through less direct or reliable channels of communication.  While this does not necessarily give rise to a strong inference of scienter, it significantly reduces the possibility that the misstatements "were the result of merely careless mistakes at the management level based on false information fed it from below . . . ."  See Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 709 (7th Cir. 2008).

**B.    The Accounting Treatment of the 1Q and 2Q Agreements was the Fundamental to the Purpose of These Agreements**

The FAC puts more emphasis than did the CAC on Cadence's practice of renegotiating existing subscription contracts in order to realize greatly increased short-term revenue.  More importantly, the FAC does a much better job of specifically tying the 1Q and 2Q agreements to this practice.  The CAC generally alleged that by 2008, Cadence had begun to emphasize term contracts over subscription contracts, so as to "pull future revenue forward to meet the Street's expectations."  See CAC ¶¶ 6, 60, 60(c)-(d).  The Court concluded that this did little more than create a precarious financial situation for Cadence, which provided a motive for Defendants to cook their books.  In the FAC, Plaintiffs allege more facts to suggest that the 1Q and 2Q agreements were specific instances of the general practice of renegotiating subscription

**United States District Court**
For the Northern District of California

1  agreements into term agreements, in order to engorge short-term

2  revenue at the expense of long-term profit.

3      In general, Plaintiffs' allegations regarding Cadence's

4  renegotiation practices are more complete and better supported than

5  those in the CAC.  CW12 claims to have personal knowledge of this

6  practice, as an outside consultant, because he advised specific

7  Cadence customers who had been approached by Cadence to renegotiate

8  their subscription licenses into term licenses.  FAC ¶ 75(h).  CW9

9  and CW10, a Group Marketing Director and an Operations Director,

10  report that Cadence's management was consistently pressuring its

11  sales force to renew customer contracts, as term agreements, before

12  they expired.  Id. ¶ 78(b), (e).  CW14, a former Account Manager,

13  states that "the Sales force was instructed by senior management

14  and specifically Bushby to call on customers to let them renew

15  their contracts early.  According to CW14, huge discounts were

16  provided to customers in order to get them to renew early and even

17  more discounts were provided if customers paid cash upfront instead

18  of making payments over the life of the contract." Id. ¶ 78(f).

19  This "would essentially convert a Subscription contract to a Term

20  contract to allow for upfront revenue recognition." Id.  This was

21  apparently a practice that was driven by Cadence's top executives.

22      In particular, the FAC now makes a credible argument that the

23  1Q and 2Q agreements were themselves manifestations of this

24  practice.  Cadence appears to have entered into negotiations

25  regarding the 2Q agreement specifically to realize revenue from

26  Cadence's relationship with Nvidia sooner rather than later.  CW15

27  reported that Bushby gave Mike Ellow specific instructions "to re-

28  structure the transaction with Nvidia that was already in place

**United States District Court**
For the Northern District of California

1  because Cadence needed to 'count this deal as revenue' in" 2Q08.

2  FAC ¶ 110.[4]  These directions are in line with Cadence's apparent

3  sales policies during this period.  Notably, when Cadence later

4  moved away from its term-agreement model in 3Q of 2008, Palatnik

5  indicated, on several occasions, the degree to which the sales

6  force was restricted by the company's push for term licenses, by

7  stating that Cadence was "releasing the handcuffs on our channel,"

8  and "unlock[ing] our salesforce" by letting them negotiate freely,

9  without creating an artificial separation between term and

10  subscription licenses.  See Appendix to FAC, Ex. 25 ("Aug. 7, 2008

11  Conf. Call Tr.") at 5; Id. Ex. 29 ("Sept. 3, 2008 Conf. Call Tr.")

12  at 4.  Between CW15's statements and Cadence's own characterization

13  of its sales policies during 2Q, the Court may infer that the 2Q

14  agreement was not freely negotiated by Cadence's salespeople and

15  improperly classified after the fact; instead, the allegations

16  suggest that Cadence negotiated with an eye towards structuring the

17  license so that Cadence could walk away with something classifiable

18  as a term license.

19      The FAC does not include any allegations that directly

20  indicate that the 1Q agreement was negotiated for the purpose of

21  structuring a term agreement.  However, because the 1Q agreement

22  was negotiated in contemplation of the 3Q agreement (which was

23  properly treated as a subscription license), it is eminently

24  plausible that in negotiating the 1Q agreement, Cadence sought to

25  pull out the term-related aspects of the transaction in order to

26

27  ───────────────
[4] It is not clear whether statements made by CW5 corroborate this
account or not -- the Court suspects that certain allegations
28  attributed to CW5 in the FAC are the result of a typo.  See FAC
¶ 29.

