1  GIBSON, DUNN & CRUTCHER LLP
   TIMOTHY K. ROAKE, SBN 99539
2  TRoake@gibsondunn.com
   SALLY J. BERENS, SBN 218880
3  SBerens@gibsondunn.com
   1881 Page Mill Road
4  Palo Alto, California 94304
   Telephone: 650.849.5300
5  Facsimile: 650.849.5333

6  ETHAN DETTMER, SBN 196046
   EDettmer@gibsondunn.com
7  MATTHEW S. KAHN, SBN 261679
   MKahn@gibsondunn.com
8  555 Mission Street, Suite 3000
   San Francisco, California 94105
9  Telephone: 415.393.8200
   Facsimile: 415.393.8306

10
   Attorneys for Defendants
11 CADENCE DESIGN SYSTEMS, INC., MICHAEL
   J. FISTER, KEVIN S. PALATNIK, WILLIAM
12 PORTER, and KEVIN BUSHBY

13                   UNITED STATES DISTRICT COURT

14            FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                     SAN FRANCISCO DIVISION

16

17
   In re CADENCE DESIGN SYSTEMS, INC.        CASE NO. C-08-4966 SC
18 SECURITIES LITIGATION
                                             CLASS ACTION
19
   ──────────────────────────────           DEFENDANTS' MOTION FOR PARTIAL
20                                           SUMMARY JUDGMENT AND FOR
                                             JUDGMENT ON THE PLEADINGS
21
   This Document Relates To:                 *[Declarations of John Wall, Wade Loo and
22                                           Matthew S. Kahn In Support and Proposed
                                             Order Filed Concurrently Herewith]*
23    ALL ACTIONS.
                                             Date:   June 25, 2010
24                                           Time:   10:00 a.m.
                                             Place:  Courtroom 1, 17th Floor
25                                                   450 Golden Gate Avenue
                                                     San Francisco, California
26                                           Judge:  The Honorable Samuel Conti
27

28

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

Page

I.    ISSUES TO BE DECIDED ................................................................................ 1

II.   INTRODUCTION ............................................................................................... 1

III.  SUMMARY OF ARGUMENT ........................................................................... 3

IV.   STATEMENT OF FACTS .................................................................................. 5

    A.   Cadence Restated Material Transactions With Two Entities For The First And Second Quarters Of 2008. ........................................................ 5

    B.   The Court Granted Defendants' First Motion To Dismiss Plaintiff's Consolidated Complaint, Because The Complaint Failed Adequately To Tie Any Defendant To The Accounting Determinations At Issue .............. 6

    C.   The Court Denied Defendants' Second Motion To Dismiss Based Largely On Plaintiff's Allegations Related To Recognition Of Revenue On An Alleged Q2 2008 Nvidia Agreement. ................................................ 7

    D.   Plaintiff's Allegations Regarding Nvidia Are Patently And Irrefutably False. ......................................................................................................... 9

V.    ARGUMENT ..................................................................................................... 10

    A.   Defendants Are Entitled To Partial Summary Judgment, Because Plaintiff Can Adduce No Evidence Of Scienter Relevant To The Actual Restated Q2 Agreement. ........................................................................... 10

    B.   Judgment On The Pleadings Should Be Granted In Favor Of Defendants, Because Plaintiff's Remaining Claims Do Not Satisfy The PSLRA's Heightened Pleading Requirements. ......................................................... 12

        1.   The PSLRA Requires A Heightened Pleading Standard For Scienter. ..................................................................................... 14

        2.   The FAC Misidentifies The Actual Restated Q2 Agreement, And Plaintiff's Reliance On The Wrong Transaction Undercuts Any Inference That Mr. Bushby Was Involved In the Q1 Agreement. ................ 15

        3.   The FAC's Allegations Regarding A Practice Of Renegotiating Contracts Is Based On Allegations Regarding The Nvidia Contract. ................................................................................. 17

        4.   Because The Scienter Allegations Regarding Mr. Bushby Are False, No Scienter Can Be Imputed To Other Senior Executives. ............... 18

        5.   The Falsity Of CW15's Alleged Report Casts Doubt On Plaintiff's Entire Complaint. ............................................................... 18

    C.   Plaintiff's Section 20(a) Claim Is Derivative Of Its Section 10(b) Claim And Must Be Dismissed. ....................................................................... 19

1

**TABLE OF CONTENTS**
**[Continued]**

2

3
Page

4

     D.     Plaintiff Cannot Subvert The Purpose Of The PSLRA By Using Patently
False Allegations As A Vehicle To Avoid Dismissal And To Gain
Discovery Into Unpled Allegations............................................................................ 20

5

VI.     CONCLUSION ...................................................................................................................... 21

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

MOTION FOR PARTIAL SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS     CASE NO. C-08-4966

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).........................................................................................................10

*Ashcroft v. Iqbal*,
566 U.S. __, 129 S. Ct. 1937 (2009)..............................................................................15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).........................................................................................................15

*Campo v. Sears Holding Corp.*,
2010 U.S. App. LEXIS 7043 (2d Cir. Apr. 6, 2010)............................................18, 21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).........................................................................................................10

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994).........................................................................................................18

*Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004)..................................................................................11, 12

*Gompper v. VISX, Inc.*,
298 F.3d 893 (9th Cir. 2002).........................................................................................12

*Heliotrope General Inc. v. Ford Motor Co.*,
189 F.3d 971 (9th Cir. 1999).........................................................................................12

*Horizon Asset Mgmt v. H&R Block, Inc.*,
580 F.3d 755 (8th Cir. 2009).........................................................................................18

*In re Daou Sys. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005).......................................................................................10

*In re Downey Sec. Litig.*,
2009 U.S. Dist. LEXIS 83443 (C.D. Cal. Aug. 21, 2009)..........................................18

*In re Silicon Graphics Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999).........................................................................................14

*In re The Clorox Co. Sec. Litig.*,
238 F. Supp. 2d 1139 (N.D. Cal. 2002) ............................................11, 12, 20, 21

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002).......................................................................................11

*Medhekar v. United States Dist. Ct.*,
99 F.3d 325 (9th Cir. 1996)....................................................................................11, 21

*Metzler Inv. GmbH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008).......................................................................................15

*Miller v. Champion Enters., Inc.*,
346 F.3d 660 (6th Cir. 2003)....................................................................................11, 20

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003).........................................................................................19

*Pacific Investment Management Co. LLC. v. Mayer Brown LLP*,
__ F.3d __, 2010 WL 1659230 (2d Cir. Apr. 27, 2010) ............................................18

Gibson, Dunn &
Crutcher LLP

1

**TABLE OF AUTHORITIES**
**[Continued]**

2

3
Page

4
*Provenz v. Miller,*
   102 F.3d 1478 (9th Cir. 1996).................................................................... 10

5
*SG Cowen Sec. Corp. v. United States Dist. Ct.,*
   189 F.3d 909 (9th Cir. 1999)................................................................ 11, 20

6
*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,*
   552 U.S. 148, 159 (2008) ............................................................................ 18

7

8
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308, 127 S. Ct. 2499 (2007) ........................................................ 15