**United States District Court**
For the Northern District of California

realize immediate revenue.[5]  The Court finds it possible to draw an
inference that Cadence engaged in negotiations with Fujitsu and
Nvidia for the purpose of entering into term agreements.

The Court may presume that there would be nothing wrong with
renegotiating an agreement in order to alter its accounting
treatment, so long as the form and substance of the agreement is
successfully renegotiated.  If this was the purpose of the 1Q and
2Q agreement negotiations, this is not, in and of itself,
indicative of fraud.  Nevertheless, this purpose does shed a new
light on the agreements, and affects this Court's expectations as
to what details would have been most important, and necessarily
apparent, to any individual who worked on the transactions at any
level.  If Cadence employees approached Fujitsu for the specific
purpose of changing a subscription agreement into a term agreement,
or negotiated with the priority of separating term and subscription
components, then Fujitsu's desire to retain access to future
technology must have been at the very heart of these negotiations,
and not an ancillary detail.  It is difficult to imagine a scenario
in which Fujitsu's intentions would not have been communicated to

---

[5] During the conference calls noted in the previous paragraph,
Palatnik described Cadence's practices of "separating discussion
between a term license and a subscription license for some period
of time.  Going back a year, 18 months.  It used to be 30-day
separation, then it went to 45 days, then it went to one quarter,
and then it actually went to two-quarter separation.  Otherwise, in
substance, what the accountants would argue is that [it] is a
ratable arrangement."  Sept. 3, 2008 Conf. Call Tr. at 4.  This
practice of "separating" suggests that Cadence's personnel knew of
the accounting consequences of their discussion, and were taking
special measures to secure term licenses from customers who also
were interested in subscription licenses.

15

**United States District Court**
For the Northern District of California

1   everyone involved -- including, most likely, to Bushby.[6]

2   Similarly, if Cadence approached Nvidia specifically to cancel a

3   subscription agreement and replace it with a term agreement that

4   allowed Cadence to realize the revenue immediately, then everyone

5   involved must have been aware of (or deliberately reckless

6   regarding) any intention by Nvidia to retain rights under its prior

7   subscription agreement.  Perhaps Bushby believed that sufficient

8   protections or separation had been put into place to allow the

9   licenses to be classified as term licenses; however, given the size

10  of these transactions, and the importance of having these

11  transactions treated as sought-after term licenses, the Court finds

12  that it is at least as likely as not that the misclassifications

13  were the result of, at a minimum, a reckless disregard.

14      **C.   Scienter of Individual Defendants**

15      The Court has concluded that Bushby was, more likely than not,

16  involved at some level in the formation of the 1Q and 2Q

17  agreements.  The Court has further concluded that in negotiating

18  these agreements, it was a priority -- and perhaps the primary

19  purpose of the negotiations -- that the licenses be structured so

20  as to allow Cadence to recognize the revenue from the agreements

21  immediately.  From this, the Court concludes that it would be

22  plausible to infer that Bushby was at least deliberately reckless

23  regarding the term nature of the transactions.  The competing

24  inference, that he worked on these deals and innocently missed the

25  most important details, is less plausible.  There is therefore a

26

27  [6] Indeed, given that Cadence's restatement specifically stated that
    the two agreements were negotiated "in contemplation of one
    another," it is extremely unlikely that the negotiating parties,

28  and anyone to whom they reported, would not have known these
    details.  See Dec. 10 Press Release" at 10.

United States District Court
For the Northern District of California

strong inference that Bushby knew or should have known that the 1Q
and 2Q agreements were, in substance, subscription agreements at
the time that the false statements regarding Cadence's inflated
earnings were made by the other Individual Defendants.[7]  This is
sufficient to establish scienter as to Bushby under the PSLRA.

As Defendants point out, Mot. at 10 n.8, the FAC does not
claim that Bushby personally made any of the alleged misstatements,
nor that he prepared any of the statements that were ultimately
incorporated into the documents signed by the other Individual
Defendants.[8]  These statements were made by the other Individual
Defendants.  Generally, "the PSLRA requires [plaintiffs] to plead
scienter with respect to those individuals who actually made the

---

[7] In making this inference, the Court specifically notes that the
accounting practices at issue were by no means obscure to the
executives who were involved in the sales or operations-oriented
aspects of the business -- rather, the accounting distinctions
allegedly guided, and even formed the backbone of, Cadence's
business model during this period (i.e., the prioritization of term
over subscription licenses).