9
*Zucco Partners, LLC v. Digimarc Corp.,*
   552 F.3d 981 (9th Cir. 2009).......................................................... 14, 16, 19

10
**Statutes**

11
15 U.S.C. § 78u-4(b)(2) .................................................................................... 15

12
**Rules**

Fed. R. Civ. P. 56(c)............................................................................................ 9

13
**Other Authorities**

14
H.R. Conf. Rep. No. 104-369 (1995).................................................................. 11

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that on June 25, 2010, at 10:00 a.m., or as soon thereafter as counsel may be heard, in the United States District Court for the Northern District of California, San Francisco Division, Courtroom 1, located at 450 Golden Gate Avenue, San Francisco, California, 94102, Cadence Design Systems, Inc. ("Cadence"), Michael J. Fister, Kevin S. Palatnik, William Porter, and Kevin Bushby (collectively "Defendants") will and hereby do move this Court for an order granting them partial summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure and dismissing Plaintiffs' First Amended Complaint for Violation of the Federal Securities Laws ("Amended Complaint" or "FAC"), under Rule 12(c) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

This Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of John Wall, the Declaration of Wade Loo, the Declaration of Matthew S. Kahn, the pleadings, records, and papers on file with this Court, all matters upon which this Court may take judicial notice, and such oral arguments as the Court may receive.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      ISSUES TO BE DECIDED

1.      Are Defendants entitled to partial summary judgment as to alleged misstatements concerning recognition of revenue for a contract with Nvidia Corporation ("Nvidia"), where Plaintiff's allegations as to those alleged misstatements are demonstrably false?

2.      Once partial summary judgment is granted, are Defendants entitled to judgment on the pleadings where the operative complaint's remaining allegations fail to plead Defendants' scienter with the requisite particularity pursuant to Federal Rule of Civil Procedure 9(b) and the PSLRA?

### II.      INTRODUCTION

From the outset, Plaintiff Alaska Electrical Pension Fund ("Alaska Electrical" or "Plaintiff") has struggled to present this Court with allegations sufficient to establish scienter.  Cadence restated its financial statements for the first and second quarters of 2008 as a result of its later discovery that two agreements, one in the first quarter (the "Q1 Agreement") and another in the second quarter (the

"Q2 Agreement"), were accounted for incorrectly and that revenue was recognized prematurely.  To succeed on its claim, Alaska Electrical must plead and prove that Defendants knew that the first and second quarter financial statements were false when they were issued.  The Court initially dismissed the then-operative complaint, but after considering new allegations set forth in the Amended Complaint, the Court held that Alaska Electrical had "nudged" the allegations of scienter past the PSLRA's pleading hurdle.  In its Opinion, the Court emphasized the new allegations regarding the supposed involvement of one of the individual defendants in the negotiation of a Q2 contract with Nvidia that Alaska Electrical claimed was the Q2 Agreement.  But irrefutable evidence demonstrates that Alaska Electrical's claims about the Q2 Agreement, and with it the Amended Complaint's scienter allegations, are false.  The alleged Nvidia contract the Amended Complaint described was not the actual restated Q2 Agreement, *no revenue on any Q2 contract with Nvidia was subsequently restated*, and Alaska Electrical implicitly concedes that it does not even know the identity of the *actual* counterparty to the restated transaction.

In its most recent attempt to plead scienter, Alaska Electrical attributed to one of its "confidential witnesses" its assertion that the restated Q2 Agreement was a software contract with Nvidia for which revenue was improperly recognized "up front."  Alaska Electrical claims that this unidentified person supplied "details" regarding the Nvidia transaction and the involvement of one of the individual defendants.  The undisputed facts are to the contrary.  Cadence's December 2008 restatement of $12 million in revenue in connection with the Q2 Agreement did not relate to any contract with Nvidia (in Q2 or otherwise).  Thus, Alaska Electrical's allegations about revenue recognition on this supposed Q2 Nvidia contract are false, as are its allegations of  scienter as to Cadence's Q2 financial statements.  The Court should grant Defendants summary judgment on Plaintiff's claims related to misstatements made in connection with the Q2 2008 financial statements.

Because the Court relied heavily on these false allegations in denying Defendants' second motion to dismiss, Plaintiff's remaining allegations regarding scienter suffer from the same infirmities identified by the Court in its Order granting Defendant's first motion to dismiss the Consolidated Amended Complaint [Dkt #39] (the "Consolidated Complaint").  The indisputable facts show that either the confidential witness supplied Alaska Electrical with materially wrong

Gibson, Dunn & Crutcher LLP

1  information or that Alaska Electrical incorrectly reported his or her supposed statements in the

2  Amended Complaint.  Without these false allegations about revenue recognition on an Nvidia

3  contract, Plaintiffs' First Amended Complaint for Violations of the Securities Laws ("FAC") is no

4  better than the previously dismissed complaint, and the Court should grant Defendants judgment on

5  the pleadings.

6                          **III.    SUMMARY OF ARGUMENT**

7          On September 11, 2009, the Court issued an Order granting Defendants' motion to dismiss

8  (the "September 11, 2009 Order"), concluding that the Consolidated Complaint failed to plead

9  scienter because "none of the pled facts supported an inference that could 'bridge the gap' between

10  the key details of the [restated] agreements and the Individual Defendants," and none of Alaska

11  Electrical's confidential witnesses "specifically tie[d] any Defendant to the accounting

12  determinations at issue."  Dkt #48 at 18, 25-26.

13         Alaska Electrical then filed the Amended Complaint, which contained, *inter alia*, new

14  allegations from Confidential Witness 15 ("CW15") intended to supplement Plaintiff's scienter

15  allegations.  FAC ¶ 110 [Dkt #49].  CW15, who Plaintiff alleges is a former Sales Director "who

16  worked closely with senior sales executives at Cadence" (*id.* ¶ 51(o)), is alleged to have identified

17  Nvidia as the counter-party to the restated Q2 Agreement, and provided significant details regarding

18  Defendant Bushby's alleged involvement in the accounting treatment of that deal:

19         According to CW15, Bushby specifically gave instructions to VP of Sales Mike Ellow
           who communicated Bushby's instructions to Chris Cronk and Neil Zaman, the
20         Account Executives who handled the Nvidia account, to re-structure the transaction
           with Nvidia that was already in place because Cadence needed to 'count this deal as
21         revenue' in that quarter.  In essence, Bushby wanted to be able to recognize the
           revenue on the Nvidia deal all at once, instead of ratably.  As a result of the restructure
22         directed by Bushby, Cadence returned the $9 million cash to Nvidia that had already
           been paid as part of the multiple-element agreement, and entered into another contract,
23         although Cadence still remained "on the hook" to deliver the new hardware systems.

24  *Id.* ¶ 110.  CW15's allegations, in turn, formed the primary basis for Alaska Electrical's new scienter

25  allegations related to the Q2 Agreement.  *See id.* ¶ 18 ("In 2Q08, to meet the Company's already

26  lowered forecast, defendants again manipulated the Company's financials by improperly recognizing

27  $12 million in Product Revenue upfront on a Subscription license it falsely characterized as a Term

28

license.  This deal involved Nvidia, and was orchestrated specifically by Bushby to restructure a multiple-element transaction in such a way that it would allow a lump-sum payment upfront.").