[8] Defendants also request that the Court dismiss Bushby from this
suit on this basis.  Mot. at 10 n.8.  However, Plaintiffs have
created a strong inference that Bushby was closely involved in
deals that were wrongly classified by Cadence's accountants, and
that he was either knowledgeable or reckless with regard to this
misclassification.  He surely knew of the importance of the proper
classification for these transactions, and he probably had control
over the information that was passed along to those within Cadence
who were responsible for classifying the transactions.  The Court
therefore finds that this is sufficient to infer, at this stage,
that Bushby substantially participated in the alleged
misstatements.  C.f. Cooper v. Pickett, 137 F.3d 616, 625 (9th Cir.
1997) (finding that plaintiff could plead violation of Section
10(b) against defendant who passed misinformation to analysts who
then released false reports); see also SEC v. Fraser, No. 09-443,
2010 U.S. Dist. LEXIS 7038, *13-15 (D. Ariz. Jan. 28, 2010) (not
for publication) ("When a corporate officer instructs a company
accountant to book fraudulent transactions, with knowledge that
those false transactions will be incorporated into the company's
financial statements, it can fairly be said that the officer
substantially participated in the 'creation, drafting, editing, or
making' of the false statements.").

United States District Court
For the Northern District of California

false statements . . . ," and Plaintiffs must therefore plead

"'facts that constitute strong circumstantial evidence of

deliberately reckless or conscious misconduct' on the part of" the

Individual Defendants who made the false statements. <u>Glazer</u>

<u>Capital Mgmt., LP c. Magistri</u>, 549 F.3d 736, 745 (9th Cir. 2008)

(quoting <u>In re Silicon Graphics</u>, 183 F.3d 970, 974 (9th Cir. 1999).

The Court finds that Plaintiffs have met this burden.

Bushby was one of only five of Cadence's executive officers,

and these deals were among the largest deals of their respective

quarters.  The deals were not routine sales calls, which happened

to be classified as term licenses as an afterthought -- rather,

Cadence most likely approached Fujitsu and Nvidia for the specific

purpose of acquiring term, and not subscription, licenses.  The

accounting mistreatment of these deals made the difference between

missing and meeting Cadence's projections for each quarter.  It is

possible that Bushby kept his knowledge or apprehension of the

transactions to himself.  However, this is no more likely than the

competing inference: that Bushby informed at least some of the

other Individual Defendants of the facts that rendered the

accounting treatment of the 1Q and 2Q agreements incorrect.  Given

the nature and context of these transactions, the inference that

Bushby knew or was reckless regarding the nature of the agreements

is incompatible with an inference that the other Individual

Defendants lacked scienter.  Under these peculiar facts, having

penetrated the Defendants' executive circle, so to speak,

Plaintiffs may support an inference that the other executive

officers were aware of certain key facts about certain key deals --

because these facts were almost certainly known to Bushby, as was

**United States District Court**
For the Northern District of California

1   their import.

2       In reaching this conclusion, the Court does not rely upon the

3   group pleading doctrine, which has been rejected by a majority of

4   district courts in this circuit and this district.  See, e.g., In

5   re Tibco Software Secs. Litig., No. 05-2146, 2006 U.S. Dist. LEXIS

6   36666, *82 (N.D. Cal. May 25, 2006) ("[C]ourts in this district are

7   increasingly finding that the group pleading doctrine is contrary

8   to the PSLRA.").  The inference of scienter against the other

9   Individual Defendants -- namely, Fister, Palatnik, and Porter --

10  does not arise from any presumption or theory of collective action

11  or collective knowledge.  Rather, it arises because of the

12  likelihood that Bushby would have told other executive officers

13  that these important deals involved factors that rendered their

14  classification as term licenses highly questionable.[9]  Having

15  weighed the competing inferences, and when considered in light of

16  the various individual factors discussed in this Court's previous

17  Order, the Court concludes that it is at least as likely as not

18  that the other Individual Defendants were aware of, or deliberately

19  reckless, regarding the facts that rendered the 1Q and 2Q

20  agreements subscription licenses, rather than term licenses.