In denying Defendants' second motion to dismiss (the "March 2, 2010 Order"), the Court relied heavily on the new allegations provided by CW15.  In holding that Alaska Electrical had adequately pled scienter for the first time in relation to the Q2 Agreement, the Court found:

> that the level of detail provided by CW15, coupled with the coherence and plausibility of the allegations, provide an adequate basis for reliability at this stage of the litigation.  CW15's statements nudge Plaintiffs' allegations as to Bushby's involvement beyond the realm of mere speculation.

Dkt #71 at 8-9.  CW15's allegations then became the primary new factual allegations cited by the Court in reaching its conclusion that the Amended Complaint sufficiently "bridged the gap" between Defendants and the details of the accounting decisions surrounding the alleged Q2 Nvidia agreement. The Court found that "[t]he level of detail provided by [CW15's] statement lends his account a significant amount of credibility."  *Id.* at 8.

But the indisputable facts show that Alaska Electrical's basic claim about revenue recognition and the supposed Q2 Nvidia agreement is false.  Alaska Electrical claims that a Q2 2008 agreement with Nvidia was manipulated such that revenue was recognized immediately up front, rather than ratably over time.  FAC ¶ 12.  The evidence filed along with this motion demonstrates, to the contrary, that:

- No revenue was recognized in Q2 2008 related to the Nvidia agreement that Plaintiff's Amended Complaint purports to describe.

- No revenue from Nvidia was restated as part of the restatement of its previously filed financial statements Cadence finalized in December 2008 (the "Restatement").

In short, the **key** allegations contained in the FAC relating to Cadence's restatement of the Q2 Agreement are false.  Because Alaska Electrical cannot contradict the testimony and evidence submitted with this motion, Defendants are entitled to summary judgment as to the portion of its claims related to any misstatements allegedly made in connection with the Q2 financial statements.

Moreover, without the Nvidia allegations, the FAC pleads scienter no better than the previously dismissed Consolidated Complaint, and the PSLRA prevents Alaska Electrical from

1 proceeding on a markedly deficient operative complaint.

2      Nor should Plaintiff be permitted to conduct discovery to correct these demonstrably false

3 allegations in an attempt to devise some new theory of scienter and identify the true counterparty to

4 the Q2 Agreement.  The PSLRA was enacted precisely to prevent plaintiffs with unsupported claims

5 from seeking potentially expensive and burdensome discovery for the purpose of finding a basis for a

6 claim.  Permitting such an end run around the heightened pleading standards of the PSLRA would

7 undermine its protections against exactly this sort of abuse.

### IV.    STATEMENT OF FACTS

### A.    Cadence Restated Material Transactions With Two Entities For The First And Second Quarters Of 2008.

On October 22, 2008, Cadence announced that it was postponing the release of its third

quarter financial results and reviewing revenue recognition related to a customer contract signed in

Q1 2008.  FAC ¶ 132; Ex. 34.  Cadence initiated the review after "preliminarily determining during

its regular review of the third quarter results that approximately $24 million of revenue" from one

contract should have been recognized over the duration of the contract, rather than recognized up

front in Q1 2008.  FAC ¶ 132.  Cadence announced that it expected to restate its financial statements

for the first half of 2008 to "correct the revenue recognition."  *Id.*

On December 10, 2008, Cadence announced its third quarter 2008 results, completion of the

previously announced review conducted by Cadence's Audit Committee along with independent

counsel and other advisors, and the restatement of the first two quarters of 2008.  FAC Ex. 39.  The

Audit Committee and its independent advisors determined that revenue had been recognized

improperly for the Q1 and Q2 Agreements in the first two quarters of 2008, and that such revenue

should have been recognized over the duration of those agreements, rather than up front.  *Id.*

Cadence provided the following detail regarding the Q1 Agreement:

> During the first quarter of 2008, Cadence executed a term license arrangement with a
> customer and, during the third quarter of 2008, Cadence executed a subscription
> license arrangement with the same customer.  As part of its regular quarterly review
> process for the third quarter, Cadence identified certain factors that, when evaluated
> together, indicated that the software arrangements executed with this customer both in
> the first quarter and in the third quarter were negotiated in contemplation of one
> another.

1   *Id.* Cadence determined that the revenue relating to the term license arrangement executed in the first

2   quarter should be recognized over the duration of the arrangement, instead of entirely up front. *Id.*

3   This accounting adjustment was made only after Cadence accounting personnel learned additional

4   information regarding the Q1 and Q3 contracts during the third quarter contract review and

5   subsequent investigation. *Id.*

6   As part of its subsequent remediation efforts, Cadence reviewed other transactions, including

7   one that occurred during Q2 2008, in which a Cadence customer "concurrently cancelled a

8   subscription arrangement and executed both a term license arrangement and hardware arrangement."

9   *Id.* After its review of the Q2 Agreement, "Cadence determined that, despite the cancellation of the

10  subscription arrangement, the customer did not intend to substantively cancel its right to access

11  future new technology . . . at a later time." *Id*. As a result, Cadence determined that the $12 million

12  in revenue initially recognized up front would be recognized over the duration of the Q2 Agreement.

13  *Id.* This adjustment was made only after Cadence accounting personnel learned this additional

14  information regarding the Q2 Agreement. *Id.*

15  As one analyst report attached to the Amended Complaint noted, these were "modest"

16  restatements with an "isolated" impact, and recognizing the revenue over the term of the agreements

17  instead of up front had the beneficial result of "improving backlog." *See* FAC, Ex. 43 at 2.

18  **B.    The Court Granted Defendants' First Motion To Dismiss Plaintiff's Consolidated
        Complaint, Because The Complaint Failed Adequately To Tie Any Defendant To**

19  **The Accounting Determinations At Issue.**

20  In this Court's September 11, 2009 Order on Defendants' original motion to dismiss, the

21  Court held that the Consolidated Complaint failed to allege adequately that Defendants acted with

22  scienter, because it did not "specifically tie[] any Defendant to the accounting determinations at

23  issue." Dkt #48 at 18. Alaska Electrical initially attempted to plead scienter by alleging (1) GAAP

24  violations and internal accounting policy violations related to the upfront, rather than ratable,

25  accounting for two agreements in Q1 and Q2 of 2008; (2) the resignation of several Cadence

26  executives; and (3) that a motive existed to create a "rosy picture" of Cadence's financial state to

27  improve the chances of acquiring Mentor Graphics Corporation ("Mentor"). *See, e.g.*, Dkt #39

28  ¶¶ 54-56, 66-73, 92-97, 105-09, 123-39. That pleading did not even identify the counterparty to the

restated Q2 Agreement.  *Id.* ¶ 135.  This Court held that such allegations did not establish a strong

inference that Defendants were aware of the accounting errors in Cadence's Q1 and Q2 2008

financial statements at the time they were made.  Dkt #48 at 25.  The Court also held that Alaska

Electrical's alleged confidential witnesses (or "CWs") did not "provide any concrete allegations that

Individual Defendants actually knew about the accounting errors [in connection with the recognition

of revenue upfront], or that they were familiar with the key details of [the relevant customer

agreements], such that they could have identified them as subscription contracts."  *Id.* at 20.  In short,

the Court found Alaska Electrical's scienter allegations to be "fatally undermined by Plaintiff's

inability to connect any of the Individual Defendants, or any particular person at Cadence, with the

1Q and 2Q agreements, except in remote or speculative ways that may or may not have entailed

knowledge of the specific facts that rendered the accounting classifications incorrect."  *Id.* at 20.