21  Plaintiffs have therefore met their burden to support a strong

22  inference that Defendants were at least reckless with regard to the

23  nature of the 1Q and 2Q agreements, and their statements regarding

24

25

26  _____

27  [9] The Court further notes that, given the size and purpose of the
    deals, the inference that the various Individual Defendants knew of
    the transactions would be, at least, more than speculative even
28  absent Plaintiffs' allegations regarding Bushby's direct
    involvement.

1    Cadence's earnings during 1Q and 2Q of 2008.[10]

2        **D.   <u>Plaintiffs' Section 20(a) Claim</u>**

3        To plead a prima facie case under Section 20(a) of the

4    Securities Exchange Act, Plaintiffs must show: (1) "a primary

5    violation of federal securities law" and (2) "that the defendant

6    exercised actual power or control over the primary violator."

7    <u>Howard v. Everex Sys., Inc.</u>, 228 F.3d 1057, 1065 (9th Cir. 2000).

8    Defendants first argue that Plaintiffs' Section 20(a) claim must

9    fail because Plaintiffs' underlying claim fails.  Mot. at 25.  The

10   Court declines to dismiss Plaintiffs' Section 20(a) claim on this

11   basis because it concludes that Plaintiffs have successfully stated

12   an underlying claim.

13       Defendants also argue, quite succinctly, that "under Section

14   20(a), Plaintiffs must allege Defendants were 'control persons'

15   with reference to the fraudulent conduct alleged in the primary

16   violation.  But Plaintiffs' 'control' allegations are generalized,

17   conclusory, and unsupported by factual allegations.  Such

18   _____

19   [10] Defendants requested judicial notice, Docket No. 60 ("RJN"), of
     ten documents attached to a declaration submitted by Sarah A.
20   Brown, counsel for Defendants, Docket No. 59.  Because Defendants'
     Motion focuses exclusively on scienter, the Court DENIES
21   Defendants' request for judicial notice as to Cadence's stock
     prices over the relevant period.  As this Court stated in its
22   previous Order, it does not find this information to illuminate the
     questions of scienter in this case.  <u>See</u> MTD Order at 26 n.10.  The
23   Court also DENIES Defendants' request for judicial notice of
     excerpts from nine 10-Q reports because it finds this information
24   unnecessary.  These documents were submitted to refute Plaintiffs'
     allegations that Cadence had added the qualifier "sufficiently" in
25   its public representations, that its "disclosure controls and
     procedures were sufficiently effective."  FAC ¶ 67; RJN at 2-3.
26   Plaintiffs hoped that the use of this additional word may be
     indicative of fraud.  Even assuming that Cadence made this change
27   in its disclosures, the Court is not persuaded that this change
     adds any weight whatsoever to an inference of fraud.  Consequently,
28   the documents that Defendants have submitted to refute this point
     are unnecessary.

**United States District Court**
For the Northern District of California

1   'boilerplate' allegations are insufficient to state a claim." <u>Id.</u>

2   (quoting <u>In re Downey Sec. Litig.</u>, 2009 U.S. Dist. LEXIS 25007,

3   *44-46 (C.D. Cal. Mar. 18, 2009)).

4        "'Control' is defined in the regulations as 'the possession,

5   direct or indirect, of the power to direct or cause the direction

6   of the management and policies of a person . . . .'" <u>No. 84</u>

7   <u>Employer-Teamster Joint Council Pension Trust Fund v. Am. W.</u>

8   <u>Holding Corp.</u>, 320 F.3d 920, 945 (9th Cir. 2003) (quoting 17 C.F.R.

9   § 230.405).  "In order to make out a prima facie case, it is not

10  necessary to show actual participation or the exercise of power . .

11  . ." <u>Howard</u>, 228 F.3d at 1065.  Much of the FAC is directed at

12  describing, with support from confidential witnesses, the

13  Individual Defendants' roles within Cadence, in order to support

14  the inference that they possessed the proper scienter as to the 1Q

15  and 2Q agreements.  While many of these generalized descriptions do

16  not go a long way, in and of themselves, towards establishing the

17  requisite scienter, they do strongly show that Defendants performed

18  review, control, or accounting functions related to the relevant

19  transactions that were misstated, and the process by which these

20  transactions were recognized for accounting purposes.  The Court

21  concludes that Plaintiffs have met their burden to state a claim

22  under Section 20(a).

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

IV.   <u>CONCLUSION</u>

     For the reasons stated above, Defendants' Motion to Dismiss is

DENIED.


     IT IS SO ORDERED.


     Dated: March 2, 2010



                              UNITED STATES DISTRICT JUDGE