The Court noted the type of factual allegations that might overcome these deficiencies:

Alaska Electrical "must plead facts that suggest that Defendants were aware that it was inappropriate

to classify the 1Q and 2Q agreements as term licenses."  *Id.* at 16.  Specifically with regard to the

restated agreement in the Q2 2008 financial statements the Court stated that:

> Plaintiffs must allege facts that suggest that Defendants knew (or at least suspected)
> that the licensee intended to retain certain rights to use future technology, which it had
> enjoyed under a subscription license[] that it simultaneously cancelled.

*Id.*  Absent such details, amendment would be futile:

> Plaintiffs' allegations must, when taken as a whole, give rise to a "strong inference"
> that Defendants were aware of these details—otherwise, Defendants would have no
> way of knowing that the licenses were improperly classified.

*Id.* at 16-17.  Thus, in order to amend its complaint successfully and survive a second motion to

dismiss, Alaska Electrical had to come up with new allegations that demonstrated that Defendants

were aware that the Q1 and Q2 Agreements were improperly accounted for at the time that the

financial statements were published.

**C.    The Court Denied Defendants' Second Motion To Dismiss Based Largely On Plaintiff's Allegations Related To Recognition Of Revenue On An Alleged Q2 2008 Nvidia Agreement.**

To address these pleading deficiencies, Alaska Electrical turned to CW15, a "former Sales

Director" who "worked closely" with unidentified "senior sales executives."  FAC ¶¶ 51(o), 110.

Gibson, Dunn &
Crutcher LLP

CW15's allegations were critical to Alaska Electrical's attempt to address the Court's concerns. The new "facts" purportedly provided by CW15 included the identification of Nvidia as the counterparty to the restated Q2 Agreement, the details and structure of the Nvidia agreement and the accounting issues presented by it, and allegations linking Defendant Bushby to the alleged improper decision to recognize revenue related to the Nvidia agreement immediately instead of ratably. FAC ¶ 110. Indeed, in their response to Defendants' second motion to dismiss, Alaska Electrical explicitly identified CW15's allegations from paragraph 110 of the FAC as its answer to the Court's concerns regarding scienter:

> Plaintiffs' new allegations in the FAC address and indeed cure all of the Court's earlier concerns providing detailed facts linking defendants to both the 1Q08 and 2Q08 transactions and alleging defendants' knowledge and negotiation of the restated transactions….With respect to the 2Q08 transaction, the FAC now also provides the details of the 2Q08 restated transaction identifying the customer (Nvidia), the amount ($12 million) of overstatement,[1] and that defendant Bushby ordered the restructuring of the deal so that a lump sum revenue could be recorded upfront in 2Q08 to make up for the revenue gap. ¶ 110.

Opposition to Defendants' Motion to Dismiss First Amended Complaint [Dkt #62] at 1-2.

This Court then relied on these new allegations in concluding that Alaska Electrical satisfied the heightened pleading standards imposed by the PSLRA. Noting that "[n]o single new allegation in the FAC constitutes a 'smoking gun' that, taken alone, supports a strong inference of scienter," the Court found that, unlike the Consolidated Complaint, the Amended Complaint "ties Bushby—one of Cadence's executive officers—directly to the 2Q agreement." Dkt #71 at 6. The Court determined that Alaska Electrical sufficiently pled these ties based on CW15's purported statements, including his or her alleged claim that "Bushby specifically gave instructions to … the Account Executives who handled the Nvidia account, to re-structure the transaction with Nvidia that was already in place because Cadence needed to 'count this deal as revenue' in that quarter." *Id.* at 8 (quoting FAC ¶ 110). The Court found that the "level of detail" provided by CW15 lent his account of the transaction "a significant amount of credibility." *Id.* The Court concluded that "the level of detail provided by

---

[1] The amount of overstatement of revenue in Q2 2008 related to the Q2 Agreement had been disclosed publicly in Cadence's Form 10-Q/A for the second quarter of 2008 filed on December 11, 2008. *See* FAC Ex. 45 [Dkt #50-3] at 6, subpart B.

CW15, coupled with the coherence and plausibility of the allegations, provide an adequate basis for the reliability at this stage of the litigation." *Id.*

    **D.**    **Plaintiff's Allegations Regarding Nvidia Are Patently And Irrefutably False.**

    Alaska Electrical alleged that:

> In 2Q08, to meet the Company's already lowered forecast, defendants again manipulated the Company's financials by improperly recognizing $12 million in Product Revenue upfront on a Subscription license it falsely characterized as a Term license. This deal involved Nvidia, and was orchestrated specifically by Bushby to restructure a multiple-element transaction that had already been in place in 4Q07. [FAC] ¶110. To close the revenue gap, Bushby instructed his Sales Account Executives to restructure the multiple-element transaction in such a way that it would allow a lump-sum revenue upfront.

FAC ¶ 18. The FAC further alleged that "[a]s a result of the restructure directed by Bushby, Cadence returned the $9 million cash to Nvidia that had already been paid as part of the multiple-element agreement, and entered into another contract, although Cadence still remained "on the hook" to deliver the new hardware systems." FAC ¶ 110.

    Cadence did enter into a multiple element arrangement with Nvidia in Q4 2007, and it returned $6.9 million to Nvidia in Q2 2008. Declaration of John Wall ("Wall Decl.") ¶ 8; *compare* FAC ¶ 110. However, assuming he or she was accurately quoted, CW15 had the crucial facts wrong: no revenue was recognized on that arrangement until ***Q2 2009***, not in Q2 2008 as alleged. Wall Decl. ¶ 8. Revenue was delayed in connection with that arrangement, because one element of the arrangement was not delivered until June 2009. *Id.*

    It is perhaps not surprising that a former manager who reported to unidentified "sales executives" would have his or her facts wrong. Contrary to Plaintiff's Amended Complaint and the supposed confident assertions of CW15, the agreement referenced in Cadence's disclosure regarding the restatement of its Q2 2008 Form 10-Q did not involve Nvidia, but rather another Cadence customer. *Id.* ¶ 7; Declaration of Wade Loo ("Loo Decl.") ¶ 4. Thus, the Amended Complaint's identification of Nvidia as the counterparty to that transaction (*see* FAC ¶¶ 18, 110) is false.[2]

---

[2] Alaska Electrical implicitly concedes it does not even know the name of the counterparty to the actual, restated Q2 Agreement. Declaration of Matthew S. Kahn, Ex. X at 2 n.1. After having been repeatedly advised by briefs in support of Defendants' motion to dismiss and recent

                                                                     [Footnote continued on next page]

CW15's purported claims and Alaska Electrical's allegations regarding revenue recognition in connection with the supposed Q2 Nvidia contract, and Plaintiff's assertion that revenue recognition on this contract was adjusted as part of the restatement, are wrong, plain and simple.

## V.   ARGUMENT

### A.   Defendants Are Entitled To Partial Summary Judgment, Because Plaintiff Can Adduce No Evidence Of Scienter Relevant To The Actual Restated Q2 Agreement.

Summary judgment is proper when the pleadings and evidence demonstrate that "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c).  The "mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient;  there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Where the plaintiff bears the burden of proof, a defendant seeking summary judgment need only show that there is an absence of evidence to support any element of the case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

In order to succeed in its 10b-5 claim as to the alleged misstatements and omissions made in connection with the Q2 2008 financial statements, Plaintiff must demonstrate: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005).  As the Court held in its September 11, 2009 Order, "[t]he 'required state of mind' for establishing securities fraud is the knowing, intentional, or deliberately reckless disclosure of false or misleading statements." Dkt #48 at 14 (citing *Daou*, 411 F.3d at 1014-15). "[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996).  Instead, to prove scienter, Alaska Electrical must establish that Defendants "were aware that it was inappropriate to classify the 1Q and 2Q agreements as term licenses" at the time the accounting decisions were made.  Dkt #48 at 16.

---

[Footnote continued from previous page]
conversations that the Amended Complaint was wrong, its counsel complained that Defendants had not told them "which customer, if not Nvidia, was the customer associated with the 2Q08 restated transaction." *Id.*

Alaska Electrical's only scienter allegations related to the Q2 2008 restated Form 10-Q are directed to a purported Nvidia agreement in connection with which $12 million in revenue was supposedly overstated. *See* FAC ¶¶ 18, 110. As the Court noted, "the crucial detail that rendered Cadence's initial accounting treatment of this agreement erroneous was the fact that Nvdia intended to retain certain rights to use future technology, which Nvidia had enjoyed under the subscription license that it simultaneously cancelled." Dkt #71 at 6. But this description relates to the Q2 Agreement with another customer, not Nvidia. Wall Decl. ¶¶ 6-8. Cadence did not overstate revenue from an Nvidia transaction. *Id*. ¶¶ 7-8. Instead, the restatement modified the accounting treatment for a completely separate customer agreement. *Id*.; Loo Decl. ¶ 4.

Because Alaska Electrical's theory of the case is demonstrably wrong, and the only scienter allegations it has made relate to an agreement for which revenue was never mistakenly recognized or restated, Alaska Electrical cannot prove scienter as to any misstatement related to the Q2 2008 Form 10-Q and cannot remedy its error through an after the fact attempt to discover some basis for its claims. Further, it is not proper for Alaska Electrical to use these false allegations to obtain discovery on additional matters. *Medhekar v. United States Dist. Ct.*, 99 F.3d 325, 328 (9th Cir. 1996) ("Congress clearly intended that complaints in these securities actions should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed").[3] The PSLRA limits Alaska Electrical to the only theory of the case that has survived a motion to dismiss. *Clorox*, 238 F. Supp. 2d at 1143.

---

[3] Allowing Alaska Electrical to change course and argue an entirely new theory of liability that has never been subjected to the PSLRA's heightened pleading requirements would defeat Congress's goal in enacting the PSLRA and allow one of the "'countless fishing expeditions' which the PSLRA was designed to deter." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087 (9th Cir. 2002) (citation omitted). Not only is it improper for Plaintiff to use its false allegations as an excuse for such a fishing expedition, but it is also improper for Plaintiff to use this case as an excuse to burden and harass Defendants and third parties with abusive discovery. "The PSLRA was enacted in part to curb abusive discovery." *In re The Clorox Co. Sec. Litig.*, 238 F. Supp. 2d 1139, 1143 (N.D. Cal. 2002), *aff'd sub nom. Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125 (9th Cir. 2004); *see also SG Cowen Sec. Corp. v. United States Dist. Ct.*, 189 F.3d 909, 911 (9th Cir. 1999) (explaining the PSLRA was passed in response to, among other things, the abuse of the discovery process to coerce settlement); *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 691 (6th Cir. 2003) (PSLRA "operates to prevent plaintiffs with baseless claims from squeezing a nuisance settlement from an innocent defendant"). Congress passed the PSLRA after concluding that "Plaintiffs were using the threat of extensive discovery to force settlements on meritless claims, and sought to create a higher

[Footnote continued on next page]

Gibson, Dunn & Crutcher LLP

MOTION FOR PARTIAL SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS          CASE NO. C-08-4966

1    Partial summary judgment should be entered for Defendants on this claim.

2    **B.      Judgment On The Pleadings Should Be Granted In Favor Of Defendants,
         Because Plaintiff's Remaining Claims Do Not Satisfy The PSLRA's Heightened
3        Pleading Requirements.**

4        Judgment on the pleadings is appropriate when a plaintiff's complaint fails to meet the

5    pleading standards established by the PSLRA. *See Clorox*, 238 F. Supp. 2d at 1142 (citing

6    *Heliotrope General Inc. v. Ford Motor Co.*, 189 F.3d 971, 979 (9th Cir. 1999)). "[T]he heightened

7    pleading standard under the PSLRA means that, 'when determining whether the plaintiffs have

8    shown a strong inference of scienter, the court must consider all reasonable inferences to be drawn

9    from the allegations, including inferences unfavorable to the plaintiffs.'" *Employers Teamsters*, 353

10   F.3d at 1134 (*citing Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002)).

11       Because the evidence presented in this motion establishes the falsity of the primary new

12   allegations that allowed Alaska Electical to overcome the Court's misgivings regarding scienter and

13   "nudge" their complaint past the pleading challenge, Alaska Electrical's scienter theory is likewise

14   undermined, and the Amended Complaint should now be dismissed with prejudice in its entirety.[4]

15       As noted above, this Court dismissed Alaska Electical's Consolidated Complaint because it

16   did not "specifically tie[] any Defendant to the accounting determinations at issue."  Dkt #48 at 18.

17

18   [Footnote continued from previous page]
         pleading bar in order to protect companies from the threat of pointless, expensive discovery."
19       *Clorox*, 238 F. Supp. 2d at 1143; *see also* H.R. Conf. Rep. No. 104-369, at 37 (1995), reprinted in
         1995 U.S.C.C.A.N. 730, 1995 WL 709276 (recognizing that the "threat that the time of key
20       employees will be spent responding to discovery requests, including providing deposition
         testimony, often forces coercive settlements); *id.* at 31 (securities plaintiffs may "abuse the
21       discovery process to impose costs so burdensome that it is often economical for the victimized
         party to settle.").
22

23   [4] Defendants incorporate by reference their Motion to Dismiss First Amended Complaint [Dkt #57]
         and the memoranda filed in support of that motion ("Motion to Dismiss II").  In that motion,
24       Defendants argued that Plaintiff's factual allegations and conclusory statements implying that
         Nvidia was the counterparty to the Q2 Agreement were inconsistent and implausible.  *See, e.g.*,
25       Motion to Dismiss II at 15:23-27 ("The FAC contains CW15's speculation that the restatement
         resulted from a restructured deal with Nvidia, in which Cadence allegedly cancelled a 2007 deal,
26       refunded $9 million in cash, and "entered into another contract," which somehow became a $12
         million restatement.  FAC ¶ 110.  There is no factual allegation that CW15 was involved with, or
27       otherwise had any personal knowledge regarding, an Nvidia deal, let alone the restated deal.");
         *see also id.* at 3:18-20, 14:24-15:3, 15:6-8, 15:12-13, 15:17-19, 22:14-17, and 24 n.12;
28       Defendant's Reply Brief in Support of their Motion to Dismiss First Amended Complaint [Dkt
         #65] at 6:11-18, 6 n.4.

Gibson, Dunn &
Crutcher LLP

1   Noting that Alaska Electrical did not "provide any concrete allegations that Individual Defendants

2   actually knew about the accounting errors [in connection with the recognition of revenue upfront], or

3   that they were familiar with the key details of [the relevant customer agreements], such that they

4   could have identified them as subscription contracts," the Court held that the Consolidated

5   Complaint's scienter allegations were "fatally undermined by Plaintiffs' inability to connect any of

6   the Individual Defendants, or any particular person at Cadence, with the 1Q and 2Q agreements,

7   except in remote or speculative ways that may or may not have entailed knowledge of the specific

8   facts that rendered the accounting classifications incorrect," a deficiency which "leaves a gap, for

9   which Plaintiffs provide little more than motive and opportunity to bridge." *Id.* at 20, 25.

10       Alaska Electrical was able to satisfy this Court's concerns by adding a number of new

11   allegations to the Amended Complaint.  In its order, the Court stated that "[n]o single new allegation

12   in the FAC constitutes a 'smoking gun' that, taken alone, supports a strong inference of scienter."

13   Dkt #71 at 6.  However, the March 2, 2010 opinion recounted "those particular allegations that, when

14   considered together, can convincingly contribute to the conclusion that the inference of fraud or

15   reckless conduct is at least as likely as the inference of negligence or innocent mistake." *Id.*  It then

16   discussed three areas in which the Amended Complaint's new allegations purportedly demonstrated

17   the required strong inference of scienter.  *First*, the Court noted that "the FAC ties Bushby—one of

18   Cadence's executive officers—directly to the 2Q agreement, and additional allegations suggest that

19   Bushby was *likely* involved in the 1Q agreement, as well.[5]  Dkt #71 at 6-7 (italics supplied).

20   *Second*, "The FAC puts more emphasis than did the CAC on Cadence's practice of renegotiating

21   existing subscription contracts in order to realize greatly increased short-term revenue."  Dkt #71 at

22   12.  *Third*, the Court concluded that, based on the allegations regarding Mr. Bushby's "likely"

23   involvement in the Q1 Agreement and CW15's claims regarding his involvement in the Q2

24   _____

25   [5] The opinion does not specifically identify the other allegations that supposedly demonstrated Mr.
     Bushby's involvement in a transaction with a Japanese customer, other than a reference to a
26   "problematic" allegation by another confidential witness that supported an "inference" that Mr.
     Bushby might have been involved in that Q1 Agreement.  Dkt #71 at 9-10.  And, of course, mere
27   "involvement" in the Q1 Agreement is not indicative of scienter without some allegation to
     "bridge the gap" to the underlying facts that required the change in accounting.  Dkt #48 at 18,
28   25-26.

Agreement, "it would be plausible to infer that Bushby was at least deliberately reckless regarding the term nature of the transactions." Dkt #71 at 16.  Moreover, the Court found that it was plausible that "Bushby informed at least some of the other Individual Defendants of the facts that rendered the accounting treatment of the 1Q and 2Q agreements incorrect"—in effect finding that other senior executives' scienter was derivative of Mr. Bushby's.  *Id.* at 18-20.

The Court was misled.  Each of these allegations has, as its foundation, the false allegation that Cadence recognized $12 million in up front revenue in connection with an agreement with Nvidia in Q2 2008.  Only the false claims regarding a purported Nvidia contract were said to be part of the "practice of renegotiating existing subscription contracts in order to realize greatly increased short term revenue"—no claim has ever been made that the Q1 Agreement was part of any such "practice."  *Compare* FAC ¶ 16 *with* ¶ 18.  When CW15's allegations regarding premature recognition of revenue in connection with an agreement with Nvidia are excised from the Amended Complaint, Alaska Electrical not only fails to establish scienter with regard to the Q2 Agreement, but also can no longer meet the PSLRA's heightened pleading requirements for pleading scienter with regard to the Q1 Agreement.

### 1.    The PSLRA Requires A Heightened Pleading Standard For Scienter.

To adequately plead a Section 10(b) claim, Alaska Electrical must allege, among other things, that Defendants made false or misleading statements of fact, and that those false or misleading statements were made with scienter, "a form of intentional or knowing misconduct." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (quoting *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999)).  Even the *least* rigorous showing of scienter—"deliberate recklessness"—involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (quoting *In re Silicon Graphics*, 183 F.3d at 976).

1   Under the PSLRA's heightened pleading standards, Alaska Electrical must allege these

2   elements with particularity.[6]  Conclusory allegations, unsupported by specific facts, do not suffice.

3   *Metzler Inv. GmbH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061, 1070 (9th Cir. 2008).  In

4   particular, the Amended Complaint must "state with particularity facts giving rise to a *strong*

5   inference that [Defendants] acted with the required state of mind," *i.e.*, scienter.  15 U.S.C. § 78u-

6   4(b)(2) (emphasis added).  Scienter allegations are inadequate unless "a reasonable person would

7   deem the inference of scienter *cogent and at least as compelling* as any opposing inference one could

8   draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct.

9   2499, 2510 (2007) (emphasis added).  Courts engage in an "inherently comparative" inquiry when

10  evaluating scienter allegations, and "must take into account plausible opposing inferences" arising

11  from the facts alleged.  *Id.* at 2509.  In other words, this Court should *not* view Plaintiff's allegations

12  in the light most favorable to it.  More exacting scrutiny is required.

13        **2.     The FAC Misidentifies The Actual Restated Q2 Agreement, And
                   Plaintiff's Reliance On The Wrong Transaction Undercuts Any Inference
14                 That Mr. Bushby Was Involved In The Q1 Agreement.**

15        The March 2, 2010 Order relied heavily on the Amended Complaint's allegations tying Mr.

16  Bushby "directly" to the restated Q2 Agreement.  *Id.* at 7.  These allegations are supported by

17  CW15's supposed statement that "Bushby specifically gave instructions to VP of Sales Mike Ellow

18  who communicated Bushby's instructions to Chris Cronk and Neil Zaman, the Account Executives

19  who handled the Nvidia account, to re-structure the transaction with Nvidia that was already in place

20  because Cadence needed to 'count this deal as revenue' in that quarter."  *Id.* at 8.  The March 2, 2010

21  Order found that CW15 was credible based on the "level of detail provided by his statement," detail

22  that the Court can now determine was without foundation, as it concerned an irrelevant agreement.

23  *Id.*

24

25  _____

26  [6]  Alaska Electrical fails to state a claim even under Rule 8, which requires plaintiffs to state a
        *plausible*—as opposed to merely *possible*—claim for relief.  *Ashcroft v. Iqbal*, 566 U.S. __, 129
27      S. Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Plaintiff's
        many legal conclusions couched as factual allegations are *not* presumed true, and need not be
28      considered by the Court on a motion for judgment on the pleadings.  *Id.* at 1949-50, 1954.

The Court also noted that "[t]he FAC's allegations with respect to Bushby's involvement in the 1Q agreement are significantly less direct," and while the size of the transaction "alone may be insufficient to conclude that the Individual Defendants were closely involved," CW12 purportedly said that Fister told Bushby to renegotiate the Q1 Agreement. *Id*. at 9. However, the Court noted that CW12's credibility is "problematic," because he was an industry analyst and not a Cadence employee. *Id*. at 9-10. Although it discounted "the contention that Bushby 'was told to do it' by Fister, or that Bushby and Fister were fired because of the transaction," the Court did find that there was "an inference that Bushby was involved at some level in the 1Q agreement." *Id*. at 10 and n.3.

Only once it found sufficient allegations, based on the Amended Complaint's false allegations about the Q2 Agreement, that Mr. Bushby was involved in the two transactions at issue, did the Court consider whether his involvement was "indicative of scienter." *Id*. at 10-11. The Court determined that the allegations were indicative of scienter based on CW statements that had been alleged in the previously dismissed CAC. *Id*. at 11. The Court noted that those statements "remain general in nature" and were "regrettably vague." *Id*.

Thus, the Court's determination that Alaska Electrical had adequately pled Mr. Bushby's scienter hinged on allegations regarding Mr. Bushby's negotiation of an Nvidia transaction in Q2 2008 for which CW15 purportedly claimed (incorrectly) that revenue was subsequently restated. Once CW15's false claims are removed from the Amended Complaint, Alaska Electrical's allegations of scienter in general (and in connection with either of the Q1 or Q2 Agreements individually) cannot overcome the Court's criticisms of the Consolidated Complaint in its September 11, 2009 Order.

Aside from vague, circumstantial allegations of a general practice of front-loading revenue, an allegation based largely on CW15's purported statements, the only confidential witness actually tying Defendant Bushby to the Fujitsu agreement is CW12, whose credibility the Court found to be "problematic." *Id*. at 9. CW12's allegations, severed from the circumstantial evidence of a general practice of renegotiating term agreements to "engorge short-term revenue at the expense of long-term profit" provided by CW15, are inadequate standing alone to satisfy Alaska Electical's heavy burden to allege scienter adequately under the PSLRA. *Zucco Partners*, 552 F.3d at 995. As the Court

recognized (Dkt #71), there is no claim that the Fujitsu transaction was part of any "practice" of renegotiating term agreements in order to gain short-term revenue.  That "practice" claim focused on the restated Q2 Agreement (FAC ¶ 110);  but that restated transaction did not involve Nvidia, as Alaska Electrical has represented to the Court.

### 3. The FAC's Allegations Regarding A Practice Of Renegotiating Contracts Is Based On Allegations Regarding The Nvidia Contract.

In upholding the Amended Complaint, the Court noted that the pleading contained "more facts to suggest that the 1Q and 2Q agreements were specific instances of the general practice of renegotiating subscription agreements into term agreements, in order to engorge short-term revenue at the expense of long-term profit."  Dkt #71 at 12-13.  The Court properly recognized that it "may presume that there would be nothing wrong with renegotiating an agreement in order to alter its accounting treatment, so long as the form and substance of the agreement is successfully renegotiated" (Dkt #71 at 15), but then noted that the existence of such a practice might "shed a new light on the agreements, and affect [the] Court's expectations as to what details would have been most important, and necessarily apparent, to any individual who worked on the transactions at any level."  *Id.* at 15.

But the Court's discussion of this general practice was based on CW15's allegation that "Bushby gave Mike Ellow specific instructions 'to restructure the transaction with Nvidia that was already in place because Cadence needed to 'count this deal as revenue' in' 2Q08."  *Id.* at 13-14 (quoting FAC ¶ 110.  The Court acknowledged that "[t]he FAC does not include any allegations that directly indicates that the 1Q agreement was negotiated for the purpose of structuring a term agreement" (*id.* at 14), and recognized throughout its March 2, 2010 Order that "[t]he FAC's allegations with respect to Bushby's involvement in the 1Q agreement are significantly less direct."  Dkt #71 at 9; *see also* Dkt #71 at 7 ("the FAC ties Bushby – one of Cadence's executive officers – directly to the 2Q agreement, and additional allegations suggest that Bushby was *likely* involved in the 1Q agreement as well.") (emphasis added).  The issue with the Q1 Agreement did not concern any renegotiation of an earlier agreement.  Instead, the accounting issue related to a term license agreement in Q1, followed months later by a subscription license agreement with the same customer.

FAC Ex. 39.  Because CW15's alleged statements have now been shown to be fundamentally wrong, the Court should not consider them in evaluating the sufficiency of Alaska Electrical's allegations. *Clorox*, 238 F. Supp. 2d at 1146.

### 4. Because The Scienter Allegations Regarding Mr. Bushby Are False, No Scienter Can Be Imputed To Other Senior Executives.

The March 2, 2010 Order's determination that the Amended Complaint had pled scienter sufficiently as to the other Individual Defendants was based entirely on the potential inference "that Bushby informed at least some of the other Individual Defendants of the facts that rendered the accounting treatment of the 1Q and 2Q agreements incorrect."  Dkt #71 at 18.  Thus, because the Amended Complaint, stripped of its falsities, does not state a plausible basis to infer scienter as to Defendant Bushby,[7] its allegations against the other Individual Defendants fail, as well.

### 5. The Falsity Of CW15's Alleged Report Casts Doubt On Plaintiff's Entire Complaint.

The credibility of the various alleged reports of Alaska Electrical's CWs is called into serious question by CW15's apparent misstatements (or the mischaracterization of his or her statements).  Courts properly consider inconsistent, inaccurate or unreliable allegations of confidential witnesses in assessing whether a plaintiff has adequately pled scienter under the PSLRA.  *See Horizon Asset Mgmt v. H&R Block, Inc.*, 580 F.3d 755, 764 (8th Cir. 2009) ("Any inference of scienter is further weakened by the fact that, elsewhere in Horizon's complaint, this same confidential witness inaccurately alleged that [one individual] had knowledge of accounting errors at a time when he was not even employed by [defendant]"); *see also In re Downey Sec. Litig.*, 2009 U.S. Dist. LEXIS 83443, at *33 (C.D. Cal. Aug. 21, 2009) (noting that the lack of corroboration for confidential witness allegations and the contradictions between confidential witness allegations "severely

---

[7]  Nor, as argued in Defendants' Motions to Dismiss, did Mr. Bushby ever publicly make any allegedly false statement.  *See* Motion to Dismiss II at 10 n.8.  As a recent appellate case has reaffirmed, liability does not attach where no statements are attributed to a secondary actor when those statements are disseminated.  *Pacific Investment Management Co. LLC. v. Mayer Brown LLP*, ___ F.3d ___, 2010 WL 1659230, *1, *10 (2d Cir. Apr. 27, 2010).  Aiding and abetting liability was foreclosed by the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994).  *See also Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159, 161 (2008) (no private right of action for scheme liability under Section 10(b)).

Gibson, Dunn & Crutcher LLP

1  undermine the reliability of the confidential witnesses and, as a result, are insufficient to support a

2  finding of scienter."); *Campo v. Sears Holding Corp.*, __ F.3d __, 2010 U.S. App. LEXIS 7043, *8

3  n.4 (2d Cir. Apr. 6, 2010) (permitting depositions of confidential witnesses to "test the good faith

4  basis of plaintiffs' compliance with *Tellabs*" at pleading stage).

5          Here, CW15's lack of reliability not only calls into doubt the factual foundations of the

6  conclusory allegations made by other confidential witnesses, but also eliminates a key source of

7  "corroboration" for other allegations regarding a supposed general "practice" of renegotiating

8  subscription agreements into term agreements.  As discussed above, the Court's March 2, 2010 Order

9  indicated that its decision to deny Defendants' second motion to dismiss was motivated largely by

10  what it considered to be the strength of Alaska Electrical's scienter allegations related to the Q2

11  Agreement:  "The FAC's allegations with respect to Bushby's involvement in the 1Q agreement are

12  significantly less direct."  Dkt #71 at 9; *see also id.* at 7.  In other words, the Court never concluded

13  that Alaska Electrical's scienter allegations related to the Q1 Agreement were sufficient standing

14  alone.  Rather, they were sufficient when combined with, and corroborated by, what appeared to be

15  the more reliable CW allegations tied to the Q2 Agreement.  *See* Dkt #71 at 6 ("The Court recounts

16  only those particular allegations that, *when considered together*, can convincingly contribute to the

17  conclusion that the inference of fraud or reckless conduct is at least as likely as the inference of

18  negligence or innocent mistake.") (emphasis added).  Without that foundation, Alaska Electrical's

19  scienter allegations related to the Q1 Agreement cannot stand on their own.  For this reason, the

20  Court should grant Defendants' motion for judgment on the pleadings.

21          **C.      Plaintiff's Section 20(a) Claim Is Derivative Of Its Section 10(b) Claim And Must
                    Be Dismissed.**

22          Plaintiff's Section 20(a) claim must allege "a primary violation of federal securities law," and

23  "that the defendant exercised actual power or control over the primary violator."  *No. 84 Employer-*

24  *Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir.

25  2003) (citation omitted).  The claim must be dismissed if Plaintiff's alleged primary violation (*i.e.*,

26  their Section 10(b) claim) is dismissed, or if the Complaint does not adequately plead control over

27  corporate actions.  *See Zucco Partners*, 552 F.3d at 990.

28

Gibson, Dunn &
Crutcher LLP

19

### D.   Plaintiff Cannot Subvert The Purpose Of The PSLRA By Using Patently False Allegations As A Vehicle To Avoid Dismissal And To Gain Discovery Into Unpled Allegations.

Having had CW15's allegations regarding the Nvidia transaction exposed as fiction, Alaska Electrical may attempt to avoid summary judgment and dismissal by requesting additional discovery into the Q2 Agreement that was the actual subject of the restatement.  To allow such discovery would undermine the very purpose of the PSLRA.  *Clorox*, 238 F. Supp.2d at 1143; *see also SG Cowen*, 189 F.3d at 911; *Miller*, 346 F.3d at 691.  Alaska Electrical cannot clear the PSLRA's heightened pleading bar by alleging false facts to evade a motion to dismiss, only to use the imminent dismissal of those very claims as a justification to seek extensive, invasive discovery to which it would not have been entitled without pleading a cognizable claim.

This Court's *Clorox* decision is instructive on this point.  In *Clorox*, as in this case, defendants were initially successful in moving to dismiss plaintiffs' claims for violations of the Securities Exchange Act of 1934.  *Id.* at 1140-41.  Though this Court eventually allowed plaintiffs to proceed with their third amended complaint, it held that plaintiffs had only successfully stated a claim based on two alleged misstatements.  *Id.* at 1141.  Plaintiffs proceeded to seek discovery from defendants on all of the allegations in their complaint.  A discovery dispute arose when defendants contended that discovery was only available with regard to the two narrow colorable claims identified by the Court at the pleading stage.  The Court held that plaintiffs' argument for broad discovery rights defied "the purposes of the Securities Litigation Reform Act."  *Id.* at 1143.  Though the Court had not dismissed any portion of the third amended complaint at the motion to dismiss stage, it did explicitly find that "only two allegations provided any basis for a colorable claim."  *Id.*  Thus, "[p]laintiffs earned the right to proceed with discovery on those statements, but did not earn the right to proceed on all the other twice-dismissed allegations contained in the [third amended complaint]."  *Id.*

The same rationale applies in this instance.  Alaska Electrical's theory of the case, as pled in its Amended Complaint, is that Cadence misstated the revenue it recognized pursuant to an agreement with Nvidia.  Alaska Electrical pled no basis for discovery into any other transactions that took place in the second quarter of 2008.  *See*, *generally*, FAC; *see also* Dkt #71 at 7-8.  As *Clorox*

instructs, the right to discovery only flows from allegations properly pled under the PSLRA, not the other way around. *Clorox*, 238 F. Supp. 2d at 1143; *see also Medhekar*, 99 F.3d at 328. Alaska Electrical is not now entitled to discovery into unpled allegations simply because it succeeded in clearing the initial PSLRA hurdle with allegations that have now been shown to be baseless.[8]

## VI. CONCLUSION

Alaska Electrical survived Defendants' second motion to dismiss only by alleging additional false facts, largely through the vehicle of CW15, to address the Court's concerns regarding the adequacy of the Consolidated Complaint's scienter allegations. The factual foundation of Alaska Electrical's claims regarding Defendants' supposed scienter in connection with the restatement of Cadence's Q2 2008 financial statements has now been exposed as non-existent. For this reason, Defendants' motion for partial summary judgment should granted.

Because the allegations that remain are inadequate to satisfy the PSLRA's heightened pleading requirements for alleging scienter, Defendants' motion for judgment on the pleadings should be granted, as well. Plaintiff's Amended Complaint should be dismissed with prejudice.

DATED: May 6, 2010

GIBSON, DUNN & CRUTCHER LLP

By: _____ /s/ Ethan D. Dettmer _____
     Ethan D. Dettmer

Attorneys for Defendants

CADENCE DESIGN SYSTEMS, INC., MICHAEL J. FISTER, KEVIN S. PALATNIK, WILLIAM PORTER, and KEVIN BUSHBY

100858840_3.DOC

---

[8] To the extent Alaska Electrical is permitted to conduct limited additional discovery, Defendants request that all other discovery be stayed except that Defendants be permitted to conduct limited discovery to test the factual accuracy of the purported allegations of confidential witnesses contained in the Amended Complaint and Plaintiff's counsel's compliance with Rule 11. *See Campo*, 2010 U.S. App. LEXIS 7043, at *8 n.4 (permitting depositions of confidential witnesses to "test the good faith basis of plaintiffs' compliance with *Tellabs*" at pleading stage).